

$400

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

RALPH "TREY" JOHNSON
individually and on behalf of all persons
similarly situated,

                      Plaintiff,

   v.

THE NATIONAL COLLEGIATE ATHLETIC
ASSOCIATION, a/k/a the NCAA, and the
following NCAA Division I Member Schools
as representatives of a Defendant Class of
all private and semi-public NCAA Division I
Member Schools:[i]

BUCKNELL UNIVERSITY,
DREXEL UNIVERSITY,
DUQUESNE UNIVERSITY,
FAIRLEIGH DICKINSON UNIVERSITY,
LA SALLE UNIVERSITY,
LAFAYETTE COLLEGE,
LEHIGH UNIVERSITY,
MONMOUTH UNIVERSITY,
PRINCETON UNIVERSITY,
RIDER UNIVERSITY,
ROBERT MORRIS UNIVERSITY,
SETON HALL UNIVERSITY,
SAINT FRANCIS UNIVERSITY,
SAINT JOSEPH'S UNIVERSITY,
SAINT PETER'S UNIVERSITY,
VILLANOVA UNIVERSITY,
UNIVERSITY OF DELAWARE,
PENNSYLVANIA STATE UNIVERSITY,
UNIVERSITY OF PENNSYLVANIA,
UNIVERSITY OF PITTSBURGH,
RUTGERS, STATE UNIVERSITY OF
NEW JERSEY, and
TEMPLE UNIVERSITY,

                      Defendants.

Civil Action No.

**19    5230**

**Complaint – Class and Collective Action**

**Jury Trial Demanded**



---

[i]    NCAA Division I Member Schools are sued in their respective incorporated name and/or in the name of their respective Board of Regents, Board of Trustees or governing body.

## TABLE OF CONTENTS

INTRODUCTION ............................................................................... 1

JURISDICTION AND VENUE ........................................................... 3

THE PARTIES .................................................................................. 5

FACTS ............................................................................................. 5

I.   WORK STUDY PROGRAMS AND GUIDELINES ................................... 5

II.  STUDENT ATHLETES ARE EMPLOYEES THE SAME AS, IF NOT MORE SO THAN,
     PARTICIPANTS IN WORK STUDY PROGRAMS ................................... 6

     A.   The "Special Circumstances" of Unpaid Prison Labor in
          *Vanskike v. Peters*, 974 F.2d 806 (7th Cir. 1992), Are *Not* Comparable,
          or Relevant, to NCAA Sports .............................................. 6

     B.   Employee Tests Apply to NCAA Sports ................................. 8

     C.   The Applicable Employee Tests ........................................... 9

          1.   The *Glatt* Student Employee Test ................................. 9

          2.   The *Donovan* Independent Contractor v. Employee Test .......... 40

III. DEFENDANTS AND THE PROPOSED DEFENDANT CLASS ARE
     JOINT EMPLOYERS OF STUDENT ATHLETES ................................ 55

     A.   NCAA Bylaws Apply to *All* Student Athletes on An Equal Basis ........ 55

     B.   The Role(s) of NCAA Member Schools in
          *Handing Down* NCAA Bylaws .............................................. 55

     C.   The Role(s) of NCAA Member Schools in
          *Enforcing* NCAA Bylaws .................................................. 58

     D.   The Role(s) of NCAA Staff in *Enforcing* NCAA Bylaws .................. 60

     E.   The Applicable Joint Employment Test ................................... 66

          1.   The *Enterprise Rent-A-Car* Joint Employment Test ............... 66

IV.  STUDENT ATHLETES ARE *NOT* EXEMPT FROM THE PROTECTIONS
     OF WAGE AND HOUR LAWS .................................................... 77

V.   DEFENDANTS' VIOLATIONS OF THE WAGE AND HOUR LAWS ARE WILLFUL ............. 78

   A.   The *Livers v. NCAA* Willfulness Test ........................................................... 78

      1.   Defendants *Never* Relied upon DOL FOH § 10b03(e)
           in Failing to Classify and Pay Student Athletes As Employees .............. 80

      2.   At All Relevant Times, Defendants Understood
           That FOH § 10b03(e) Applies to Student-Run Groups
           (incl. Interscholastic Club Sports), *But Not to NCAA Sports* ................... 81

      3.   At All Relevant Times, Defendants Understood
           That Student Athletes Meet Employee Criteria
           *More* Than Students Employed in Work Study ................................... 87

PLAINTIFF'S PROPOSED FLSA COLLECTIVE ACTION ALLEGATIONS .................. 87

PLAINTIFF'S PROPOSED PMWA CLASS ACTION ALLEGATIONS ........................... 90

PLAINTIFF'S PROPOSED DEFENDANT CLASS ACTION ALLEGATIONS
REGARDING FLSA COLLECTIVE ACTION ................................................................ 96

COUNT I | VIOLATIONS OF THE FLSA ......................................................................... 99

COUNT II | VIOLATIONS OF THE PENNSYLVANIA MINIMUM WAGE ACT ......................... 100

COUNT III | UNJUST ENRICHMENT ............................................................................ 102

PRAYER FOR RELIEF ................................................................................................ 103

JURY DEMAND .......................................................................................................... 104

www.StudentAthletePay.com

## INTRODUCTION

1.      The crux of this Complaint is that Student Athletes – engaged in athletic work that is unrelated to academics; supervised by full-time, well-paid coaching and training staff; and integral to the billion dollar Big Business of NCAA sports – are student employees as much as, and arguably more than, fellow students employed in Work Study programs.[1]

2.      In fact, under NCAA rules, NCAA Division I ("D1") member schools treat Student Athletes *like* students employed in Work Study programs by, among other things, **requiring adult supervisors to maintain timesheets for *both*.** *See* NCAA D1 Bylaw 17.1.7.3.4. NCAA D1 member schools just do **not** pay Student Athletes the same as students employed in Work Study.

3.      Notably, student ticket takers, seating attendants and food concession workers at NCAA contests are paid on a minimum wage scale averaging $10.53 to $13.36 per hour under Work Study.[2] At the same time, the Student Athletes, whose athletic work creates *those* Work Study jobs at the ticket gate, in the seats and at concession stands, are paid **nothing**.

4.      Every time that the NCAA has been required to defend its unlawful policy of refusing to pay Student Athletes, it has relied heavily on drawing an offensive analogy between Student Athletes and *prisoners*, who may be required to work without pay because the *Thirteenth Amendment* permits involuntary servitude as punishment for crime. *See, e.g.,* Sally Jenkins, "Are college athletes the same as prisoners? These judges seem to think so," WASHINGTON POST, Jan. 5, 2017; Shaun King, "The NCAA Says Student-Athletes Shouldn't Be Paid Because the 13th Amendment Allows Unpaid Prison Labor," TheIntercept.com,

---

[1]     "Work study," as herein referenced, includes *all* student employment by a college or university, whether federally subsidized or not and irrespective of student financial need or assistance.

[2]     *See* Bureau of Labor Statistics, May 2018 National Industry-Specific Occupational Employment and Wage Estimates – NAICS 611300 – Colleges, Universities, and Professional Schools, *e.g.,* Occupation Codes 35-3020, 39-3000, 39-3031 and 39-3090.

www.StudentAthletePay.com

Feb. 22, 2018; Elie Mystal, "NCAA Doubles Down on Comparing Student Athletes to Prisoners," AboveTheLaw.com, Feb. 23, 2018; Brandi Collins-Dexter, "NCAA's amateurism rule exploits black athletes as slave labor," The Undefeated.com (ESPN), Mar. 27, 2018.

5.      While the NCAA may wish to treat Student Athletes as *prisoners*, **there is** *no* **legal basis for the decision to do so.**

6.      Accordingly, Plaintiff Ralph "Trey" Johnson ("Johnson") – who formerly played professional football for the Pittsburg Steelers and Denver Broncos, and collegiate football at Villanova University ("Villanova") – through undersigned counsel, individually and on behalf of all persons similarly situated, files this Class and Collective Action Complaint against Defendants NCAA and private and semi-public NCAA D1 member schools seeking all available relief under the Fair Labor Standards Act, 29 U.S.C. §§ 201 *et seq.* ("FLSA") and the Pennsylvania Minimum Wage Act, 43 P.S. §§ 333.101 *et seq.* ("PMWA").

7.      The allegations herein are made based upon: (i) federal regulations governing Work Study; (ii) NCAA and Villanova policies published in their own documents and websites *which, upon information and belief, are representative of all NCAA D1 member schools;* (iii) NCAA and Villanova admissions in *Livers (Phillips) v. NCAA,* 2:17-cv-4271 (E.D. Pa. Sept. 26, 2017),[3] *which, upon information and belief, are representative of all NCAA D1 member schools;* (iv) NCAA President Mark Emmert's 2014 testimony before a U.S. Senate Committee; and (v) personal knowledge or information and belief.

8.      To be clear, like most Student Athletes, Mr. Johnson thoroughly enjoyed and deeply valued the experience of playing for his coaches and school.  This Complaint does **not** disparage that experience, people closely associated with that experience or the school.

---

[3]    The parties in *Livers (Phillips) v. NCAA* stipulated to voluntary dismissal entered April 2, 2019 (ECF 138).

www.StudentAthletePay.com

This Complaint merely recognizes that the NCAA athletic experience, by comparison to Work Study, constitutes work for which Student Athletes deserve to be paid under federal and state laws that overrule the NCAA's *self*-defined amateurism.

## JURISDICTION AND VENUE

9.    This Court has subject matter jurisdiction over Plaintiff's FLSA claim under 29 U.S.C. § 216(b) and 28 U.S.C. § 1331.

10.    This Court has supplemental jurisdiction over Plaintiff's state law claims under 28 U.S.C. § 1367 because those claims derive from the same nucleus of operative facts as Plaintiff's FLSA claim.

11.    Venue is proper in this District pursuant to 28 U.S.C. § 1391.  Each of the Defendants can be found, resides, has an agent, or transacts business in this District, and the unlawful conduct has been, or will be, carried on in part by one or more of the Defendants within this District.

12.    Eight (8) NCAA D1 member schools are in this District: Drexel University, La Salle University, Lafayette College, Lehigh University, Saint Joseph's University, Villanova, Temple University and the University of Pennsylvania.  Other member schools compete against those located in this District in the recruitment of Student Athletes residing in this District, and in NCAA contests held in this District.

13.    The NCAA has entered into multi-year, multi-billion dollar agreements with ESPN, CBS and Turner Sports to broadcast NCAA contests between NCAA D1 member schools, including broadcasts from and into this District, and the NCAA has distributed, and is to distribute, shares of these broadcasting fees to NCAA D1 member schools, including to those in this District.

www.StudentAthletePay.com

14.     In addition to shares of fees from the NCAA's broadcasting agreements, NCAA D1 member schools, including those in this District, receive shares of fees from multi-year, multi-million dollar agreements entered into jointly as part of an NCAA conference, or individually, with television and radio networks to broadcast NCAA contests between NCAA D1 member schools, including broadcasts from and into this District.

15.     NCAA D1 member schools aim to increase applications from prospective students from this District through promotion of their NCAA sports programs, and through advertisements during broadcasts of NCAA contests into this District.

16.     In this decade, the NCAA has conducted, and NCAA member schools have participated in, NCAA D1 post-season and championship segments in this District, including:  Men's Basketball (2013 Second and Third Rounds, and 2016 East Regional); Women's Basketball (2011 Regional); Men's Hockey (2014 Championship); Men's Soccer (2013 and 2017 Championships); Men's Lacrosse (2013, 2015, 2016 and 2019 Championships); Women's Lacrosse (2015 and 2016 Championships); and Wrestling (2011 Championship). Furthermore, NCAA member schools annually participate in the Penn Relays, the oldest track and field competition in the nation.

17.     NCAA member schools engage in other commercial conduct in this District, including: (i) application pitches to prospective students in this District; (ii) collection of application fees, tuition and room and board from residents of this District; (iii) fundraising appeals to, and collections from, alumni and donors in this District; and (iv) in-store and internet sales of collegiate- and NCAA-licensed products in this District.

-4-

## THE PARTIES

18.     Plaintiff Johnson is an individual residing in Tampa, Florida.  Johnson worked for Defendants as a Student Athlete on Villanova's NCAA Football Squad List from June 2013 to November 18, 2017.  Johnson subsequently worked for the Pittsburgh Steelers, and then Denver Broncos, of the National Football League, and currently works for the Winnipeg Blue Bombers of the Canadian Football League.  Johnson's written consent to be a Plaintiff in this action pursuant to 29 U.S.C. § 216(b) is attached hereto as Exhibit A.

19.     Defendants NCAA and NCAA D1 member schools maintain principal offices as identified in Exhibits B and C attached hereto.  Defendants jointly operate the billion dollar Big Business of NCAA sports.

20.     Defendants jointly employed Plaintiff and have jointly employed, and continue to jointly employ, similarly situated persons within the meaning of 29 U.S.C. § 203(g).

21.     Defendants have been, and continue to be, enterprises engaged in commerce within the meaning of 29 U.S.C. §§ 203(r) and (s), which employ individuals engaged in commerce and to which minimum wage provisions of 29 U.S.C. § 206(a) apply.  *See* 29 U.S.C. § 202(a).

## FACTS

I.     WORK STUDY PROGRAMS AND GUIDELINES

22.     Student participants in Work Study (including academic scholarship recipients who participate in Work Study) are classified as employees under the FLSA.

23.     Work Study guidelines are set forth in the U.S. Department of Education Federal Student Aid Handbook ("FSA HB"), Chapter 2: The Federal Work-Study Program. *See, e.g.,* the 2017-18 FSA HB, Ch. 2, available at: https://ifap.ed.gov/fsahandbook/attachments/1718FSAHdbkVol6Ch2.pdf.

24.    Services performed by students employed in Work Study are **not** considered professional services and are **not** subject to FICA (Social Security and Medicare) taxes. *See* FSA HB, Ch. 2, at 6-50 ("Student Exception to FICA Tax").

25.    The policies and practices of NCAA D1 member schools, like Villanova, comply with guidelines set forth in the FSA HB. *See, e.g., Livers (Phillips) v. NCAA*: Villanova's Resp. to Pl.'s Second Set of Reqs. for Admis., at Nos. 32 and 33, attached hereto as Exhibit D.[4]

II.   **STUDENT ATHLETES ARE EMPLOYEES THE SAME AS, IF NOT MORE SO THAN, PARTICIPANTS IN WORK STUDY PROGRAMS**

    A.   **The "Special Circumstances" of Unpaid Prison Labor in *Vanskike v. Peters*, 974 F.2d 806 (7th Cir. 1992), Are *Not* Comparable, or Relevant, to NCAA Sports**

26.    The NCAA has *thrice* relied on *Vanskike v. Peters*, 974 F.2d 806 (7th Cir. 1992) to argue that, as a threshold matter, courts should not even consider – *i.e.*, should not apply a test to determine – whether Student Athletes are employees under the FLSA. *See Berger v. NCAA,* 843 F.3d 285 (7th Cir. 2016); *Dawson v. NCAA*, 250 F.Supp.3d 401 (N.D. Cal. 2017); *Livers v. NCAA*, No. 17-4271, 2018 U.S. Dist. LEXIS 83655 (E.D. Pa. May 17, 2018).

27.    As explained by the *Livers* Court:

> Both *Berger* and *Dawson* **relied heavily** on *Vanskike v. Peters*, 974 F.2d 806 (7th Cir. 1992) as precedent for, and an example of, the rejection of a multi-factor test to evaluate the "economic reality" of alleged employment relationships in **special circumstances**.... The [*Vanskike*] court observed that **"the *Thirteenth Amendment* excludes convicted criminals from the prohibition of involuntary servitude, so prisoners may be required to work."** *Vanskike*, 974 F.2d at 809.

*Livers*, 2018 U.S. Dist. LEXIS 83655, at *45-46. (emphasis supplied).

---

[4]    For ease of filing, Plaintiff has not included Exhibits D-U with the initial mailing in this case. However, Plaintiff will, of course, provide the Court with a copy of Exhibits D-U upon the Court's request.

28.     The courts in *Berger v. NCAA* and *Dawson v. NCAA* had "relied heavily on *Vanskike v. Peters*" because the NCAA had relied solely on *Vanskike* in those cases in support of its argument that "special circumstances" – in this case, NCAA *self*-defined amateurism, *which is **not** codified in any act of Congress* – exist to justify refusal to pay Student Athletes despite the provisions of the FLSA and state wage and hour laws.

29.     The NCAA's reliance on *Vanskike* to analogize Student Athletes to *prisoners*, who may be required to work without pay because the *Thirteenth Amendment* permits involuntary servitude as punishment for crime, is both offensive and misplaced.

30.     To be clear, the *Vanskike* Court described the "special circumstances" thusly:

> [T]he relationship between the DOC [Department of Corrections] and a prisoner is far different from a traditional employer-employee relationship, because … inmate labor belongs to the institution.   The ***Thirteenth Amendment*** excludes convicted criminals from the prohibition of involuntary servitude, so prisoners may be required to work ….
>
> [L]iteral application of the *Bonnette* factors [*i.e.*, a multi-factor employee test] in the present context …. fail to capture the true nature of the relationship for essentially they presuppose a free labor situation. Put simply, the DOC's "control" over Vanskike [stems] from incarceration itself.   The control that the DOC exercises over a prisoner is nearly total, and control over his work is merely incidental to that general control.   Indeed, the ***Thirteenth Amendment**'s* specific exclusion of prisoner labor supports the idea that a prisoner performing required work for the prison is actually engaged in involuntary servitude, not employment ….
>
> When [prisoners] are assigned work within the prison for purposes of training and rehabilitation …. they are working as part of their sentences of incarceration. Because Vanskike's allegations reveal that he worked in the prison and for the DOC pursuant to penological work assignments, the economic reality is that he was not an "employee" under the FLSA.

974 F.2d at 809-810. (emphasis supplied).

www.StudentAthletePay.com

31.     The NCAA's reliance upon *Vanskike* as legal justification for classifying

Student Athletes as unpaid laborers rather than employees was rejected by the *Livers* Court

and has been denounced.  *See, e.g.*, Sally Jenkins, "Are college athletes the same as

prisoners? These judges seem to think so," WASHINGTON POST, Jan. 5, 2017; Shaun King,

"The NCAA Says Student-Athletes Shouldn't Be Paid Because the 13th Amendment Allows

Unpaid Prison Labor," TheIntercept.com, Feb. 22, 2018; Elie Mystal, "NCAA Doubles Down

on Comparing Student Athletes to Prisoners," AboveTheLaw.com, Feb. 23, 2018;

Brandi Collins-Dexter, "NCAA's amateurism rule exploits black athletes as slave labor,"

The Undefeated.com (ESPN), Mar. 27, 2018.

32.     While the NCAA may wish to treat Student Athletes as *prisoners*, **there is**

*no* **legal basis for the decision to do so.**

### B.     Employee Tests Apply to NCAA Sports

33.     The *Livers* Court recognized that "standard FLSA cases" – and tests – are

applicable to NCAA sports:

> Congress hasn't made any special provision for the
> colleges who have -- give out athletic scholarships.  And
> I don't know where a Court has the right to adopt a
> special test for student athletes …. I mean, that's
> usually not how we decide cases.  We look at a standard
> … the only exception for that is organized baseball
> [Major League Baseball's *limited* antitrust exemption]
> …. so I don't know why colleges that give out athletic
> scholarships should expect to have some special rule of
> law that only applies to them.

*Livers v. NCAA*: Mot. Hr'g Tr., Apr. 19, 2018 (ECF 58), at 35:22-36:11.

www.StudentAthletePay.com

C.     **The Applicable Employee Tests**

34.     There are two relevant tests that courts use in determining whether an individual is an "employee" for the purposes of coverage under the FLSA (and, in this case, the PMWA):

     i.  the student employee test in ***Glatt v. Fox Searchlight Pictures, Inc.***, 811 F.3d 528 (2d Cir. 2016), which, as the Court in *Livers v. NCAA* recognized, "[the NCAA and Villanova] concede that among those multi-factor tests that have been used … is the most relevant to the facts presented in this case," *Livers v. NCAA*, No. 17-4271, 2018 U.S. Dist. LEXIS 124780, at 16 n.2 (E.D. Pa. July 25, 2018); and

    ii.  the independent contractor v. employee test in ***Razak v. Uber Techs., Inc.***, No. 16-573, 2018 U.S. Dist. LEXIS 61230 (E.D. Pa. Apr. 11, 2018) (relying upon ***Donovan v. DialAmerica Marketing, Inc.***, 757 F.2d 1376 (3d Cir. 1985)).

35.     An analysis under both of these tests demonstrates that Mr. Johnson and the members of the Proposed FLSA Collective (as defined *infra*, Paragraphs 250 and 251) and Proposed Pennsylvania Class (as defined *infra*, Paragraphs 261 and 262) are all "employees" of Defendants and the Proposed Defendant Class (as defined *infra*, Paragraph 293) under the applicable law.

1.     **The *Glatt* Student Employee Test**

36.     The student employee test in ***Glatt*** includes, among its factors:

     i.  The extent to which the student and the employer clearly understand that there is no expectation of compensation;

    ii.  The extent to which the position provides training that would be similar to that which would be given in an educational environment;

    iii.  The extent to which the position is tied to the student's formal education program by integrated coursework or the receipt of academic credit;

iv. The extent to which the position accommodates the student's academic commitments by corresponding to the academic calendar [or does **not** interfere with scheduled classes or the pursuit of academic degrees];

v. The extent to which the position's duration is limited to the period in which the position provides the student with beneficial learning;

vi. The extent to which the student's work complements, rather than displaces, the work of paid employees while providing significant educational benefits to the student [or to which the alleged employer is the primary beneficiary]; and

vii. The extent to which the student and the employer understand that the assignment is conducted without entitlement to a paid job at the conclusion of the assignment.

*Glatt*, 811 F.3d at 536-37.

    i.     ***Glatt* Factor No. 1**
                 The extent to which the student and the employer clearly
                 understand that there is no expectation of compensation

37. For reasons set forth in Paragraphs 38 through 55, *infra*, Student Athletes do **not** have any options to choose any opportunities to play NCAA sports for wages at any NCAA D1 member school.  Student Athletes also do **not** have any options to bargain for such wages with any such school.

38. In the United States, three associations of colleges and universities regulate intercollegiate Varsity sports, *i.e.*, sports which are sponsored by the school, supervised by school staff and funded through the school's budget, and from which the school derives school branding benefits and revenues: the NCAA, National Association of Intercollegiate Athletics ("NAIA"), and National Junior College Athletic Association ("NJCAA").  *See* www.NCAA.org; www.NAIA.org; www.NJCAA.org.

39. The NCAA has jurisdiction over some 1,117 four-year colleges and universities and nearly 500,000 student athletes.  *See* What Is the NCAA?, available on NCAA.org at:

www.NCAA.org/about/resources/media-center/ncaa-101/what-ncaa.

40.    NCAA D1 bylaws are set forth in the NCAA D1 Manual.  *See, e.g.,* the 2017-18

NCAA Division I Manual, available on NCAApublications.com at:

www.NCAApublications.com/DownloadPublication.aspx?download=D118.pdf.

41.    The NAIA has jurisdiction over some 250 four-year colleges and universities

and 65,000 student athletes.  *See* www.NAIA.org.

42.    NAIA bylaws are set forth in the NAIA Official & Policy Handbook available

at: www.NAIA.org/fls/27900/1NAIA/pubs/legislative/NAIA_Official_Handbook.pdf.

43.    The NJCAA has jurisdiction over some 515 two-year junior colleges and

60,000 student athletes.  *See* Member College Directory, available at:

www.NJCAA.org/member_colleges/college-directory; Student-Athlete Participation Statistics,

available at: www.NJCAA.org/about/history/SA_Participation/index.

44.    NJCAA bylaws are set forth in the NJCAA Handbook & Casebook.  *See, e.g.,*

the 2017-18 NJCAA Handbook & Casebook, available at:

https://d2o2figo6ddd0g.cloudfront.net/a/1/o4bxsuaw8aflcy/2017-

18_NJCAA_Handbook_Jan_4_2018.pdf.

45.    All schools in each of the NCAA, NAIA and NJCAA have mutually agreed **not**

to offer wages for participation in intercollegiate Varsity sports, and they have adopted bylaws

prohibiting schools from offering wages and Student Athletes from accepting wages.  *See,*

*e.g.,* NCAA D1 Bylaw 12.1.2; NAIA Bylaw VII; NJCAA Bylaw V.4.A.

46.    To enforce their mutual agreements and bylaws prohibiting schools from

offering wages and Student Athletes from accepting wages, all schools in each of the NCAA,

NAIA and NJCAA have adopted bylaws prescribing sanctions for infractions, including, but

not limited to, suspension or termination of the student athlete's eligibility; reduction of the

letters of intent that the school is permitted to accept from high school recruits and/or

www.StudentAthletePay.com

athletic scholarships that the school is permitted to offer; suspension of coaching staff; and/or school team disqualification from regular season competition and/or post-season and championship segments. *See, e.g.,* NCAA D1 Bylaws 19.1, 19.9.5, 19.9.7 and 19.9.8; NAIA Bylaws VI.B and VI.C; NJCAA Bylaws I.3.A.1, V.3.D, V.4.B.4 and V.4.E.

47.     In the NCAA, "[c]ash payment or other benefits provided by a coach, administrator or representative of the institution's athletics interests" are considered a Severe Breach of Conduct (Level I Violation) subject to the highest penalties, including, for the Student Athlete, suspension or termination of eligibility, and for the member school, competition penalties (*e.g.,* postseason bans), financial penalties, scholarship reductions, head coach restrictions and recruiting restrictions. *See* NCAA D1 Bylaws 19.1.1(f), 19.9.5 and 19.9.7.

48.     In 2010, ESPN's docuseries "30 for 30" featured NCAA sanctions imposed against Southern Methodist University in 1987 for prohibited cash payments, including a two year ban on football regular and post-season referred to as the "death penalty" and reductions in scholarships. *See Pony Excess. (2010). [documentary] Directed by T. Matula. ESPN;* Major Infractions Case | Southern Methodist University (Feb. 25, 1987), available on NCAA.org at https://web3.NCAA.org/lsdbi/search/miCaseView?id=44.

49.     In 2015, ESPN's docuseries "30 for 30" featured NCAA sanctions imposed against the University of Southern California in 2010, for prohibited cash payments, including a two year ban on football post-season, reductions in scholarships and a $206,020 fine. *See Trojan War. (2015). [documentary] Directed by A. Thomas. ESPN;* Major Infractions Case | University of Southern California (June 10, 2010), available on NCAA.org at https://web3.NCAA.org/lsdbi/search/miCaseView?id=691.

50.     In the NCAA, the only circumstance under which a Student Athlete is permitted to receive payment based upon athletic performance and retain NCAA eligibility

is through the U.S. Olympic Committee's ("USOC") Operation Gold program. *See* NCAA D1 Bylaw 12.1.2.1.5.1.

51. In Olympic Games competition, the USOC Operation Gold program currently pays NCAA-eligible Student Athletes the following amounts for each medal won: $37,500 for each Gold, $22,500 for each Silver and $15,000 for each Bronze. *See* Athlete Services / Financial Resources, available on TeamUSA.org at:

www.teamusa.org/Home/Team%20USA%20Athlete%20Services/Financial%20Resources.

52. In 2016, USA TODAY reported that the USOC Operation Gold program offers NCAA-eligible Student Athletes *additional* pay through USA sport governing bodies and organizations, *e.g.*, USA Swimming and USA Wrestling, in *non*-Olympic Games competition:

> Kyle Snyder couldn't get much more than an athletic scholarship from Ohio State this past school year, when he won an NCAA wrestling title for the Buckeyes as a sophomore.
>
> But he did get paid by somebody else to wrestle.
>
> In addition to $50,000 for winning a world championship in September, USA Wrestling has been giving Snyder $1,000 a month to cover training expenses — both without running afoul of NCAA rules.
>
> *****
>
> Ohio State's Snyder — the youngest world champion in American wrestling history — will be at the Games, and as with any U.S. wrestler, a gold medal will bring him a total of $250,000 from USA Wrestling and the USOC, a silver $50,000 and a bronze $25,000 ....
>
> But as the NCAA creates more opportunities for prospective Olympians to get money based on their athletic skills, it continues to fight several legal battles to restrict what football and basketball players can receive ....
>
> *****
>
> World record-setting swimmer Katie Ledecky, who is slated to enter three individual events and two relays in Rio, could pocket $125,000 from the USOC and keep her commitment to begin competing for Stanford this school

> year.  She also will be able to keep additional money
> from USA Swimming under Operation Gold, although
> Scott Leightman, a spokesman for the organization,
> declined to provide the amounts available.

*See* <u>Steve Berkowitz, "Olympics offer rare chance for NCAA athletes to be paid," USA TODAY,</u>

<u>Aug. 2, 2016.</u>

53.     By contrast to Student Athletes, *non*-student athletes have the option to apply

for paid positions in NCAA D1 member school Athletic Departments.  For example, the

Villanova Athletic Department hires unpaid and paid student interns.  Some internships in

the Business Office, Marketing & Promotions (Spring and Summer), Facilities & Operations

(Position 2), and Video Production (Volunteer Intern) are unpaid.  But, other internships in

Academic Support, the Athletic Director's Office, Compliance and Student Services,

Facilities & Operations (Position 1), Marketing & Promotions (Fall/Spring), Media Relations,

Strength & Conditioning, the Ticket Office and Video Production are paid $1400 per month.

*See* Athletic Department Internship Program, attached hereto as Exhibit L and available on

Villanova.com at: <u>https://Villanova.com/sports/2018/6/18/internships.aspx</u>.

54.     If injury or illness prevents a Student Athlete from playing NCAA sports, s/he is

"expected to assist the athletics department in other operational activities (i.e. coaching

and/or support staff duties" without pay.  *See, e.g.,* Athletic Financial Aid Agreement, attached

hereto as Exhibit M and available on NCAA.org at

<u>https://www.NCAA.org/sites/default/files/FinAidForm_0.pdf</u>.[5]

55.     By contrast to Student Athletes, *non*-student athletes who perform

operational activities in NCAA D1 member school Athletic Department are paid at least

---

[5]    All Student Athletes are expected to assist the athletics department in this manner without
pay.  The NCAA admits there is **no** principled distinction between scholarship athletes and walk-ons,
and that the only policies and practices that apply to scholarship athletes exclusively are bylaws that
set the number of scholarships schools may award and that permit revocation of scholarships for
misconduct (as opposed to revocation of athletic eligibility, which applies to scholarship athletes and
walk-ons alike). *See* Paragraphs 164, 253 and 254, *infra*.

minimum wage. *See, e.g., Livers (Phillips) v. NCAA*: Answer (ECF 130), at ¶ 67; Villanova

Athletic Department Internship Program (Ex. L) (Athletic Director's Office Interns are paid

$1400 per month to support "day-to-day coordination of operational activities … answering

the phone, typing memos and letters, preparing HR forms, maintaining the Athletic

Director's email account, compiling a monthly calendar and the department personnel

directory [and] assisting with special projects")

ii.    *Glatt* Factor No. 2
The extent to which the position provides training that would
be similar to that which would be given in an educational
<u>environment</u>

56.    For reasons set forth in Paragraphs 57 through 64, *infra*, Work Study provides

training similar to that given in an educational environment *more* than NCAA sports; thus,

NCAA sports meet employee criteria under *Glatt* Factor No. 2 ***more*** than Work Study.

57.    Various Work Study guidelines require NCAA D1 member schools, like

Villanova, to offer Work Study jobs providing training similar to that which would be given

in an educational environment and/or beneficial learning. *See* FSA HB, Ch. 2.

58.    Pursuant to Work Study guidelines:

> To the maximum extent practicable, a school must
> provide FWS ["Federal Work Study"] jobs that
> **complement and reinforce each recipient's
> educational program or career goals**.

*Id.*, at 6-39. (emphasis supplied).

59.    NCAA D1 member schools, like Villanova, offer jobs through Work Study that

complement and reinforce student employees' respective educational program. *See, e.g.,*

*Livers (Phillips) v. NCAA*: Villanova's Resp. to Pl.'s Second Set of Reqs. for Admis. (Ex. D),

at No. 34.

-15-

60.   Pursuant to Work Study guidelines:

> Job descriptions for all FWS positions should be a part of the control procedures included in your school's policies and procedures manual.... [A] written job description provides students with the information they need to determine whether they qualify for the job, **whether the job is related to their educational or career objectives**, and whether the job is of interest to them.

FSA HB, Ch. 2, at 6-45. (emphasis supplied).

61.   Pursuant to Work Study guidelines:

> At any type of postsecondary institution, including proprietary schools, **an FWS student may be assigned to assist a professor** if the student is doing work the school would normally support under its own employment program. Having a student serve as a **research assistant to a professor** is appropriate, as long as the work is in line with the professor's official duties and is considered work for the school itself.

*Id.*, at 6-68. (emphasis supplied).

62.   NCAA D1 member schools, like Villanova, offer jobs through Work Study that assist academic faculty. *See, e.g., Livers (Phillips) v. NCAA:* Villanova's Resp. to Pl.'s Second Set of Req. for Admis. (Ex. D), at No. 35.

63.   Pursuant to Work Study guidelines:

> **If a student's skill level depends on his or her academic advancement**, the school may pay a student on that basis. For example, a junior or third-year lab student may be paid a higher rate than a sophomore or second-year lab student.

FSA HB, Ch. 2, at 6-47. (emphasis supplied).

64.   In response to an Interrogatory asking the NCAA and Villanova to describe all academic or learning benefits from Student Athletes' performances in NCAA sports, the NCAA and Villanova identified **no academic benefits**. *See Livers (Phillips) v. NCAA:* Defs.' Resp. to Pl.'s First Set of Interrogs., at No. 3, attached hereto as Exhibits H and I.

-16-

("Learning benefits from participation in NCAA athletics include, but are not limited to: discipline, work ethic, strategic thinking, time management, leadership, goal-setting, and teamwork.[6])

> iii. **_Glatt_ Factor No. 3**
> The extent to which the position is tied to the student's formal education program by integrated coursework or the receipt of <u>academic credit</u>

65.  For reasons set forth in Paragraphs 66 through 70, _infra_, Work Study is integrated into coursework, _e.g._, through receipt of academic credit, _more_ than NCAA sports; thus, NCAA sports meet employee criteria under _Glatt_ Factor No. 3 _more_ than Work Study.

66.  Work Study guidelines permit NCAA D1 member schools, like Villanova, to offer Work Study jobs tied to the student's formal education program by integrated coursework and/or the receipt of academic credit.  _See_ FSA HB, Ch. 2; _Livers (Phillips) v. NCAA_: Villanova's Resp. to Pl.'s Second Set of Req. for Admis. (Ex. D), at No. 36.

67.  Pursuant to Work Study guidelines:

> **A student may earn academic credit as well as compensation for FWS jobs.** Such jobs include but are not limited to internships, practica, or assistantships (e.g., research or teaching assistantships).

FSA HB, Ch. 2, at 6-44. (emphasis supplied).

---

[6]  _Compare, also_, these alleged "learning benefits" to former Northwestern University quarterback Theodis Kain Colter's testimony in _In re Northwestern Univ. and College Athletes Players Ass'n_, Case No. 13-RC-121359, NLRB Tr., Feb. 18, 2014 ("Colter Test.") on NLRB.gov at <u>http://apps.nlrb.gov/link/document.aspx/09031d4581603b6a</u>:

> Q:  But you've heard from the University that playing football helps build character. You've heard that kind of thing before?
>
> A:  Performing any type of job helps build, you know, these human values. You know, character, perseverance, anything like that. Those values don't help us, you know, obtain a college degree. They didn't help me get my psychology degree.

Colter Test. at 174:15-23.

68.     Similarly, the NCAA operates a Postgraduate Internship Program for which a

student employed by the NCAA may receive academic credit at a graduate school:

> NCAA postgraduate interns are nonexempt
> employees with benefits .... [W]ith graduate school
> approval, an intern can be eligible to earn
> graduate degree credit.

NCAA Postgraduate Internship Program, available on NCAA.org at:

www.NCAA.org/about/resources/leadership-development/postgraduate-internship-program.

(emphasis supplied).

69.     Similarly, Villanova operates an Internship Program that ties employment of

students by third parties to Villanova's formal education program by integrated coursework

*and* the receipt of academic credit:

> **Credit Approval**
>
> Students must secure academic credit approval before
> the internship begins. Students must schedule a
> meeting with the Director of the Internship Program.
> **Academic credit is not awarded retroactively for
> an internship. A maximum of 15 total credits may
> be earned through the Internship Program.**
>
> **Compensation**
>
> Monetary compensation for an internship does not affect
> eligibility to receive academic credit. A student may
> receive <u>both</u> monetary compensation and academic
> credit for an internship.
>
> **Course Requirements**
>
> To earn academic credit for an internship, a student
> agrees to complete the following requirements:
>
> * **Work Hours:** The student must complete a
>   minimum of 150 work hours within a single
>   semester to be eligible to earn three (3) credits. The
>   student must track the number of hours worked
>   each week in the Activity Journal, to be signed
>   weekly by their internship supervisor.

www.StudentAthletePay.com

- <u>Student Internship Agreement</u>: The student must meet with a representative from the Internship Program or attend a group meeting prior to the start of the Internship. The student must sign the Student Internship Agreement as part of the application process and abide by all conditions outlined therein during their internship experience.

- <u>Learning Objectives:</u> At the beginning of the internship, the student will meet with the site supervisor to establish three to five learning objectives. The student will record the objectives on the Learning Objectives Agreement and both the intern and the site supervisor will sign the Agreement. The Learning Objectives Agreement is due no later than the third week of the internship.

- **Academic Paper:** A student who completes an internship through a major, minor, or concentration must follow the Academic Paper/Research guidelines required by that department. A student who completes an internship as a Liberal Arts elective is required to complete the online course requirements.

**<u>Activity Journal Requirements (Rev Nov 2015).pdf</u>**

Interns must maintain an Activity Journal that recounts the specific jobs and functions that he or she has performed. These entries should include the relationship of the projects and tasks performed, the relationship of the activity to the goals and objectives set forth in the Learning Objectives Agreement. The Intern should complete entries for each day at work and indicate the number of hours worked per day. To ensure the intern remains focused on the learning objectives, the site supervisor will review and initial the Activity Journal weekly.

Office for Undergraduate Students / Internships / General Policies, available on

Villanova.edu at:

https://www1.Villanova.edu/villanova/artsci/undergrad/ous/internship/policies.html.

(emphasis in original)

70.     The NCAA and Villanova admit that NCAA sports are not tied to the

student's formal education program by integrated coursework or receipt of academic credit.

*See Livers (Phillips) v. NCAA*: Defs.' Resp. to Pl.'s Second Set of Reqs. for Admis. (Exs. D

and E), at No. 37.

           **iv.**    ***Glatt* Factor No. 4**
               The extent to which the position accommodates the student's
               academic commitments by corresponding to the academic
               calendar [or does **not** interfere with scheduled classes or the
               <u>pursuit of academic degrees</u>]

71.     For reasons set forth in Paragraphs 72 through 105, *infra*, Work Study

accommodates students' preferred/chosen classes and academic degree programs *more than*

NCAA sports and hinders their academic progress *less* than NCAA sports; thus, NCAA sports

meet employee criteria under *Glatt* Factor No. 4 ***more*** than Work Study.

72.     Villanova requires all undergraduate students to complete five (5) specified

Core Foundational Courses:

- Augustine and Culture Seminars (ACS) 1000 **and** ACS 1001;
- Theology (THL) 1000: Faith, Reason and Culture;
- Philosophy (PHI) 1000: Knowledge, Reality and Self; and
- Ethics (ETH) 2050: The Good Life: Ethics and Contemporary Moral Problems

College of Liberal Arts and Sciences / Undergraduate Programs / Core Curriculum, available

on Villanova.edu at:

<u>https://www1.Villanova.edu/content/villanova/artsci/undergrad/core.html</u>.

73.     To accommodate all student schedules, required Core Foundational Courses

are offered multiple times – at different morning, afternoon, and evening hours – throughout

the academic week. *See, e.g.,* Fall 2016 and Spring 2017 Core Foundational Course

schedules, attached hereto at Exhibit N and generated using NOVASIS Master Schedule of

Classes on Villanova.edu at:

https://novasis.Villanova.edu/pls/bannerprd/bvckschd.p_disp_dyn_sched.

74.    For example, in Fall Semester 2016:

- ACS 1000 was listed 113 times, including classes starting as early as 8:30 a.m. and starting as late as 6:10 p.m.
- THL 1000 was listed 46 times, including classes starting as early as 8:30 a.m. and starting as late as 6:10 p.m.
- PHI 1000 was listed 41 times, including classes starting as early as 8:00 a.m. and starting as late as 8:00 p.m.
- ETH 2050 was listed 35 times, including classes starting as early as 8:30 a.m. and starting as late as 6:10 p.m.

*Id.*

75.    For example, in Spring Semester 2017:

- ACS 1001 was listed 113 times, including classes starting as early as 8:30 a.m. and starting as late as 6:10 p.m.
- THL 1000 was listed 31 times, including classes starting as early as 8:30 a.m. and starting as late as 8:00 p.m.
- PHI 1000 was listed 31 times, including classes starting as early as 8:00 a.m. and starting as late as 6:10 p.m.
- ETH 2050 was listed 23 times, including classes starting as early as 8:30 a.m. and starting as late as 6:10 p.m.

*Id.*

76.    Other than the required Core Foundational Courses, students are generally permitted to select their preferred classes, from a broad range of topics and times available on the NOVASIS Master Schedule of Classes, to attain credits in Additional Core Courses, Major Course and Free Electives (subject to enrollment limitations related to class size, completion of prerequisite classes, and Major prioritization). *See* College of Liberal Arts and Sciences / Undergraduate Programs / Core Curriculum, available on Villanova.edu at:

https://www1.Villanova.edu/content/villanova/artsci/undergrad/core.html; NOVASIS

Master Schedule of Classes on Villanova.edu at:

https://novasis.Villanova.edu/pls/bannerprd/bvckschd.p_disp_dyn_sched.

77.     Various Work Study guidelines require NCAA D1 member schools, like

Villanova, to offer Work Study jobs that accommodate the student employee's academic

commitments, *i.e.*, do **not** conflict with the student employee's preferred/chosen classes and

academic degree program and do **not** hinder the student employee's academic progress. *See*

FSA HB, Ch. 2.

78.     Pursuant to Work Study guidelines:

> **Working During Scheduled Class Time Is
> Prohibited.** In general, students are not permitted to
> work in FWS [Federal Work Study] positions during
> scheduled class times. Exceptions are permitted if an
> individual class is cancelled, if the instructor has
> excused the student from attending for a particular day,
> and if the student is receiving credit for employment in
> an internship, externship, or community work study
> experience. Any such exemptions must be documented.

*Id.*, at 6-43. (emphasis in original)

79.     Villanova admits that student employees are **not** permitted to work in

Work Study jobs during scheduled class times. *See Livers (Phillips) v. NCAA*: Villanova's

Resp. to Pl.'s Second Set of Req. for Admis. (Ex. D), at No. 38.

80.     Pursuant to Work Study guidelines:

> A school should determine the number of hours a
> student is allowed to work based on … how the
> combination of work and study hours will affect the
> student's health and academic progress.

FSA HB, Ch. 2, at 6-46.

81.     NCAA D1 member schools, like Villanova, limit hours that a student employee

is allowed to work in Work Study to 20 hours per week during academic periods. For example,

in the Villanova Student Employment Program:

**Eligibility**

The Student Employment Program allows currently enrolled students, excluding University faculty and staff employees, to work up to 20 hours per week during the Fall and Spring semesters and 35 hours per week during the Summer semester and academic breaks to earn funds to help pay for their educational expenses. Departments with 40 hour workweeks may allow students to work up to 40 hours during breaks and the Summer semester.

If a student holds multiple jobs on campus, the hours restriction applies across all University student employment. That is, no student may work more than a total of 20 hours per week during academic periods cumulative between all University student jobs. The student employee is responsible for notifying his or her supervisor in each job of all other University student employment positions held, along with information regarding scheduled hours of work in each.

Villanova Student Employment Program Handbook, available on Villanova.edu at:

https://www1.Villanova.edu/villanova/hr/employment/student-employment/student-handbook.html.

83. Villanova permits student employees in Work Study to schedule work weeks of 10 hours or fewer. *See Livers (Phillips) v. NCAA*: Villanova's Resp. to Pl.'s Second Set of Req. for Admis. (Ex. D), at No. 27.

83. To accommodate preferred/chosen classes and academic degree programs of student employees in Work Study and manage their combination of work and study hours, NCAA D1 member schools, like Villanova:

- offer Work Study jobs at multiple times — during morning hours (6:00 a.m. to 12:00 p.m.), afternoon hours (12:00 p.m. to 5:00 p.m.), and evening hours (5:00 p.m. to 12:00 a.m.) — throughout the academic week and on the weekend. *Id.*, at Nos. 19-22 and 26.

- offer Work Study jobs having variable hours that permit a student employee to schedule different shifts on different days of the academic week. *Id.*, at No. 23.

www.StudentAthletePay.com

- offer a range of Work Study jobs at different hourly rates. *Id.*, at No. 50.
- permit a student employee to work in up to two different Work Study jobs, having different duties, work hours, hourly rates and work days, provided s/he does **not** exceed the maximum 20 work hours per week. *Id.*, at Nos. 24 and 50.
- offer Work Study jobs that permit a student employee to schedule a day(s) off from working during the academic week. *Id.*, at No. 25.

84. By contrast to Work Study, Student Athletes are **obligated** to schedule classes around required NCAA athletically related activities – and **not** permitted to (re)schedule required NCAA athletically related activities to accommodate their preferred/chosen classes and academic degree programs.

85. Villanova only excuses a Student Athlete from participating in required athletically related activities "if there is a conflict between practice and a class that a student is required to take," *i.e.*, the required Core Foundational Courses *already* offered multiple times – at different morning, afternoon and evening hours – throughout the academic week to accommodate all student schedules. *See Livers (Phillips) v. NCAA*: Villanova's Resp. to Pl.'s Second Set of Reqs. for Admis. (Ex. D), at Nos. 11-12, 14, 16 and 40; Paragraphs 72 through 76, *supra*.

86. In NCAA football playing and practice seasons during Plaintiff's tenure at Villanova, required NCAA athletically related activities and activities incidental thereto (*e.g.*, medical treatment before and/or after practice, dress for practice, showering, dress for class, and travel to class) occurred on weekdays from 5:45 a.m. to 11:30 a.m. – **precluding** Plaintiff from enrolling in any of the hundreds of *non*-required, *non*-Core Foundational, classes offered during that time period including prerequisites for academic degree programs. *See, e.g.,* Fall 2016 Courses conflicting with NCAA football practice between 5:45 a.m. to 11:30 a.m., attached hereto in Exhibit P and generated using the NOVASIS Master Schedule of Classes

www.StudentAthletePay.com

on Villanova.edu at:

https://novasis.Villanova.edu/pls/bannerprd/bvckschd.p_disp_dyn_sched. (incl.

undergraduate level courses and graduate level courses available pursuant to NCAA D1

Bylaw 14.6 Graduate Student / Postbaccalaureate Participation)

87.    NCAA D1 member schools, like Villanova, require Student Athlete participation

in Countable Athletically Related Activities (CARA) recorded on timesheets under NCAA D1

Bylaw 17.1.7.3.4, including, but not limited to:

> Activities considered as practice shall be considered to have occurred if one or more coaches and one of more student-athletes engage in any of the following activities:
>
> - Team conditioning or physical-fitness activities
> - Field, floor or on-court activity
> - Setting up offensive or defensive alignments
> - Chalk talk
> - Lecture on or discussion of strategy relating to the sport
> - Activities utilizing equipment relating to the sport
> - Discussions or review of game films, motion pictures or videotapes relating to the sport
> - Required weight-training and conditioning activities held at the direction of or supervised by an institutional staff member
> - Film or videotape reviews of athletic practices or contests that are required, supervised or monitored by institutional staff members
> - Meetings initiated by coaches or other institutional staff members on athletically related matters
> - Individual workouts required or supervised by a member of the coaching staff
> - On-court or on-field activities called by any member or members of a team and confined primarily to members of that team that are considered as requisite for participation in that sport (e.g., captain's practices)

www.StudentAthletePay.com

Villanova University Athletics Department Student-Athlete Handbook and Planner, at 28 (pdf page, because document is unnumbered), attached hereto as Exhibit O and available at: https://s3.amazonaws.com/villanova.com/documents/2018/6/22/201718Handbook.pdf.

88.     Under NCAA bylaws, Student Athletes are also required to participate in the following Required Athletically Related Activities:

> (a) Compliance meetings;
> (b) Organized team promotional activities;
> (c) Recruiting activities;
> (d) Media activities;
> (e) Fundraising events;
> (f) Community service events;
> (g) Team-building activities; and
> (h) Travel to and from away-from-home competition.

NCAA D1 Bylaw 17.02.14.

89.     If a Student Athlete fails to attend squad or individual meetings and participate in athletic practice sessions and scheduled contests as specified by the sport coach, s/he can be disciplined, including suspension or dismissal from the team. *See, e.g.,* Athletic Financial Aid Agreement (Ex. M), at ¶ 2.e.[7]

90.     Because Student Athletes are obligated to schedule classes around required athletically related activities – and **not** permitted to (re)schedule NCAA sports activities to accommodate their preferred/chosen classes – considerable percentages of Student Athletes reported in the NCAA Growth, Opportunities, Aspirations and Learning of Students in

---

[7]     All Student Athletes are expected to attend squad or individual meetings and participate in athletic practice sessions and scheduled contests as specified by the sport coach. The NCAA admits that there is **no** principled distinction between scholarship athletes and walk-ons, and that the only policies and practices that apply to scholarship athletes exclusively are bylaws that set the number of scholarships schools may award and that permit revocation of scholarships for misconduct (as opposed to revocation of athletic eligibility, which applies to scholarship athletes and walk-ons alike). *See* Paragraphs 164, 253 and 254, *infra.*

www.StudentAthletePay.com

College ("GOALS") Study (2015) that participation in NCAA D1 sports prevented them from

taking classes they wanted to take:

> Football Bowl Subdivision | 50%
> Football Championship Subdivision | 42%
> Men's Basketball | 34%
> Women's Basketball | 51%
> Baseball | 41%
> All Other Men's Sports | 48%
> All Other Women's Sports | 53%

*See* Results from the 2015 GOALS Study of the Student-Athlete Experience, Findings on

Academic Experiences, at 13 (pdf page, because document is unnumbered),

http://www.NCAA.org/sites/default/files/GOALS_convention_slidebank_jan2016_public.pdf.

91.     Because Student Athletes are obligated to schedule classes in academic degree

programs around required athletically related activities – and **not** permitted to (re)schedule

NCAA sports activities to accommodate their preferred/chosen academic degree programs –

considerable percentages of Student Athletes reported in the NCAA GOALS Study (2015) that

participation in NCAA D1 sports prevented them from majoring in what they really wanted:

> Football Bowl Subdivision | 36%
> Football Championship Subdivision | 28%
> Men's Basketball | 29%
> Women's Basketball | 32%
> Baseball | 32%
> All Other Men's Sports | 23%
> All Other Women's Sports | 25%

*Id.*, at 15 (pdf page, because document is unnumbered).

92.     In addition to Countable Athletically Related Activities (CARA) recorded on

timesheets under NCAA D1 Bylaw 17.1.7.3.4, Student Athletes at Villanova are required to

participate in the following activities **not** considered CARA:

www.StudentAthletePay.com

> The following are considered non-countable athletically related activities and are not counted in the weekly or daily time limitations:
>
> - Training table or competition related meals
> - Physical rehabilitation
> - Dressing, showering or taping ....
> - Travel to and from practice and competition
> - Medical examinations or treatments ....

Villanova University Athletics Department Student-Athlete Handbook and Planner (Ex. O), at 29 (pdf page, because document is unnumbered).

93.     In addition to Countable Athletically Related Activities (CARA) recorded on timesheets under NCAA D1 Bylaw 17.1.7.3.4, Student Athletes at Villanova are *encouraged* to participate in the following activities **not** considered CARA:

> - *Voluntary* individual workouts ...
> - Individual consultation with a coaching staff member initiated *voluntarily* by a student-athlete ....

*Id.* (emphasis supplied).

94.     In the NCAA GOALS Study (2015), medians of Student Athlete reported hours spent per week on all athletically related activities – Countable Athletically Related Activities (CARA) recorded on timesheets and *non*-CARA – demonstrate a full-time commitment to NCAA D1 sports that exceeds the (maximum) 20 hour per week, part-time commitment of student employees in Work Study:

> Football Bowl Subdivision | 42 hours per week
>
> Football Championship Subdivision | 41 hours per week
>
> Men's Basketball | 34 hours per week
>
> Women's Basketball | 35 hours per week
>
> Baseball | 40 hours per week
>
> All Other Men's Sports | 32 hours per week
>
> All Other Women's Sports | 32 hours per week

-28-

*See* Results from the 2015 GOALS Study of the Student-Athlete Experience, Findings on

Student-Athlete Time Commitments, at 33 (pdf page, because document is unnumbered).

95.     The taxation and rigidity of Student Athlete schedules are exemplified by the

15-hour daily schedule that the University of Florida lays out for its football players during

playing and practice season.  Reporting about a June 8, 2015 tweet from Florida head coach

Jim McElwain – "All Gators, All Day.  Here's an inside look at a typical day for our players.

#NoTimeToLose #GoGators" – SBNation observed:

> Here's that itinerary, stripped of the bright colors and ads:
>
> - 6:00 – 7:00 a.m.:     Wake up
> - 7:00 – 7:45 a.m.:     Eat breakfast
> - 8:00 – 11:30 a.m.:    Class
> - 12:00 – 12:30 p.m.:   Eat lunch
> - 12:30 – 1:30 p.m.:    Lift
> - 1:30 – 2:30 p.m.:     Fuel and recover
> - 2:30 – 3:30 p.m.:     Meetings
> - 3:30 – 5:30 p.m.:     Practice
> - 6:00 – 6:30 p.m.:     Fuel and recover
> - 6:30 – 7:00 p.m.:     Eat
> - 7:30 – 9:00 p.m.:     Study
>
> Savor those 30-minute breaks between the end of class
> and lunch and the end of dinner and study hall, kids:
> They're all you're going to get ….
>
> [W]e rarely get as clear a delineation of the
> extraordinary effort put forth by "student-athletes" to
> play sports (and to be college students) ….

www.StudentAthletePay.com

For a Florida football player, waking up at 6 a.m. is a fact of life. So is a three-hour block of classes beginning at 8 a.m. that was plotted out by advisors. So is spending four hours of every afternoon on mandatory football duties – the maximum allowed to be mandated by the NCAA in season, though extra work is always encouraged and typically praised – and so is the hour and a half of studying after the completion of a 13-hour day.

**This schedule is a work schedule.** The work done by "student-athletes" is hard work. There is "no time to lose," of course, because inefficiency is the bane of businesses.

Andy Hutchins, "Florida details football players' 15-hour days with daily schedule graphic," SB Nation, June 9, 2015. (emphasis supplied).

96.     Considerable percentages of Student Athletes reported in the NCAA GOALS Study (2015) that they felt less than positive about their ability to keep up with classes in NCAA D1 playing and practice season:

> Football Bowl Subdivision | 40%
>
> Football Championship Subdivision | 45%
>
> Men's Basketball | 38%
>
> Women's Basketball | 44%
>
> Baseball | 44%
>
> All Other Men's Sports | 40%
>
> All Other Women's Sports | 39%

*Id.*, Findings on Academic Experiences, at 11 (pdf page, because document is unnumbered).

97.     The findings reported in the NCAA GOALS Study (2015) are consistent with former Northwestern University quarterback Theodis Kain Colter's testimony in *In re Northwestern Univ. and College Athletes Players Ass'n*, Case No. 13-RC-121359, NLRB Tr., Feb. 18, 2014 on NLRB.gov at http://apps.nlrb.gov/link/document.aspx/09031d4581603b6a:

> Q:  Can you tell us how you view yourself?
>
> A:  We are first and foremost an athlete, an employee of the school who provides an athletic service.

www.StudentAthletePay.com

Q: And why do you say that?

A: Everything that we do is scheduled around football, what classes you can take, what major you could really participate in. It's all depending on football and your schedule.

*****

Q: And in terms of the academic calendar year, when are the chemistry and physics classes generally scheduled?

A: Chemistry and organic chemistry were offered in the mornings, only in the mornings.

Q: And so were you able to take any of those in the fall or the winter?

A: I tried to take it the fall of my sophomore year. But I think class began at 10:00 in the morning, and we were going to still be in practice, so I would have to miss, you know, a little bit towards the end of practice. And they informed me -- the athletic department and coaches, my advisers, that, you know, Kain -- you know I was taking a big role as the team starting quarterback and I was playing a lot. And they informed me that, you know, Kain, you can't schedule this class. You can't miss practice. So...

*****

Q: How does the playing of football affect or impact academic studies?

A: It makes it hard for you to succeed. You know every year we do an exit interview with all the seniors after, you know, they've went through their time at Northwestern.

And this year in our exit interview the number one thing said was, Due to the time demands, you can't ever reach your academic potential. You're merely just surviving. There's so much time demand towards football and being a great football player that you have to sacrifice one, and we're not allowed to sacrifice football. So...

*****

Q: Do you consider playing football, as the attorney for the University mentioned, part of your, quote, educational experience?

A: Absolutely not. They're completely separate.

www.StudentAthletePay.com

Q: Why do you say they're completely separate?

A: You know if they were together, you know, we would get academic credit for playing sports, but we don't. Really, the amount of time that we dedicate towards football, it really makes it harder for us to, you know, be great academically. So it's just a testament to the type of kids that we have at Northwestern, that they're able to, you know, time manage and, you know, do fairly good academically while also having this huge time demand for football.

Q: Do you see that being a student and an athlete are necessarily connected or are they separate?

A: They are completely separate.

Q: But you've heard from the University that playing football helps build character. You've heard that kind of thing before?

A: Performing any type of job helps build, you know, these human values. You know, character, perseverance, anything like that. Those values don't help us, you know, obtain a college degree. They didn't help me get my psychology degree.

\*\*\*\*\*

Q: And in terms of the amount of time you spent studying and attending classes, how would that compare to the time you spent performing the various obligations as a football player?

A: We spent a lot more time dedicating ourselves to football, performing football activities.

Q: Than being -- than academics?

A: Than academics.

Q: Why is that?

A: Because I believe it just shows that we're brought there to play football. That's our first priority. We must do our football requirement. And then if you can, you know, fit in the academics.

Colter Test. at 166:14-25; 169:1-18; 170:3-15; 173:18-174:23; and 177:7-21.

98.     In recognition that participation in NCAA sports hinders academic progress,

NCAA D1 member schools, like Villanova, provide *exclusive* academic support services to

Student Athletes that *exceed* academic support services offered to other students.

www.StudentAthletePay.com

99. Villanova, for example, operates an *exclusive* Office of Academic Support for Athletics "to provide supplemental academic support for all varsity student-athletes at Villanova University in a manner that addresses their unique academic needs." *See* Office of the Provost / Academic Support for Athletics, available on Villanova.edu at: https://www1.Villanova.edu/villanova/provost/academicsupport.html.

100. Villanova does **not** operate any academic support office specific to the needs of student employees in Work Study that is **not** generally available to all students. *See Livers (Phillips) v. NCAA*: Villanova's Resp. to Pl.'s Second Set of Reqs. for Admis. (Ex. D), at No. 9.

101. In the Office of Academic Support for Athletics, Villanova employs a Director, Assistant Director, two Athletic Academic Advisors and an academic support staff person. *Id.*, at No. 5.

102. As part of the Office of Academic Support for Athletics, Villanova operates a Tutorial Assistance Program and employs *non*-student athletes as tutors for Student Athletes:

> The Tutorial Assistance Program was created in order to provide supplemental instruction to classroom lectures for student-athletes at Villanova University ....
>
> **Becoming a Tutor**
>
> Thank you for showing an interest in tutoring for the Office of Academic Support for Athletics. For many of our student-athletes, the Tutorial Assistance Program is a fundamental component of their academic needs and helps them achieve their goal of graduation. Below is some basic information that you will need to consider prior to applying for this position.
>
> **Tutorial Position Minimum Requirements**
>
> **Academic Requirements:**
>
> - Students with a 3.0 cumulative GPA or above with Sophomore, Junior, or Senior standing. We also hire Graduate students.

www.StudentAthletePay.com

**Our Tutors:**

- On average, we employ 70-80 qualified tutors to help our student-athletes in a variety of coursework.
- Hours vary and are flexible. Hours are based on the needs of the student-athletes and the subject being tutored ....
- Compensation varies and is based on the courses tutored as well as the education level of the tutor (i.e.: undergraduate vs graduate student). Contact Krista Chmielewski for more information on pay rates ...

**Expectations of Student-Athletes Receiving Tutorial Services:**

- Be prepared to ask questions! Tutors are not expected to teach the course and do not take the place of the professor. Tutors are there to supplement what you're learning and can help clarify any confusion you may have about the course content ...
- Expect the tutor to challenge you to become an independent learner who will answer your questions along the way in an effort to help you reach your academic goals.
- Be patient! Learning new material takes time and practice!

Academic Support for Athletics / Support Services / Tutorial Assistance Program, available

on Villanova.edu at:

https://www1.Villanova.edu/villanova/provost/academicsupport/services/tutor.html.

103.    In its Office of Academic Support for Athletics, Villanova's Athletic Department

employs Academic Support Interns at $1400 per month.  *See* Athletic Department

Internship Program (Ex. L).

104.    In response to Findings on Student-Athlete Time Commitment in the NCAA

GOALS Study (2015), the "Power Five" NCAA D1 conferences, *i.e.*, Atlantic Coast, Big 12,

Big Ten, Pacific-12 and Southeastern, approved proposals during the 2017 NCAA Convention:

(i) requiring a time management plan for each sport, and an annual review of that plan;

(ii) prohibiting athletically related activities during a continuous 8 hour period between 9 p.m.

and 6 a.m.; and (iii) requiring a 7 day break after a season and 14 more days off during the

academic year.  Other NCAA D1 conferences and/or member schools can individually decide

whether to adopt these proposals.  *See* Michelle Brutlag Hosick, "Conferences refer time

demands proposals for further study," NCAA.org, Jan. 15, 2016; Michelle Brutlag Hosick,

"DI student-athletes to have more time away from sports," NCAA.org, Jan. 20, 2017; NCAA

D1 Bylaws 17.1.7.8; 17.1.7.9.6, 17.1.7.9.7, and 17.1.8.

     105.    Regarding the various NCAA proposals approved by the "Power Five" during

the 2017 NCAA Convention in response to Findings on Student-Athlete Time Commitment in

the NCAA GOALS Study (2015), former University of Oklahoma football player Ty Darlington,

"whose impassioned pleas on the [NCAA convention] floor [in 2016] were credited in part

with spurring action," remarked:

> Coaches need to understand that student-athletes aren't
> on call at all times.

Brutlag Hosick, "DI student-athletes to have more time away from sports."

      **v.**    ***Glatt* Factor No. 5**
          The extent to which the position's duration is limited to the
          period in which the position provides the student with
          beneficial learning

     106.    For reasons set forth in Paragraphs 56 through 105, *supra*, Work Study

provides beneficial learning *more* than NCAA sports; thus, NCAA sports meet employee

criteria under *Glatt* Factor No. 5 ***more*** than Work Study.

www.StudentAthletePay.com

vi.   *Glatt* Factor No. 6
The extent to which the student's work complements, rather than displaces, the work of paid employees while providing significant educational benefits to the student [or to which the alleged employer is the primary beneficiary]

107.   For reasons set forth in Paragraphs 108 through 125, *infra*, Student Athlete performance is integral to the billion dollar Big Business of NCAA sports while student performance in Work Study merely complements the work of *non*-student employees; thus, NCAA sports meet employee criteria under *Glatt* Factor No. 6 **more** than Work Study.

108.   For reasons set forth in Paragraphs 56 through 106, *supra*, NCAA sports do **not** provide any of the educational benefits that Work Study provides to students.

109.   Work Study guidelines prohibit NCAA D1 member schools, like Villanova, from displacing *non*-student employees with the work of students in Work Study; instead, NCAA D1 member schools are only permitted to use Work Study to complement the work of *non*-student employees. *See* FSA HB, Ch. 2.

110.   Pursuant to Work Study guidelines:

FWS employment must not displace employees (including those on strike) or impair existing service contracts. Also, if the school has an employment agreement with an organization in the private sector, the organization's employees must not be replaced with FWS students.

**Replacement is interpreted as displacement.** Therefore, replacing a full-time employee whose position was eliminated (for any reason) with a student employee paid with FWS funds is prohibited. Moreover, this prohibition extends to instances where a school first replaces the full-time employee with a student position paid with college funds.

*Id.*, at 6-43. (emphasis in original)

111.   The NCAA and Villanova admit that NCAA member schools employ students in Work Study to complement tasks performed by *non*-student employees in campus departments and offices, libraries, dining halls, facilities and stores. *See Livers (Phillips) v. NCAA*: Defs.' Resp. to Pl.'s First Set of Reqs. for Admis., at No. 5, attached hereto as Exhibits F and G; Answer (ECF 130), at ¶¶ 66 and 98.

112.   Villanova, for example, employs Athletic Director's Office Interns, whose prime duties are to support "day-to-day coordination of operational activities in the Athletic Director's Office including: answering the phone, typing memos and letters, preparing HR forms, maintaining the Athletic Director's email account, compiling a monthly calendar and the department personnel directory [and] assisting with special projects" and who are paid $1400 per month. *See* Athletic Department Internship Program (Ex. L).

113.   NCAA bylaws permit NCAA D1 member schools to employ Student Athletes through Work Study to complement tasks performed by coaches in Sports Camps and Clinics. *See* NCAA D1 Bylaws 12.4.3 and 13.12.

114.   The use of Student Athletes to assist coaches in Sports Camps and Clinics is optional, **not** integral, as Sports Camps and Clinics can, and often do, operate without Student Athlete employees.

115.   The NCAA and Villanova admit that sports contests **cannot** take place without athletes. *See Livers (Phillips) v. NCAA*: Answer (ECF 130), at ¶ 134.

116.   The NCAA and Villanova admit that the NCAA permits only Student Athletes eligible under NCAA bylaws to participate on teams in NCAA-governed sports. *See Livers (Phillips) v. NCAA*: Defs.' Resp. to Pl.'s First Set of Reqs. for Admis. (Exs. F and G), at No. 5.

117.    The NCAA and Villanova admit the NCAA does **not** permit athletic contests to take place if a participating school **cannot** field a team with the minimum number of competitors required under the rules of the sport. *Id.*

118.    While students (including academic scholarship recipients) in ticket taker, seating attendant and food concession positions at NCAA contests are classified as employees and paid at least the minimum wage by NCAA D1 member schools, the Student Athletes, without whose performance there would be **no** NCAA contests, are **not** similarly classified and paid. *See Livers (Phillips) v. NCAA:* Answer (ECF 130), at ¶¶ 4 and 67.

119.    While the NCAA and Villanova admit that Student Athletes participate in promotion of NCAA sports through use of their names, images and likenesses in advertising and interaction with the community of sports consumers, sports donors and sports media, only NCAA D1 member schools and conferences are permitted to financially benefit from such promotion by, for example, entering into licensing, marketing, sponsorship, advertising, broadcast and other commercial agreements that involve use of Student Athlete names and likenesses. *Id.,* at ¶ 135; *also see* NCAA D1 Constitution 3.2.4.21 and 3.3.4.6.

120.    The NCAA and Villanova admit that NCAA member schools derive benefits from school branding, identity and spirit related to NCAA sport mascots, and secure tangible gross revenues, as a result of Student Athletes competing in NCAA sports. *See Livers (Phillips) v. NCAA:* Defs.' Resp. to Pl.'s First Set of Reqs. for Admis. (Exs. F and G), at No. 2.

121.    For the Fiscal Year that ended August 31, 2018, the NCAA reported total revenues of $1,064,403,240 – mostly from television and marketing rights fees, championships and tournaments, and sales. *See* 2017-18 NCAA Financial Statements, at 4, available at https://ncaaorg.s3.amazonaws.com/ncaa/finance/2017-18NCAAFin_NCAAFinancialStatement.pdf.

122.    For Fiscal Year 2016, NCAA D1 schools reported median total revenues for

NCAA sports of:

> Football Bowl Subdivision "Power Five" | $97,276,000
> Football Bowl Subdivision | $33,470,000
> Football Championship Subdivision | $17,409,000
> Sans Football | $16,018,000

*See* NCAA Revenues / Expenses Division I Report 2004 – 2016, at 12, available on NCAA.org

at http://www.NCAA.org/sites/default/files/2017RES_D1-

RevExp_Entire_2017_Final·20180123.pdf.

123.    For the Fiscal Year that ended May 31, 2018, Villanova reported total revenue

for NCAA sports of $48,977,278.  *See* U.S. Department of Education Equity in Athletics

Data Analysis (OPE ID: 00338800), available at: https://ope.ed.gov/athletics/#/.

124.    By contrast to Student Athletes competing in NCAA sports, the NCAA and

Villanova admit that some college employees, including student employees in Work Study,

perform work that does **not** generate revenue for the school for which they work.  *See Livers*

*(Phillips) v. NCAA*: Answer (ECF 130), at ¶ 130.

125.    **Neither** the NCAA **nor** Villanova contends that the "learning benefits" that

they claim accrue to Student Athletes from participation in NCAA sports (*i.e.*, "discipline,

work ethic, strategic thinking, time management, leadership, goal-setting, and teamwork")

are comparable to the benefits that they admit accrue to NCAA member schools as a result

of Student Athletes competing in NCAA sports (*i.e.*, "tangible gross revenues" and "benefits

related to school branding, identity and spirit related to an athletic mascot").  *See Livers*

*(Phillips) v. NCAA*: Defs.' Resp. to Pl.'s First Set of Reqs. for Admis. (Exs. F and G), at

No. 2; Defs.' Resp. to Pl.'s First Set of Interrogs. (Exs. H and I), at No. 3.

www.StudentAthletePay.com

vii. *Glatt* Factor No. 7
The extent to which the student and the employer understand
that the assignment is conducted without entitlement to a paid
<u>job at the conclusion of the assignment</u>

126.   **Neither** student employees in Work Study, **nor** Student Athletes in the

NCAA sports program, are entitled to a paid job at their respective NCAA D1 member school

after graduation.[8] *See, e.g., Livers (Phillips) v. NCAA*: Villanova's Resp. to Pl.'s Second Set of

Reqs. for Admis. (Ex. D), at No. 53.

2.   <u>The *Donovan* Independent Contractor v. Employee Test</u>

127.   The independent contractor/employee test in *Donovan* includes, among

its factors:

i.   The degree of the alleged employer's right to control the
manner in which the work is to be performed

ii.   The alleged employee's opportunity for profit or loss depending
upon his managerial skill, *i.e.*, permission to work as much or
as little as he would like and to work during whichever hours
he chooses

iii.   The alleged employee's investment in required equipment or
materials

iv.   Whether the service rendered requires a special skill

v.   The degree of permanence of the working relationship

vi.   Whether service rendered is integral to the alleged employer's
business

*Razak*, 2018 U.S. Dist. LEXIS 61230, at *21-22.

i.   *Donovan* Factor No. 1
The degree of the alleged employer's right to control the
<u>manner in which the work is to be performed</u>

128.   For reasons set forth in Paragraphs 129 through 141, and 164 through 225,

*infra*, NCAA D1 member schools exercise *more* authority to control the performance and

---

8   In effect, *Glatt* Factor No. 7 *only* applies to corporations and similar employers – **not** to
colleges, universities or proprietary schools.

conduct of Student Athletes in NCAA sports than of student employees in Work Study; thus, NCAA sports meet employee criteria under *Donovan* Factor No. 1 **more** than Work Study.

129.    The NCAA and Villanova admit that all Student Athletes who participate in NCAA sports are supervised by coaching and training staff. *See Livers (Phillips) v. NCAA*: Answer (ECF 130), at ¶ 154.

130.    Both Work Study and NCAA D1 sports require adult supervisors to maintain timesheets for participants. *See* FSA HB, Ch. 2, at 6-48 and NCAA D1 Bylaw 17.1.7.3.4.

131.    Work Study at NCAA D1 member schools is governed by **38 pages** of the FSA HB, Chapter 2.[9]  *See* FSA HB, Ch. 2, at 6-39 to 6-68; 6-71 to 6-72; and 6-83 to 6-88.

132.    NCAA D1 member schools typically publish shorter, supplemental handbooks articulating standards controlling student employee performance and conduct in Work Study. *See, e.g.*, the **6-page** Villanova University Student Employment Program Handbook[10] available on Villanova.edu at: https://www1.Villanova.edu/villanova/hr/employment/student-employment/student-handbook.html.

133.    NCAA D1 sports are governed by the **415-page** NCAA D1 Manual **and** the NCAA Rule Books *for each sport* (available on NCAA.org at: www.NCAApublications.com).

134.    In addition to the Rule Book *for each NCAA sport* that defines related work, NCAA D1 member schools exercise authority, and discretion, to control Student Athlete performance and conduct under threat of discipline, including suspension or dismissal from the team, if a Student Athlete:

---

[9]    Excluding 12 pages addressing Proprietary Schools, Apprenticeships, the Job Location and Development Program and Work Colleges.

[10]    The online handbook prints out as 6 pages after expanding headings, which headings include Eligibility, International Students, On-Campus Employment, Off-Campus Employment, Completing Employment Paperwork, Pay Policies, Employment of Relatives, Operation of Vehicles, Employment Verifications, Resignations and Terminations, Sexual Violence Policy and Additional University Policies.

- "Renders himself/herself ineligible for intercollegiate competition," *i.e.*, is suspected or determined to have run afoul of any of the myriad of bylaws in the NCAA D1 Manual

- "Engages in serious misconduct ... or manifest disobedience," *i.e.*, is suspected or determined to have run afoul of "Rules and regulations of the Department of Intercollegiate Athletics and specific rules of the recipient's sport as defined by the head coach as they apply"

- "Fails to attend ... squad or individual meetings ... and participate in athletic practice sessions and scheduled contests, as specified by the sport coach"

- "Does not comply with expected personal conduct, appearance and dress, both on and off the University campus, and accepted uniform for athletic contests, when such violations bring discredit to the athletic program"

- "Fails to adhere to training rules and regulations"

- "Engages in gambling activities on intercollegiate activities prohibited by NCAA legislation"

*See, e.g.*, Athletic Financial Aid Agreement (Ex. M), at ¶ 2.[11]

135.    NCAA D1 member schools publish supplemental handbooks articulating standards controlling Student Athlete performance and conduct on, and off, the field.  For example, the **44-page** Villanova University Athletic Department Student-Athlete Handbook and Planner states, among other things:

> **AGENTS**
>
> It is essential that student-athletes know the NCAA rules related to professional sports. A violation of the rules concerning agents could have severe negative consequences for the student-athlete and the

---

[11]    All Student Athletes are subject to discipline, including suspension or dismissal from the team, for the enumerated reasons.  The NCAA admits that there is **no** principled distinction between scholarship athletes and walk-ons, and that the only policies and practices that apply to scholarship athletes exclusively are bylaws that set the number of scholarships schools may award and that permit revocation of scholarships for misconduct (as opposed to revocation of athletic eligibility, which applies to scholarship athletes and walk-ons alike).  *See* Paragraphs 164, 253 and 254, *infra*.

University. To remain eligible for intercollegiate competition, NCAA rules stipulate that a student-athlete <u>may not</u>:

1. Agree, either orally or in writing, to be represented by an agent or organization in the marketing of his/her athletic ability or reputation until after completion of his/her collegiate eligibility. In addition, representation by an agent may not be arranged until after the last intercollegiate contest, including post-season games.

2. Negotiate or sign a playing contract in any sport in which the student-athlete intends to compete.

3. Ask to be placed on a professional league's draft list. There are sport specific exceptions. Please contact the Compliance Office for more information.

\*\*\*\*\*

## AMATEURISM

The following are NCAA guidelines for maintaining athletic amateur status:

*WITHIN YOUR SPORT, YOU MAY NOT:*

1. Accept payment, or a promise of payment (in cash, prizes, gifts, or travel) for participation in your sport.

2. Enter into an agreement of any kind to compete in professional athletics (you cannot negotiate a verbal or written professional contract).

3. Request that your name be put on a draft list for professional sports. In basketball, you may try out during the summer and retain your eligibility so long as you receive no more than actual and necessary expenses from the professional organization ....

*IN ANY SPORT, YOU MAY NOT:*

1. Agree to have your picture or name used to promote a commercial product ....

3. Be represented by an agent or organization to market your athletic skill or reputation ...

\*\*\*\*\*

-43-

## GAMBLING

Student-athletes shall not knowingly ....

- Participate in any gambling activity through a bookmaker, a parlay, or any other method employed by organized gambling;

- Participate in any gambling activity involving collegiate or professional sports.

INVOLVEMENT IN ANY OF THESE ACTIVITIES WILL RESULT IN YOUR IMMEDIATE LOSS OF ELIGIBILITY, DISMISSAL FROM THE ATHLETICS PROGRAM, AND/OR CANCELLATION OF YOUR ATHLETIC SCHOLARSHIP.

Sports that cannot be bet on are:

- All sports sponsored by the NCAA (including all NCAA Tournament Pools)

- Professional Sports

- Amateur sports

- Fantasy sports

Sports that can be bet on if you are of age (21) include: Horse Racing and Casino Games.

\*\*\*\*\*

## SOCIAL NETWORKING

Villanova University Athletics Department recognizes and supports its student-athletes' rights to freedom of speech and expression, including the use of online social networks. However, each student-athlete must remember that being a student-athlete at Villanova University is a privilege, not a right. As a student-athlete you represent not only yourself, your team, and this department, but the University as a whole. As such, you are expected to portray yourself, your team, and the University in an appropriate manner at all times. Therefore, any online postings must be consistent with the Villanova University mission, Federal and State laws, as well as Team, Department, University, Conference, and NCAA rules, regulations and policies.

\*\*\*\*\*

www.StudentAthletePay.com

**Social Media: Non-permissive online activity**

Inappropriate or offensive activities or behaviors on online communities that could lead to student-athletes facing the penalties outlined below include but are not limited to:

- Photos, videos, comments or posts showing the personal use of alcohol, drugs and tobacco e.g., no holding cups, cans, shot glasses etc. ….

- Content online that is unsportsmanlike, derogatory, demeaning or threatening toward any other individual or entity
    - Example: derogatory comments regarding another institution; taunting comments aimed at a student athlete, coach or team at this or any other institution ….

- Content online that would constitute a violation of Conference or NCAA rules
    - Examples: commenting publicly about a prospective student-athlete …

Ex. O, at 21-25 (pdf pages, because document is unnumbered).

136.   The National Labor Relations Board has determined that certain restrictions on Student Athlete speech and use of social networks constitute unfair labor practices. *See* NLRB Advice Memo Re: Northwestern University, Case 13-CA-157467, Sept. 22, 2016; Lester Munson, "Free to Tweet: Northwestern's restrictions on football players ruled unlawful," ESPN.com, Oct. 10, 2016.

137.   NCAA D1 member schools, like Villanova, publish NCAA team policies that restrict the *legal* consumption of alcohol and *legal* use of nicotine products.

138.   NCAA bylaws also restrict a Student Athlete's self-employment:

A student-athlete may establish his or her own business, provided the student-athlete's name, photograph, appearance or athletics reputation are not used to promote the business.

NCAA D1 Bylaw 12.4.4.

139.    In 2017, the ASSOCIATED PRESS reported on the NCAA's investigation of University of Central Florida kicker Donald De La Haye for his receipt of advertising revenue from his YouTube channel as part of YouTube's policies applicable to video content creators:

> [De La Haye] could be violating NCAA rules by receiving money from the advertising revenue off his YouTube videos that chronicle his life as a college student and as a college football player.
>
> De La Haye has nearly 56,000 subscribers on YouTube and his latest video detailing his battle to keep his channel going had 113,042 views as of Wednesday afternoon. YouTube pays video creators a percentage of the ad revenue profits ....
>
> NCAA rules prohibit student-athletes from profiting from their likeness or status as student-athletes because it violates amateur guidelines. NCAA bylaw 12.4.4 regarding self-employment states a student-athlete may establish his or her own business, provided the student-athlete's name, photograph, appearance or athletics reputation are not used to promote the business.
>
> De La Haye, a marketing major, said in that video posted Monday that he created the channel as a way to further his career. He went on to say it is means to make a little extra money, money the Costa Rica native said his family needs.
>
> "Basically, I'm not allowed to make any money off my YouTube videos," he said. "So I'm working hard — basically like a job filming, editing, creating ideas — and I'm not allowed to make any money. And if I do bad things will happen."

"UCF kicker's YouTube profits may be violation of NCAA rules," AP, June 14, 2017.

140.    FOX Business reported the decision to remove De La Haye's NCAA eligibility:

> Donald De La Haye, a backup kicker, has a YouTube channel with more than 100,000 subscribers that has generated over five million total viewers. The National Collegiate Athletic Association (NCAA) ruled the kicker ineligible because he earns advertising revenue from his YouTube page, which chronicles his life as a college student and a UCF football player.

-46-

In interview with FOX Business' Stuart Varney, De La Haye said the NCAA should change the rules to allow student-athletes to earn an income while in college.

[T]he reason we go to college is to learn how to make money, and an entrepreneur like myself should have the right to profit off his own business, he said.

According to the NCAA amateur guidelines, the rules prohibit student-athletes from profiting from their likeness. NCAA bylaw 12.4.4 regarding self-employment states that "a student-athlete may establish his or her own business, provided the student-athlete's name, photograph, appearance or athletics reputation are not used to promote the business.

"They offer[ed] me some conditions that you know the NCAA didn't really state too clearly. The waiver they offered me to sign [] says, I can't even post unmonetized footage of me playing football. I can't be at the beach tossing up footballs with my friends. I can't even mention quarterbacks, nothing like that." De La Haye said.

The former UCF football player noted it is unfair that any other person or non-student-athlete is able to make a profit off advertising revenue from a YouTube page.

"[A] student, you know, with the same aspirations and goals and works as hard as me would be praised for what he is doing, but you know the NCAA kicked me out."

Henry Fernandez, "NCAA rules UCF kicker Donald De La Haye ineligible over YouTube profits," FOX Business, Aug. 2, 2017.

141.    There are **no** comparable school rules restricting a *non*-student athlete's or Work Study participant's pursuit of career options; use of her/his name, image, likenesses or skill set (*also see* Paragraph 119, *supra*); use of social media; *legal* gambling; *legal* consumption of alcohol; or *legal* use of nicotine products.

www.StudentAthletePay.com

  ii. ***Donovan*** Factor No. 2
    The alleged employee's opportunity for profit or loss depending
    upon his managerial skill, *i.e.*, permission to work as much or
    as little as he would like and to work during whichever hours
    <u>he chooses</u>

 142. For reasons set forth in Paragraph 143, *infra*, Work Study provides options for

a student to work as much or as little as s/he would like, to work during whichever hours

s/he chooses and to work for whichever hourly rate s/he chooses *more* than NCAA sports; thus,

NCAA sports meet employee criteria under *Donovan* Factor No. 2 ***more*** than Work Study.

 143. The same Work Study guidelines that permit a student employee to flexibly

schedule hours, days and different jobs at different hourly rates to accommodate preferred/

chosen classes and academic degree programs also permit a student employee to manage

her/his profit (or loss).  *See* Paragraphs 81 through 83, *supra*; *compare with* Paragraphs 84

through 97, 104 and 105, *supra*.

  iii. ***Donovan*** Factor No. 3
    The alleged employee's investment in required equipment or
    <u>materials</u>

 144. For the reasons set forth in Paragraphs 145 through 153, *infra*, NCAA D1

member schools invest substantially *more* in equipment, materials and personnel required

to field NCAA teams than do the Student Athlete participants; thus, NCAA sports meet

employee criteria under *Donovan* Factor No. 3 – and ***more*** than Work Study to the extent

member schools spend less on equipment, materials and personnel required for Work Study.

 145. For Fiscal Year 2016, NCAA D1 schools reported median total expenses and

investments in Athletic Department personnel and equipment to field NCAA teams of:

    Football Bowl Subdivision "Power Five" | $98,913,000
    Football Bowl Subdivision | $33,113,000
    Football Championship Subdivision | $17,290,000
    Sans Football | $15,956,000

*See* NCAA Revenues / Expenses Division I Report 2004 – 2016, at 12.

146.   NCAA D1 member schools, like Villanova, invest substantially more on equipment, materials and personnel required to field NCAA teams than on equipment, materials and personnel required to operate Work Study.

147.   In 2015, THE WASHINGTON POST examined NCAA D1 member school spending on professional-grade facilities and on professional-level staffing and coaching salaries in a series of investigative reports, including:

- Will Hobson and Steven Rich, "Playing in the Red," THE WASHINGTON POST, Nov. 23, 2015.

- Will Hobson and Steven Rich, "The latest extravagances in the college sports arms race? Laser tag and mini golf," THE WASHINGTON POST, Dec. 15, 2015.

148.   From Hobson and Rich, "The latest extravagances in the college sports arms race? Laser tag and mini golf":

> A decade of rampant athletics construction across the country has redefined what it takes to field a competitive top-tier college sports program. Football stadiums and basketball arenas now must be complemented by practice facilities, professional-quality locker rooms, players' lounges with high-definition televisions and video game systems, and luxury suites to coax more money from boosters.
>
> *****
>
> On April 19, 2013, the University of Tennessee dedicated its new $45 million Anderson Training Center, a 145,000-square-foot home for its football team with a two-story weight room, hydrotherapy room, amphitheater-style team meeting room and a public entrance featuring a waterwall and museum commemorating Volunteers football history.
>
> At the dedication ceremony, Tennessee Athletic Director Dave Hart told donors that professional football scouts had offered unanimous praise.
>
> "They have all told me this is the best facility, college or professional, that they've ever seen," Hart said. "Quite a

tribute and quite a legacy to all of you who helped make this possible."

*****

The facilities arms race is not solely benefiting football teams. In the past decade, many athletic departments in the wealthy Power Five conferences – the Atlantic Coast Conference, Southeastern Conference, Big 12, Big Ten and Pacific-12 –have built baseball stadiums, volleyball courts, soccer fields, golf practice facilities and ice hockey arenas ....

*****

Some collegiate players now enjoy facilities superior to those offered by some professional teams. Florida State and the University of Florida have indoor football practice facilities. The NFL's Jacksonville Jaguars do not.

149.   From Hobson and Rich, "Playing in the Red":

Auburn Athletics Chief Operating Officer David Benedict explained in an interview how his department lost more money in 2014 than it did in 2004, even though its income nearly doubled during that time ....

In 2004, Auburn athletics nearly broke even on earnings of $57.5 million. (All 2004 figures are adjusted for inflation.)

By 2014, income had risen to $109.3 million, but spending soared to $126.5 million ....

Coaches' pay more than doubled (from $9.3 million to $20.4 million). Facilities spending tripled (from $8.6 million to $27.8 million), thanks to a building boom including a new basketball arena and practice facility ($89.4 million), a new indoor football practice facility ($23.1 million) and a new soccer-track facility ($17.7 million).

Some purchases, Benedict acknowledged, were optional, like two new twin-engine jets: a six-seat 2008 Cessna Citation CJ2+ ($6.4 million) and a seven-seat 2009 Cessna Citation CJ3 ($7.8 million), each bearing a blue and orange "AU" insignia on its tail.

The jets are used primarily by coaches to criss-cross the country meeting with recruits, contributing to Auburn's recruiting costs nearly doubling in a decade, from $1.6 million to $2.7 million ....

-50-

> That new [$13.9 million] video board, the largest in
> college sports, was also optional. Auburn has a history of
> trend-setting electronics displays. In 2007, it installed
> the first high-definition video board in the SEC, a
> $2.9 million purchase Athletic Director Jacobs decided
> was obsolete eight years later.

150.   For the Fiscal Year that ended May 31, 2018, Villanova reported total expenses and investments in Athletic Department personnel and equipment to field NCAA teams of $48,977,278. *See* U.S. Department of Education Equity in Athletics Data Analysis (OPE ID: 00338800), available at: https://ope.ed.gov/athletics/#/.

151.   NCAA D1 member schools, like Villanova, provide Student Athletes with *all* equipment and materials required to participate in NCAA sports – *only excluding incidental, nonessential and minimal expenses.*

152.   For example, the *only* "Charges Not Paid By the Athletics Department," for which Villanova Student Athletes are *personally responsible*, include:

- All phone charges;
- Consumable charges (i.e. lab fees for breakage, non-required field trips, Lab Coats, etc.);
- Library fines, parking fines or fines for damage to University property, including residence halls;
- Key deposits or the costs of key replacements;
- Replacement costs for lost student I.D.'s;
- School supplies, dictionaries, reference books, pens, notebooks, paper, etc. unless specified on students syllabus;
- Vehicle registration fees or parking stickers;
- University breakage deposit;
- Use of institutional phones to call off campus is strictly prohibited.

Villanova University Athletics Department Student-Athlete Handbook and Planner (Ex. O), at 24 (pdf page, because document is unnumbered).

153.   None of the "Charges Not Paid By the Athletics Department," for which Villanova Student Athletes are personally responsible, reflects or relates to an investment in equipment or materials required to participate in NCAA sports. *Id.*

iv.   ***Donovan*** **Factor No. 4**
      Whether the service rendered requires a special skill

154.   For reasons set forth in Paragraphs 107 through 125, *supra*, Student Athlete

performance, which is integral to the billion dollar Big Business of NCAA sports, requires

*more* specialized skill than student performance in Work Study, which merely complements

the work of *non*-student employees (*e.g.*, answering the phone and typing memos in offices;

serving food and washing dishes in dining halls; checking IDs and re-stacking books in

libraries; selling merchandise in bookstores; and cleaning facilities); thus, NCAA sports

meet employee criteria under *Donovan* Factor No. 4 ***more*** than Work Study.

155.   NCAA sports are Varsity sports – *i.e.*, sports which are sponsored by the

school, supervised by school staff and funded through the school's budget, and from which

the school derives school branding benefits and revenues – and, as Varsity sports, require

much *more* specialized skill than *recreational* student-run interscholastic Club Sports or

student-run intramural sports.

v.   ***Donovan*** **Factor No. 5**
      The degree of permanence of the working relationship

156.   For the reasons set forth in Paragraphs 157 through 162, *infra*, NCAA D1

member schools have *more* authority, and discretion, to deny, or impose conditions upon,

the transfer to another member school of a Student Athlete than of a student employee in

Work Study; thus, NCAA sports meet employee criteria under *Donovan* Factor No. 5 ***more***

than Work Study.

157.   NCAA D1 member schools, **cannot** deny, or impose conditions upon, the

transfer of a student employed in Work Study to another college.  *See, e.g., Livers (Phillips) v.*

*NCAA*: Villanova's Resp. to Pl.'s Second Set of Reqs. for Admis. (Ex. D), at Nos. 45 and 46.

158.    Through the 2017-18 academic year, NCAA bylaws permitted a member school to enforce the permanence of its relationship to a Student Athlete by blocking her/him from accepting an athletic scholarship offer to transfer to another member school of her/his choice and play for that school the same or following season. *See* 2017-18 NCAA D1 Bylaw 13.1.1.3.

159.    The NCAA and Villanova admit that, after the 2017-18 academic year, member schools may still separately adopt NCAA member conference rules that permit Student Athlete transfers to be blocked. *See* Defs.' Resp. to Pl.'s Second Set of Reqs. for Admis. (Exs. D and E), at No. 48; Michelle Brutlag Hosick, "New transfer rule eliminates permission-to-contact process," NCAA.org, June 13, 2018 ("Conferences, however, still can make rules that are more restrictive than the national rule.")

160.    In 2013, The NEW YORK TIMES described the saga of Oklahoma State quarterback Wes Lunt, who decided he wanted to transfer after losing his starting position in the aftermath of a knee injury and a concussion:

> [T]he transfer process started, producing the latest and perhaps an extreme example of what is occurring throughout the country this time of year as many college athletes try to move to different universities.
>
> The Oklahoma State coach, Mike Gundy, ruled out nearly 40 universities as transfer options for quarterback Wes Lunt, an apparent show of gamesmanship and punishment toward a college athlete who wanted to take his skills elsewhere.
>
> The forces at work were not new, but Gundy, like a growing number of coaches, chose to harness them to eliminate many, if not all, of Lunt's preferred options and to keep a potential rival from gaining the services of a highly regarded quarterback entering his sophomore season.   It was a powerful illustration of the big-business mind-set of college sports and the control that coaches have over players.

*****

> Coaches cannot fully prevent athletes like Lunt from transferring to any university they want. **But if a coach does not grant an athlete a release, the player must forfeit any scholarship opportunity, pay his own way to the new university and sit out the next season.** Meanwhile, Gundy, whose contract pays him $30.3 million over eight years, and other coaches can routinely move from one college to another with minimal consequence, often for bigger contracts after arranging a buyout with the first college.

Greg Bishop, "Want to Play at a Different College?  O.K., but Not There or There,"

NEW YORK TIMES, June 7, 2013 (emphasis supplied); *also see* Will Hobson and Steven Rich,

"College sports' fastest-rising expense: Paying coaches not to work," THE WASHINGTON POST,

Dec. 11, 2015 (regarding the economic freedom of coaches to routinely move from one college

to another with minimal consequence, often for bigger contracts after arranging a buyout

with the first college).

161.    In 2017, ESPN described the transfer sagas of University of Pittsburgh

shooting guard Cameron Johnson, initially blocked from transferring to any other school in

the Atlantic Coast Conference or school on the University of Pittsburgh's schedule, and

Kansas State University wide receiver Corey Sutton, initially blocked from transferring to

any of 35 schools on his preferred list:

> [H]ow can any institution complain when a student decides to leave the school to pursue his or her education elsewhere? Whether on scholarship or not, there is no restriction for any non-athlete student leaving one school and attending another and being able to receive aid or participate in any extracurricular activity.
>
> Yet, with athletes (and only athletes), the school the athlete is leaving has the power to limit to where an athlete can transfer and receive aid and participate in varsity athletics. **That is the equivalent of a "noncompete" provision in an employment contract.  If not employees, how can NCAA rules allow any school to restrict the choice and movement of any student?**

Jay Bilas, "Cameron Johnson is the perfect example of the transfer rule gone wrong."
ESPN.com, June 13, 2017. (emphasis supplied).

162.   If a Student Athlete is cleared to transfer to another NCAA D1 member school,
that Student Athlete *still* **cannot** participate in NCAA sports the *same* season, and typically
must forego participating in NCAA sports the *following* season, *i.e.*, sit out one full season. *See*
NCAA D1 Bylaw 14.5.5.

> **vi.**   *Donovan* **Factor No. 6**
> Whether service rendered is integral to the alleged employer's
> business

163.   For reasons set forth in Paragraphs 107 through 125, *supra*, Student Athlete
performance is integral to the billion dollar Big Business of NCAA sports while student
performance in Work Study merely complements the work of *non*-student employees; thus,
NCAA sports meet employee criteria under *Donovan* Factor No. 6 *more* than Work Study.

## III.   DEFENDANTS AND THE PROPOSED DEFENDANT CLASS ARE JOINT EMPLOYERS OF STUDENT ATHLETES

### A.   NCAA Bylaws Apply to *All* Student Athletes on An Equal Basis

164.   The NCAA and Villanova admit that NCAA rules apply to all Student Athletes
in NCAA sports on an equal basis, and that these bylaws address, among other subjects,
Student Athlete recruitment, eligibility, hours of participation, duration of eligibility and
discipline. *See Livers (Phillips) v. NCAA*: Answer (ECF 130), at ¶ 30.

### B.   The Role(s) of NCAA Member Schools in *Handing Down* NCAA Bylaws

165.   "What Is the NCAA?," attached hereto as Exhibit Q and available on
NCAA.org at www.NCAA.org/about/resources/media-center/ncaa-101/what-ncaa, states,
among other things:

WHAT IS THE NCAA?

The National Collegiate Athletic Association is a **member-led organization** ...

WHOSE RANKS INCLUDE

**College**                                          Presidents
lead their schools and the NCAA

\*\*\*\*\*

WHO MAKES THE RULES?

**Member representatives serve on committees that propose rule and policies surrounding college sports.   Members ultimately decide which rules to adopt** – everything from recruiting and compliance to academics and championships – and implement them on campus.

WHAT DOES THE NATIONAL OFFICE DO?

The 500 employees at the NCAA's Indianapolis headquarters interpret and support member legislation, run all championships and manage programs that benefit student athletes.

(emphasis supplied).

166. "How the NCAA Works: Division I," attached hereto as Exhibit R and available on NCAA.org at www.NCAA.org/sites/default/files/2018DINCAA-HowTheNCAAWorks-DI_20180313.pdf, states, among other things:

**Rule-making starts with the schools and athletics conferences that belong to Division I.**

If an athletics director wants to change recruiting legislation, for example, the idea could be introduced through the committee structure.

\*\*\*\*\*

**Representatives serve on NCAA committees that determine the division's direction and develop legislation.**

\*\*\*\*\*

www.StudentAthletePay.com

DIVISION I COUNCIL

Made up of practitioners who work daily in Division I college sports[12] ...

40 members, including one from each of the 32 conferences

BOARD OF DIRECTORS

The Board of Directors is the top governing body for Division I, responsible for strategy and policy and overseeing legislation and management of the division

24 members: 20 presidents, 1 from each FBS conference and 10 seats rotating among the remaining 22 conferences

(emphasis supplied).

167.    NCAA D1 Constitution Article 5. Legislative Authority and Process states, among other things:

5.01.1 **Basis of Legislation.** All legislation of the Association that governs the conduct of the intercollegiate athletics programs of its member institutions shall be adopted by the membership in Convention assembled, or by the divisional governance structures as set forth in Constitution 4, as determined by the constitution and bylaws governing each division, and shall be consistent with the purposes and fundamental policy set forth in Constitution 1, and shall be designed to advance one or more principles such as those set forth in Constitution 2.

*****

5.1.3 **Annual or Special Convention Delegates ....**

5.1.3.1.1 **With Voting Privileges.** Each active member and each member conference with voting privileges, as specified in Constitution 3.3.2.2, shall be entitled to one vote.

---

[12]    *See, also,* Division I Council available on NCAA.org at: www.NCAA.org/governance/committees/division-i-council ("**The Division I Council is a high-level group responsible for the day-to-day decision-making for Division I.** Athletics directors, athletics administrators, senior women administrators, faculty athletics representatives and student-athletes serve on the Council.") (emphasis supplied)

www.StudentAthletePay.com

168.    In a U.S. Senate hearing on NCAA sports, NCAA President Mark Emmert explained:

> [I]t's important to understand that the NCAA is a democratically governed, membership-led association .... Members make rules through a representative process much as you do in Congress.

*Promoting the Well-Being and Academic Success of College Athletes: Hearing Before the Senate Comm. on Commerce, Sci. and Transp.*, 113th Cong. 40 (2014) (statement of Mark Emmert, President, NCAA).

### C.    The Role(s) of NCAA Member Schools in *Enforcing* NCAA Bylaws

169.    As discussed in detail in **Section III.D. The Role(s) of NCAA Staff in *Enforcing* NCAA Bylaws**, *infra*, the NCAA Enforcement staff is tasked with investigating potential violations of NCAA bylaws and bringing charges.  *See* NCAA Division I Infractions Annual Report | 2017-18, at Infractions Snapshot, available on NCAA.org at: http://www.NCAA.org/sites/default/files/18-00697%20NCAA%20Infractions%20Annual%20Report_Final_150dpi.pdf.

170.    The NCAA D1 Committee on Infractions decides cases brought by the NCAA Enforcement Staff. *Id.*

171.    The NCAA D1 Committee on Infractions:

> **is structured around a peer-review model and is composed of as many as 24 (currently 22) qualified representatives from member schools, conferences and the public.** This can include university presidents, conference commissioners, athletics directors, campus administrators, faculty athletics representatives, former coaches, high-profile members of the public and more. Members of the committee deliberate, conclude if violations occurred, prescribe appropriate penalties, then issue a written decision. The committee also monitors schools on probation.

-58-

*Id.*, at 5. (emphasis supplied).

172.    The D1 Infractions Appeal Committee is also **peer-reviewed** and composed of five (5) representatives from member schools, conferences and the public. *Id.*, at 28-29.

173.    Under NCAA D1 bylaws, NCAA member schools have "Shared Responsibility" to report all potential violations regarding any Student Athlete, and to cooperate in the investigation of any Student Athlete, including those attending another member school:

> **19.2 Expectations and Shared Responsibility ....**
>
> **19.2.2   Member   Responsibility   to   Report Noncompliance.** Each institution has an affirmative obligation to report all instances of noncompliance to the Association in a timely manner.
>
> **19.2.3 Responsibility to Cooperate.** Current and former institutional staff members or prospective or enrolled student-athletes of member institutions have an affirmative obligation to cooperate fully with and assist the NCAA enforcement staff, the Committee on Infractions and the Infractions Appeals Committee to further the objectives of the Association and its infractions program. The responsibility to cooperate requires institutions and individuals to protect the integrity of investigations and to make a full and complete disclosure of any relevant information, including any information requested by the enforcement staff or relevant committees. Current and former institutional staff members or prospective or enrolled student-athletes of member institutions have an affirmative   obligation   to   report   instances   of noncompliance to the Association in a timely manner and assist in developing full information to determine whether a possible violation has occurred and the details thereof.

174.    Failure to cooperate in an NCAA enforcement investigation is considered a Severe Breach of Conduct (Level I Violation) subject to the highest penalties, including competition penalties (*e.g.*, postseason bans), financial penalties, scholarship reductions, head coach restrictions, and recruiting restrictions. *See* NCAA D1 Bylaws 19.1.1(c), 19.9.5 and 19.9.7.

### D. The Role(s) of NCAA Staff in *Enforcing* NCAA Bylaws

175. In a U.S. Senate hearing on NCAA sports, NCAA President Mark Emmert explained:

> Nearly 1,100 NCAA member colleges and universities work together to create rules .... **Those rules are administered by NCAA national office staff**, which also organize 89 national championships in 23 sports and provides other resources to support student-athletes and the schools they attend.

*Promoting the Well-Being and Academic Success of College Athletes*: *Hearing Before the Senate Comm. on Commerce, Sci. and Transp.*, 113th Cong. 45 (2014) (emphasis supplied).

176. In the same U.S. Senate hearing, NCAA President Emmert further explained:

> college and university members have given the NCAA the responsibility to explore potential NCAA violations.

*Id.*, at 49.

177. In its 2017-18 Division I Infractions Annual Report, the NCAA described roles of NCAA staff in investigating and prosecuting NCAA rules violations and in supporting peer-review adjudicative and appellate committees:

> **ENFORCEMENT**
>
> **The enforcement staff, tasked with investigating cases and bringing charges**, has streamlined its processes in recent years. Investigations into Level I and II violations are moving more swiftly, all while **the enforcement staff processes a significantly higher volume of violations each year**. The enforcement staff also has worked to make informed projections about cases earlier, meaning that unsubstantiated or less significant matters can be closed or processed faster. **Outside of cases, the enforcement staff continues to develop relationships with institutions, coaches and others in a continuing effort to address threats to college sports proactively**.

www.StudentAthletePay.com

**COMMITTEE ON INFRACTIONS**

**The Division I Committee on Infractions, which decides cases brought by the enforcement group,** has focused on improving efficiencies in several areas. **The committee and staff who support it** have made efforts to educate members about the process at regional rules seminars and conference meetings. They have heightened focus on timeliness and docket management and have increasingly relied on guidelines and data to drive decisions and streamline processes. The committee also has heightened its focus on consistency. Not only has it operated within prescribed penalty guidelines, but also it has engaged in ongoing efforts to review violation and penalty data.

**INFRACTIONS APPEALS COMMITTEE**

The Infractions Appeals Committee is undergoing important change as well. **In the spring, the NCAA office serving the committee appointed its first managing director. The office soon will expand by two staffers, who will be able to offer committee members unprecedented support.**

NCAA Division I Infractions Annual Report | 2017-18, at Infractions Snapshot, available on NCAA.org at: http://www.NCAA.org/sites/default/files/18-00697%20NCAA%20Infractions%20Annual%20Report_Final_150dpi.pdf. (emphasis supplied).

178.    The NCAA employs a Vice President for Enforcement. *Id.*

179.    58 percent of NCAA Enforcement Staff hold law degrees. *Id.*, at 12.

180.    30 percent of NCAA Enforcement Staff have prior experience in a professional investigative role. *Id.*

181.    In addition to three NCAA staff members supporting the NCAA D1 Infractions Appeal Committee referenced in the Infractions Snapshot, *see* Paragraph 177, *supra*, the NCAA D1 Committee on Infractions is supported by eight NCAA staff members who "provide the group case management support, research, drafting, strategic planning

-61-

and administrative support, and other duties as assigned by the committee chair." *Id.,* at 17.

182.   The NCAA D1 Manual describes investigative and prosecutorial duties of NCAA Enforcement Staff in detail, including, among others duties:

> **19.5.1 Enforcement Staff to Receive Information and Conduct Investigations.** Information regarding an alleged failure to comply with the NCAA constitution and bylaws or to meet the conditions and obligations of membership shall be provided to the enforcement staff. The enforcement staff shall determine whether an investigation is warranted or whether the matter may be resolved without a formal investigation.  If an investigation is warranted, the enforcement staff shall conduct an investigation on behalf of the entire membership to develop, to the extent reasonably possible, all relevant information ....
>
> *****
>
> **19.7.1 Notice of Allegations.** If the enforcement staff determines after an investigation that there is sufficient information to conclude that a hearing panel of the Committee on Infractions could conclude that a violation occurred, it shall issue a cover letter and notice of allegations to the chancellor or president of the institution involved (with copies to the faculty athletics representative, the director of athletics and the executive officer of the conference of which the institution is a member). The institution and/or involved individuals, if applicable, shall be given notice of the alleged violation(s), the details of the allegations, the possible level of each alleged violation, the processing level of the case, the available hearing procedures and the opportunity to answer the allegations. The notice of allegations shall also identify the factual information and aggravating and/or mitigating factors on which the enforcement staff may rely in presenting the case ....
>
> **19.7.3 Submissions by Enforcement Staff.** Within 60 days after the institution and involved individuals, if any, submit written responses to the notice of allegations, the enforcement staff shall submit a written reply to the hearing panel, and pertinent portions to an involved individual or institution. In addition to submitting its reply and after the prehearing conference, the enforcement staff shall prepare a

www.StudentAthletePay.com

statement of the case, which shall set forth a brief history of the case, summary of the parties' positions on each allegation and a list of any remaining items of disagreement. An involved individual will be provided those portions of the statement in which he or she is named.

**19.7.4 Prehearing Conference.** Within 60 days after the institution and involved individuals, if any, submit written responses to the notice of allegations, the enforcement staff shall consult with institutional representatives and other involved individuals in order to clarify the issues to be discussed during the hearing, make suggestions regarding additional investigation or interviews that should be conducted to supplement a response and identify allegations that the staff intends to amend or withdraw. The enforcement staff shall conduct independent prehearings with the institution and/or any involved individuals, unless mutually agreed by all parties to do otherwise.

*****

**19.7.7.5 Appearance of Individuals at Hearings.** Except as otherwise provided herein or as ordered by the chief hearing officer, hearing attendees shall be limited to institutional representatives (Bylaw 19.7.7.5.2), involved individuals, enforcement staff representatives, hearing panel members, representatives from the office of the Committees on Infractions, representatives from the NCAA office of legal affairs, the audio recorder, court reporter and other technical/support staff as permitted by the chief hearing officer.

*****

**19.10.3 Written Materials on Appeal ....**

**19.10.3.2 Response by Committee Appeals Advocate.** Within 30 days after receipt of an initial submission in support of its appeal by an institution or involved individual, the committee appeals advocate shall submit a response to the Infractions Appeals Committee ....

**19.10.3.4 Enforcement Staff Statement.** Within 10 days after the deadline for submission of all rebuttals, the enforcement staff may provide a written statement to the Infractions Appeals Committee regarding perceived new information, errors, misstatements and omissions relating to the initial submission(s), the

www.StudentAthletePay.com

committee appeals advocate's response and/or rebuttal documents.

**19.10.5 Appeal Arguments.** If one or more of the appealing parties request an appeal oral argument, an appeal oral argument may be conducted as set forth below, subject to procedures promulgated by the Infractions Appeals Committee or as otherwise directed by the committee.

> (a) Only those individuals identified in Bylaw 19.7.7.5 may attend the appeal oral argument ....

183.    The NCAA Enforcement Staff has authority to enter into "plea deals" as to Level I and II violations,[13] and to prescribe, or waive, penalties as to Level III violations:[14]

---

[13]   Level I and Level II violations include:

**19.1.1 Severe Breach of Conduct (Level I Violation).** A severe breach of conduct is one or more violations that seriously undermine or threaten the integrity of the NCAA Collegiate Model, as set forth in the constitution and bylaws, including any violation that provides or is intended to provide a substantial or extensive recruiting, competitive or other advantage, or a substantial or extensive impermissible benefit. Among other examples, the following, in appropriate circumstances, may constitute a severe breach of conduct:

> (a) Lack of institutional control;
>
> (b) Academic misconduct;
>
> (c) Failure to cooperate in an NCAA enforcement investigation;
>
> (d) Individual unethical or dishonest conduct, regardless of whether the underlying institutional violations are considered Level I;
>
> (e) A Bylaw 11.1.1.1 violation by a head coach resulting from an underlying Level I violation by an individual within the sports program;
>
> (f) Cash payment or other benefits provided by a coach, administrative or representative of the institution's athletics interests intended to secure, or which resulted in, enrollment of a prospective student-athlete;
>
> (g) Third-party involvement in recruiting violations in which institutional officials knew or should have known about the involvement;
>
> (h) Intentional violations or reckless indifference to the NCAA constitution and bylaws; or
>
> (i) Collective Level II and/or Level III violations.

**19.1.2 Significant Breach of Conduct (Level II Violation).** A significant breach of conduct is one or more violations that provide or are intended to provide more than a minimal but less than a substantial or extensive recruiting, competitive or other

www.StudentAthletePay.com

**19.6.1 Summary Disposition Election.** In a case involving Level I or Level II violations, the institution, involved individuals and the enforcement staff may elect to use the summary disposition procedures specified below. To invoke the summary disposition procedures, the enforcement staff, involved individuals, if participating, and the institution must agree to summary disposition ....

*****

**19.11.3 Authority to Prescribe Penalties.** As authorized by the Committee on Infractions, upon a conclusion that one or more Level III violations occurred, the vice president of enforcement, or his or her designee, may determine whether a penalty is warranted and, if

---

advantage; include more than a minimal but less than a substantial or extensive impermissible benefit; or involve conduct that may compromise the integrity of the NCAA Collegiate Model as set forth in the constitution and bylaws. Among other examples, the following may constitute a significant breach of conduct:

   (a) Violations that do not rise to the level of Level I violations and are more serious than Level III violations

   (b) Failure to monitor (such violations will be presumed Level II but may be deemed to be of a Level I nature if the failure is substantial or egregious);

   (c) Systemic violations that do not amount to a lack of institutional control;

   (d) Multiple recruiting, financial aid, or eligibility violations that do not amount to a lack of institutional control;

   (e) A Bylaw 11.1.1.1 violation by a head coach resulting from an underlying Level II violation by an individual within the sport program; or

   (f) Collective Level III violations.

[14] Level III violations include:

**19.1.3 Breach of Conduct (Level III Violation).** A breach of conduct is one or more violations that are isolated or limited in nature; provide no more than a minimal recruiting, competitive or other advantage; and provide no more than a minimal impermissible benefit. Among other examples, the following may constitute a breach of conduct:

   (a) Inadvertent violations that are isolated or limited in nature; or

   (b) Extra-benefit, financial aid, academic eligibility and recruiting violations, provided they do not create more than minimal advantages.

www.StudentAthletePay.com

so, prescribe and announce an appropriate penalty
pursuant to Bylaw 19.9.8.

*Id.*

E.   **The Applicable Joint Employment Test**

184.   The relevant test that courts use in determining whether multiple defendants

jointly employ an individual under the FLSA (and, in this case, the PMWA) is set forth in

*In re Enterprise Rent-A-Car Wage & Hour Emp't Practices Litig.*, 683 F.3d 462

(3d Cir. 2012).[15]

1.   **The *Enterprise Rent-A-Car* Joint Employment Test**

185.   The joint employment test in *Enterprise Rent-A-Car* includes, among

its factors:

    i.   The alleged employer's authority to hire and fire the
relevant employees;

    ii.   The alleged employer's authority to promulgate work
rules and assignments and to set the employees'
conditions of employment: compensation, benefits, and
work schedules, including the rate and method of
payment;

    iii.   The alleged employer's involvement in day-to-day
employee supervision, including employee discipline;
and

    iv.   The alleged employer's actual control of employee
records, such as payroll, insurance, or taxes.

*Enterprise Rent-A-Car*, 683 F.3d at 469.

---

[15]   *But see, also, North American Soccer League v. NLRB*, 613 F.2d 1379, 1382 (5th Cir. 1980)
(finding joint employment under the National Labor Relations Act in a sports league where, "the
League exercises a significant degree of control over essential aspects of the [member] clubs' labor
relations, including but not limited to the selection, retention, and termination of the players, the
terms of individual player contracts, dispute resolution and player discipline," and "each [member]
club granted the [League] authority over not only its own labor relations but also, on its behalf,
authority over the labor relations of the other member clubs.")  The National Labor Relations Act
applied in *North American Soccer League* actually defines employer more narrowly than the FLSA.
*See Enterprise Rent-A-Car*, 683 F.3d at 467-68 ("the FLSA defines employer 'expansively,' and with
'striking breadth.'  The Supreme Court has even gone so far as to acknowledge that the FLSA's
definition of an employer is 'the broadest definition that has ever been included in any one act.'")

186.    An analysis under this test demonstrates that Mr. Johnson and the members of the Proposed FLSA Collective (as defined *infra*, Paragraphs 250 and 251) and the Proposed Pennsylvania Class (as defined *infra*, Paragraphs 261 and 262) were/are all jointly employed by Defendants and the Proposed Defendant Class (as defined *infra*, Paragraph 293) under the applicable law.

i.    ***Enterprise Rent-A-Car* Factor No. 1**
The alleged employer's authority to hire and fire the relevant employees

187.    An NCAA D1 member school does **not** have unilateral discretion to recruit, hire, suspend or fire Student Athletes pursuant to a myriad of NCAA bylaws set forth in the NCAA D1 Manual, including:

- NCAA D1 Bylaw Article 10 Ethical Conduct
- NCAA D1 Bylaw Article 12 Amateurism and Athletics Eligibility
- NCAA D1 Bylaw Article 13 Recruiting
- NCAA D1 Bylaw Article 14 Academic Eligibility
- NCAA D1 Bylaw Article 15 Financial Aid
- NCAA D1 Bylaw Article 17 Playing and Practice Seasons

*See, e.g.*, Summary of NCAA Eligibility Regulations – NCAA Division I, attached hereto as Exhibit S.

188.    NCAA D1 member schools are required to use the **NCAA Eligibility Center** to determine the initial eligibility of a prospective Student Athlete. *See* NCAA D1 Bylaws 12.1.1.1 Amateurism Certification Process and 14.1.2.5 NCAA Eligibility Center.

www.StudentAthletePay.com

189.    Recruitment of prospective Student Athletes by NCAA D1 member schools is subject to numerical limitations on, among other things:

- Contacts, defined as "any face to face encounter between a prospective student-athlete or the prospective student-athlete's parents, relatives or legal guardians ... regardless of whether any conversation occurs. *See, e.g.,* NCAA D1 Bylaws 13.02.4 and 13.1.5.

- Evaluations, defined as "any off-campus activity designed to assess the academic qualifications or athletics ability of a prospective student-athlete." *See, e.g.,* NCAA D1 Bylaws 13.02.7 and 13.1.7.

- Telephone Calls. *See, e.g.,* NCAA D1 Bylaw 13.1.3.1.8 ("Once an institution reaches the applicable limit on telephone calls to a prospective student-athlete [] for a particular time period [], the institution may not initiate an additional telephone call during the same time period, even if no direct conversation occurs during the additional call (e.g., voicemail message).")

190.    Recruiting Contacts, Evaluations and Telephone Calls are further restricted to "Periods of Recruiting Activities," including:

**Contact Period**. A contact period is a period of time when it is permissible for authorized athletics department staff members to make in-person, off-campus recruiting contacts and evaluations.

**Evaluation Period**. An evaluation period is a period of time when it is permissible for authorized athletics department staff members to be involved in off-campus activities designed to assess the academic qualifications and playing ability of prospective student-athletes. No in-person, off-campus recruiting contacts shall be made with the prospective student-athlete during an evaluation period.

**Quiet Period**. A quiet period is a period of time when it is permissible to make in-person recruiting contacts only on the institution's campus. No in-person, off-campus recruiting contacts or evaluations may be made during the quiet period.

www.StudentAthletePay.com

> **Dead Period.** A dead period is a period of time when it is not permissible to make in-person recruiting contacts or evaluations on or off the institution's campus or to permit official or unofficial visits by prospective student-athletes to the institution's campus. It remains permissible, however, for an institutional staff member to write or telephone a prospective student-athlete during a dead period.

NCAA D1 Bylaw 13.02.5.

191.    NCAA D1 member schools are prohibited from offering certain inducements to recruit prospective Student Athletes. *See* NCAA D1 Bylaw 13.2.1.1.

192.    NCAA D1 member schools are subject to annual limitations on the total number and value (equivalencies) of athletic scholarships, per sport, that can be offered to recruit prospective Student Athletes or retain Student Athletes. *See* NCAA D1 Bylaw 15.5.

193.    Through the 2017-18 academic year, an NCAA D1 member school had to request permission to recruit a prospective transfer Student Athlete attending another school – *from the attended school*. *See* 2017-18 NCAA D1 Bylaw 13.1.1.3.

194.    Through the 2017-18 academic year, permission to recruit a prospective transfer Student Athlete attending another school could be denied by the attended school, or conditioned by the attended school on the inability to offer an athletic scholarship to the prospective transfer Student Athlete for one academic year. *Id.*

195.    After the 2017-18 academic year, NCAA D1 member schools may still separately adopt NCAA member conference rules that require permission to recruit a prospective transfer Student Athlete. *See* Paragraph 159, *supra*.

196.    Even if an NCAA D1 member school is cleared to hire a transfer Student Athlete, the transfer Student Athlete ordinarily is **not** permitted to work for her/his new school for one academic year after the transfer. *See* NCAA D1 Bylaw 14.5.5.

197.    NCAA D1 member schools are *continually* "responsible for certifying the eligibility of student-athletes under the terms of the constitution, bylaws or other legislation of the Association before permitting a student-athlete to represent the institution in intercollegiate competition." *See* NCAA D1 (Constitution) Bylaw 3.2.4.3.

198.    As part of their *continual* responsibility for certifying Student Athlete eligibility, NCAA D1 member schools are "obligated immediately to apply all applicable rules and withhold ineligible student-athletes from all intercollegiate competition." *Id.*

199.    Failure to comply with NCAA bylaws related to recruiting, hiring, suspending or firing Student Athletes, or to the *continual* responsibility to certify Student Athlete eligibility, ordinarily constitutes a Level III violation. *See* NCAA D1 Bylaw 19.1.3 (b).

200.    For a Level III violation, NCAA Enforcement Staff may seek, or prescribe, the following penalties:

- Preclude Hiring ("Termination of the recruitment of a prospective student-athlete by the institution ..."); or
- Require Suspension or Firing ("not allow the student-athlete to participate in intercollegiate athletics unless and until his or her eligibility is restored by the Committee on Student-Athlete Reinstatement ...")

*See* NCAA D1 Bylaws 19.9.8(a) and 19.11.3.

201.    Multiple violations of NCAA bylaws related to recruiting, hiring, suspending or firing Student Athletes, or to the *continual* responsibility to certify Student Athlete eligibility, could constitute either a Level I or II violation. *See* NCAA D1 Bylaws 19.1.1(i) and 19.1.2(d).

202.    For Level I or II violations, NCAA Enforcement Staff may seek, or agree to, penalties including, but not limited to:

- Competition Penalties (*i.e.*, limitations on postseason)
- Financial Penalties

www.StudentAthletePay.com

- Scholarship Reductions
- Head Coach Restrictions
- Recruiting Restrictions

*See* NCAA D1 Bylaw 19.9.5.

    ii.    ***Enterprise Rent-A-Car* Factor No. 2**
        The alleged employer's authority to promulgate work rules and
        assignments and to set the employees' conditions of employment:
        compensation, benefits, and work schedules, including the rate and
        <u>method of payment</u>

    203.    An NCAA D1 member school does **not** have unilateral discretion to set

conditions of Student Athlete employment, *e.g.*, pay, benefits, rules, assignments, schedules

and tenure, pursuant to a myriad of NCAA bylaws set forth in the NCAA D1 Manual,

including:

- NCAA D1 Bylaw Article 12 Amateurism and Athletics Eligibility
- NCAA D1 Bylaw Article 16 Awards, Benefits and Expenses for Enrolled Student-Athletes
- NCAA D1 Bylaw Article 17 Playing and Practice Seasons

    204.    NCAA D1 member schools are prohibited from offering a salary, gratuity or

compensation, or division or split of surplus (*e.g.*, bonuses, game receipts), to Student Athletes.

*See* NCAA D1 Bylaw 12.1.2.1.

    205.    Permissible benefits (*e.g.*, participation awards of limited value not for resale;

complimentary tickets not for resale; snacks and nutritional supplements; and entertainment)

and *non*-permissible benefits (*e.g.*, loan; automobile or use of one; and transportation) are

enumerated in NCAA D1 Bylaw Article 16.

www.StudentAthletePay.com

206.     Mandatory benefits are also enumerated, including academic counseling/ support services; life skills programs; medical treatment by a designated team physician; and insurance coverage for medical expenses resulting from athletically related injuries of equal or greater value than the deductible of the NCAA catastrophic injury insurance program. *See* NCAA D1 Bylaw 16.3.1 and (Constitution) Bylaws 3.2.4.8 and 3.2.4.16.

207.     NCAA D1 member schools are required to administer a drug testing program for Student Athletes. *See* NCAA D1 (Constitution) Bylaw 3.2.4.7.

208.     Playing and Practice Seasons and Off-Seasons, for all sports, are regulated under NCAA D1 Bylaw Article 17, including, among other regulations:

- Enumeration of Required Athletically Related Activities:
  - (a) Compliance meetings
  - (b) Organized team promotional activities
  - (c) Recruiting activities
  - (d) Media activities
  - (e) Fundraising events
  - (f) Community service events
  - (g) Team-building activities
  - (h) Travel to and from away-from-home competition.

  *See* NCAA D1 Bylaw 17.02.14.

- Limitations on Countable Athletically Related Activities (CARA) (*i.e.*, activities supervised by school staff):
  - 4 hours per day and 20 hours per week during Playing and Practice Season
  - 8 hours per week during the Off-Season
  - Prohibiting CARA during a continuous 8 hours between 9 p.m. and 6 a.m.
  - Requiring one day off during a 7 day week in Playing and Practice Season

www.StudentAthletePay.com

- Requiring a 7 day break after Playing and Practice Season and 14 more days off during the academic year

*See* NCAA D1 Bylaws 17.7.7.1, 17.1.7.2, 17.1.7.4, 17.1.7.8, 17.1.7.9.6, and 17.1.7.9.7.

- Recording of CARA hours on timesheets maintained by supervising school staff.

*See* NCAA D1 Bylaw 17.1.7.3.4.

209.   An NCAA D1 member school may **not** permit a Student Athlete to represent it in an NCAA sport once the Student Athlete has participated in that NCAA sport four seasons; moreover, the Student Athlete must complete those four seasons within five years from the first semester or quarter s/he first registered at a school (*i.e.*, the "Five Year Rule"). *See* NCAA D1 Bylaw 12.8.

210.   Failure to comply with NCAA bylaws related to work rules, assignments, schedules and tenure ordinarily may constitute a Level II or III violation. *See* NCAA D1 Bylaws 19.1.2(a), (b), (c), and (f), and 19.1.3; Paragraphs 200 through 202, *supra*, regarding penalties that the NCAA Enforcement Staff may seek, agree to, or prescribe.

211.   Cash payment or other benefits provided by a coach, administrative or representative of the institution's athletics interests is considered a Severe Breach of Conduct and Level I violation. *See* NCAA D1 Bylaw 19.1.1(f); Paragraph 202, *supra*, regarding penalties that the NCAA Enforcement Staff may seek or agree to.

iii.   ***Enterprise Rent-A-Car* Factor No. 3**
The alleged employer's involvement in day-to-day employee supervision, including employee discipline

212.   An NCAA D1 member school does **not** have unilateral discretion to discipline Student Athletes because NCAA bylaws: (i) restrict the grounds for a school to reduce or cancel an athletic scholarship during the period of its award to only disciplinary reasons; (ii) require suspension or firing of a Student Athlete if s/he has violated any bylaw related to

-73-

eligibility; and (iii) subject a school's "home team" Student Athletes to discipline meted out by NCAA Enforcement Staff and/or panels of the peer-review NCAA D1 Committees on Infractions and Infractions Appeals composed of representatives from competing schools. *See* NCAA D1 Bylaws 12.11.1, 15.3.4.2, 15.3.4.3, 19.3.4 and 19.4.3; and Paragraphs 169 through 183, *supra.*

213.   An NCAA D1 member school may reduce or cancel an athletic scholarship during the period of its award for the following disciplinary reasons if the recipient:

  (a) "Renders himself or herself ineligible for intercollegiate competition"

  (b) "Fraudulently misrepresents any information on an application, letter of intent or financial aid agreement"

  (c) "Engages in serious misconduct warranting substantial disciplinary penalty (e.g., "found to have engaged in misconduct by the university's regular student disciplinary authority, even if the loss-of-aid requirement does not apply to the student body in general")"

*See* NCAA D1 Bylaws 15.3.4.2 and 15.3.4.2.4.

214.   An NCAA D1 member school may **not** reduce or cancel an athletic scholarship during the period of its award on the basis of the Student Athlete's athletics ability, performance or contribution to a team's success. *See* NCAA D1 Bylaw 15.3.4.3.

215.   NCAA D1 member schools are required to *continually* verify and certify the eligibility of Student Athletes under NCAA bylaws before permitting them to participate in NCAA competition, and are obligated to immediately suspend or fire Student Athletes determined to be ineligible *by the school*, subject to penalties sought, agreed to, or prescribed by NCAA Enforcement Staff. *See* Paragraphs 197 through 202, *supra.*

216.   If a Student Athlete is determined to be ineligible through action brought by the NCAA Enforcement Staff, the attended NCAA D1 member school is required to suspend or fire that Student Athlete upon notice of the violation. *See* NCAA D1 Bylaw 19.9.11.

www.StudentAthletePay.com

217.    If, after notice, an NCAA D1 member school fails to suspend or fire a Student Athlete determined to be ineligible through action brought by the NCAA Enforcement Staff, the attended NCAA D1 member school is "required to show cause to the Committee on Infractions why additional penalties should not be prescribed for a failure to abide by the conditions and obligations of membership." *Id.*

218.    A Show-Cause Order for failure to suspend or fire a Student Athlete determined to be ineligible through action brought by the NCAA Enforcement Staff constitutes a Level I or II violation and penalty.  *See* NCAA D1 Bylaw 19.9.5.4.

219.    In addition to the suspension or firing of a Student Athlete determined to be ineligible through action brought by the NCAA Enforcement Staff, the individual records and performances of the ineligible Student Athlete may be vacated and individual awards of the ineligible Student Athlete may be required to be returned.  *See* NCAA D1 Bylaw 19.9.7(g)(1) and (3).

220.    Furthermore, an NCAA D1 member school's "home team" Student Athletes are subject to discipline meted out by NCAA Enforcement Staff and/or panels of the peer-review NCAA D1 Committees on Infractions and Infractions Appeals composed of representatives from competing schools having no conflicts of interest, *i.e.*, not "directly connected with an institution under investigation." *See* Paragraphs 169 through 183, *supra*; NCAA D1 Bylaws 19.3.4 and 19.4.3.

iv.    ***Enterprise Rent-A-Car* Factor No. 4**
The alleged employer's actual control of employee records, such as payroll, insurance, or taxes

221.    The **NCAA Eligibility Center** maintains all records related to the initial determination of Student Athlete eligibility.  *See, e.g.,* NCAA D1 Bylaws 12.1.1.1 Amateurism Certification Process and 14.1.2.5 NCAA Eligibility Center.

www.StudentAthletePay.com

222.    An NCAA D1 member school is required to provide the NCAA Eligibility Center with any additional information if the school "has cause to believe that a prospective student-athlete's amateur status has been jeopardized" and report to the Eligibility Center "all discrepancies in information related to a student-athlete's amateurism certification." *See* NCAA D1 Bylaws 12.1.1.1.2.2.

223.    Pursuant to a Student Athlete consent form, the NCAA receives, and maintains, records regarding any injury, illness, or medical treatment related to or affecting a Student Athlete's training for and participation in NCAA sports. *See* NCAA Student-Athlete Authorization/Consent for Disclosure of Protected Health Information for NCAA-Related Research Purposes, attached hereto as Exhibit T.

224.    NCAA D1 member schools are required to make certain records available for examination upon request to the NCAA, including:

- Student-Athlete Statement.

    Prior to participation in intercollegiate competition each academic year, a student-athlete shall sign a statement in a form prescribed by the Council in which the student-athlete submits information related to eligibility, recruitment, financial aid, amateur status, previous positive-drug tests administered by any other athletics organization and involvement in organized gambling activities related to intercollegiate or professional athletics competition under the Association's governing legislation. Failure to complete and sign the statement shall result in the student-athlete's ineligibility for participation in all intercollegiate competition.

    *See* NCAA D1 Bylaws 12.7.2 and 12.7.2.2(b)

- Drug-Testing Consent Form.

    *See* NCAA D1 Bylaws 12.7.3 and 12.7.3.2(c).

- Squad List.

    To be eligible to represent an institution in intercollegiate athletics competition, a student-athlete shall be included on the institution's squad-list form.

-76-

*See* NCAA D1 Bylaws 15.5.11 and 15.5.11.2.1(a).

225.    Furthermore, as part of "Expectations and Shared Responsibility" under the
NCAA D1 Bylaw Article 19 Infractions Program, NCAA D1 member schools are required to
produce all Student Athlete records relevant to, or are requested for, any investigation
conducted by NCAA Enforcement Staff and/or panels of the peer-reviewed NCAA D1
Committees on Infractions and Infractions Appeals composed of representatives from
competing schools having no conflicts of interest, *i.e.*, not "directly connected with an
institution under investigation." *See* Paragraphs 169 through 183, *supra*; NCAA D1
Bylaws 19.2.3, 19.3.4 and 19.4.3.

## IV.    STUDENT ATHLETES ARE *NOT* EXEMPT FROM THE PROTECTIONS OF WAGE AND HOUR LAWS

226.    The FLSA does **not** include, among its employee exemptions, any reference to
"amateurism," "amateur," "athletic," "athlete" or "student athlete." *See* 29 U.S.C. § 213.

227.    Student Athletes do **not** meet criteria for volunteer status under the FLSA.
*See* 29 U.S.C. § 203(e)(4);[16] 29 U.S.C. § 203(e)(5);[17] FOH § 10b03(c).[18]

---

[16]   29 U.S.C. § 203(e)(4) exempts:

> any individual who **volunteers** to perform services for a public agency
> which is a State, a political subdivision of a State, or an interstate
> governmental agency, if the individual receives no compensation or is
> paid expenses, reasonable benefits, or a nominal fee to perform the
> services for which the individual **volunteered**; and such services are
> not the same type of services which the individual is employed to
> perform for such public agency.

(emphasis supplied).

The Code of Federal Regulations further elaborates:

> An individual who performs hours of service for a public agency for
> civic, charitable, or humanitarian reasons, without promise,
> expectation or receipt of compensation for services rendered, is
> considered to be a **volunteer** during such hours ....

29 CFR § 553.101. (emphasis supplied).

[17]   29 U.S.C. § 203(e)(5) exempts:

## V.   DEFENDANTS' VIOLATIONS OF THE WAGE AND HOUR LAWS ARE WILLFUL

### A.   The *Livers v. NCAA* Willfulness Test

228.   The *Livers* Court articulated a two-step test for evaluating the willfulness of NCAA and NCAA member school conduct:

> 1.   Did Defendants rely on the U.S. Department of Labor Field Operations Handbook ("FOH") § 10b03(e) in failing to classify and pay Student Athletes as employees?

---

> individuals who **volunteer** their services solely for humanitarian purposes to private non-profit food banks and who receive from the food banks groceries.

(emphasis supplied).

[18]   FOH § 10b03(c) states, in relevant part:

> In many cases the nature of **religious, charitable, and similar nonprofit organizations and schools** is such that individuals may **volunteer** their services in one capacity or another, usually on a part-time basis, **not as employees or in contemplation of pay for the services rendered.** For example, members of civic organizations may help out in a sheltered workshop; women's organizations may send members or students into hospitals or nursing homes to provide certain personal services for the sick or the elderly; mothers may assist in a school library or cafeteria as a public duty to maintain effective services for their children; or fathers may drive a school bus to carry a football team or band on a trip. Similarly, individuals may volunteer to perform such tasks as driving vehicles or folding bandages for the Red Cross; working with children with disabilities or disadvantaged youth; helping in youth programs as camp counselors, scoutmasters, or den mothers; providing child care assistance for needy working mothers; soliciting contributions or participating in benefit programs for such organizations; and **volunteering other services needed to carry out their charitable, educational, or religious programs.** The fact that services are performed under such circumstances is not sufficient to create an employer-employee relationship.

(emphasis supplied).  *See, e.g.*, *Acosta v. Cathedral Buffet, Inc.*, 887 F.3d 761, 766-69 (6th Cir. 2018) ("[W]hen a **religious organization** undertakes a commercial endeavor, its workers are only covered under the FLSA if they 'engage in those activities in expectation of compensation.' *Tony & Susan Alamo Found. v. Sec'y of Labor*, 471 U.S. 290, 302 (1985) …. The [FLSA] does not go so far as to regulate when, where, and how a person may volunteer her time to her church. After all, the giving of one's time and money through religious obligation is a common tenet of many faiths …. *[S]piritual coercion* cannot stand in for the economic coercion that the FLSA and the *Alamo* decision require.") (emphasis supplied); *Tony & Susan Alamo Found.* ("volunteers" for a **religious foundation** – former "drug addicts, derelicts, or criminals before their conversion and rehabilitation by the Foundation" – were economically coerced to perform services in order to continue receiving in-kind benefits upon which they were dependent, incl. food, clothing and shelter; thus, these "volunteers" were in fact employees.)

-78-

2. If the Answer to No. 1 is "Yes," had such reliance been reasonable in light of:

    (a) the requirement in FOH § 10b03(e) that an activity be "conducted primarily for the benefit of the participants as part of the educational opportunities provided to the students by the school" in order for the activity not to be work of the kind contemplated by the FLSA, *e.g.*, student-run groups, such as student-run, interscholastic Club Sports; and/or

    (b) similarities between Student Athlete performance outside the classroom and that of students involved in Work Study.

*Livers*, 2018 U.S. Dist. LEXIS 124780, at *11-13.[19]

---

[19]    The *Livers* Court concluded, in relevant part:

> **The Amended Complaint plausibly states a willful FLSA violation sufficient to survive at the Motion to Dismiss stage.** Plaintiff has added an allegation to the Amended Complaint that NCAA member schools understood that Scholarship Athletes are directly comparable to students employed in work study programs, individuals who are classified as employees under the FLSA. The Amended Complaint includes detailed factual allegations comparing and contrasting Scholarship Athletes and students involved in work study programs in order to demonstrate that Scholarship Athletes' performance outside the classroom is similar in many ways to that of students involved in work study, and in fact that it is more arduous and time consuming. The Amended Complaint also includes detailed factual allegations contrasting the experience of Scholarship Athletes and students involved in work study programs to that of students involved in student-run groups, to demonstrate that this latter group is subject to much less discretionary control by college supervisory staff, and **that members of student-run groups often engage in activity related to educational programming in the course of participation in these groups whereas the Scholarship Athlete and work study experience is strictly non-academic in nature.** Finally, Villanova's website, like the websites of many other NCAA member schools, excludes NCAA athletics from its directory of student-run groups.

> **These allegations permit the plausible inferences that Scholarship Athletes, like their work study counterparts, fall within employee status under the FLSA, and that Defendants Villanova and the NCAA were aware of this when they chose not to pay them, suggesting reckless disregard of the alleged duty.**

> In his Amended Complaint Plaintiff also alleges new facts dealing with willfulness and the FOH guidance at issue. Plaintiff's allegation that over the course of a decade-plus public debate during which college administrators, athletic directors, and coaches have publicly asserted

-79-

229.    An analysis under this test demonstrates that Defendants and the Proposed

Defendant Class (as defined *infra*, Paragraph 293) have been violating wage and hour laws

*willfully*.

      1.      **Defendants *Never* Relied upon DOL FOH § 10b03(e) in Failing
to Classify and Pay Student Athletes As Employees**

230.    In *Livers (Phillips) v. NCAA*, the NCAA and Villanova asserted, during a

"willfulness" hearing on November 1, 2018, that they had relied upon FOH § 10b03(e) in

failing to classify and pay Student Athletes as employees:

> COURT:    Mr. Katz, did your clients rely on the FOH?
> Do you want – can you answer that?
>
> MR. KATZ:    Well, yes, Your Honor.  Certainly the FOH
> is part of the legal background against
> which my clients made their decisions.

*Livers v. NCAA*: Mot. Hr'g Tr., Nov. 1, 2018 (ECF 97), at 16:7-11.

231.    Plaintiff Phillips then served the NCAA and Villanova with Second Requests

for Production of Documents on February 1, 2019, including Request No. 1:

> All Communications and Documents referring or related
> to FOH § 10b03(e) that also refer to or relate in any way
> to classification of student athletes as school employees.

---

reasons for the refusal to pay student athletes a wage, no such person
has ever professed reliance on Section 10b03(e) as one such
justification, casts doubt on the argument that the existence of the
FOH guidance makes Defendants' decision in this regard reasonable.

**More specifically, these allegations permit a plausible inference
that Defendants did not rely on the FOH guidance in making
this decision. As such, at the Motion to Dismiss stage it remains
an open fact question what impact, if any, the FOH guidance
had on Defendants' thought process and reasoning behind the
decision not to pay Plaintiff and other student athletes. This
Court cannot say, at this stage, that the existence of the FOH
guidance renders Defendants' decision reasonable, and
therefore not a willful violation of the FLSA, as a matter of law.**

(emphasis supplied).

www.StudentAthletePay.com

*See* Defs.' Objections to Pl.'s Second Set of Doc. Reqs., at No. 1, attached hereto as Exhibits J and K.

232.   In response to Plaintiff Phillips' Second Requests for Production of Documents, No. 1, the NCAA and Villanova admitted that they, *in truth*, **never** relied upon FOH § 10b03(e) in failing to classify and pay Student Athletes as employees:

> [A]fter a diligent search and reasonable inquiry, **no responsive documents** exist within Defendant's possession, custody, or control.

*Id.* (emphasis supplied).

### 2.   At All Relevant Times, Defendants Understood That FOH § 10b03(e) Applies to Student-Run Groups (incl. Interscholastic Club Sports), *But Not to NCAA Sports*

233.   In any event, FOH § 10b03(e) clearly does **not** apply to NCAA Sports.

234.   FOH § 10b03(e) states, in relevant part:

> As part of their overall educational program, public or private schools and institutions of higher learning may permit or require students to engage in activities in connection with dramatics, student publications, glee clubs, bands, choirs, debating teams, radio stations, intramurals and interscholastic athletics and other similar endeavors.   Activities of students in such programs, **conducted primarily for the benefit of the participants as part of the educational opportunities provided to the students** by the school or institution, are not work of the kind contemplated by section 3(g) of the Act and do not result in an employer-employee relationship between the student and the school of institution.

(emphasis supplied).

235.   For the reasons set forth in Paragraphs 56 through 125, *supra*, at all relevant times, Defendants understood that NCAA sports are **not** "conducted primarily for the benefit of the participants as part of the educational opportunities provided to the students" as required to meet the criteria set forth in FOH § 10b03(e).

-81-

236. The NCAA and Villanova admit student-run groups meet the criteria set forth in FOH § 10b03(e). *See Livers (Phillips) v. NCAA*: Answer (ECF 130), at ¶ 119 and 120.

237. For reasons set forth in Paragraphs 238 through 242, *infra*, student-run groups are "conducted primarily for the benefit of the participants as part of the educational opportunities provided to the students." *See* FOH § 10b03(e).

238. The NCAA and Villanova admit that student-run groups such as dramatics, publications, glee clubs, bands, choirs, debate and radio stations can be related or relevant to an academic degree program. *See Livers (Phillips) v. NCAA*: Answer (ECF 130), at ¶ 106.

239. The NCAA and Villanova admit that students in student-run groups can be solely or principally responsible for leadership, organization and decision-making and faculty involvement in student-run groups can be in an *advisory* capacity. *Id.*, at ¶ 103.

240. NCAA D1 member schools, like Villanova, characterize *student*-leadership, *student*-organizing, and *student*-decision-making in student-run groups as providing educational benefits to participants and also encourage and/or recognize the connection of some student-run groups to academic faculty advisors and/or academic departments. *See, e.g., Livers (Phillips) v. NCAA*: Villanova's Resp. to Pl.'s First Set of Reqs. for Admis. (Ex. F), at No. 6.

241. In fact, NCAA D1 member schools describe *student*-leadership, *student*-organizing and *student*-decision-making in **student-run interscholastic Club Sports** as educational experiences distinctly different from NCAA sports. For example (as posted October 28, 2017, and memorialized in *Livers v. NCAA* and Exhibit U attached hereto):

> **Lafayette College**
>
> Sports clubs at Lafayette are student-initiated and student-run organizations that depend on a membership. Members are fully involved in the club's leadership, decision-making, and organization. Each club has been

founded and is governed by the executive board of that
particular club.

*See* Sports Clubs on Lafayette.edu at
https://recreation.lafayette.edu/sportsclubs/.

> Varsity sports [*i.e.*, NCAA sports] are sponsored by the
> College and funded through the operating budget, NCAA
> funding, revenue generated through various events, and
> gifts from generous donors. Sports clubs are not
> sponsored by the college, but by Student Government in
> response to student interest and initiative. The primary
> sources of funding for sports clubs are student activity
> fees (distributed at the discretion of Student
> Government), sport club member dues, fundraising
> activities, and gifts from generous donors.

> Unlike varsity sports, sport clubs are student-run
> organizations who decide for themselves their level of
> competitiveness, whether or not they will hire a coach or
> instructor, how often they will practice, and if they will
> continue to exist at all .... [Sport clubs] participate in
> competitions with clubs from other institutions (in many
> cases as a member of a specific league), and others enter
> a variety of weekend tournaments.

*See* Sport Clubs Frequently Asked Questions on Lafayette.edu
at http://recreation.lafayette.edu/sport-clubs-faqs/.

**Lehigh University**

> [T]he intention is to offer club competition at the
> highest level and student commitment, including
> expanded practice and extramural competitions on a
> regular and formal basis within the club sport model ....

> The primary differences between Club Sports and
> Varsity Intercollegiate Sports [*i.e.*, NCAA athletics] are
> the funding sources associated with participation and
> the wide range of commitment levels regarding time and
> competitiveness. At the intercollegiate level, the
> institution has made the commitment to sponsor the
> sport under NCAA and Patriot League Division I
> guidelines. A Club Sport is one that is initiated and
> must be sustained by student interest. The club is self-
> directed under the Club Sports guidelines with a
> combination of resources from student senate funds,
> dues and/or their own fundraising initiatives.

www.StudentAthletePay.com

*See* Club Sports-Competitive Levels (Club Varsity) on LehighSports.com at
http://www.lehighsports.com/sports/2013/6/3/GEN_0603134752.aspx?id=3.

**Seton Hall University**

> [Club sports] practice regularly and participate in
> extramural competition …. [but] should not be mistaken
> for [NCAA] sports that are also supported by the
> department.  In a club, the members assume the financial
> responsibilities and assist in organization. There are no
> athletic scholarships available for club sport participants.

*See* Club Sports on SHUPirates.com at
http://www.shupirates.com/sports/2016/7/10/recreation-seha-
club-sports-html.aspx.

> Students in each club are responsible for the internal
> organization and conduct of their club …. **The
> management and organization of a club sport is an
> educational experience providing many challenges
> for students, such as: writing their constitution
> and by-laws, conducting club meetings,
> establishing dues to offset club expenditures,
> planning fund raising projects, coordinating
> practices, competition and special events,
> publicizing club events ….**

*See* Club Sport Manual, at 1, on SHUPirates.com at
http://www.shupirates.com/documents/2016/7/14//club%20sport
%20manual%202011%20final.pdf?id=2336. (emphasis
supplied).

**Saint Joseph's University**

> Voluntarily organized by students, club sports exist for
> the purpose of furthering a common interest in a physical
> activity …. Students elect their own officers, draft their
> own constitution, request facility space, get approval for
> and make travel arrangements, schedule contests with
> other teams, develop contracts with officials, fundraise
> and manage their budget.

*See* Club Sports on SJU.edu at
https://sites.sju.edu/recreation/club-sports/.

www.StudentAthletePay.com

(Another member school in the Defendant Class, Mount St. Mary's University, explains that, "running a club sports team is a lot like running your own business." *See* Club Sports on MSMary.edu at http://msmary.edu/student-life/recreation/club-sports/.)

242.    The NEW YORK TIMES similarly described **student-run, interscholastic Club Sports** as educational experiences distinctly different from NCAA sports:

> In intercollegiate club sports, there are no athletic scholarships, no adoring crowds and minimal adult leadership.
>
> Institutional financing is meager and hard work abundant, with dozens of volunteer hours required from the athletes just to put on a single game or match.
>
> **It's college athletics without the pageantry or prerogative, and that's the way athletes in club sports like it. They devise the practices, make the team rules, decide whom to play and when, raise the money for uniforms and game officials, schedule the hotel and travel arrangements and manage the paperwork.**
>
> "It's a ton of work, but we do it because we take ownership of our team," said David Gerstle, the player-coach of Yale's club water polo team, which like most club teams operates largely outside the purview of the university athletic department ....
>
> *****
>
> An estimated two million college students play competitive club sports compared with about 430,000 involved in athletics governed by the National Collegiate Athletic Association and the National Association of Intercollegiate Athletics.
>
> The less restrictive nature of club teams has also been a magnet for the thriving nontraditional sports market .... [C]lub teams are competing for national championships in bass fishing, ballroom dancing and Brazilian martial arts.
>
> Because of this independent and inclusive spirit, competitive club sports have emerged as an alternative to the semiprofessional, regulated, commercial environment of modern, elite college athletics ....
>
> *****

www.StudentAthletePay.com

The ability to balance one's academic, athletic and social life is an apparent draw to the club sports model.  Chip Spear, a volunteer coach for the Yale water polo team, said that one of his players was a member of the Whiffenpoofs, Yale's celebrated a cappella group.

"He misses some practices for their engagements," said Spear, who played water polo at Yale when it was still a varsity sport.  "The team works it out because all practices are not mandatory.  I'm not sure how that would have worked on a varsity team."  Students say they sometimes choose a club sport (like sailing) for cultural or lifestyle reasons or because it was not available in high school (like Ultimate Frisbee).

In either case, the students shape and influence the makeup and philosophy of the team, and tailor their commitment to it.

**College administrators said they put club sports in the same category as student development.**

Bill Pennington, "Rise of College Club Teams Creates a Whole New Level of Success," NEW YORK Times, Dec. 2, 2008. (emphasis supplied).

243.    By contrast to student-run groups, in which NCAA D1 member schools characterize *student*-leadership, *student*-organizing, and *student*-decision-making as educational experiences and benefits for participants, **in Work Study and NCAA sports, full-time school staff *supervise* participants**, *i.e.*, full-time school staff are responsible for managerial leadership, organizing and decision-making.

244.    By contrast to student-run groups and for the reasons set forth in Paragraphs 56 through 125, and 236 through 243, *supra*, at all relevant times, Defendants understood that NCAA sports are **not** "conducted primarily for the benefit of the participants as part of the educational opportunities provided to the students." *See* FOH § 10b03(e).

245.    NCAA D1 member schools, like Villanova, publish student-run group directories on their websites, the hyperlinks to which are incorporated into Defendant NCAA

Division I Websites | Student-Run Interscholastic Club Sports v. NCAA-Regulated Sports, attached hereto as Exhibit U.

246.    NCAA D1 member schools' student-run group directories track the list in FOH § 10b03(e), including dramatics, student publications, glee clubs, bands, choirs, debating teams, radio stations, intramurals and **interscholastic Club Sports**. *Id.*

247.    NCAA D1 member school's student-run group directories *expressly* exclude NCAA sports, and *expressly* distinguish **student-run interscholastic Club Sports** from NCAA sports. *Id.*

248.    NCAA D1 member schools' student-run group directories demonstrate that NCAA D1 member schools understood FOH § 10b03(e) to *only* apply to student-run groups *and* **not** *to NCAA sports. See, also*, Paragraph 236, *supra* (regarding Defendants' admission that student-run groups meet the criteria set forth in FOH § 10b03(e)).

> 3.    **At All Relevant Times, Defendants Understood That Student Athletes Meet Employee Criteria *More* Than Students Employed in Work Study**

249.    For reasons set forth in Paragraphs 34 through 163, *supra*, at all relevant times, Defendants understood that Student Athletes meet employee criteria ***more*** than students in Work Study, who Defendants classified and paid as employees.

### PLAINTIFF'S PROPOSED FLSA COLLECTIVE ACTION ALLEGATIONS

250.    Plaintiff brings Count I (FLSA) of this suit pursuant to the FLSA, 29 U.S.C. § 216(b), as a collective action on behalf of himself and the following similarly situated persons of the Proposed FLSA Collective, defined as:

> All individuals, in all NCAA sports and of both genders, who were identified on any NCAA Squad List maintained by Defendants pursuant to NCAA Division I Bylaws 12.10.2 and/or 15.5.11, at any time within the FLSA statute of limitations and through the date of final judgment (the "Proposed FLSA Collective Period").

251.    The Proposed FLSA Collective and the Proposed Pennsylvania Class, defined at Paragraph 261, *infra*, are collectively referred to as "Student Athletes."

252.    At all relevant times, Plaintiff and the other members of the Proposed FLSA Collective were similarly-situated, had substantially similar job requirements, were not paid any compensation by Defendants under the same common policies, plans and practices, and were subject to Defendants' practice of willfully failing and refusing to pay them at the legally required minimum wage for all hours worked.

253.    Indeed, Defendants admit that Plaintiff and the Proposed FLSA Collective were/are similarly-situated:

> (a) the NCAA and Villanova "admit that the NCAA bylaws apply to all athletes in NCAA sports on an equal basis, and that these bylaws address, among other subjects, recruitment, eligibility, hours of participation, duration of eligibility, and sanctions for noncompliance;" and
>
> (b) the NCAA and Villanova "admit that NCAA bylaws apply to all member schools and are uniformly interpreted and applied to insure a 'level playing field' under threat of sanction for failure to comply."

*Livers (Phillips) v. NCAA*: Answer (ECF 130), at ¶¶ 28, 30 and 44.

254.    Members of the Proposed FLSA Collective on athletic scholarship and those members not on athletic scholarship, *i.e.*, "walk-ons," are also similarly situated because, *inter alia*, the NCAA and Villanova admit that there is "no principled distinction" between scholarship athletes and walk-ons:

> The only "policies and practices" ... which apply only to scholarship athletes are bylaws that set the number of scholarships schools may award, and that permit revocation of scholarships for misconduct (as opposed to revocation of athletic eligibility, which applies to scholarship athletes and walk-ons alike).

*Livers (Phillips) v. NCAA*: Defs.' Mem. in Supp. of Mot. to Dismiss Claim of Taurus Phillips (ECF 109-1), at 4-6. (emphasis supplied).

-88-

255.    During the Proposed FLSA Collective Period, Defendants were fully aware of the duties performed by Plaintiff and the other members of the Proposed FLSA Collective, and that those duties were not exempt from the minimum wage provisions of the FLSA.

256.    As a result of Defendants' conduct as alleged herein, Defendants violated the FLSA by not paying Plaintiff and the other members of the Proposed FLSA Collective the prevailing minimum wage for all hours worked.

257.    Defendants' violations of the FLSA were willful, repeated, knowing, intentional and without a good faith basis, and significantly damaged Plaintiff and the other members of the Proposed FLSA Collective.

258.    As a result of the Defendants' conduct, the Defendants are liable to Plaintiff and the other members of the Proposed FLSA Collective for the full amount of their unpaid minimum wages, plus an additional equal amount as liquidated damages, plus the attorneys' fees and costs incurred by Plaintiff and the other members of the Proposed FLSA Collective.

259.    While the exact number of individuals within the Proposed FLSA Collective is unknown at the present time, upon information and belief, there are tens of thousands of persons similarly-situated to Plaintiff who make up the putative Proposed FLSA Collective during the Proposed FLSA Collective Period.

260.    Pursuant to the Family Educational Rights and Privacy Act, 20 U.S.C. § 1232g ("FERPA"), a/k/a the Buckley Amendment, a student may require a school to not disclose certain "directory information" to third parties, including information necessary to send notice to the tens of thousands of persons similarly-situated to Plaintiff who make up the putative Proposed FLSA Collective.  Accordingly, in order to ensure FERPA compliance, Defendants should be required to send court-approved notice to the other members of the

Proposed FLSA Collective so that each has the opportunity to make an informed decision about whether to participate in this action.

### PLAINTIFF'S PROPOSED PMWA CLASS ACTION ALLEGATIONS

I.    CLASS DEFINITION

261.    Plaintiff brings Counts II (PMWA) and III (Unjust Enrichment) of this suit as a class action pursuant to Fed. R. Civ. P. 23 on behalf of himself and the following Proposed Pennsylvania Class, defined as:

> All individuals, in all NCAA sports and of both genders, who were identified on any NCAA Squad List maintained by Pennsylvania-based Defendants[20] pursuant to NCAA Division I Bylaws 12.10.2 and/or 15.5.11, at any time within the Pennsylvania unjust enrichment statute of limitations and through the date of final judgment (the "Proposed Pennsylvania Class Period").

262.    The Proposed Pennsylvania Class and the Proposed FLSA Collective, defined at Paragraph 250, *supra*, are collectively referred to as "Student Athletes."

263.    The unlawful conduct that the Pennsylvania-based Defendants committed against Plaintiff and the other members of the Proposed Pennsylvania Class, includes, but is not limited to:

- Failing to pay Plaintiff and the members of the Proposd Proposed Pennsylvania Class the prevailing minimum wage under the PMWA;

- Receiving and benefiting from the uncompensated labors of Plaintiff and the other members of the Proposed Pennsylvania Class such that to retain said benefit without compensation would be inequitable and rise to the level of unjust enrichment;

- Devising and implementing a plan to increase the Pennsylvania-based Defendants' earnings and profits by fostering a scheme of securing work from Plaintiff and

---

[20] The Pennsylvania-based Defendants are: Bucknell University, Drexel University, Duquesne University, La Salle University, Lafayette College, Lehigh University, Robert Morris University, Saint Francis University, Saint Joseph's University, Villanova, University of Pennsylvania, Pennsylvania State University, University of Pittsburgh and Temple University.

the other members of the Proposed Pennsylvania Class
without properly paying them any compensation;

- Inducing Plaintiff and the members of the Proposed
  Pennsylvania Class to perform work while failing to
  properly compensate them for all hours worked as
  required by law;

- Reducing overhead with respect to their labor costs, and
  therefore realizing additional earnings and profits to
  their own benefit and to the detriment of Plaintiff and
  the members of the Proposed Pennsylvania Class, by
  securing the work and efforts of Plaintiff and the
  members of the Proposed Pennsylvania Class without
  proper compensation as required by law; and

- Retaining and continuing to retain such benefits
  contrary to the fundamental principles of justice, equity,
  and good conscience.

264. Plaintiff and the members of the Proposed Pennsylvania Class have standing
to seek the relief sought herein because of the adverse effects that the Pennsylvania-based
Defendants' unlawful patterns, practices and/or policies have had on them individually and
generally.

265. The patterns, practices and/or policies described in this Complaint
demonstrate that the Pennsylvania-based Defendants' violations of the PMWA and
Pennsylvania common law are not sporadic or unusual; rather, these violations are part
and parcel to their standard operating patterns, practices and/or policies.

II.   NUMEROSITY AND IMPRACTICALITY OF JOINDER

266. The members of the Proposed Pennsylvania Class are sufficiently numerous
to make joinder of their claims impracticable. While the exact number of Proposed
Pennsylvania Class members is unknown because such information is in the exclusive
control of the Pennsylvania-based Defendants, upon information and belief there are tens of
thousands of current and former Student Athletes who have been the victim of the
Pennsylvania-based Defendants' violations of the PMWA and Pennsylvania common law.

-91-

267.    Case in point, upon information and belief, there are currently more than 9,350 Student Athletes at the 14 Pennsylvania-based Defendants within the four year statute of limitations for unjust enrichment under Pennsylvania state law.[21] Because the Proposed Pennsylvania Class also includes Student Athlete alumnae of such Defendants, who graduated within the last four (4) years, the Proposed Pennsylvania Class could total more than 18,700 current and alumnae Student Athletes at the time of filing.

268.    For each year of pendency, another 2,340 Student Athletes, or more, could be added to the Proposed Pennsylvania Class.

269.    Although precise determination of the number of Proposed Pennsylvania Class members is impossible at this time, it is significant and satisfies the numerosity requirement of FRCP 23(a).

III.    COMMON QUESTIONS OF LAW AND FACT

270.    The claims alleged on behalf of Plaintiff and the members of the Proposed Pennsylvania Class raise questions of law and fact common to all the members of the Proposed Pennsylvania Class, including Plaintiff. Chief among these questions are as follows:

- Whether the Pennsylvania-based Defendants Failed to pay Plaintiff and the members of the Proposed Pennsylvania Class the prevailing minimum wage under the PMWA;

- Whether the Pennsylvania-based Defendants received and benefitted from the uncompensated labors of Plaintiff and the other members of the Proposed Pennsylvania Class such that to retain said benefit without compensation would be inequitable and rise to the level of unjust enrichment;

---

[21]    *See, e.g.*, statistics reported under Student Life/Sports on www.CollegeFactual.com (last visited October 14, 2019, as all hyperlinks referenced herein if not otherwise indicated) for Bucknell University, Drexel University, Duquesne University, La Salle University, Lafayette College, Lehigh University, Robert Morris University, Saint Francis University, Saint Joseph's University, Villanova, University of Pennsylvania, Pennsylvania State University, University of Pittsburgh and Temple University.

www.StudentAthletePay.com

- Whether the Pennsylvania-based Defendants devised and implemented a plan to increase Defendants' earnings and profits by fostering a scheme of securing work from Plaintiff and the other members of the Proposed Pennsylvania Class without properly paying them any compensation;

- Whether the Pennsylvania-based Defendants induced Plaintiff and members of the Proposed Pennsylvania Class to perform work while failing to properly compensate them for all hours worked as required by law;

- Whether the Pennsylvania-based Defendants reduced overhead with respect to their labor costs, and therefore realized additional earnings and profits to their own benefit and to the detriment of Plaintiff and the members of the Proposed Pennsylvania Class by securing the work and efforts of Plaintiff and the members of the Proposed Pennsylvania Class without proper compensation as required by law; and

- Whether the Pennsylvania-based Defendants retained and continue to retain such benefits contrary to the fundamental principles of justice, equity and good conscience.

271.    Thus, the commonality requirement of FRCP 23(a) is satisfied.

## IV.    TYPICALITY OF CLAIMS AND RELIEF SOUGHT

272.    Plaintiff is a member of the Proposed Pennsylvania Class he seeks to represent.

273.    The claims of Plaintiff are typical of claims of the Proposed Pennsylvania Class in that they all arise from the same unlawful patterns, practices and/or policies of the Pennsylvania-based Defendants and are based on the legal theory that these patterns, practices and/or policies violate legal rights protected by state law.

274.    Plaintiff and the members of the Proposed Pennsylvania Class all allege that they each were the victim of violations of the PMWA and Pennsylvania common law, including a failure to pay the prevailing minimum wage and unjust enrichment.

www.StudentAthletePay.com

275. The relief that Plaintiff seeks for the Pennsylvania-based Defendants' unlawful patterns, practices and/or policies is typical of the relief which is sought on behalf of the Proposed Pennsylvania Class.

276. Thus, the typicality requirement of FRCP 23(a) is satisfied.

## V.   ADEQUACY OF REPRESENTATION

277. The interests of Plaintiff are co-extensive with those of the Proposed Pennsylvania Class he seeks to represent in the instant case.

278. Plaintiff is willing and able to represent the Proposed Pennsylvania Class fairly and vigorously as he pursues his similar individual claims.

279. Plaintiff has retained counsel who are qualified and experienced in employment and wage and hour class action litigation and who are subject matter experts with respect to Defendants' operations. Plaintiff's counsel is able to meet the time and fiscal demands necessary to litigate a class action of this size and complexity.

280. The combined interests, experience and resources of Plaintiff and his counsel to competently litigate the individual and class claims at issue in the instant case satisfy the adequacy of representation requirement of FRCP 23(a).

## VI.   REQUIREMENTS OF RULE 23(b)

### A.   Rule 23(b)(1)

281. Without class certification, the same evidence and issues would be subject to re-litigation in a multitude of individual lawsuits with an attendant risk of inconsistent adjudications and conflicting obligations.

282. Specifically, all evidence of the Pennsylvania-based Defendants' patterns, practices and/or policies, and the issue of whether they are in violation of state law would be exchanged and litigated repeatedly.

www.StudentAthletePay.com

283.     Accordingly, certification of the Proposed Pennsylvania Class is the most efficient and judicious means of presenting the evidence and arguments necessary to resolve such questions for Plaintiff, the members of the Proposed Pennsylvania Class and the Pennsylvania-based Defendants.

284.     By filing this action, Plaintiff is preserving the rights of the members of the Proposed Pennsylvania Class with respect to the statute of limitations on their claims. Therefore, not certifying a class would substantially impair and/or impede the other members' ability to protect their interests.

**B.     Rule 23(b)(2)**

285.     The Pennsylvania-based Defendants have acted on grounds, described herein, generally applicable to the Plaintiff and the members of the Proposed Pennsylvania Class, by adopting and following systemic patterns, practices and/or policies that violate the rights provided to Plaintiff and the members of the Proposed Pennsylvania Class under the PMWA and Pennsylvania common law.

286.     These unlawful acts are fostered by the Pennsylvania-based Defendants' standard patterns, practices and/or policies, are not sporadic or isolated and support the request for final injunctive and declaratory relief with respect to Plaintiff and the Proposed Pennsylvania Class as a whole.

287.     Declaratory and injunctive relief are the factual and legal predicates for the Plaintiff and the members of the Proposed Pennsylvania Class' entitlement to monetary and non-monetary remedies for individual losses caused by, and exemplary purposes necessitated by, such systemic wage and hour and common law violations.

288.     Accordingly, injunctive and declaratory relief are among the predominant forms of relief sought in this case.

www.StudentAthletePay.com

C.    Rule 23(b)(3)

289.    The common issues of fact and law affecting Plaintiff's claims and those of

the members of the Proposed Pennsylvania Class, including, but not limited to, the

common issues identified in the Paragraphs above, predominate over issues affecting

only individual claims.

290.    A class action is superior to other available means for the fair and efficient

adjudication of Plaintiff's claims and the claims of the members of the Proposed

Pennsylvania Class.

291.    The cost of proving the Pennsylvania-based Defendants' pattern and practice

of violating the PMWA and Pennsylvania common law makes it impracticable for the

members of the Proposed Pennsylvania Class to pursue their claims individually.

292.    The class action will not be difficult to manage given the discrete and

ubiquitous violations of the PMWA and common law at issue.

## PLAINTIFF'S PROPOSED DEFENDANT CLASS ACTION ALLEGATIONS REGARDING FLSA COLLECTIVE ACTION

293.    The 22 NCAA D1 member schools named in this Complaint are representative

of a Proposed Defendant Class of private and semi-public NCAA D1 member schools

subject to FLSA collective action allegations.  The remaining members of this Proposed

Defendant Class are identified in Exhibit C.

294.    Each of the 22 NCAA D1 member schools named in this Complaint as a

representative of this Proposed Defendant Class is geographically located within the

boundaries of the U.S. Court of Appeals for the Third Circuit.  The remaining members of

this Proposed Defendant Class are so numerous (103) and so geographically dispersed

www.StudentAthletePay.com

(as far North as New Hampshire and Vermont, as far South as Florida, as far West as California, and in nearly every state in between) that joinder of all members of this Proposed Defendant Class is impracticable.

295.    Questions of law and fact that are common to this Proposed Defendant Class predominate over any questions affecting only individual Proposed Defendant Class members, and the defenses of the NCAA and 22 NCAA D1 member schools named in this Complaint are typical of defenses of this Proposed Defendant Class for the reasons stated in Paragraphs 252 through 254, *supra*.

296.    In *Berger v. NCAA*, No. 1:14-CV-1710 (S.D. Ind. Mar. 18, 2015), a case similar to this suit but which "relied heavily on *Vanskike v. Peters*, 974 F.2d 806 (7th Cir. 1992) [where] [t]he court observed that 'the *Thirteenth Amendment* excludes convicted criminals from the prohibition of involuntary servitude, so prisoners may be required to work,'" *Livers v. NCAA*, No. 17-4271, 2018 U.S. Dist. LEXIS 83655, at *45-47 (E.D. Pa. May 17, 2018), defendants included the NCAA and 123 member schools in this Proposed Defendant Class here.  The NCAA and 123 D1 member schools mounted a joint defense; one law firm represented the NCAA and 90 D1 member schools, and another law firm represented 30 D1 member schools.

297.    The NCAA and 22 NCAA D1 member schools named in this Complaint will fairly and adequately represent and protect the interests of this Proposed Defendant Class because, without limitation: (i) their defenses (claims) are typical, as discussed in Paragraphs 295 and 296, *supra*; (ii) the NCAA is the association and representative legislative body through which NCAA D1 bylaws are handed down by NCAA D1 member schools and jointly enforced by NCAA Enforcement Staff and member peer-review committees; and

(iii) the 22 NCAA D1 member schools named in this Complaint include three members of "Power Five" conferences (the Atlantic Coast and Big Ten conferences), one member of the "Group of Five" conferences (*e.g.*, American Athletic conference), two members of the "High-Major" conference (Big East conference), and 16 members of "Mid-Major" conferences (Atlantic 10, Colonial, Ivy League, Metro Atlantic Athletic, and Northeast conferences and the Patriot League).

298.    NCAA bylaws define the shared responsibilities and benefits of the joint enterprise of the NCAA and its member schools.  Such bylaws are uniformly interpreted and applied by NCAA D1 member schools to insure a "level playing field" under threat of competition and financial penalties for failure to comply.  Such bylaws also compel the unlawful conduct complained of here.  Thus, if any adjudication of Plaintiff's claims were to require any NCAA D1 member school(s) to classify and pay Student Athletes as employees, either the NCAA D1 member school(s) party to such Order would be expelled from the NCAA or the NCAA and member schools not party to such Order would have to also comply. Thus, certifying this Proposed Defendant Class is appropriate because prosecuting separate actions against individual members of this Proposed Defendant Class would create a risk of: (i) inconsistent or varying adjudications with respect to individual members of this Proposed Defendant Class that would establish incompatible standards of conduct for the party opposing the class; and/or (ii) adjudications with respect to individual members of this Proposed Defendant Class that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests.  Fed. R. Civ. P. 23(b)(1).

www.StudentAthletePay.com

299.    Because Defendants unlawful conduct is compelled by NCAA bylaws set forth in the NCAA D1 Manual, from which this actual, and recurring, controversy arises, and because Plaintiff seeks a declaration that NCAA bylaws, as uniformly interpreted and applied by Defendants to prohibit proper classification and compensation of Student Athletes, violate wage and hour laws, certification of this Proposed Defendant Class is also appropriate to the extent any party opposing the class has acted or refused to act on grounds that apply generally to the class, so that declaratory relief is appropriate respecting the class as a whole. Fed. R. Civ. P. 23(b)(2).

## COUNT I
### Violations of the FLSA
### (On Behalf of Plaintiff Johnson and the Proposed FLSA Collective)

300.    All previous Paragraphs are incorporated as though fully set forth herein.

301.    The Minimum Wage provisions in the FLSA apply to Defendants and the members of the Proposed Defendant Class and protect Plaintiff and the members of the Proposed FLSA Collective.  *See* 29 U.S.C. § 206.

302.    Defendants and the members of the Proposed Defendant Class have been, and continue to be, enterprises engaged in commerce within the meaning of 29 U.S.C. §§ 203(r) and (s), and to which the Minimum Wage provisions of 29 U.S.C. § 206(a) apply.

303.    Plaintiff and the members of the Proposed FLSA Collective have been, and/or continue to be, employees of Defendants and the members of the Proposed Defendant Class within the meaning of 29 U.S.C. § 203(e).

304.    Defendants and the members of the Proposed Defendant Class have jointly employed, and/or continue to jointly employ, Plaintiff and the members of the Proposed FLSA Collective within the meaning of 29 U.S.C. § 203(g).

305.   By operation of NCAA bylaws, Defendants and the members of the Proposed Defendant Class have jointly agreed to engage in a widespread pattern, policy and practice of misclassifying Plaintiff and the members of the Proposed FLSA Collective as unpaid labor rather than employees, prohibiting payment of minimum wages to them for any, and all, hours that Defendants and the members of the Proposed Defendant Class suffered or permitted Plaintiff and the members of the Proposed FLSA Collective to perform work integral to the billion dollar Big Business of NCAA sports.

306.   Defendants and the members of the Proposed Defendant Class were aware, or should have been aware, that Student Athletes, like fellow students in Work Study, fall within employee status under the FLSA when Defendants and the members of the Proposed Defendant Class willfully chose not to classify and pay Student Athletes as employees with reckless disregard of employer duties under the FLSA.

307.   Plaintiff and the members of the Proposed FLSA Collective have suffered damages, and are entitled to recovery of unpaid wages, an additional equal amount as liquidated damages, attorneys' fees, costs and other relief under 29 U.S.C. § 216(b).

## COUNT II
### Violations of the Pennsylvania Minimum Wage Act
### (On Behalf of Plaintiff Johnson and the Proposed Pennsylvania Class)

308.   All previous Paragraphs are incorporated as though fully set forth herein.

309.   The Minimum Wage provisions in the Pennsylvania Minimum Wage Act, 43 P.S. §§ 333.101 *et seq.* ("PMWA") apply to the Pennsylvania-based Defendants[22] and protect Plaintiff and the members of the Proposed Pennsylvania Class. *See* 43 P.S. § 333.104(e).

---

[22]   The Pennsylvania-based Defendants are: Bucknell University, Drexel University, Duquesne University, La Salle University, Lafayette College, Lehigh University, Robert Morris University, Saint Francis University, Saint Joseph's University, Villanova, University of Pennsylvania, Pennsylvania State University, University of Pittsburgh and Temple University.

www.StudentAthletePay.com

310.    The Pennsylvania-based Defendants have been, and continue to be, employers within the meaning of 43 P.S. § 333.103(g), and to which the Minimum Wage provisions of 43 P.S. § 333.104(e) apply.

311.    Plaintiff and the members of the Proposed Pennsylvania Class have been, and/or continue to be, employees of the Pennsylvania-based Defendants within the meaning of 43 P.S. § 333.103(h).

312.    The Pennsylvania-based Defendants have jointly employed, and/or continue to jointly employ, Plaintiff and the members of the Proposed Pennsylvania Class within the meaning of 43 P.S. § 333.103(f).

313.    By operation of NCAA bylaws, the Pennsylvania-based Defendants have jointly agreed to engage in a widespread pattern, policy and practice of misclassifying Plaintiff and the members of the Proposed Pennsylvania Class as unpaid labor rather than employees, prohibiting payment of minimum wages to them for any, and all, hours that Pennsylvania-based Defendants suffered or permitted Plaintiff and the members of the Proposed Pennsylvania Class to perform work integral to the billion dollar Big Business of NCAA sports.

314.    The Pennsylvania-based Defendants were aware, or should have been aware, that Student Athletes, like fellow students in Work Study, fall within employee status under the PMWA when the Pennsylvania-based Defendants willfully chose not to classify and pay Student Athletes as employees with reckless disregard of employer duties under the PMWA.

315.    Plaintiff and the members of the Proposed Pennsylvania Class have suffered damages, and are entitled to recovery of unpaid wages, attorneys' fees, costs and other relief under 43 P.S. § 333.113.

www.StudentAthletePay.com

## COUNT III
### Unjust Enrichment
### (On Behalf of Plaintiff Johnson and the Proposed Pennsylvania Class)

316.　All previous Paragraphs are incorporated as though fully set forth herein.

317.　The Pennsylvania-based Defendants received and benefited from the uncompensated labors of Plaintiff and the Proposed Pennsylvania Class such that to retain said benefit without compensation would be inequitable and rise to the level of unjust enrichment.

318.　At all relevant times, the Pennsylvania-based Defendants devised and implemented a plan to increase their earnings and profits by fostering a scheme of securing work from Plaintiff and the Proposed Pennsylvania Class without properly paying compensation.

319.　Contrary to all good faith and fair dealing, the Pennsylvania-based Defendants induced Plaintiff and the Proposed Pennsylvania Class to perform work while failing to properly compensate them for all hours worked as required by law.

320.　By reason of having secured the work and efforts of Plaintiff and the Proposed Pennsylvania Class without proper compensation as required by law, the Pennsylvania-based Defendants enjoyed reduced overhead with respect to their labor costs, and therefore realized additional earnings and profits to their own benefit and to the detriment of Plaintiff and the Proposed Pennsylvania Class. The Pennsylvania-based Defendants retained and continue to retain such benefits contrary to the fundamental principles of justice, equity and good conscience.

321.　Accordingly, Plaintiff and the Proposed Pennsylvania Class are entitled to judgment in an amount equal to the benefits unjustly retained by the Pennsylvania-based Defendants.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff seeks the following relief on behalf of himself and all others similarly situated:

(a)   An order certifying this litigation to proceed as an FLSA collective action pursuant to 29 U.S.C. 216(b);

(b)   Prompt notice, pursuant to 29 U.S.C. 216(b), of this litigation to all potential members of the Proposed FLSA Collective;[23]

(c)   An order certifying this litigation to proceed as a class action pursuant to Fed. R. Civ. P. 23 on behalf of the Proposed Pennsylvania Class;

(d)   Economic damages and prejudgment interest to the fullest extent permitted under the law;

(e)   Disgorgement of any monies that have caused Defendants and the members of the Proposed Defendant Class to become unjustly enriched;

(f)   Non-economic damages, including compensatory and punitive damages, to the fullest extent permitted by law;

(g)   Liquidated damages to the fullest extent permitted under the law;

(h)   Litigation costs, expenses and attorneys' fees to the fullest extent permitted under the law;

(i)   A declaration that NCAA bylaws, as uniformly interpreted and applied by Defendants and the members of the Proposed Defendant Class to prohibit the proper classification and compensation of Student Athletes, violate wage and hour laws; and

(j)   Such other and further relief as this Court deems just and proper.

---

[23]   Pursuant to the Family Educational Rights and Privacy Act, 20 U.S.C. § 1232g ("FERPA"), a/k/a the Buckley Amendment, a student may require a school to not disclose certain "directory information" to third parties, including information necessary to send notice to FLSA Class members such as names; permanent home addresses and/ or temporary local or campus addresses; and email addresses. To ensure FERPA compliance and efficient case management, Plaintiff requests that the Court order Defendant NCAA member schools to send notice.

## JURY DEMAND

Plaintiff demands a jury trial on all triable claims and issues of fact.

Dated: November 6, 2019

Respectfully submitted,

Paul L. McDonald (PA Bar No. 84856)
**P L MCDONALD LAW LLC**
1800 JFK Boulevard, Suite 300
Philadelphia, PA  19103
Tel:      (267) 238-3835
Fax:      (267) 238-3801
paul@plmcdonaldlaw.com

AND

**WIGDOR LLP**
Douglas H. Wigdor   (*Pro Hac Vice* Pending)
Michael J. Willemin (*Pro Hac Vice* Pending)
Renan F. Varghese (*Pro Hac Vice* Pending)
85 Fifth Avenue
New York, NY   10003
Tel:      (212) 257-6800
Fax:      (212) 257-6845
dwigdor@wigdorlaw.com
mwillemin@wigdorlaw.com
rvarghese@wigdorlaw.com

*Counsel for Plaintiff and*
*Proposed Counsel for the Members of the*
*Proposed FLSA Collective and Proposed*
*Pennsylvania Class*

www.StudentAthletePay.com

Exhibit A

## CONSENT TO JOIN

I hereby consent to be a party plaintiff in a lawsuit against the National Collegiate Athletic Association (a/k/a the "NCAA") and private and semi-public NCAA Division I Member Schools seeking monetary damages and other relief that may be appropriate for alleged violations of the Fair Labor Standards Act, 29 U.S.C. §§ 201 *et seq.*

I hereby designate Wigdor LLP and P L McDonald Law LLC to represent me in this lawsuit and to make decisions on my behalf concerning this lawsuit.

I understand that Wigdor LLP and P L McDonald Law LLC will petition the Court to award attorney fees from any settlement or judgment in the amount of the greater of: (1) the "lodestar" amount, calculated by multiplying reasonable hourly rates by the number of hours expended on the lawsuit, or (2) 1/3 of the gross settlement or judgment amount.

I understand reasonable costs expended by Wigdor LLP and P L McDonald Law LLC or third parties on my behalf may be deducted from any settlement or judgment amount on a pro rata basis among all plaintiff members of the collective.

*Ralph Johnson (Trey)*
Signature

*10/15/19*
Date

*Ralph "Trey" Johnson*
Print Name

**REDACTED**
Street Address

*Tampa, FL, 34638*
City, State, and Zip Code

Exhibit B

NATIONAL COLLEGIATE ATHLETIC
ASSOCIATION
700 W. Washington Street
Indianapolis, IN 46206-6222

BUCKNELL UNIVERSITY
701 Moore Avenue
Lewisburg, PA 17837

DREXEL UNIVERSITY
3141 Chestnut Street
Philadelphia, PA 19104

DUQUESNE UNIVERSITY
600 Forbes Avenue
Pittsburgh, PA 15282

FAIRLEIGH DICKINSON UNIVERSITY
1000 River Road
Teaneck, NJ 07666

LA SALLE UNIVERSITY
1900 W Olney Avenue
Philadelphia, PA 19141

LAFAYETTE COLLEGE
730 High Street
Easton, PA 18042

LEHIGH UNIVERSITY
27 Memorial Drive W
Bethlehem, PA 18015

MONMOUTH UNIVERSITY
400 Cedar Avenue
West Long Branch, NJ 07764

PRINCETON UNIVERSITY
Princeton, NJ 08544

RIDER UNIVERSITY
2083 Lawrenceville Road
Lawrence Township, NJ 08648

ROBERT MORRIS UNIVERSITY
6001 University Boulevard
Pittsburgh, PA 15108

SETON HALL UNIVERSITY
400 South Orange Avenue
South Orange, NJ 07079

SAINT FRANCIS UNIVERSITY
117 Evergreen Drive
Loretto, PA 15940

SAINT JOSEPH'S UNIVERSITY
5600 City Avenue
Philadelphia, PA 19131

SAINT PETER'S UNIVERSITY
2641 John F Kennedy Boulevard W
Jersey City, NJ 07306

VILLANOVA UNIVERSITY
800 E Lancaster Avenue
Villanova, PA 19085

UNIVERSITY OF DELAWARE
Newark, DE 19716

UNIVERSITY OF PENNSYLVANIA
Philadelphia, PA 19104

PENNSYLVANIA STATE UNIVERSITY
University Park
State College, PA 16801

UNIVERSITY OF PITTSBURGH
4200 Fifth Avenue
Pittsburgh, PA 15260

RUTGERS, STATE UNIVERSITY OF
NEW JERSEY
57 U.S. 1
New Brunswick, NJ 08901

TEMPLE UNIVERSITY
1801 N Broad Street
Philadelphia, PA 19122

Exhibit C

**ABILENE CHRISTIAN UNIVERSITY**
1600 Campus Court
Abilene, TX 79601

**AMERICAN UNIVERSITY**
4400 Massachusetts Avenue NW
Washington, DC 20016

**BAYLOR UNIVERSITY**
1311 S 5th Street
Waco, TX 76706

**BELMONT UNIVERSITY**
1900 Belmont Boulevard
Nashville, TN 37212

**BETHUNE-COOKMAN UNIVERSITY**
640 Dr. Mary McLeod Bethune Boulevard
Daytona Beach, FL 32114

**BOSTON COLLEGE**
Chestnut Hill, MA 02467

**BOSTON UNIVERSITY**
Boston, MA 02215

**BRADLEY UNIVERSITY**
1501 W Bradley Avenue
Peoria, IL 61625

**BRIGHAM YOUNG UNIVERSITY**
Provo, UT 84602

**BROWN UNIVERSITY**
Providence, RI 02912

**BRYANT UNIVERSITY**
1150 Douglas Turnpike
Smithfield, RI 02917

**BUTLER UNIVERSITY**
4600 Sunset Avenue
Indianapolis, IN 46208

**CAMPBELL UNIVERSITY**
143 Main Street
Buies Creek, NC 27506

**CANISIUS COLLEGE**
2001 Main Street
Buffalo, NY 14208

**CHARLESTON SOUTHERN UNIVERSITY**
9200 University Boulevard
North Charleston, SC 29406

**COLGATE UNIVERSITY**
13 Oak Drive
Hamilton, NY 13346

**COLUMBIA UNIVERSITY**
116th Street and Broadway
New York, NY 10027

**CORNELL UNIVERSITY**
Ithaca, NY 14850

**CREIGHTON UNIVERSITY**
2500 California Plaza
Omaha, NE 68102

**DARTMOUTH COLLEGE**
Hanover, NH 03755

**DAVIDSON COLLEGE**
405 N Main Street
Davidson, NC 28035

**UNIVERSITY OF DAYTON**
300 College Park
Dayton, OH 45469

**UNIVERSITY OF DENVER**
2199 S University Boulevard
Denver, CO 80208

**DEPAUL UNIVERSITY**
2400 N Sheffield Avenue
Chicago, IL 60614

**UNIVERSITY OF DETROIT MERCY**
4001 McNichols Road
Detroit, MI 48221

**DRAKE UNIVERSITY**
2507 University Avenue
Des Moines, IA 50311

**DUKE UNIVERSITY**
Durham, NC 27708

**ELON UNIVERSITY**
100 Campus Drive
Elon, NC 27244

**UNIVERSITY OF EVANSVILLE**
1800 Lincoln Avenue
Evansville, IN 47714

**FAIRFIELD UNIVERSITY**
1073 N Benson Road
Fairfield, CT 06824

1

**FORDHAM UNIVERSITY**
Bronx, NY 10458

**FURMAN UNIVERSITY**
3300 Poinsett Highway
Greenville, SC 29613

**GARDNER-WEBB UNIVERSITY**
110 S Main Street
Boiling Springs, NC 28017

**GEORGE WASHINGTON UNIVERSITY**
2121 Eye Street, NW
Washington, DC 20052

**GEORGETOWN UNIVERSITY**
3700 O Street NW
Washington, DC 20057

**GONZAGA UNIVERSITY**
502 E Boone Avenue
Spokane, WA 99202

**GRAND CANYON UNIVERSITY**
3300 W Camelback Road
Phoenix, AZ 85017

**HAMPTON UNIVERSITY**
100 E Queen Street
Hampton, VA 23668

**HARVARD UNIVERSITY**
Cambridge, MA 02138

**UNIVERSITY OF HARTFORD**
200 Bloomfield Avenue
West Hartford, CT 06117

**HIGH POINT UNIVERSITY**
833 Montlieu Avenue
High Point, NC 27262

**HOFSTRA UNIVERSITY**
1000 Fulton Avenue
Hempstead, NY 11550

**COLLEGE OF THE HOLY CROSS**
1 College Street
Worcester, MA 01610

**HOUSTON BAPTIST UNIVERSITY**
7502 Fondren Road
Houston, TX 77074

**HOWARD UNIVERSITY**
2400 Sixth Street NW
Washington, DC 20059

**UNIVERSITY OF THE INCARNATE WORD**
4301 Broadway Street
San Antonio, TX 78209

**IONA COLLEGE**
715 North Avenue
New Rochelle, NY 10801

**JACKSONVILLE UNIVERSITY**
2800 University Boulevard N
Jacksonville, FL 32211

**LIBERTY UNIVERSITY**
1971 Liberty University Drive
Lynchburg, VA 24502

**LIPSCOMB UNIVERSITY**
1 University Park Drive
Nashville, TN 37204

**LONG ISLAND UNIVERSITY, BROOKLYN**
1 University Plaza
New York, NY 11201

**LOYOLA MARYMOUNT UNIVERSITY**
1 LMU Drive
Los Angeles, CA 90045

**LOYOLA UNIVERSITY CHICAGO**
1032 W Sheridan Road
Chicago, IL 60660

**LOYOLA UNIVERSITY MARYLAND**
4501 North Charles Street
Baltimore, MD 21210-2694

**MANHATTAN COLLEGE**
4513 Manhattan College Parkway
Riverdale, NY 10463

**MARIST COLLEGE**
3399 N Road
Poughkeepsie, NY 12601

**MARQUETTE UNIVERSITY**
1250 W Wisconsin Avenue
Milwaukee, WI 53233

**MERCER UNIVERSITY**
1400 Coleman Avenue
Macon, GA 31207

**UNIVERSITY OF MIAMI**
Coral Gables, FL 33124

**MOUNT ST. MARY'S UNIVERSITY**
16300 Old Emmitsburg Road
Emmitsburg, MD 21727

**NIAGARA UNIVERSITY**
5795 Lewiston Road
Niagara University, NY 14109

**NORTHEASTERN UNIVERSITY**
360 Huntington Avenue
Boston, MA 02115

**NORTHWESTERN UNIVERSITY**
633 Clark Street
Evanston, IL 60208

**UNIVERSITY OF NOTRE DAME**
Notre Dame, IN 46556

**ORAL ROBERTS UNIVERSITY**
7777 S Lewis Avenue
Tulsa, OK 74171

**UNIVERSITY OF THE PACIFIC**
3601 Pacific Avenue
Stockton, CA 95211

**PEPPERDINE UNIVERSITY**
24255 Pacific Coast Highway
Malibu, CA 90263

**UNIVERSITY OF PORTLAND**
5000 N Willamette Boulevard
Portland, OR 97203

**PRESBYTERIAN COLLEGE**
503 S Broad Street
Clinton, SC 29325

**PROVIDENCE COLLEGE**
1 Cunningham Square
Providence, RI 02908

**QUINNIPIAC UNIVERSITY**
275 Mt Carmel Avenue
Hamden, CT 06518

**RICE UNIVERSITY**
6100 Main Street
Houston, TX 77005

**UNIVERSITY OF RICHMOND**
28 Westhampton Way
Richmond, VA 23173

**SACRED HEART UNIVERSITY**
5151 Park Avenue
Fairfield, CT 06825

**SAMFORD UNIVERSITY**
800 Lakeshore Drive
Birmingham, AL 35229

**UNIVERSITY OF SAN DIEGO**
5998 Alcalá Park
San Diego, CA 92110

**UNIVERSITY OF SAN FRANCISCO**
2130 Fulton Street
San Francisco, CA 94117

**SANTA CLARA UNIVERSITY**
500 El Camino Real
Santa Clara, CA 95053

**SEATTLE UNIVERSITY**
901 12th Avenue
Seattle, WA 98122

**SIENA COLLEGE**
515 Loudon Road
Loudonville, NY 12211

**UNIVERSITY OF SOUTHERN CALIFORNIA**
Los Angeles, CA 90089

**SOUTHERN METHODIST UNIVERSITY**
6425 Boaz Lane
Dallas TX 75205

**ST. BONAVENTURE UNIVERSITY**
3261 W State Road
St Bonaventure, NY 14778

**ST. FRANCIS COLLEGE BROOKLYN**
180 Remsen Street
Brooklyn, NY 11201

**ST. JOHN'S UNIVERSITY**
8000 Utopia Parkway
Queens, NY 11439

**SAINT LOUIS UNIVERSITY**
221 N Grand Boulevard
St Louis, MO 63103

**ST. MARY'S COLLEGE OF CALIFORNIA**
1928 St Mary's Road
Moraga, CA 94556

**STANFORD UNIVERSITY**
450 Serra Mall
Stanford, CA 94305

**STETSON UNIVERSITY**
421 N Woodland Boulevard
DeLand, FL 32723

**SYRACUSE UNIVERSITY**
900 S Crouse Avenue
Syracuse, NY 13210

**TEXAS CHRISTIAN UNIVERSITY**
2800 S University Drive
Fort Worth, TX 76129

**TULANE UNIVERSITY**
6823 St Charles Avenue
New Orleans, LA 70118

**UNIVERSITY OF TULSA**
800 S Tucker Drive
Tulsa, OK 74104

**VALPARAISO UNIVERSITY**
1700 Chapel Drive
Valparaiso, IN 46383

**VANDERBILT UNIVERSITY**
2201 West End Avenue
Nashville, TN 37235

**WAGNER COLLEGE**
1 Campus Road
Staten Island, NY 10301

**WAKE FOREST UNIVERSITY**
1834 Wake Forest Road
Winston-Salem, NC 27106

**WOFFORD COLLEGE**
429 N Church Street
Spartanburg, SC 29303

**XAVIER UNIVERSITY**
3800 Victory Parkway
Cincinnati, OH 45207

**YALE UNIVERSITY**
New Haven, CT 06520

**UNIVERSITY OF NEW HAMPSHIRE**
105 Main Street
Durham, NH 03824

**UNIVERSITY OF RHODE ISLAND**
45 Upper College Road
Kingston, RI 02881

**UNIVERSITY OF VERMONT**
Burlington, VT 05405