John E. MacDonald (Pa. Bar No. 82828)
jmacdonald@constangy.com
CONSTANGY, BROOKS, SMITH & PROPHETE, LLP
989 Lenox Drive
Suite 206 (2nd Floor)
Lawrenceville, New Jersey 08648
Telephone: (609) 454-0096
Facsimile: (609) 844-1102

Steven B. Katz (admitted *pro hac vice*)
skatz@constangy.com
CONSTANGY, BROOKS, SMITH & PROPHETE, LLP
2029 Century Park East, Suite 1100
Los Angeles, California 90067
Telephone: (310) 909-7775
Facsimile: (424) 465-6630

Donald S. Prophete (admitted *pro hac vice*)
dprophete@constangy.com
CONSTANGY, BROOKS, SMITH & PROPHETE, LLP
2600 Grand Boulevard, Suite 750
Kansas City, Missouri 64108-4600
Telephone: (816) 472-6400
Facsimile: (816) 472-6401

*Counsel for Defendants*

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

RALPH "TREY" JOHNSON, *et al.*, individually and on behalf of all persons similarly situated,

Plaintiffs,

v.

NATIONAL COLLEGIATE ATHLETIC ASSOCIATION, a/k/a the NCAA, *et al.*,

Defendants.

Civil Action No. 2:19-cv-05230-JP

**DEFENDANTS' SUPPLEMENTAL BRIEF CONCERNING *NATIONAL COLLEGIATE ATHLETIC ASS'N v. ALSTON***

Defendants (*i.e.*, the Attended Schools, Nonattended Schools and the NCAA) submit the following Supplemental Brief supporting their Motions to Dismiss (ECF 25, 26), to address the Supreme Court's recent ruling in *National Collegiate Athletic Ass'n v. Alston*, — U.S. —, 141 S.Ct. 2141 (2021), *aff'g* In re: *National Collegiate Athletic Ass'n Athletic Grant-in-Aid Cap Antitrust Litig.*, 958 F.3d 1239 (9th Cir. 2020) ("*NCAA GIA Litig. II*") and In re: *National Collegiate Athletic Ass'n Athletic Grant-In-Aid Cap Antitrust Litig.*, 375 F. Supp. 3d 1058 (N.D. Cal. 2019) (*NCAA GIA Litig.* I).

*Alston* has no implications here. It is solely concerned with whether the lower courts properly "struck down NCAA rules limiting the *education-related benefits* schools may offer student-athletes." *Alston*, 141 S.Ct. at 2147 (emphasis added). The Court was clear about the limited scope of its opinion: "[W]e do not pass on the rules that remain in place or the district court's judgment upholding them. Our review is confined to those restrictions now enjoined." *Id.* at 2154.

This case is not about the sort of "education-related benefits" that *Alston* addressed. *Id.* It is about "compensation related to athletic performance"—a subject of NCAA rules that the lower courts in *Alston* "refused to disturb," and which rulings "the student-athletes [did] not challenge" before the Supreme Court.[1] *Id.*

[1] Below, "Student-Athletes sought to dismantle the NCAA's ***entire*** compensation framework." *NCAA GIA Litig. II*, 958 F.3d at 1247 (emphasis added). But "[t]he district court rejected . . . invalidat[ing] . . . *all* NCAA compensation limits" (*id*. at 1251 [emphasis in original]), instead "enjoin[ing] NCAA limits on most compensation and benefits that are related to education" while permitting it "to continue to limit compensation and benefits unrelated to education . . . ." *Id*. (*quoting NCAA GIA Litig. I*, 375 F. Supp. 3d at 1087). The Ninth Circuit declined to reverse the district court's decision to leave in place all NCAA "limits on cash compensation untethered to education." "In our view, the district court struck the right balance in crafting a remedy that both prevents anticompetitive harm to Student-Athletes while serving the procompetitive purpose of preserving the popularity of college sports. Thus, we neither

Proof of *Alston's* irrelevance lies in Plaintiffs' disregard. The district court ruling ultimately affirmed in full by the Supreme Court was issued in 2019—long before Plaintiffs filed their opposition briefs. But none cite *NCAA GIA Litig.* I even once. (*See* ECF 28, 30, 43.) The Ninth Circuit affirmed the district court while these motions were pending, but Plaintiffs never sought to submit a supplemental brief on the decision. Only at this April's hearing on the motions—held after the oral argument in *Alston*—did Plaintiffs mention it. But they did so only to 'cherry-pick' sympathetic policy comments from Justice Kavanaugh—which were eventually memorialized in a concurrence *in which no other justice joined*.

Plaintiffs will no doubt point to the Supreme Court's rejection of the argument that "the NCAA's status as a particular type of venture categorically exempt its restraints from ordinary rule of reason review" under antitrust law (*Alston*, 141 S.Ct. at 2156), as having implications for the FLSA as well. But Defendants have never argued that their *status* (as schools, or as the NCAA) calls for any modified application of the FLSA. Rather, they argue that application of the generally-applicable economic reality standard leads to the conclusion that student-athletes are not *ipso facto* employees (*see Berger v. National Collegiate Athletic Ass'n*, 843 F.3d 285 [7th Cir. 2016]), and that the Department of Labor's longstanding position that "interscholastic athletics . . . do not result in an employer-employee relationship" (FIELD OPERATIONS HANDBOOK § 10b03[e]) provides a complete defense to liability under 29 U.S.C. § 259(a),[2] just

vacate nor broaden the injunction, but affirm." *Id*. at 1263. The student-athletes did not press the point before the Supreme Court. *Alston*, 141 S.Ct. at 2154.

[2] Plaintiffs argue that "Defendants claim that FOH § 10b03(e) should be held to apply in the instant case because it comports with this tradition of amateurism." (ECF 53, p. 2.) Not so. Defendants claim it should be held to apply because its plain language addresses "interscholastic athletics," and Congress has provided that it amounts to a complete defense to FLSA liability under 29 U.S.C. § 259(a).

like any other entity covered by a written administrative interpretation of the Wage & Hour Division.

*Alston* does not support Plaintiffs' FLSA claims, or undermine in the slightest the continuing viability of either the Seventh Circuit's decision in *Berger* or the Ninth Circuit's decision in *Dawson v. Nat'l Collegiate Athletic Ass'n*, 932 F.3d 905 (9th Cir. 2019). If anything, by strongly distinguishing education-related financial support for student athletes from direct compensation for playing sport, *Alston* supports the principle that the economic reality of student athletics is—and should continue to be—that student athletes do not receive "'unlimited payments *unrelated to education*, akin to salaries seen in professional sports leagues.'" *NCAA GIA Litig. II*, 958 F.3d at 1258 (*quoting* 375 F. Supp. 3d at 1083) (emphasis added).[3] The Supreme Court concurred in the Ninth circuit's description of this core principle. Indeed, *Alston* praises the district court's care in crafting a remedy that "*would not blur the distinction between college and professional sports*" (*Alston*, 141 S.Ct. at 2164 [emphasis added]) and leaves undisturbed numerous statements in the lower court opinions erecting a veritable 'jurisprudential firewall' between defraying the costs of education for student athletes and paying them to play sport:

- "The [district] court uncapped education-related benefits, but left in place NCAA limits on compensation unrelated to education, consistent with the majority's observation that 'student-athletes remain amateurs as long as any money paid to them goes to cover *legitimate educational expenses*.' [*O'Bannon*, 802 F.3d] at 1075 (emphasis added); *see also id*. at 1076 (vacating injunction only

[3] Plaintiffs point to the same language—only italicizing "unlimited" instead—to argue that they "are seeking not unlimited compensation but the payment of the minimum wage" for playing sport. (ECF 53, p. 4 n.2.) Their argument founders on the fact that even the minimum wage simply for playing sport would be a payment "unrelated to education." It would "blur the distinction between college and professional sports." *Alston*, 141 S.Ct. at 2164.

insofar as it forced NCAA to permit 'cash payments untethered to . . . education expenses')." *NCAA GIA Litig. II*, 958 F.3d at 1254.

- "Thus, the district court properly 'credit[ed] the importance to consumer demand of maintaining a distinction between college and professional sports.' [*NCAA GIA Litig.* I], 375 F. Supp. 3d at 1082. [¶] The district court concluded, however, that only some of the challenged rules serve that procompetitive purpose: *limits on above-COA payments unrelated to education*, the COA cap on athletic scholarships, and certain restrictions on cash academic or graduation awards and incentives. *Id*. at 1101–02 (recognizing that removal of these restrictions could result in unlimited cash payments akin to professional salaries). It explained that the remaining rules—those restricting 'non-cash education-related benefits'—do nothing to foster or preserve demand because '[t]he value of such benefits, like a scholarship for post-eligibility graduate school tuition, is inherently limited to its actual value, and could not be confused with a professional athlete's salary.' *Id*. at 1083." *NCAA GIA Litig. II*, 958 F.3d at 1257 (emphasis added).

- "[T]he record supports a much narrower conception of amateurism that still gives rise to procompetitive effects: Not paying student-athletes 'unlimited payments unrelated to education, akin to salaries seen in professional sports leagues' is what makes them 'amateurs.' [*NCAA GIA Litig.* I], 375 F. Supp. 3d at 1083. The district court credited NCAA testimony that *college sports resonates with fans because they are not professionalized*, and that 'if the college game looks to be professional sports, [fewer] people will watch it.' *Id*. at 1082 (internal citations omitted)." *NCAA GIA Litig. II*, 958 F.3d at 1258 (emphasis added).

- "[T]he district court was using the term 'unlimited pay' as shorthand for payments that run the risk of eroding consumer perception of student athletes as students—that is, *cash* payments *unrelated to education and akin to professional salaries*." *NCAA GIA Litig. II*, 958 F.3d at 1260, n.16 (emphasis in original).

- "The district court reasonably concluded that uncapping certain education-related benefits would preserve consumer demand for college athletics just as well as the challenged rules do. Such benefits are *easily distinguishable from professional salaries*, as they are 'connect[ed] to education'; 'their value is inherently limited to their actual costs'; and 'they can be provided in kind, not in cash.' [*NCAA GIA Litig.* I], 375 F. Supp. 3d at 1102." *NCAA GIA Litig. II*, 958 F.3d at 1260 (emphasis in original).

- "In light of this evidence, the district court reasonably concluded that market competition in connection with *education-related benefits* will only reinforce consumers' perception of student-athletes as students, thereby preserving demand." *NCAA GIA Litig. II*, 958 F.3d at 1261 (emphasis in original).

- "No evidence in the record substantiates the NCAA's concerns that certain benefits permissible under the LRA, if uncapped, will become vehicles for payments that are virtually indistinguishable from a professional's salary. . . . . [The district court] expressly envisioned "non-cash education-related benefits" for "*legitimate* education-related costs," not luxury cars or expensive musical instruments for students who are not studying music. [*NCAA GIA Litig.* I], 375 F. Supp. 3d at 1105 (emphasis added)." *NCAA GIA Litig. II*, 958 F.3d at 1261 (emphasis in original).

- "If the district court had concluded, as Student-Athletes contend, that NCAA limits on compensation unrelated to education unreasonably restrain trade, then it should have enjoined those limits. . . . The problem for Student-Athletes is that the court did not conclude as much; instead, it determined that NCAA limits on *education*-related compensation are the only challenged rules that flunk the Rule of Reason." *NCAA GIA Litig. II*, 958 F.3d at 1264 (emphasis in original).

- "As previously stated, the district court concluded, at step two, that the NCAA satisfied its burden of showing that *'[r]ules that prevent unlimited payments'—'unrelated to education' and 'akin to salaries seen in professional sports leagues'*—serve the procompetitive end of distinguishing college from professional sports. [*NCAA GIA Litig.* I], 375 F. Supp. 3d at 1083. And at step three, it rejected Student-Athletes proposed LRAs, which would have eliminated such limits." *NCAA GIA Litig. II*, 958 F.3d at 1264 (emphasis added).

*Alston* is an antitrust decision that does not affect the FLSA claims raised here. It leaves undisturbed the idea that athletics in colleges and universities has an educational purpose, student athletes are *students*, and they should not be paid to play sport as if they were instead professionals.

Dated: July 6, 2021 Respectfully submitted

s/ Steven B. Katz .

John E. MacDonald
CONSTANGY, BROOKS, SMITH &
PROPHETE, LLP
989 Lenox Drive
Suite 206 (2nd Floor)
Lawrenceville, New Jersey 08648
Telephone: (609) 454-0096
Facsimile: (609) 844-1102

Donald S. Prophete (admitted *pro hac vice*)
CONSTANGY, BROOKS, SMITH &
PROPHETE, LLP
2600 Grand Boulevard, Suite 750
Kansas City, Missouri 64108-4600
Telephone: (816) 472-6400
Facsimile: (816) 472-6401

Steven B. Katz (admitted *pro hac vice*)
CONSTANGY, BROOKS, SMITH &
PROPHETE, LLP
2029 Century Park East, Suite 1100
Los Angeles, California 90067
Telephone: (310) 909-7775
Facsimile: (424) 465-6630

*Counsel for Defendants.*

**CERTIFICATE OF SERVICE**

I hereby certify that on July 6, 2021, the foregoing document was served on counsel by filing via the CM/ECF system, which will send an email notice to registered parties.

s/ Steven B. Katz__