IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| RALPH "TREY" JOHNSON, ET AL., | : | CIVIL ACTION |
| individually and on behalf of all persons | : | |
| similarly situated | : | |
| | : | |
| v. | : | |
| | : | |
| THE NATIONAL COLLEGIATE | : | |
| ATHLETIC ASSOCIATION, ET AL. | : | NO.  19-5230 |

## MEMORANDUM

**Padova, J.**                                                                          August 25, 2021

Plaintiffs, student athletes at five of the Defendant colleges and universities, contend that student athletes who engage in interscholastic athletic activity for their colleges and universities are employees who should be paid for the time they spend related to those athletic activities. Plaintiffs, Ralph "Trey" Johnson, Stephanie Kerkeles, Nicholas Labella, Claudia Ruiz, Jacob Willebeek-Lemair, and Alexa Cooke, assert claims on behalf of themselves, a Fair Labor Standards Act ("FLSA") collective, and three state classes against the colleges and universities they attend (or attended) (the "Attended Schools Defendants," or "ASD"), the National Collegiate Athletic Association ("NCAA"), twenty additional named universities that are members of the NCAA Division I ("D1"), and a putative Defendant class made up of 125 NCAA D1 colleges and universities.  The First Amended Complaint ("Complaint") asserts claims for violations of the FLSA, 29 U.S.C. § 200 et seq., the Pennsylvania Minimum Wage Act, 43 Pa. Stat. § 333.101 et seq. (the "PMWA"), the New York Labor Law, N.Y. Lab. Law § 191 et seq. ("NYLL"), and the Connecticut Minimum Wage Act, Conn. Gen. Stat. Ann. §§ 31-58 et seq. ("CMWA").  The Complaint also asserts three common law unjust enrichment claims.  The ASD have moved to dismiss the Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) on the ground that

they do not employ Plaintiffs.[1]  We held argument on the Motion on April 14, 2021.  For the reasons that follow, the Motion is denied.

## I.      FACTUAL BACKGROUND

The Complaint alleges the following facts.  The NCAA is an association that regulates intercollegiate sports and has jurisdiction over approximately 1,100 schools and nearly 500,000 student athletes.  (Compl. ¶¶ 44-45.)  The NCAA has entered into multi-year, multi-billion-dollar contracts with broadcasters ESPN, CBS, and Turner Sports to show athletic competitions between NCAA D1 member schools, and it distributes shares of those broadcasting fees to its member schools.  (Id. ¶ 14.)  In addition to shares of broadcasting fees, NCAA D1 member schools also receive fees from multi-year, multi-million-dollar agreements with television and radio networks that they have entered into, either individually or as part of an NCAA conference, to broadcast athletic competitions between NCAA D1 member schools.  (Id. ¶ 15.)

Plaintiff Johnson was a student athlete on the Villanova University NCAA football team from June 2013 until November 18, 2017.  (Id. ¶ 19.)  Plaintiff Kerkeles has been a student athlete on Fordham University's NCAA swimming and diving team since 2016.  (Id. ¶ 20.)  Plaintiff Labella was a student athlete on Fordham University's NCAA baseball team during the 2018 and 2019 baseball practice and competition seasons.  (Id. ¶ 21.)  Plaintiff Ruiz was a student athlete on Sacred Heart University's NCAA tennis team from 2014 to 2018.  (Id. ¶ 22.)  Plaintiff Willebeek-Lemair was a student athlete on Cornell University's NCAA soccer team during the 2017 and 2018 practice and playing seasons.  (Id. ¶ 23.)  Plaintiff Cooke has been a student athlete on Lafayette College's NCAA tennis team since 2017.  (Id. ¶ 24.)

---

[1] The NCAA and the other named Defendant universities have also filed a Motion to Dismiss pursuant to Rule 12(b)(6) on the ground that the Complaint does not plausibly allege that they were joint employers of Plaintiffs.  That motion will be addressed separately.

The Defendants are the NCAA and 25 NCAA D1 member schools (the "University Defendants"). (Id. ¶ 25.) The ASD are: Villanova University, Fordham University, Sacred Heart University, Cornell University, and Lafayette College. (Id. ¶¶ 19-24.) The remaining University Defendants, none of which were attended by the named Plaintiffs, are: Bucknell University, Drexel University, Duquesne University, Fairleigh Dickinson University, La Salle University, Lehigh University, Monmouth University, Princeton University, Rider University, Robert Morris University, Seton Hall University, Saint Francis University, Saint Joseph's University, Saint Peter's University, the University of Delaware, Pennsylvania State University, the University of Pennsylvania, the University of Pittsburgh, Rutgers State University of New Jersey, and Temple University. The Complaint also alleges claims against a putative Defendant class made up of the named University Defendants and 100 additional universities that are members of the NCAA D1. (Id. ¶¶ 360-6, Ex. C.) According to the Complaint, these Defendants jointly employed Plaintiffs and similarly situated persons who are members of the putative FLSA Collective. (Id. ¶ 26.)

Student athletes do not have the option to play NCAA sports for wages at any NCAA D1 school. (Id. ¶ 43.) All member schools in the NCAA have agreed not to pay students to participate in intercollegiate varsity sports. (Id. ¶ 51.) The NCAA's Bylaws prohibit schools from offering wages and prohibit student athletes from accepting wages. (Id. (citations omitted).) A student athlete who participates in NCAA sports can only receive payment based on athletic performance through the U.S. Olympic Committee's ("USOC") Operation Gold program, which pays NCAA-eligible student athletes for winning medals. (Id. ¶¶ 56-57 (citations omitted).) The USOC Operation Gold program also permits NCAA-eligible student athletes to receive additional pay through USA sport governing bodies and organizations, such as USA Swimming and US Wrestling. (Id. ¶ 58 (citation omitted).)

Student athletes at NCAA D1 schools must schedule classes around their required NCAA athletic activities and cannot reschedule their NCAA athletic activities around their academic programs.  (Id. ¶ 90.)  As a result, Villanova University only excuses a student athlete from participating in required athletic activities if there is a conflict between practice and a mandatory core class.  (Id. ¶ 91 (citation omitted).)  For example, when Plaintiff Johnson played football at Villanova University he was required to participate in NCAA athletically related activities on weekdays between 5:45 a.m. and 11:30 a.m. and could not enroll in a non-core class during that time, including classes that were prerequisites for academic degree programs.  (Id. ¶ 92 (citations omitted).)  In addition, NCAA D1 member schools require student athletes to participate in Countable Athletically Related Activities ("CARA"),[2] which are recorded on timesheets under an NCAA D1 Bylaw.  (Id. ¶ 93 (citation omitted).)  NCAA Bylaws also require student athletes to participate in Required Athletically Related Activities like fundraising and community service.  (Id. ¶ 94.)  A student athlete who fails to attend meetings, participate in practice, or participate in scheduled competitions can be disciplined, including suspension or dismissal from the team.  (Id. ¶ 95 (citation omitted).)  Because student athletes have to schedule their classes around their required athletic activities, many student athletes have reported that participation in NCAA D1 sports have prevented them from taking classes that they wanted to take.  (Id. ¶ 96 (citation omitted).)  Many student athletes have also reported that their participation in NCAA D1 sports has prevented them from majoring in their preferred major.  (Id. ¶ 97 (citations omitted).)  Student athletes at Villanova University are also required to participate in activities like meals, physical rehabilitation, dressing, showering, and travel that are not considered CARA.  (Id. ¶ 98 (citation

---

[2] CARA include team conditioning; discussions of strategy; on-field, floor or court activity; review of game film; strength training; individual workouts; and meetings with coaches.  (Compl. ¶ 93 (citation omitted).)

omitted).)  They are also encouraged to engage in additional workouts and consultations with coaches that are not counted in CARA.  (Id. ¶ 99 (citation omitted).)  Student athletes have reported spending more than 30 hours per week on athletically related activities, both CARA and non-CARA, and football players who attend schools in the NCAA bowl and championship subdivisions report spending more than 40 hours per week on these activities.  (Id. ¶ 100.)

At the same time, the NCAA procures substantial revenues from sports.  (See id. ¶¶ 127-29 (citations omitted).)  In the 2018 fiscal year, the NCAA reported total revenues of $1,064,403,240.  (Id. ¶ 127 (citation omitted).)  These revenues came from fees collected for television and marketing rights, championships, tournaments, and sales.  (Id.)  In their 2016 fiscal year, NCAA D1 schools in the football power five subdivision had median total revenues related to NCAA sports of $97,276,000; schools in the football bowl subdivision reported median total revenues related to NCAA sports of $33,470,000; schools in the football championship subdivision had median total revenues related to NCAA sports of $17,409,000; and schools that did not have NCAA football teams reported median total revenues from NCAA sports of $16,018,000.  (Id. ¶ 128 (citation omitted).)  Villanova University in particular had total revenues from NCAA sports of $48,977,278 in its 2018 fiscal year.  (Id. ¶ 129 (citation omitted).)  While student athletes do not receive wages, the NCAA and Villanova University claim that they acquire intangible educational benefits from participating in NCAA sports, including "discipline, work ethic, strategic thinking, time management, leadership, goal setting, and teamwork."  (Id. ¶ 131 (quotation omitted).)

The NCAA D1 member schools exercise significant control over their student athletes. The NCAA Bylaws apply to all student athletes who participate in NCAA sports and they address "recruitment, eligibility, hours of participation, duration of eligibility and discipline."  (Id. ¶ 170 (citation omitted).)  Student athletes who participate in NCAA sports are supervised by coaching

and training staff.  (Id. ¶ 135 (citation omitted).)  NCAA D1 member schools are required to have adult supervisors maintain timesheets for participants.  (Id. ¶ 136 (citations omitted).)  They also have handbooks that contain standards for controlling student athletes' performance and conduct.  (Id. ¶¶ 139-40 (citations omitted).)  NCAA D1 member schools impose discipline, including suspension and dismissal from a team, in instances of specified misconduct.  (Id. ¶ 140 (citations omitted).)  NCAA D1 member schools also publish supplemental handbooks with standards that are used to control the performance and conduct of student athletes both on and off the field.  (Id. ¶ 141.)  These handbooks contain rules regarding agents, prohibiting certain categories of legal gambling, and restricting social media use, including restrictions on making derogatory comments about other teams.  (Id. (citation omitted).)  NCAA D1 member schools also have NCAA team policies that restrict the legal consumption of alcohol and legal use of nicotine products by student athletes.  (Id. ¶ 143.)

Based upon these factual allegations, the Complaint asserts that Plaintiffs are the employees of Defendants, including the ASD, and it asserts eight claims for relief, seeking payment of wages for the time Plaintiffs spent engaged in activities connected to NCAA sports. Count I asserts claims pursuant to the FLSA on behalf of Plaintiffs and the proposed FLSA collective against all Defendants and the proposed Defendant class for failure to pay them minimum wages as employees.  Plaintiffs and the members of the proposed FLSA Collective seek unpaid minimum wages, an equal amount as liquidated damages, attorneys' fees, and costs in connection with Count I.  Count II asserts claims on behalf of Plaintiffs Johnson and Cooke and the proposed Pennsylvania class against fourteen colleges and universities located in Pennsylvania

(the "Pennsylvania-based Defendants"[3]) for violating the PMWA by failing to pay them minimum wages for the hours they spent on activities relating to NCAA D1 sports.  Plaintiffs Johnson, Cooke, and the proposed Pennsylvania class seek recovery of unpaid wages, attorneys' fees, and costs in connection with Count II.  Count III asserts a claim for unjust enrichment on behalf of Plaintiffs Johnson, Cooke, and the proposed Pennsylvania class against the Pennsylvania-based Defendants for benefiting from the unpaid labor of Plaintiffs Johnson, Cooke, and the proposed Pennsylvania class.  Plaintiffs Johnson, Cooke, and the proposed Pennsylvania class seek judgment in an amount equal to the benefits unjustly retained by the Pennsylvania-based Defendants in connection with Count III.

Count IV asserts a claim on behalf of Plaintiffs Kerkeles, Labella, Willebeek-Lemair, and the proposed New York class against eighteen schools located in New York (the "New York-based Defendants"[4]) for failure to pay them minimum wages under the NYLL.  Plaintiffs Kerkeles, Labella, Willebeek-Lemair, and the proposed New York class seek recovery of unpaid wages, liquidated damages, attorneys' fees, and costs in connection with Count IV.  Count V asserts a claim on behalf of Plaintiffs Kerkeles, Labella, Willebeek-Lemair, and the proposed New York class against the New York-based Defendants for failure to pay them wages for all hours they spent

---

[3] The Pennsylvania-based Defendants are identified in the Complaint as Bucknell University, Drexel University, Duquesne University, La Salle University, Lafayette College, Lehigh University, Robert Morris University, Saint Francis University, Saint Joseph's University, Villanova University, the University of Pennsylvania, Pennsylvania State University, the University of Pittsburgh, and Temple University.  (Compl. ¶ 272 n. 22.)

[4] The New York-based Defendants are identified in the Complaint as Colgate University, Canisius College, Columbia University, Cornell University, Fordham University, Manhattan College, Iona College, Marist College, Hofstra University, Long Island University, Brooklyn College, Niagara University, St. John's University, Siena College, St. Bonaventure University, St. Francis College Brooklyn, Syracuse University, and Wagner College.  (Compl. ¶ 389 n.28.)

on NCAA D1 sports in violation of the NYLL.  Plaintiffs Kerkeles, Labella, Willebeek-Lemair, and the proposed New York class seek the total amount of their unpaid straight-time wages, liquidated damages, attorneys' fees, costs, and interest in connection with Count V.  Count VI asserts a claim on behalf of Plaintiffs Kerkeles, Labella, Willebeek-Lemair and the proposed New York class against the New York-based Defendants for unjust enrichment for benefiting from their uncompensated labor.  Plaintiffs Kerkeles, Labella, Willebeek-Lemair, and the proposed New York class seek judgment in an amount equal to the benefits unjustly retained by the New York-based Defendants in connection with Count VI.

Count VII asserts a claim on behalf of Plaintiff Ruiz and the members of the proposed Connecticut class against five universities located in Connecticut (the "Connecticut-based Defendants"[5]) for violating the CMWA by failing to pay them minimum wages for any and all hours that they allowed Plaintiff Ruiz and the proposed Connecticut class to work.  Plaintiff Ruiz and the members of the proposed Connecticut class seek payment of unpaid wages, liquidated damages, attorneys' fees, and costs in connection with Count VII.  Count VIII asserts a claim on behalf of Plaintiff Ruiz and the members of the proposed Connecticut class against the Connecticut-based Defendants for unjust enrichment for inducing them to perform work while failing to properly compensate them.  Plaintiff Ruiz and the proposed Connecticut class seek judgment in the amount of the benefits unjustly retained by the Connecticut-based Defendants in connection with Count VIII.

---

[5] The Connecticut-based Defendants are identified in the Complaint as Fairfield University, the University of Hartford, Quinnipiac University, Sacred Heart University, and Yale University. (Compl. ¶ 409 n.29.)

The Attended Schools Defendants have moved to dismiss all claims against them pursuant to Federal Rule of Civil Procedure 12(b)(6) on the ground that it does not plausibly allege that Plaintiffs are their employees.

## II.   LEGAL STANDARD

When deciding a motion to dismiss pursuant to Rule 12(b)(6), we "'consider only the complaint, exhibits attached to the complaint, [and] matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents.'" Alpizar-Fallas v. Favero, 908 F.3d 910, 914 (3d Cir. 2018) (quoting Mayer v. Belichick, 605 F.3d 223, 230 (3d Cir. 2010)). We take the factual allegations of the complaint as true and "'construe the complaint in the light most favorable to the plaintiff.'" DelRio-Mocci v. Connolly Props., Inc., 672 F.3d 241, 245 (3d Cir. 2012) (quoting Warren Gen. Hosp. v. Amgen Inc., 643 F.3d 77, 84 (3d Cir. 2011)). However, we "'are not bound to accept as true a legal conclusion couched as a factual allegation.'" Wood v. Moss, 572 U.S. 744, 755 n.5 (2014) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)).

A plaintiff's pleading obligation is to set forth "a short and plain statement of the claim," Fed. R. Civ. P. 8(a)(2), which gives the defendant "'fair notice of what the . . . claim is and the grounds upon which it rests.'" Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (alteration in original) (quoting Conley v. Gibson, 355 U.S. 41, 47 (1957)). The complaint must allege "'sufficient factual matter to show that the claim is facially plausible,' thus enabling 'the court to draw the reasonable inference that the defendant is liable for [the] misconduct alleged.'" Warren Gen. Hosp., 643 F.3d at 84 (quoting Fowler v. UPMC Shadyside, 578 F.3d 203, 210 (3d Cir. 2009)). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." Iqbal, 556 U.S. at 678

(citing <u>Twombly</u>, 550 U.S. at 556).  In the end, we will grant a motion to dismiss brought pursuant to Rule 12(b)(6) if the factual allegations in the complaint are not sufficient "'to raise a right to relief above the speculative level.'"  <u>Geness v. Admin. Office of Pa. Courts</u>, 974 F.3d 263, 269 (3d Cir. 2020), <u>cert. denied</u> 2021 WL 2044599 (2021) (quoting <u>Twombly</u>, 550 U.S. at 555).

## III.   DISCUSSION

The ASD argue that the Complaint fails to state any claims against them because it does not allege facts that would establish that Plaintiffs are their employees, which is a requirement for bringing a claim under the FLSA.[6]  <u>See</u> <u>Razak v. Uber Techs. Inc.</u>, 951 F.3d 137, 143 (3d Cir. 2020), <u>cert. denied</u>, 209 L.Ed.2d 755 (U.S. May 17, 2021) (noting that "[t]he burden lies with Plaintiffs to prove that they are employees" (citation omitted)).  The FLSA defines the term "employee" as "any individual employed by an employer."  29 U.S.C. § 203(e)(1).  The United States Court of Appeals for the Third Circuit has explained that "[t]his statutory definition is 'necessarily broad to effectuate the remedial purposes of the Act.'"  <u>Safarian v. Am. DG Energy Inc.</u>, 622 F. App'x 149, 151 (3d Cir. 2015) (quoting <u>Martin v. Selker Bros.</u>, 949 F.2d 1286, 1293 (3d Cir. 1991)).  "In accordance with this 'expansive definition[ ],' courts must 'look to the economic realities of the relationship in determining employee status under the FLSA.'"  <u>Id.</u> (alteration in original) (quoting <u>Martin</u>, 949 F.2d at 1293; citing <u>Tony & Susan Alamo Found. v. Sec'y of Labor</u>, 471 U.S. 290, 301 (1985)); <u>see also</u> <u>Tony & Susan Alamo Found.</u>, 471 U.S. at 301 ("The test of employment under the Act is one of 'economic reality.'" (citing <u>Goldberg v. Whitaker House Co-op., Inc.</u>, 366 U.S. 28, 33 (1961))).  The ASD assert three reasons why Plaintiffs cannot be their employees:  (1) student athletes such as Plaintiffs are amateurs; (2) the Department of

---

[6] We note that, while the ASD seek dismissal of all of Plaintiffs' claims against them, they do not directly address Plaintiffs' state statutory and common law claims, which comprise Counts II through VIII of the Complaint).

Labor has determined that interscholastic athletes are not employees for purposes of the FLSA; and (3) the Complaint does not plausibly allege that Plaintiffs are employees pursuant to a multi-factor test used to determine whether individuals are employees.

      A.     <u>Amateurism</u>

The ASD maintain that Plaintiffs are not employees of the schools they attend, and for which they compete in interscholastic athletics, because they are amateurs and the Supreme Court has recognized that "[c]ollege athletics in the United States is defined by its century-old 'revered tradition of amateurism.'" (ASD Mem. at 6 (quoting <u>Nat'l Collegiate Athletic Ass'n v. Bd. of Regents</u>, 468 U.S. 85, 120 (1984)). The ASD rely both on the Supreme Court's decision in <u>National Collegiate Athletic Association v. Board of Regents</u> and on <u>Berger v. National Collegiate Athletic Association</u>, 843 F.3d 285 (7th Cir. 2016), in which the United States Court of Appeals for the Seventh Circuit rejected a lawsuit brought pursuant to the FLSA by former student athletes against the NCAA and more than 120 of its D1 member schools. <u>See</u> <u>Berger</u>, 843 F.3d at 288 (affirming dismissal of lawsuit brought by former student athletes of the University of Pennsylvania alleging that student athletes are employees entitled to minimum wages under the FLSA because "student athletes are not employees and are not covered by the FLSA"). The <u>Berger</u> Court relied on the Supreme Court's recognition of the tradition of amateurism in college sports in <u>Board of Regents</u> to find that this "long-standing tradition defines the economic reality of the relationship between student athletes and their schools." <u>Id.</u> at 291. The ASD maintain that the NCAA member schools' history of "'[n]ot paying student-athletes is *precisely what makes them amateurs*.'" (ASD Mem. at 9 (quoting <u>O'Bannon v. Nat'l Collegiate Athletic Ass'n</u>, 802 F.3d 1049, 1076 (9th Cir. 2015)). Thus, the ASD engage in the circular reasoning that they should not be required to pay Plaintiffs a minimum wage under the FLSA because Plaintiffs are amateurs,

and that Plaintiffs are amateurs because the ASD and the other NCAA member schools have a long history of not paying student athletes like Plaintiffs.

The Supreme Court did, indeed, note in Board of Regents that "[t]he NCAA plays a critical role in the maintenance of a revered tradition of amateurism in college sports."  468 U.S. at 120. However, it recently rejected the NCAA's argument that Board of Regents "expressly approved its limits on student-athlete compensation—and [that] this approval forecloses any meaningful review of those limits today."  Nat'l Collegiate Athletic Ass'n v. Alston, 141 S. Ct. 2141, 2157 (2021).  The Supreme Court explained in Alston that:

> Board of Regents may suggest that courts should take care when assessing the NCAA's restraints on student-athlete compensation, sensitive to their procompetitive possibilities.  But these remarks do not suggest that courts must reflexively reject *all* challenges to the NCAA's compensation restrictions.  Student-athlete compensation rules were not even at issue in Board of Regents.

Id. at 2158; see also id. at 2167 ("The Court makes clear that the decades-old 'stray comments' about college sports and amateurism made in [Board of Regents] were dicta and have no bearing on whether the NCAA's current compensation rules are lawful." (Kavanaugh, J., concurring) (citation omitted)).  As Justice Kavanaugh noted in his concurring opinion in Alston, the argument "that colleges may decline to pay student athletes because the defining feature of college sports . . . is that the student athletes are not paid. . . . is circular and unpersuasive."  Id. at 2167 (Kavanaugh, J., concurring).  Accordingly, we reject the ASD's argument that Plaintiffs are not employees entitled to minimum wages pursuant to the FLSA because there is a long-standing tradition of amateurism in NCAA interscholastic athletics that defines the economic reality of the relationship between Plaintiffs and the ASD.[7]

---

[7] The ASD also argue that student athletes who play intercollegiate sports cannot be "employees" under the FLSA because the common usage of the terms "employment" and "work" do not encompass students playing sports.  (ASD Mem. at 20-21.)  The ASD rely on the following

B.      The Department of Labor

The ASD also argue that Plaintiffs are not their employees for purposes of the FLSA

because the Department of Labor has determined that student participation in extracurricular

activities, including that of interscholastic athletes, does not result in an employer/employee

relationship.  The ASD rely on the Field Operations Handbook ("FOH"), which is published by

the Wage and Hour Division of the Department of Labor.  See Berger, 843 F.3d at 292.  "The FOH

is an operations manual that provides Wage and Hour Division . . . investigators and staff with

interpretations of statutory provisions, procedures for conducting investigations, and general

administrative guidance."  Id. (alteration in original) (quotation omitted).  Section 10b24 of the

FOH provides that "University or college students who participate in activities generally

recognized as extracurricular are generally not considered to be employees within the meaning of

the Act."  2016 FOH, Dep't of Labor, https://www.dol.gov/sites/dolgov/files/WHD/legacy/files/F

OH_Ch10.pdf (last visited August 10, 2021).  FOH § 10b03(e) more specifically provides as

follows:

> As part of their overall educational program, public or private schools and
> institutions of higher learning may permit or require students to engage in activities
> in connection with dramatics, student publications, glee clubs, bands, choirs,
> debating teams, radio stations, intramural and **interscholastic athletics** and other
> similar endeavors.  **Activities of students in such programs, conducted
> primarily for the benefit of the participants as a part of the educational
> opportunities provided to the students by the school or institution, are not
> work of the kind contemplated by . . . the Act and do not result in an employer-
> employee relationship between the student and the school or institution**.

---

comment in Berger:  "[s]imply put, student-athlete 'play' is not 'work.'"  843 F.3d at 293.
However, athletic "play" is "work" when the athletes are paid, which is evident from the number
of individuals who are employed to "play" for professional teams competing in football, baseball,
basketball, and ice hockey, among other sports.  We also note that many students are "employed"
to do paid work, such as students who have work-study positions with their respective universities.
Accordingly, we reject the ASD's contention that student athletes who play intercollegiate sports
cannot be "employees" under the FLSA because the common usage of the terms "employment"
and "work" do not encompass students playing sports.

Id. (emphasis added).

The ASD contend that FOH § 10b03(e) provides a complete defense to Plaintiffs' claims in this action.  In support, they cite 29 U.S.C. § 259, which provides as follows:

> no employer shall be subject to any liability or punishment for or on account of the failure of the employer to pay minimum wages . . . under the Fair Labor Standards Act of 1938, as amended, . . . if he pleads and proves that the act or omission complained of was in good faith in conformity with and in reliance on any written administrative regulation, order, ruling, approval, or interpretation, of the agency of the United States specified in subsection (b) of this section.

29 U.S.C.A. § 259(a).  Subsection (b) includes the Administrator of the Wage and Hour Division as an agency referred to in subsection (a).  29 U.S.C. § 259(b).  "To be insulated from liability under § 259's good faith exception, an employer must 'show it acted in (1) good faith, (2) conformity with, and (3) reliance on the DOL's regulations or the Administrator's Opinion Letter.'"  Alvarez v. IBP, Inc., 339 F.3d 894, 907 (9th Cir. 2003) (quoting Frank v. McQuigg, 950 F.2d 590, 598 (9th Cir. 1991)), aff'd, 546 U.S. 21 (2005).  "The employer bears the burden of proof to establish this exception."  Id.  However, there is nothing on the record of this Motion to Dismiss upon which we could determine whether the ASD failed to pay minimum wages to their student athletes in reliance on FOH §§ 10b03(e) and 10b24 and, thus, there is nothing upon which we could rely to determine, at this juncture, whether the ASD are entitled to a complete defense to Plaintiffs' FLSA claim based upon § 259(a).[8]  Accordingly, we deny the Motion to Dismiss with respect to this argument.

---

[8] The ASD argue that their good faith reliance on FOH § 10b03(e) is "demonstrated— objectively—by over 50 years of unanimity among state and federal courts that student-athletes are not *ipso facto* 'employees' of their schools."  (ASD Mem. at 28.)  However, whatever else is demonstrated by such unanimity, if it exists, such unanimity does not show what the ASD relied on when they individually decided not to pay minimum wages to their student athletes.  The ASD also contend that their reliance on FOH § 10b03(e) in other lawsuits challenging their failure to pay student athletes pursuant to the FLSA is subject to judicial notice and establishes their good

The ASD also argue, in the alternative, that we should give deference to the Wage and Hour Division's interpretation of the FLSA in FOH § 10b03(e) pursuant to Skidmore v. Swift & Co., 323 U.S. 134 (1944), and decide, as a matter of law, that they do not have an employer/employee relationship with their student athletes.   In Skidmore, the Supreme Court discussed the degree of deference that should be given to the DOL's rulings and interpretations of the FLSA:

> the rulings, interpretations and opinions of the Administrator under this Act, while not controlling upon the courts by reason of their authority, do constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance. The weight of such a judgment in a particular case will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control.

Id. at 140.  Similarly, in Secretary United States Department of Labor v. American Future Systems, Inc., 873 F.3d 420 (3d Cir. 2017), the Third Circuit noted that, while the Wage and Hour Division's "interpretations are not technically 'law,' the regulations nevertheless 'constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance.'"  Id. at 427 (quoting Babcock v. Butler County, 806 F.3d 153, 157 n.7 (3d Cir. 2015)).  The Third Circuit has adopted a "'sliding-scale' test" for application of Skidmore deference.  Id. (quoting Hagans v. Comm'r of Soc. Sec., 694 F.3d 287, 304 (3d Cir. 2012)).  In this test, "'the level of weight afforded to an interpretation varies depending on [the] analysis of the enumerated factors."  Id. (alteration in original) (quoting Hagans, 694 F.3d at 304).  "Those factors include

---

faith reliance on that section.  However, the ASD's reliance on FOH § 10b03(e) in defending lawsuits alleging that they violated the FLSA by failing to pay student athletes a minimum wage does not establish that they relied on § 10b03(e) when they made their decisions not to pay student athletes minimum wages.  We find, accordingly, that there is nothing on the limited record before us on this Motion to Dismiss that sheds light, one way or the other, on whether the ASD relied on FOH § 10b03(e) in not paying minimum wages to their student athletes.

whether the interpretation was:  (1) issued contemporaneously with the statute; (2) consistent with other agency pronouncements; (3) reasonable given the language and purposes of the statute; (4) within the expertise of the relevant agency; and (5) part of a longstanding and unchanging policy." Id. (citing Hagans, 694 F.3d at 304-05; Cleary ex rel. Cleary v. Waldman, 167 F.3d 801, 808 (3d Cir. 1999)).  We note that "Skidmore deference can . . . actually be quite limited, indeed, almost non-deferential."  Ebbert v. DaimlerChrysler Corp., 319 F.3d 103, 114 (3d Cir. 2003) (citation omitted).  Moreover, an internal agency manual, because it "is not subject to the kind of deliberateness or thoroughness that gives rise to significant deference," is "automatically at the lower end of the Skidmore scale of deference."  Id. at 115 (citing Skidmore, 323 U.S. at 140).

The ASD argue that the five factors discussed in American Future Systems weigh in favor of Skidmore deference, and they urge us to accord FOH § 10b03(e) significant deference even though it was not issued contemporaneously with the enactment of the FLSA in 1938.  With respect to factors two through five, the ASD argue that FOH § 10b03 is entitled to considerable deference because it is consistent with FOH § 10b24(a); there are no inconsistent opinion letters or other pronouncements of the DOL; determining who is and who is not an employee is within the expertise of the DOL; and, because the Wage and Hour Division issued FOH § 10b03 more than fifty years ago, it is part of a longstanding and unchanging policy.  However, there is nothing in the limited record before us to support these contentions.  Nonetheless, we will assume, for the purposes of this Motion only, that FOH § 10b03(e) is entitled to some deference.

Plaintiffs argue that FOH § 10b03(e) does not apply to their relationship with the ASD because they participate in NCAA sanctioned college sports and FOH § 10b03(e) only applies to student-run groups.  The Seventh Circuit, in Berger, rejected this argument because most of the activities listed in FOH § 10b03(e) are not student run.  Berger, 843 F.3d at 293.  We agree.

Plaintiffs also argue, however, that FOH § 10b03(e) does not apply to students who participate in NCAA sports because those sports, unlike the other extracurricular activities listed in that section, provide no educational benefits to students and are not conducted primarily for the benefit of the participants as part of the educational opportunities provided to students.[9]

The Complaint alleges that student athletes are required to schedule classes around their required NCAA athletic activities and cannot reschedule their NCAA athletic activities around their academic programs.  (Compl. ¶ 90.)  For example, Villanova University only excuses a student athlete from participating in required athletic activities if there is a conflict between practice and a mandatory core class.  (Id. ¶ 91.)  When Plaintiff Johnson played football at Villanova University, he was required to participate in NCAA athletically related activities on weekdays between 5:45 a.m. and 11:30 a.m. during the football practice and playing seasons and

---

[9] The ASD argue that Plaintiffs' interpretation of FOH § 10b03(e) as applying only to extracurricular activities that are "conducted primarily for the benefit of the participants as a part of the educational opportunities provided to the students," FOH § 10b03(e), ignores the plain meaning of that section and defies canons of statutory construction because "the phrase 'conducted primarily for the benefit of the participants as a part of the educational opportunities provided' modifies 'programs,' the word it immediately follows."  (ASD Mem. at 30.)  The ASD further contend that "FOH § 10b03(e) itself reflects the DOL's conclusion that interscholastic sports *are* programs that are conducted primarily for the benefit of the participants as part of the educational opportunities provided to them."  (Id.)  However, the ASD have failed to elaborate on these contentions or support them with references to the canons of statutory construction purportedly defied.

Plaintiffs posit that the phrase "primarily for the benefit of the participants as a part of the educational opportunities provided to the students" in FOH § 10b03(e) is used to describe a necessary factor that all of the listed extracurricular activities have in common.  Plaintiffs maintain that this use of the phrase follows the cannon of statutory construction known as "*ejusdem generis*," which means "of the same kind or class."  Black's Law Dictionary (11th ed. 2019).  Black's Law Dictionary explains that *ejusdem generis* is "[a] canon of construction holding that when a general word or phrase follows a list of specifics, the general word or phrase will be interpreted to include only items of the same class as those listed."  Id.  We conclude, for the purposes of this Motion, that Plaintiffs' suggested interpretation of the phrase "primarily for the benefit of the participants, as part of the educational opportunities provided to the students" as describing a necessary factor of the extracurricular activities that are listed in FOH § 10b03(e) is reasonable and comports with the canons of statutory construction.

could not enroll in a non-core class during that time, including classes that were "prerequisites for academic degree programs." (<u>Id.</u> ¶ 92.)  In addition, because student athletes are required to schedule their classes around their required athletic activities, many student athletes have reported that participation in NCAA D1 sports has prevented them from taking classes that they want to take and from majoring in their preferred major. (<u>Id.</u> ¶¶ 96-97.)  Student athletes are also required by their schools to participate in CARA and in non-countable Required Athletically Related Activities. (<u>Id.</u> ¶¶ 93-94.)  Student athletes have reported spending more than 30 hours per week on CARA and non-CARA activities and football players in the bowl and championship subdivisions report spending more than 40 hours per week on these activities. (<u>Id.</u> ¶ 100.)  Many student athletes believe that these activities, which are required by the NCAA, prevent them from being able to keep up with their classes during the playing and practice seasons. (<u>Id.</u> ¶ 102.)

The Complaint also alleges that "Student Athlete performance is integral to the billion dollar Big Business of NCAA sports." (<u>Id.</u> ¶ 113.)  NCAA "sports contests **cannot** take place without athletes." (<u>Id.</u> ¶ 121 (citation omitted).)  Only student athletes eligible under NCAA Bylaws, who are not paid, may participate on teams in NCAA-governed sports. (<u>Id.</u> ¶¶ 122, 124.) NCAA D1 member schools benefit financially from the promotion of NCAA sports by student athletes. (<u>Id.</u> ¶ 125.)  As we previously discussed, in its 2018 fiscal year, the NCAA reported total revenues of $1,064,403,240, which was primarily generated by "television and marketing rights fees, championships, tournaments, and sales." (<u>Id.</u> ¶ 127 (citation omitted).)  In their 2016 fiscal year, NCAA D1 schools reported median total revenues from NCAA sports as follows: (1) schools in the football power five subdivision had median total revenues of $97,276,000; schools in the football bowl subdivision had median total revenues of $33,470,000; (3) schools in the football championship subdivision had media total revenues of $17,409,000; and (4) schools that did not

18

have NCAA football teams had median total revenues of $16,018,000. (Id. ¶ 128 (citation omitted).) Villanova University reported total revenues from NCAA sports of $48,977,278 in its 2018 fiscal year. (Id. ¶ 129.) The Complaint also specifically alleges that the intangible educational benefits that the NCAA and Villanova University claim that student athletes acquire from participating in NCAA sports, i.e., "discipline, work ethic, strategic thinking, time management, leadership, goal-setting and teamwork" are not comparable to the tangible benefits that accrue to NCAA member schools as a result of student athletes competing in NCAA sports, such as revenue and the benefits from school branding. (Id. ¶ 131 (quotation omitted).)

"'[C]onstru[ing] the complaint in the light most favorable to the plaintiff,'" DelRio-Mocci, 672 F.3d at 245 (quoting Warren Gen. Hosp., 643 F.3d at 84), we find that the Complaint plausibly alleges that NCAA D1 interscholastic athletics are not conducted primarily for the benefit of the student athletes who participate in them, but for the monetary benefit of the NCAA and the colleges and universities that those student athletes attend. We further find that the Complaint plausibly alleges that the NCAA D1 interscholastic athletics are not part of the educational opportunities provided to the student athletes by the colleges and universities that they attend but, rather, interfere with the student athletes' abilities to participate in and get the maximum benefit from the academic opportunities offered by their colleges and universities. Accordingly, we conclude that the Complaint plausibly alleges that NCAA D1 interscholastic athletics are not the types of activities listed in FOH § 10b03(e) that "do not result in an employer-employee relationship between the student and the school or institution." FOH § 10b03(e). We further conclude, accordingly, that FOH § 10b03(e) does not require us to find, as a matter of law, that Plaintiffs cannot be employees of the ASD. Consequently, we deny the Motion to Dismiss as to this argument.

C.     The Economic Reality of the Relationship Between Plaintiffs and the ASD

1.     Expectation of compensation

As we mentioned above, we "look to the economic realities of the relationship in determining employee status under the FLSA."  Safarian, 622 F. App'x at 151 (quotation and citation omitted).  The ASD argue that Plaintiffs and other student athletes cannot be employees of the schools they attend because they participate in interscholastic athletics for those schools without any expectation of payment and this amateurism "defines the economic reality of the relationship between student athletes and their schools."  Berger, 843 F.3d at 291.  The ASD maintain that, while the FLSA's definition of employee is exceedingly broad, it does not include an individual who works for a covered enterprise without any express or implied compensation agreement.  The ASD rely on Walling v. Portland Terminal Co., 330 U.S. 148 (1947), in which the Supreme Court noted that the definition of employee in Section 3(g) of the FLSA "was obviously not intended to stamp all persons as employees who, without any express or implied compensation agreement, might work for their own advantage on the premises of another."  Id. at 152.  In Portland Terminal, the Supreme Court determined that individuals who participated in a railroad company's training session for prospective brakemen were not employees of the railroad entitled to minimum and overtime wages under the FLSA, even though they were required to complete the training session before the railroad would hire them.  Id. at 150, 153.  The Court noted that the definitions of employer and employee in the FLSA, while broad, "cannot be interpreted so as to make a person whose work serves only his own interest an employee of another person who gives him aid and instruction."  Id. at 152.  Thus, since the record in Portland Terminal showed "that the railroads receive no 'immediate advantage' from any work done by the trainees," the Supreme Court held that those trainees were not employees within the meaning of the FLSA.

20

Id. at 153.  In contrast, the Complaint in this action alleges that the ASD receive considerable financial advantage from Plaintiffs' participation in interscholastic athletics.  (See Compl. ¶¶ 128-29.)  We conclude, accordingly, that Portland Terminal is not controlling here.

The ASD also rely on Tony & Susan Alamo Foundation, in which the Supreme Court determined that some individuals who believed themselves to be volunteers for the Foundation, but who relied on non-wage benefits they received from the Foundation, were employees under the FLSA.  The Tony and Susan Alamo Foundation was a nonprofit religious organization that derived its income from commercial businesses staffed by individuals associated with the Foundation, many of whom had been drug addicts before being rehabilitated by the Foundation. Tony & Susan Alamo Found., 471 U.S. at 292.  The Foundation provided its associates with room and board but did not pay them salaries.  Id.  The Secretary of Labor filed an action against the Foundation, asserting that the Foundation violated the minimum wage, overtime, and recordkeeping provisions of the FLSA by not paying the associates wages.  Id. at 293.  Some Foundation associates testified at the trial and "vigorously protested the payment of wages, asserting that they considered themselves volunteers who were working only for religious and evangelical reasons."   Id.   Nonetheless, the Supreme Court affirmed the lower court's determination that the associates were employees even though they considered themselves to be volunteers and did not seek wages under the FLSA.  Id. at 293-94, 306. The Supreme Court explained that "the purposes of the Act require that it be applied even to those who would decline its protections.  If an exception to the Act were carved out for employees willing to testify that they performed work 'voluntarily,' employers might be able to use superior bargaining power to coerce employees to make such assertions, or to waive their protections under the Act."  Id. at 302 (citations omitted).  Consequently, we cannot dismiss Plaintiffs' claims simply because they

commenced their careers as student athletes for the ASD without an express or implied compensation agreement, as in this regard, they are like the Tony and Susan Alamo Foundation associates who had no expectation that they would be paid wages and yet were found to be employees.[10]   Rather, we look at the whole "economic reality" of Plaintiffs' relationships with the ASD.  Id. at 301 (quotation omitted).

---

[10] The ASD rely on the Supreme Court's consideration of the associates' reliance on the in-kind benefits they received from the Tony & Susan Alamo Foundation as creating a requirement that employees have an expectation that they will be compensated by wages or by in-kind benefits. See Tony & Susan Alamo Found., 471 U.S. at 301 (agreeing with the district court's determination "the associates were entirely dependent upon the Foundation for long periods, in some cases several years" and, therefore, "must have expected to receive in-kind benefits—and expected them in exchange for their services" (quotation omitted)).  However, in Tony & Susan Alamo Foundation, the Supreme Court was concerned with distinguishing between volunteers and employees of a religious organization.  Id. at 302-03.  The Supreme Court noted in that case that the FLSA "reaches only the 'ordinary commercial activities' of religious organizations, and only those who engage in those activities in expectation of compensation," so that "[o]rdinary volunteerism is not threatened by this interpretation of the statute."  Id. at 302-03 (quoting 29 CFR § 779.214)).  Thus, Tony & Susan Alamo Foundation's concern with the expectation of compensation in that case related to whether the associates were volunteers as that term is defined by the FLSA, a concern that does not exist in the instant case.  See id. at 303 n.25 ("The Solicitor General states that in determining whether individuals have truly volunteered their services, the Department of Labor considers a variety of facts, including the receipt of any benefits from those for whom the services are performed, whether the activity is a less than full-time occupation, and whether the services are of the kind typically associated with volunteer work.").  Furthermore, while the existence of an expectation of compensation was one of the factors considered in both Tony & Susan Alamo Foundation and Portland Terminal, it is only one of several non-dispositive factors that courts use to analyze whether an individual is an employee.  For example, as the Ninth Circuit noted in Dawson v. National Collegiate Athletic Association, 932 F.3d 905 (9th Cir. 2019), expectation of compensation is only one of the circumstances that is relevant to the economic reality of the relationship between possible employees and their employers.  Id. at 909 ("The Supreme Court has found a number of circumstances relevant in evaluating economic reality, including: (1) expectation of compensation, Portland Terminal, 330 U.S. at 152; (2) the power to hire and fire, Goldberg [v. Whitaker House Cooperative, Inc., 366 U.S. 28, 33 (1961)]; (3) and evidence that an arrangement was 'conceived or carried out' to evade the law, Portland Terminal, 330 U.S. at 153.").  In addition, expectation of compensation was just one of seven non-dispositive factors considered by the United States Court of Appeals for the Second Circuit in determining whether a student intern is an employee in Glatt v. Fox Searchlight Pictures, Inc., 811 F.3d 528, 536 (2d Cir. 2016).   Moreover, expectation of compensation is not even one of the six factors used by the Third Circuit for distinguishing between employees and independent contractors.  See Donovan v. DialAmerica Mktg., Inc., 757 F.2d 1376, 1382 (3d Cir. 1985); Razak, 951 F.3d at 144-

When we consider whether Plaintiffs are employees of the ASD, we are mindful "that the determination of the relationship does not depend on . . . isolated factors but rather upon the circumstances of the whole activity." Rutherford Food Corp. v. McComb, 331 U.S. 722, 730 (1947). Thus, "'[w]hen determining whether someone is an employee under the FLSA, economic reality rather than technical concepts is to be the test of employment.'" Thompson v. Real Est. Mortg. Network, 748 F.3d 142, 148 (3d Cir. 2014) (quoting In re Enter. Rent-A-Car Wage & Hour Emp. Pracs. Litig., 683 F.3d 462, 467 (3d Cir. 2012)). "'Under this theory, the FLSA defines employer 'expansively,' and with 'striking breadth.' The Supreme Court has even gone so far as to acknowledge that the FLSA's definition of an employer is 'the broadest definition that has ever been included in any one act.'" Id. (quoting In re Enter. Rent-A-Car, 683 F.3d at 467-68).

Courts have, accordingly, developed multifactor tests to be used in determining, based on the circumstances of the whole relationship between the parties, whether individuals are employees or independent contractors, whether entities are joint employers, and whether individuals are employees or interns. See Donovan v. DialAmerica Mktg., Inc., 757 F.2d 1376, 1382 (3d Cir. 1985) (adopting a six-factor test developed in Donovan v. Sureway Cleaners, 656 F.2d 1368, 1370 (9th Cir. 1981), to determine whether an individual is an employee or an independent contractor); In re Enter. Rent-A-Car, 683 F.3d at 469 (adopting a four-factor test to determine whether entities are joint employers); Glatt v. Fox Searchlight Pictures, Inc., 811 F.3d 528, 536-37 (2d Cir. 2016) (adopting a non-exhaustive set of seven factors to be used to determine whether an individual is a student intern or an employee). The ASD ask us to reject the use of any existing multifactor tests because they fail to "account[] for the 'revered tradition of amateurism in college sports.'" (ASD

---

45. Thus, while expectation of compensation is one factor that may shed light on whether an individual is an employee, it is not determinative.

Mem. at 36 (quoting <u>Board of Regents</u>, 468 U.S. at 120).)   As we have rejected the ASD's argument that Plaintiffs cannot be their employees because of the "revered tradition of amateurism in college sports," <u>Board of Regents</u>, 468 U.S. at 120, we also reject their argument that we should not use existing multifactor tests because they fail to account for this "revered tradition."

    2.  <u>The Glatt multi-factor test</u>

   The ASD suggest in the alternative, that, of the three multifactor tests mentioned above, the <u>Glatt</u> test would be the best for analyzing the economic reality of the relationship between student athletes and their schools.   In <u>Glatt</u>, the United States Court of Appeals for the Second Circuit considered "the broad question of under what circumstances an unpaid intern must be deemed an 'employee' under the FLSA and therefore compensated for his work."  811 F.3d at 533. The Second Circuit determined that "the proper question is whether the intern or the employer is the primary beneficiary of the relationship."   <u>Id.</u> at 536.   According to <u>Glatt</u>, the "primary beneficiary test" has three important features:   (1) "it focuses on what the intern receives in exchange for his work[;]" (2) "it also accords courts the flexibility to examine the economic reality as it exists between the intern and the employer[;]" and (3) "it acknowledges that the intern-employer relationship should not be analyzed in the same manner as the standard employer-employee relationship because the intern enters into the relationship with the expectation of receiving educational or vocational benefits that are not necessarily expected with all forms of employment."   <u>Id.</u> (citations omitted).   Additionally, the United States Court of Appeals for the Ninth Circuit has commented that "that the primary beneficiary test best captures the Supreme Court's economic realities test in the student/employee context and that it is therefore the most appropriate test for deciding whether students should be regarded as employees under the FLSA."

Benjamin v. B & H Educ., Inc., 877 F.3d 1139, 1147 (9th Cir. 2017).  The primary beneficiary test

described in Glatt utilizes the following seven factors:

> 1. The extent to which the intern and the employer clearly understand that there is
> no expectation of compensation.  Any promise of compensation, express or
> implied, suggests that the intern is an employee—and vice versa.

> 2. The extent to which the internship provides training that would be similar to that
> which would be given in an educational environment, including the clinical and
> other hands-on training provided by educational institutions.

> 3. The extent to which the internship is tied to the intern's formal education program
> by integrated coursework or the receipt of academic credit.

> 4. The extent to which the internship accommodates the intern's academic
> commitments by corresponding to the academic calendar.

> 5. The extent to which the internship's duration is limited to the period in which the
> internship provides the intern with beneficial learning.

> 6. The extent to which the intern's work complements, rather than displaces, the
> work of paid employees while providing significant educational benefits to the
> intern.

> 7. The extent to which the intern and the employer understand that the internship is
> conducted without entitlement to a paid job at the conclusion of the internship.

Glatt, 811 F.3d at 536-37.  "Applying these considerations requires weighing and balancing all of

the circumstances.  No one factor is dispositive and every factor need not point in the same

direction for the court to conclude that the intern is not an employee entitled to the minimum

wage."  Id. at 537.  Moreover, these factors "are non-exhaustive—courts may consider relevant

evidence beyond the specified factors in appropriate cases."  Id.

   The ASD argue that the allegations of the Complaint demonstrate that the Glatt factors

either weigh in favor of finding that Plaintiffs are not their employees or are neutral, so that the

application of these factors to the facts alleged in the Complaint demonstrate that Plaintiffs are not

their employees.  The ASD maintain that the factual allegations of the Complaint clearly allege

that the first <u>Glatt</u> factor, whether there is an "expectation of compensation" between the Plaintiffs and the ASD, favors a determination that Plaintiffs are not employees of the ASD.  Pertinent to this factor, the Complaint alleges that "Student Athletes do **not** have any options to choose any opportunities to play NCAA sports for wages at any NCAA D1 member school.  Student Athletes also do **not** have any options to bargain for such wages with any such school."  (Compl. ¶ 43.)  It also alleges that all NCAA member schools "have mutually agreed **not** to offer wages for participation in intercollegiate Varsity sports, and they have adopted bylaws prohibiting schools from offering wages and Student Athletes from accepting wages."  (<u>Id.</u> ¶ 51.)  Upon consideration of these allegations, we conclude that the facts alleged in the Complaint with respect to the first <u>Glatt</u> factor weigh in favor of finding that Plaintiffs are not the employees of the ASD.

The ASD also contend that the facts alleged in the Complaint demonstrate that the second, third and fifth <u>Glatt</u> factors, "[t]he extent to which the internship provides training that would be similar to that which would be given in an educational environment," "[t]he extent to which the internship is tied to the intern's formal education program," and "[t]he extent to which the internship's duration is limited to the period in which the internship provides the intern with beneficial learning," <u>Glatt</u>, 811 F.3d at 537, all weigh in favor of finding that Plaintiffs are not their employees because the Complaint alleges that student athletes derive some educational benefit from participation in NCAA athletics.  The ASD specifically rely on the allegation that the NCAA and Villanova University have contended, in connection with a different lawsuit, that "[l]earning benefits from participation in NCAA athletics include, but are not limited to: discipline, work ethic, strategic thinking, time management, leadership, goal-setting, and teamwork."  (Compl. ¶ 70.)

The Complaint does not contain any factual allegations that specifically pertain to whether student athletes' participation in interscholastic athletics "provides training that would be similar to that which would be given in an educational environment" or whether student athletes' participation in NCAA D1 sports in their respective universities is limited in time to the period in which their participation provides them with "beneficial learning."   See Glatt, 811 F.3d at 537. Accordingly, we conclude that the facts alleged in the Complaint with respect to the second and fifth Glatt factors are neutral with respect to whether Plaintiffs are employees of the ASD.  The Complaint alleges, in connection with the third Glatt factor, that "[t]he NCAA and Villanova University admit [in connection with another lawsuit] that NCAA sports are not tied to the student's formal education program by integrated coursework or receipt of academic credit." (Compl. ¶ 76 (citation omitted).)  We conclude, accordingly, that the facts alleged in the Complaint with respect to the third Glatt factor, "the extent to which the position is tied to the intern's formal education program," 811 F.3d at 537, weigh in favor of a finding that Plaintiffs are employees of the ASD.

The ASD further argue that the Complaint alleges facts that would demonstrate that the fourth Glatt factor, "[t]he extent to which the internship accommodates the intern's academic commitments by corresponding to the academic calendar," 811 F.3d at 537, weighs in favor of finding that Plaintiffs are not their employees even though there is an "arguably-imperfect correspondence between some athletic seasons and the academic calendar," because the Complaint alleges that the ASD and other NCAA D1 member schools support student athletes in the classroom.  (ASD Mem. at 43.)  The ASD rely on allegations that they track the time that student athletes devote to their sports, that some NCAA D1 conferences have approved proposals to require time management plans for each sport and to prohibit athletically related activities during

some time periods, and that Villanova University provides academic support for students.  (See Compl. ¶¶ 105-11.)  On the other hand, Plaintiffs maintain that the facts alleged in the Complaint demonstrate that this factor weighs in favors of finding that they are employees because the Complaint alleges that they are required to participate in athletically related activities that take in excess of 30 hours per week and interfere with their academic commitments by preventing them from taking classes they wish to take and from majoring in the subjects they wish to major in.  (Id. ¶¶ 93-100.)  We conclude that the Complaint alleges facts that demonstrate that Plaintiffs' participation in NCAA athletic activities for the ASD interferes with their academic pursuits and, thus, that the facts alleged with respect to the fourth Glatt factor weigh in favor of finding that Plaintiffs are employees of the ASD.

The ASD also argue that the facts alleged in the Complaint with respect to the sixth Glatt factor, "[t]he extent to which the intern's work complements, rather than displaces, the work of paid employees while providing significant educational benefits to the intern," Glatt, 811 F.3d at 537, weighs in favor of finding that Plaintiffs are not their employees, because student athletes are not alleged to displace the work of any paid employees.  Plaintiffs do not contend that their participation in interscholastic athletics displaces any paid employees but maintain that the allegations of the Complaint demonstrate that this factor weighs in favor of finding that they are employees because the Complaint alleges that they gain no educational benefits from being student athletes.  The Complaint alleges that the NCAA and Villanova University have admitted that student athletes do not receive any academic credit for participating in NCAA sports and that "NCAA sports are not tied to the student's formal education program by integrated coursework." (Compl. ¶ 76.)  As we discussed above, the Complaint also alleges that the amount of time that student athletes spend in connection with their participation in NCAA D1 athletics interferes with

28

their ability to take the classes that they want to take and major in the fields they prefer and inhibits their ability to keep up with the classes they do take.  (See id. ¶¶ 90-94, 96-97, 100, 102-03.)   We therefore conclude that the Complaint plainly alleges that Plaintiffs' participation in interscholastic athletics for the ASD does not provide them with significant educational benefits and we further conclude, accordingly, that the facts alleged in the Complaint with respect to the sixth Glatt factor weigh in favor of a finding that Plaintiffs are the employees of the ASD, even though they are not alleged to displace other paid employees.

With respect to the seventh Glatt factor, "[t]he extent to which the intern and the employer understand that the internship is conducted without entitlement to a paid job at the conclusion of the internship," 811 F.3d at 537, the ASD also assert that the facts alleged in the Complaint weigh in favor of a finding that Plaintiffs are not their employees because the Complaint alleges that student athletes are not entitled to paid jobs at their respective NCAA D1 schools after graduation. (Compl. ¶ 132 (citation omitted).)   We agree and conclude that the facts alleged in the Complaint with respect to the seventh Glatt factor weigh in favor of a finding that Plaintiffs are not the employees of the ASD.

In sum, we have found that the facts alleged in the Complaint would, if proven, support conclusions that the first and seventh Glatt factors weigh in favor of finding that the Plaintiffs are not employees of the ASD, that the second and fifth Glatt factors would be neutral, and that the third, fourth, and sixth Glatt factors would weigh in favor of finding that Plaintiffs are employees of the ASD.  Balancing all of these factors, and mindful that none of these "factor[s] is dispositive

29

and [that] every factor need not point in the same direction," <u>Glatt</u>, 811 F.3d at 537, we conclude that the Complaint plausibly alleges that Plaintiffs are employees of the ASD under the <u>Glatt</u> test.[11]

## IV.    CONCLUSION

For the foregoing reasons, we conclude that the Complaint plausibly alleges that Plaintiffs are employees of the ASD for purposes of the FLSA.  Accordingly, we deny the Motion to Dismiss in its entirety.  An appropriate order follows.

BY THE COURT:

/s/ John R. Padova

_____

John R. Padova, J.

---

[11] The parties also disagree regarding whether the Complaint plausibly alleges that Plaintiffs are employees of the ASD using the test outlined in <u>DialAmerica</u>, 757 F.2d 1376.  Since we have determined that the Complaint plausibly alleges that Plaintiffs are employees of the ASD for purposes of the FLSA under the <u>Glatt</u> test, we need not address whether the Complaint also alleges that Plaintiffs are employees of the ASD under the <u>DialAmerica</u> test.