IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| RALPH "TREY" JOHNSON, ET AL., | : | CIVIL ACTION |
| individually and on behalf of all persons | : | |
| similarly situated | : | |
| | : | |
| v. | : | |
| | : | |
| THE NATIONAL COLLEGIATE | : | |
| ATHLETIC ASSOCIATION, ET AL. | : | NO.  19-5230 |

### MEMORANDUM

**Padova, J.**                                                    September 22, 2021

Plaintiffs, student athletes at five of the Defendant colleges and universities, contend that student athletes who engage in NCAA Division 1 ("D1") interscholastic athletic activity for their colleges and universities are employees who should be paid for the time they spend related to those athletic activities.   Plaintiffs, Ralph "Trey" Johnson, Stephanie Kerkeles, Nicholas Labella, Claudia Ruiz, Jacob Willebeek-Lemair, and Alexa Cooke, assert claims on behalf of themselves, a Fair Labor Standards Act ("FLSA") collective, and three state classes against the colleges and universities they attend (or attended) (the "Attended Schools Defendants" or "ASD"), the National Collegiate Athletic Association ("NCAA"), twenty additional named D1 universities (the "Non Attended School Defendants" or "NASD"), and a putative Defendant class made up of 125 NCAA D1 colleges and universities.   The First Amended Complaint ("Complaint") asserts claims for violations of the FLSA, 29 U.S.C. § 200 et seq.; the Pennsylvania Minimum Wage Act, 43 Pa. Stat. § 333.101 et seq. (the "PMWA"); the New York Labor Law, N.Y. Lab. Law § 191 et seq. ("NYLL"); and the Connecticut Minimum Wage Act, Conn. Gen. Stat. Ann. § 31-58 et seq. ("CMWA").  The Complaint also asserts three common law unjust enrichment claims.  The NCAA and NASD (together the "Moving Defendants") have moved to dismiss the Complaint pursuant to

Federal Rule of Civil Procedure 12(b)(1) on the ground that Plaintiffs lack standing to sue them under Article III because they are not joint employers of Plaintiffs.  For the reasons that follow, the Motion is granted in part and denied in part.

## I.      FACTUAL BACKGROUND

The Complaint alleges the following facts.  The NCAA is an association that regulates intercollegiate sports and has jurisdiction over approximately 1,100 schools and nearly 500,000 student athletes. (Compl. ¶¶ 44-45.)  The NCAA has entered into multi-year, multi-billion-dollar contracts with broadcasters ESPN, CBS, and Turner Sports to show athletic competitions between NCAA D1 member schools, and it distributes shares of those broadcasting fees to its member schools. (Id. ¶ 14.)  In addition to shares of those broadcasting fees, NCAA D1 member schools also receive fees from multi-year, multi-million-dollar agreements with television and radio networks that they have entered into, either individually or as part of an NCAA conference, to broadcast athletic competitions between NCAA D1 member schools. (Id. ¶ 15.)

The named Plaintiffs in this case are or were student athletes at Villanova University, Fordham University,  Sacred Heart University, Cornell University, and Lafayette College. (Id. ¶¶ 19-24.)  The NASD are:  Bucknell University, Drexel University, Duquesne University, Fairleigh Dickinson University, La Salle University, Lehigh University, Monmouth University, Princeton University, Rider University, Robert Morris University, Seton Hall University, Saint Francis University, Saint Joseph's University, Saint Peter's University, the University of Delaware, Pennsylvania State University, the University of Pennsylvania, the University of Pittsburgh, Rutgers State University of New Jersey, and Temple University.  According to the Complaint, all of the Defendants jointly employed Plaintiffs and similarly situated persons. (Id. ¶ 26.)

Student athletes do not have the option to play NCAA sports for wages at any NCAA D1 school.  (Id. ¶ 43.)  All member schools in the NCAA have agreed not to pay students to participate in intercollegiate varsity sports.  (Id. ¶ 51.)  The NCAA's Bylaws prohibit schools from offering wages and prohibit student athletes from accepting wages.  (Id. (citations omitted).)  A student athlete who participates in NCAA sports can only receive payment based on athletic performance in limited circumstances connected with competing in the Olympics.  (Id. ¶¶ 56-58 (citations omitted).)

NCAA D1 member schools require student athletes to participate in Countable Athletically Related Activities ("CARA"),[1] which are recorded on timesheets under an NCAA D1 Bylaw.  (Id. ¶ 93 (citation omitted).)  NCAA Bylaws also require student athletes to participate in Required Athletically Related Activities like recruiting, fundraising and community service.  (Id. ¶ 94.)  A student athlete who fails to attend meetings, participate in practices, or participate in scheduled competitions can be disciplined, including suspension or dismissal from the team.  (Id. ¶ 95 (citation omitted).)  Student athletes have reported spending more than 30 hours per week on athletically related activities, both CARA and non-CARA, and football players who attend schools in the NCAA football bowl and championship subdivisions report spending more than 40 hours per week on these activities.  (Id. ¶ 100.)

The NCAA D1 member schools exercise significant control over their student athletes. The NCAA Bylaws apply to all student athletes who participate in NCAA sports and they address "recruitment, eligibility, hours of participation, duration of eligibility and discipline."  (Id. ¶ 170 (citation omitted).)  Student athletes who participate in NCAA sports are supervised by coaching

---

[1] CARA include team conditioning; discussions of strategy; on-field, floor, or court activity; review of game film; strength training; individual workouts; and meetings with coaches. (Compl. ¶ 93 (citation omitted).)

and training staff.  (Id. ¶ 135 (citation omitted).)  NCAA D1 member schools are required to have adult supervisors maintain timesheets for participants.  (Id. ¶ 136 (citations omitted).)  NCAA D1 member schools impose discipline on student athletes, including suspension and dismissal from a team, in instances of specified misconduct.  (Id. ¶ 140 (citations omitted).)  They also have handbooks that contain standards for controlling student athletes' performance and conduct both on and off the field.  (Id. ¶¶ 139-41 (citations omitted).)  These handbooks contain rules regarding agents, prohibiting certain categories of legal gambling, and restricting social media use, including restrictions on making derogatory comments about other teams.  (Id. ¶ 141 (citation omitted).)  NCAA D1 member schools also have NCAA team policies that restrict the legal consumption of alcohol and legal use of nicotine products by student athletes.  (Id. ¶ 143.)

Based upon these factual allegations, the Complaint asserts that Plaintiffs are the employees of Defendants, including the NCAA and NASD, and it asserts eight claims for relief, seeking payment of wages for the time Plaintiffs spent engaged in activities connected to NCAA sports.  Count I asserts claims pursuant to the FLSA on behalf of Plaintiffs and the proposed FLSA collective against all Defendants and the proposed Defendant class for failure to pay them minimum wages as employees.  Plaintiffs and the members of the proposed FLSA Collective seek unpaid minimum wages, an equal amount as liquidated damages, attorneys' fees, and costs in connection with Count I.  Count II asserts claims on behalf of Plaintiffs Johnson and Cooke and the proposed Pennsylvania class against fourteen colleges and universities located in Pennsylvania (the "Pennsylvania-based Defendants"[2]) for violating the PMWA by failing to pay them minimum

_____

[2] The Pennsylvania-based Defendants are identified in the Complaint as Bucknell University, Drexel University, Duquesne University, La Salle University, Lafayette College, Lehigh University, Robert Morris University, Saint Francis University, Saint Joseph's University, Villanova University, the University of Pennsylvania, Pennsylvania State University, the University of Pittsburgh, and Temple University.  (Compl. ¶ 272 n.22.)

wages for the hours they spent on activities relating to NCAA D1 sports. Plaintiffs Johnson, Cooke, and the proposed Pennsylvania class seek unpaid wages, attorneys' fees, and costs in connection with Count II. Count III asserts a claim for unjust enrichment on behalf of Plaintiffs Johnson, Cooke, and the proposed Pennsylvania class against the Pennsylvania-based Defendants for benefiting from the unpaid labor of Plaintiffs Johnson, Cooke, and the proposed Pennsylvania class. Plaintiffs Johnson, Cooke, and the proposed Pennsylvania class seek judgment in an amount equal to the benefits unjustly retained by the Pennsylvania-based Defendants in connection with Count III.

Count IV asserts a claim on behalf of Plaintiffs Kerkeles, Labella, Willebeek-Lemair, and the proposed New York class against eighteen colleges and universities located in New York (the "New York-based Defendants"[3]) for failure to pay them minimum wages under the NYLL. Plaintiffs Kerkeles, Labella, Willebeek-Lemair, and the proposed New York class seek recovery of unpaid wages, liquidated damages, attorneys' fees, and costs in connection with Count IV. Count V asserts a claim on behalf of Plaintiffs Kerkeles, Labella, Willebeek-Lemair, and the proposed New York class against the New York-based Defendants for failure to pay them wages for all of the hours they spent on NCAA D1 sports in violation of the NYLL. Plaintiffs Kerkeles, Labella, Willebeek-Lemair, and the proposed New York class seek the total amount of their unpaid straight-time wages, liquidated damages, attorneys' fees, costs, and interest in connection with Count V. Count VI asserts a claim on behalf of Plaintiffs Kerkeles, Labella, Willebeek-Lemair

---

[3] The New York-based Defendants are identified in the Complaint as Colgate University, Canisius College, Columbia University, Cornell University, Fordham University, Manhattan College, Iona College, Marist College, Hofstra University, Long Island University, Brooklyn College, Niagara University, St. John's University, Siena College, St. Bonaventure University, St. Francis College Brooklyn, Syracuse University, and Wagner College. (Compl. ¶ 389 n.28.)

and the proposed New York class against the New York-based Defendants for unjust enrichment for benefiting from their uncompensated labor. Plaintiffs Kerkeles, Labella, Willebeek-Lemair, and the proposed New York class seek judgment in an amount equal to the benefits unjustly retained by the New York-based Defendants in connection with Count VI.

Count VII asserts a claim on behalf of Plaintiff Ruiz and the members of the proposed Connecticut class against five universities located in Connecticut (the "Connecticut-based Defendants"[4]) for violating the CMWA by failing to pay them minimum wages for any and all hours that they allowed Plaintiff Ruiz and the proposed Connecticut class to work in connection with NCAA sports. Plaintiff Ruiz and the members of the proposed Connecticut class seek payment of unpaid wages, liquidated damages, attorneys' fees, and costs in connection with Count VII. Count VIII asserts a claim on behalf of Plaintiff Ruiz and the members of the proposed Connecticut class against the Connecticut-based Defendants for unjust enrichment for inducing them to perform work while failing to properly compensate them. Plaintiff Ruiz and the proposed Connecticut class seek judgment in the amount of the benefits unjustly retained by the Connecticut-based Defendants in connection with Count VIII.

The Attended Schools Defendants brought a Motion to Dismiss the Complaint as against them on the ground that it did not plausibly allege that they employed Plaintiffs, a requirement for liability under the FLSA. We denied that Motion on August 25, 2021, concluding that the Complaint plausibly alleges that Plaintiffs are employees of the ASD for purposes of the FLSA. (See Docket Nos. 55-56.) The NCAA and the Non-Attended Schools Defendants have moved to dismiss all claims against them for lack of Article III standing on the ground that the Complaint

---

[4] The Connecticut-based Defendants are identified in the Complaint as Fairfield University, the University of Hartford, Quinnipiac University, Sacred Heart University, and Yale University. (Compl. ¶ 409 n.29.)

does not plausibly allege that they are also employers of Plaintiffs, specifically that the Complaint does not plausibly allege that they are joint employers of Plaintiffs with the ASD.

## II.    LEGAL STANDARD

"'A motion to dismiss for want of standing is . . . properly brought pursuant to Rule 12(b)(1), because standing is a jurisdictional matter.'"  Constitution Party of Pa. v. Aichele, 757 F.3d 347, 357 (3d Cir. 2014) (alteration in original) (quoting Ballentine v. United States, 486 F.3d 806, 810 (3d Cir. 2007)).[5]  "A district court has to first determine, however, whether a Rule 12(b)(1) motion presents a 'facial' attack or a 'factual' attack on the claim at issue, because that distinction determines how the pleading must be reviewed."  Id. at 357-58 (citing In re Schering Plough Corp. Intron/Temodar Consumer Class Action, 678 F.3d 235, 243 (3d Cir. 2012)).

"A facial attack . . . is an argument that considers a claim on its face and asserts that it is insufficient to invoke the subject matter jurisdiction of the court . . . ."  Id. at 358.  "Such an attack can occur before the moving party has filed an answer or otherwise contested the factual allegations of the complaint."  Id. (citing Mortensen v. First Fed. Sav. & Loan Ass'n, 549 F.2d 884, 889-92 (3d Cir. 1977)).  As such, "a facial attack 'contests the sufficiency of the pleadings.'"  Id. (quoting In re Schering Plough Corp., 678 F.3d at 243.)

"In reviewing a facial attack, 'the court must only consider the allegations of the complaint and documents referenced therein and attached thereto, in the light most favorable to the plaintiff.'"

---

[5] Although the Moving Defendants argue that Plaintiffs lack standing to sue them, they cite to Federal Rule of Civil Procedure 12(b)(6) instead of Federal Rule of Civil Procedure 12(b)(1) and ask that we "dismiss the [Complaint] as to them without leave to amend under Fed. R. Civ. Proc. 12(b)(6)." (See Moving Defs.' Mem. at 4 n.6, 15.)  However, as we discuss infra, the legal standard for a facial attack on standing brought pursuant to Rule 12(b)(1) is the same as that for a motion to dismiss for failure to state a claim upon which relief can be granted under Rule 12(b)(6). Accordingly, the Moving Defendants' failure to cite to Rule 12(b)(1) does not hinder our understanding of their arguments or our resolution of their Motion.

Id. (quoting In re Schering Plough Corp., 678 F.3d at 243).  "Thus, a facial attack calls for a district court to apply the same standard of review it would use in considering a motion to dismiss under Rule 12(b)(6), *i.e.*, construing the alleged facts in favor of the nonmoving party."  Id. (citing In re Schering Plough Corp., 678 F.3d at 243).

Pursuant to Rule 12(b)(6), a plaintiff's pleading obligation is to set forth "a short and plain statement of the claim," Fed. R. Civ. P. 8(a)(2), which gives the defendant "'fair notice of what the . . . claim is and the grounds upon which it rests.'"  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (alteration in original) (quoting Conley v. Gibson, 355 U.S. 41, 47 (1957)).  The complaint must allege "'sufficient factual matter to show that the claim is facially plausible,' thus enabling 'the court to draw the reasonable inference that the defendant is liable for [the] misconduct alleged.'"  Warren Gen. Hosp., 643 F.3d at 84 (quoting Fowler v. UPMC Shadyside, 578 F.3d 203, 210 (3d Cir. 2009)).  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."  Iqbal, 556 U.S. at 678 (citing Twombly, 550 U.S. at 556).  "With respect to 12(b)(1) motions in particular, '[t]he plaintiff must assert facts that affirmatively and plausibly suggest that the pleader has the right he claims (here, the right to jurisdiction), rather than facts that are merely consistent with such a right.'"  In re Schering Plough Corp., 678 F.3d at 244 (alteration in original) (quoting Stalley v. Catholic Health Initiatives, 509 F.3d 517, 521 (8th Cir. 2007)).

## III.   DISCUSSION

In Count I of the Complaint, Plaintiffs seek the payment of minimum wages from Defendants, including the NCAA and the NASD, for the hours they spent in connection with NCAA D1 intercollegiate athletics pursuant to Section 206 of the FLSA.  "The minimum wage . . . provision[] at issue . . . require[s] that Plaintiffs prove that they are 'employees.'"  Razak v. Uber

Techs., Inc., 951 F.3d 137, 142 (3d Cir. 2020) (citations omitted), cert. denied, 210 L. Ed. 2d 755 (2021).  The Moving Defendants argue in their Motion to Dismiss that Plaintiffs have failed to meet their burden of establishing "'the irreducible constitutional minimum' of Article III standing" because they are not employees of the Moving Defendants.  In re Schering Plough Corp., 678 F.3d at 244.  To establish standing under Article 3, the Plaintiffs must establish the following three elements:

> First, the plaintiff must have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court. Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

Id. (quoting Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992)).  The Moving Defendants argue that any injury suffered by Plaintiffs is not "fairly traceable" to them because they are not Plaintiffs' employers.  See Moore v. DirectSat USA, LLC, Civ. A. No. 08-3552, 2009 WL 10687488, at *7 (E.D. Pa. Apr. 30, 2009) ("Plaintiffs' claims pursuant to the FLSA are based on sections of those statutes that give employees the right to bring suit against their employers. Thus, it necessarily follows that Plaintiffs may only assert their claims against their employers and only for the terms of their employment with those employers." (citing 29 U.S.C. § 216(b)); see also Berger v. Nat'l Collegiate Athletic Ass'n, 843 F.3d 285, 289 (7th Cir. 2016) (determining that the complaint in that case did not plausibly allege that plaintiffs, former students of the University of Pennsylvania, were employed by the NCAA and defendant universities other than the University of Pennsylvania because plaintiffs "ha[d] not plausibly alleged any injury traceable to, or redressable by, any defendant other than Penn" and plaintiffs thus "lack[ed] standing to sue those other defendants").

The FLSA defines the term "employee" as "any individual employed by an employer." 29 U.S.C. § 203(e)(1). The Third Circuit has noted that "[t]his statutory definition is 'necessarily broad to effectuate the remedial purposes of the Act.'" Safarian v. Am. DG Energy Inc., 622 F. App'x 149, 151 (3d Cir. 2015) (quoting Martin v. Selker Bros., 949 F.2d 1286, 1293 (3d Cir. 1991)). Two different entities can be joint employers of the same individual if they both have significant control over that employee:

> where two or more employers exert significant control over the same employees—[whether] from the evidence it can be shown that they share or co-determine those matters governing essential terms and conditions of employment—they constitute "joint employers" under the FLSA. This is consistent with the FLSA regulations regarding joint employment, which state that a joint employment relationship will generally be considered to exist [w]here the employers are not completely disassociated with respect to the employment of a particular employee and may be deemed to share control of the employee, directly or indirectly, by reason of the fact that one employer controls, is controlled by, or is under common control with another employer. Ultimate control is not necessarily required to find an employer-employee relationship under the FLSA, and even "indirect" control may be sufficient. In other words, the alleged employer must exercise "significant control."

In re Enterprise Rent-A-Car Wage & Hour Empl. Practices Litig., 683 F.3d 462, 468 (3d Cir. 2012) (alterations in original) (quotations and citations omitted). Thus, we can grant the Moving Defendants' Motion to Dismiss for lack of subject matter jurisdiction only if the Complaint does not plausibly allege that the Moving Defendants are Plaintiffs' joint employers.

A.      The NCAA as a Regulatory Body

The Moving Defendants argue that the NCAA cannot be a joint employer of Plaintiffs because it merely regulates Plaintiffs' participation in intercollegiate athletics. The Moving Defendants rely on Dawson v. National Collegiate Athletic Association, 932 F.3d 905 (9th Cir. 2019), in which the United States Court of Appeals for the Ninth Circuit affirmed a lower court decision holding that college student athletes who play football for schools in the NCAA D1 Football Bowl Subdivision are not employees of the NCAA and the PAC-12 Conference for

purposes of the FLSA and California labor law.  Id. at 907-08.  In Dawson, the Ninth Circuit considered three factors:  (1) whether the plaintiff expected to be paid by the NCAA or the PAC-12 Conference, (2) whether the NCAA and the PAC-12 Conference had the power to hire or fire the plaintiff; and (3) whether there was "evidence that an arrangement was conceived or carried out to evade the law."  Id. at 909 (citations and quotation omitted).  The Dawson court found that the plaintiff had no expectation of a scholarship or other compensation from the NCAA or the PAC-12 Conference and that "there [was] no evidence . . . that the NCAA rules were 'conceived or carried out' to evade the law."  Id. at 909-10.  The Dawson court also determined that the complaint in that case alleged that the NCAA functioned solely as a regulator and not as an employer because, while the complaint alleged that "[t]he NCAA Bylaws pervasively regulate college athletics," it did not allege that the NCAA hired or fired "or exercise[d] any other analogous control, over student-athletes," or that the NCAA "cho[se] the players on any Division I football team," or "engage[d] in the actual supervision of the players' performance."  Id. at 910.  Rather, the complaint merely alleged that "the NCAA functions as a regulator, and that the NCAA member schools, for whom the student-athletes allegedly render services, enforce regulations."  Id.  While the Moving Defendants urge us to simply adopt and apply Dawson's analysis and conclusion in the instant case, the complaint in Dawson is not identical to the Complaint in this case and, accordingly, we  must engage in our own independent analysis of the instant Complaint.

The Moving Defendants also rely on Callahan v. City of Chicago, 813 F.3d 658 (7th Cir. 2016).  The plaintiff in Callahan was a taxi driver who brought FLSA claims against the City of Chicago, under the theory "that the City's regulations are so extensive that Chicago must be treated as her employer."  Id. at 659.  Noting that the FLSA "says that 'employ' includes 'suffer or permit

to work,'" the plaintiff argued that because "[t]he City of Chicago permitted her to drive a cab[, it] thus became her employer." <u>Id.</u> at 660.  The Seventh Circuit rejected this argument as follows:

> The contention that the government permits to work, and thus employs, everyone it does not *forbid* to work has nothing to recommend it.  The theory would produce multiple employers for every worker—for the United States, the State of Illinois, Cook County, and other governmental bodies permit taxi drivers to work in the same sense as Chicago does. The Occupational Safety and Health Administration and the National Highway Traffic Safety Administration have not adopted safety rules so onerous that the taxi business must shut down. Yet the goal of the Fair Labor Standards Act is to regulate employers, not the many governmental bodies that permit employers to operate.

<u>Id.</u> at 661.  However, as the Moving Defendants recognize, the NCAA, unlike the City of Chicago, is not a governmental entity.   Moreover,  <u>Callahan</u>, as a Seventh Circuit case, is not controlling authority in this district and, in any event, concerns a different set of factual allegations than are at issue in the instant case.  Accordingly, instead of relying on either <u>Dawson</u> or <u>Callahan</u>, we will analyze the Complaint using the factors developed by the Third Circuit to determine whether an entity is a joint employer.

   A.  <u>The Joint Employer Test</u>

   The Moving Defendants argue that the Complaint fails to plausibly allege that the NCAA and the NASD are joint employers of Plaintiffs under the four-factor test originally developed by the Ninth Circuit in <u>Bonnette v. California Health and Welfare Agency</u>, 704 F.2d 1465 (9th Cir. 1983), and subsequently adopted in part by the Third Circuit in <u>In re Enterprise Rent-A-Car</u>, 683 F.3d 462 (3d Cir. 2012).  The Third Circuit announced in <u>Enterprise Rent-A-Car</u> that courts should use the following four factors, referred to as the <u>Enterprise</u> test, when determining whether two entities are joint employers of the same individual or individuals:

> 1) the alleged employer's authority to hire and fire the relevant employees; 2) the alleged employer's authority to promulgate work rules and assignments and to set the employees' conditions of employment: compensation, benefits, and work schedules, including the rate and method of payment; 3) the alleged employer's

involvement in day-to-day employee supervision, including employee discipline; and 4) the alleged employer's actual control of employee records, such as payroll, insurance, or taxes.

Id. at 469-70 (citing Bonnette, 704 F.2d at 1469-70).  We thus review the factual allegations in the Complaint to determine whether they satisfy these factors with respect to both the NCAA and the NASD.[6]

1.  The NCAA's and NASD's authority to hire and fire Plaintiffs

The Complaint alleges the following facts with respect to the NCAA's ability to "hire and fire" Plaintiffs.  The NCAA's Bylaws restrict the means by which NCAA D1 member schools may recruit prospective athletes, including limiting face to face encounters with student athletes and their family members; limiting off-campus activities intended to assess the academic and athletic qualifications of a prospective student-athlete; limiting the number of telephone calls that can be made to a prospective student athlete during a defined period of time; and limiting contacts with student athletes to specified periods of time.  (Compl. ¶¶ 195-96.)  NCAA Bylaws also prohibit

---

[6]  The Moving Defendants specifically rely on Dawson, rather than the Enterprise test in connection with the NCAA.  In Dawson, the Ninth Circuit not only determined that the complaint in that case did not allege that the NCAA was an employer because it only alleged that the NCAA functioned as a regulator with respect to student athletes, but also considered whether the four-factor analysis developed in Bonnette compelled a conclusion that the NCAA and PAC-12 were joint employers of the NCAA D1 football player plaintiffs.  The Dawson court specifically considered "'whether the alleged employer (1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records.'"  932 F.3d at 910-11 (quoting Bonnette, 704 F.2d at 1470).  Using this test, the court determined that "the NCAA and PAC-12 are clearly not [the plaintiff's] employers" because "[t]hey d[id] not admit him to the school or pick him for the team; they [could not] remove him from the team; they d[id] not supervise his schedules or activities in practices or games; they d[id] not maintain his scholastic records; and, although they put caps on what he [might] receive as a scholarship, they d[id] not determine whether he g[ot] a scholarship or in what amount."  Id. at 911.  We will use a similar approach to that used in Dawson when we apply the Enterprise test factors to the Complaint in this case.  However, because our Complaint is different from the Dawson complaint, our analysis is necessarily our own.

D1 member schools from offering certain inducements to recruit student athletes. (Id. ¶ 197.) NCAA Bylaws limit the total number and value of the athletic scholarships that D1 member schools can offer to student athletes. (Id. ¶ 198.) NCAA Bylaws also make D1 member schools responsible for certifying the eligibility of student athletes before they can allow the student athletes to represent the school in intercollegiate competitions. (Id. ¶¶ 203-04.) Failure to comply with these Bylaws constitutes a Level III violation, for which NCAA Enforcement Staff could seek the following penalties: precluding recruitment of the student athlete and prohibiting the student-athlete from competing for the school until his or her eligibility is restored. (Id.¶¶ 205-06.) Multiple violations could result in stronger penalties. (Id. ¶¶ 207-08.) In addition, the NCAA Bylaws require member schools to suspend or fire student athletes who are determined to be ineligible to play by NCAA Enforcement Staff. (Id. ¶¶ 221-25.) The Complaint thus alleges that the NCAA does more than just impose rules regarding the recruitment of intercollegiate athletes; it also investigates violations of those rules and imposes penalties, including the firing of student athletes, for those violations. We thus conclude that the Complaint plausibly alleges that the NCAA exercises significant control over the hiring and firing of student athletes, including Plaintiffs, such that the Complaint satisfies the first factor of the Enterprise test with respect to the NCAA.

The Complaint alleges the following facts with respect to the NASD's ability to "hire and fire" Plaintiffs. NCAA D1 member schools have representatives on committees that decide what rules to adopt; the "NCAA rules apply to all Student Athletes in NCAA sports on an equal basis[;] and . . . these bylaws address, among other subjects, Student Athlete recruitment, eligibility, hours of participation, duration of eligibility and discipline." (Id. ¶¶ 170-71.) We conclude that these allegations are not sufficient to plausibly allege that the NASD exercise significant control over

the hiring and firing of student athletes, including Plaintiffs.  We therefore conclude that the factual allegations of the Complaint fail to satisfy the first factor of the <u>Enterprise</u> test with respect to the NASD.

2. The NCAA's and NASD's authority to promulgate work rules and set Plaintiffs' compensation, benefits, and work schedules

The Complaint alleges the following facts with respect to the NCAA's "authority to promulgate work rules and assignments and to set [Plaintiffs'] conditions of employment: compensation, benefits, and work schedules, including the rate and method of payment." <u>Enterprise Rent-A-Car</u>, 683 F.3d at 469.  The NCAA Bylaws govern amateurism, eligibility, awards, benefits, expenses, and each sport's playing and practice seasons.  (Compl. ¶ 209 (citing NCAA D1 Bylaws 12, 16 and 17).)  NCAA D1 Bylaw 12 prohibits D1 member schools from paying student athletes.  (<u>Id.</u> ¶ 210 (citing NCAA D1 Bylaw 12.1.2.1).)  NCAA D1 Bylaw 16 governs permissible benefits and non-permissible benefits for student athletes, as well as mandatory benefits for the athletes.  (<u>Id.</u> ¶ 211-12 (citing NCAA D1 Bylaws 3, 16).)  NCAA D1 Bylaw 17 lists "Required Athletically Related Activities" that student athletes must participate in, limits the number hours that student athletes may be required to participate in CARA, and requires that CARA hours be recorded by school staff.  (<u>Id.</u> ¶ 214 (citing NCAA D1 Bylaws 17.02.14, 17.7.7.1, 17.1.7.2, 17.1.7.3.4, 17.1.7.4, 17.1.7.8, 17.1.7.9.6, and 17.1.7.9.7).)  NCAA D1 Bylaw 12 limits the number of seasons a student athlete may compete for a school in a specific sport and limits the time frame in which those seasons may occur.  (<u>Id.</u> ¶ 215 (citing NCAA D1 Bylaw 12.8).)  A school's failure to comply with these rules can constitute a Level II or III violation.  (<u>Id.</u> ¶ 216 (citing NCAA D1 Bylaws 19.1.2(a), (b), (c), (f), and 19.1.3).)  The NCAA D1 Bylaws make payment to a student athlete by a coach or other school representative a Severe Breach of Conduct and a Level I violation.  (<u>Id.</u> ¶ 217 (citing NCAA D1 Bylaw 19.1.1(f)).)   The Complaint thus

alleges that the NCAA, through its Bylaws, issues work rules that apply to Plaintiffs and imposes conditions not only on the payment of compensation and other benefits to Plaintiffs but also on how much time Plaintiffs may spend in connection with NCAA intercollegiate athletic activities. We thus conclude that the Complaint plausibly alleges that the NCAA has the "authority to promulgate work rules and assignments and to set [Plaintiffs'] conditions of employment," such that the Complaint satisfies the second factor of the <u>Enterprise</u> test with respect to the NCAA. <u>Enterprise Rent-A-Car</u>, 683 F.3d at 469.

The Complaint alleges the following facts with respect to the NASD's "authority to promulgate work rules and assignments and to set [Plaintiffs'] conditions of employment: compensation, benefits, and work schedules, including the rate and method of payment." <u>Id.</u> The Complaint alleges that the NCAA D1 council has 40 members, including one from each conference, and the Board of Directors has 24 members, made up of one member from each Football Bowl Subdivision conference and 10 seats that rotate among the remaining conferences. (Compl. ¶ 172 (citation omitted).)  Each active D1 member has voting privileges in the NCAA. (<u>Id.</u> ¶ 173 (citation omitted).)  The Complaint also alleges that "All schools in . . . the NCAA . . . have mutually agreed **not** to offer wages for participation in intercollegiate Varsity sports, and they have adopted bylaws prohibiting schools from offering wages and Student Athletes from accepting wages." (<u>Id.</u> ¶ 51 (citations omitted).)  All schools in the NCAA have also adopted bylaws with sanctions for infractions of the rules prohibiting schools from paying student athletes.  (<u>Id.</u> ¶ 52 (citations omitted).)  The NCAA Enforcement Staff investigates potential NCAA violations and brings charges.  (<u>Id.</u> ¶ 175 (citation omitted).)  The NCAA D1 Committee on Infractions decides cases brought by the Enforcement Staff.  (<u>Id.</u> ¶ 176 (citation omitted).)  The NCAA D1 Committee on Infractions is composed of as many as 24 representatives from members schools, conferences,

and the public.  (Id. ¶ 177 (citation omitted).)  The D1 Infractions Appeal Committee is composed of five representatives from member schools, conferences, and the public.  (Id. ¶ 178 (citation omitted).)  NCAA member schools have "'Shared Responsibility'" to report possible violations regarding student athletes and to cooperate in the investigation of student athletes.  (Id. ¶ 179 (citing NCAA D1 Bylaw 19.2).)  Failure to cooperate in an NCAA enforcement investigation is a "Severe Breach of Conduct" that can result in post-season bans, financial penalties, scholarship reductions, recruiting restrictions, and head coach restrictions.  (Id. ¶ 180 (citing NCAA D1 Bylaws 19.1.1(c), 19.9.5, and 19.9.7.)  While the Complaint alleges that some colleges and universities have representatives on NCAA committees that create rules with respect to student athletes, and impose discipline on student athletes, the Complaint does not allege that any of the NASD have representatives that sit on any of these committees.  We conclude that these allegations, which pertain solely to the agreement of the NCAA member schools not to pay wages to student athletes, those schools' obligations with respect to the enforcement of that agreement, and the possibility that a school could be involved in investigating and imposing discipline with respect to the violation of that agreement and other infractions of the D1 Bylaws, are not sufficient to plausibly allege that the NASD themselves promulgate work rules and assignments and/or set the conditions of participation for student athletes in NCAA intercollegiate athletics.  We therefore conclude that the Complaint fails to satisfy the second factor of the Enterprise test with respect to the NASD.

3. The NCAA's and NASD's involvement in the day-to-day supervision of Plaintiffs

The Complaint alleges the following facts regarding the NCAA's involvement in the day-to-day supervision, including discipline, of student athletes who participate in NCAA sports.  The

NCAA Bylaws control the ability of the D1 member schools to discipline their student athletes as follows:

> (i) [by] restrict[ing] the grounds for a school to reduce or cancel an athletic scholarship during the period of its award to only disciplinary reasons;
>
> (ii) [by] requir[ing] suspension or firing of a Student Athlete if s/he has violated any bylaw related to eligibility; and
>
> (iii) [by] subject[ing] a school's "home team" Student Athletes to discipline meted out by NCAA Enforcement Staff and/or panels of the peer-review NCAA D1 Committees on Infractions and Infractions Appeals composed of representatives from competing schools.

(Compl. ¶ 218 (citing NCAA D1 Bylaws 12.11.1, 15.3.4.2, 15.3.4.3, 19.3.4 and 19.4.3).  The NCAA, through its Bylaws, also prohibits NCAA D1 member schools from "reduc[ing] or cancel[ing] an athletic scholarship during the period of its award on the basis of the Student Athlete's athletic ability, performance or contribution to a team's success."  (Id. ¶ 220 (citing NCAA D1 Bylaw 15.3.4.3).)  If NCAA Enforcement Staff find that a student athlete is ineligible, the attended school is required to suspend or terminate that athlete.  (Id. ¶¶ 221-24.)  Viewing the allegations of the Complaint in the light most favorable to Plaintiffs, the Complaint alleges that the NCAA promulgates rules used in disciplining student athletes, has some involvement in the discipline of student athletes, can instigate investigations that result in discipline, and has some control over what discipline is issued to student athletes.  We conclude, accordingly, that the Complaint plausibly alleges that the NCAA is involved in the day-to-day supervision, including discipline, of student athletes who participate in NCAA sports, including Plaintiffs.  We further conclude that the factual allegations of the Complaint satisfy the third factor of the Enterprise test with respect to the NCAA.

The Complaint alleges the following facts with respect to the NASD's involvement in the day-to-day supervision, including discipline, of student athletes who participate in NCAA sports.

The NCAA D1 Committee on Infractions, which can impose discipline on student athletes, is made up of as many as 24 representatives from member schools, conferences, and the public.  (Id. ¶ 177 (citation omitted).)   The D1 Infractions Appeal Committee is composed of five representatives from member schools, conferences, and the public.  (Id. ¶ 178 (citation omitted).)  All of the D1 member schools have a "'Shared Responsibility' to report all potential violations regarding any Student Athlete."  (Id. ¶ 179 (citing NCAA D1 Bylaws 19.2, 19.2.2, and 19.2.3).)  Failure to cooperate in an NCAA enforcement investigation is a Level I Violation which could result in postseason bans, financial penalties, scholarship reductions, head coach restrictions, and recruiting restrictions.  (Id. ¶ 180 (citing NCAA D1 Bylaws 19.1.1(c), 19.9.5, and 19.9.7).)  However, the Complaint does not allege that representatives of any of the NASD are members of the Committee on Infractions or of the Infractions Appeal Committee.  We conclude that these allegations, which pertain to the participation of some NCAA D1 member schools in the NCAA D1 Committee on Infractions and the D1 Infractions Appeal Committee, and the obligation of D1 member schools to cooperate in NCAA enforcement investigations, are not sufficient to plausibly allege that the NASD are involved in the day-to-day supervision, including discipline, of student athletes, including Plaintiffs, who participate in NCAA sports.  We thus conclude that the factual allegations of the Complaint fail to satisfy the third factor of the Enterprise test with respect to the NASD.

   4.   The NCAA's and NASD's control of Plaintiffs' records

      The Complaint alleges the following facts regarding the NCAA's control of the records of student athletes who participate in NCAA sports.  "The NCAA Eligibility Center maintains all records related to the initial determination of Student Athlete eligibility," and D1 member schools are required to provide the Eligibility Center with additional information if they "have cause to believe that a prospective student-athlete's amateur status has been jeopardized" and to report any

discrepancies to the Eligibility Center.  (Compl. ¶¶ 227-28 (emphasis omitted) (citations omitted).)
The NCAA also receives and maintains records regarding student athletes' injuries, illnesses and
medical treatment in connection with their training for and participation in NCAA sports.  (Id. ¶
229 (citation omitted).)   D1 member schools are also required to make each student athlete's
statement, drug testing consent form, and squad list available to the NCAA.  (Id. ¶ 230 (citations
omitted).)   D1 member schools are also required to produce student athletes' records to the NCAA
upon request in connection with investigations conducted by the NCAA Enforcement Staff or the
NCAA Committee on Infractions.  (Id. ¶ 231 (citations omitted).)  We conclude, accordingly, that
the Complaint plausibly alleges that the NCAA controls records of student athletes involved in
NCAA sports, including Plaintiffs, such that the factual allegations of the Complaint satisfy the
fourth factor of the Enterprise test with respect to the NCAA.

      The Amended Complaint does not allege that the NASD individually maintain any records
of student athletes that do not attend their schools.  Moreover, Plaintiffs do not argue that the
Complaint satisfies the fourth factor of the Enterprise test with respect to the NASD.  (See Pls.'
Resp. to NCAA's and NASD's Mot. to Dismiss at 26 n.7.)  We conclude, accordingly, that the
Complaint fails to satisfy the fourth factor of the Enterprise test with respect to the NASD.

      As we have concluded that the facts alleged in the Complaint satisfy all four factors of the
Enterprise test as to the NCAA, we further conclude that the Complaint plausibly alleges that the
NCAA is a joint employer of Plaintiffs for purposes of the FLSA and, accordingly, that Plaintiffs
have standing to sue the NCAA.  Therefore, we deny the Motion to Dismiss as to the NCAA.

      In contrast, we have concluded that the facts alleged in the Complaint do not satisfy any of
the four factors of the Enterprise test as to the NASD.  Accordingly, application of that test does
not support a conclusion that the NASD are joint employers of Plaintiffs.  Plaintiffs also argue,

however, that the Complaint plausibly alleges that the NASD are joint employers of Plaintiffs under a "Sports League Joint Employment" theory that was developed and applied by the United States Court of Appeals for the Fifth Circuit in North American Soccer League v. NLRB, 613 F.2d 1379 (5th Cir. 1980).  We will therefore consider whether the NASD can be considered joint employers under this alternative theory.

      B.      The Sports League Joint Employment Theory

     In North American Soccer League, the Fifth Circuit examined whether the North American Soccer League (the "League") and all of its member clubs were joint employers of all of the soccer players who played for clubs in the League in order to determine the "correct collective bargaining unit for the players in the . . . League." Id. at 1380.  The National Labor Relations Board ("NLRB") had concluded that the League and its member clubs were joint employers of the players and the Fifth Circuit determined that the record contained sufficient evidence to support that conclusion. Id.  The Fifth Circuit began its analysis with the proposition that "[t]he existence of a joint employer relationship depends on the control which one employer exercises, or potentially exercises, over the labor relations policy of the other." Id. at 1382.  The Fifth Circuit based its determination that the NLRB had properly deemed the League and the clubs  to be joint employers on the following facts:  (1) the League exercised "a significant degree of control over essential aspects of the clubs' labor relations, including but not limited to the selection, retention, and termination of the players, the terms of individual player contracts, dispute resolution and player discipline[;]" (2) "each club granted the [League] authority over not only its own labor relations but also, on its behalf, authority over the labor relations of the other member clubs[;]" (3) the clubs' activities were governed by the League's constitution and regulations, the commissioner was selected and compensated by the clubs, and the League's board of directors was made up of one

representative of each club; (4) the League's regulations governed interclub trades and allowed the commissioner "to void trades not deemed to be in the best interest of the League;" (5) the League's regulations governed the termination of player contracts; (6) all player contracts were submitted to the League and the commissioner could "disapprove a contract deemed not in the best interest of the League;" (7) "[d]isputes between a club and a player [were required to] be submitted to the commissioner for final and binding arbitration[;]" and (8) "[c]ontrol over player discipline [was] divided between the League and the clubs." Id. at 1382.

Plaintiffs argue that the Complaint alleges that the NCAA and its member schools operate sufficiently similarly to the League and its member clubs that it plausibly alleges that the NASD are joint employers of Plaintiffs. They argue that the Complaint alleges that NCAA D1 member schools grant enforcement authority to the NCAA over a wide range of subjects that directly impact student athletes' working conditions and that active D1 member schools have voting privileges to make the NCAA's rules. (See Compl. ¶¶ 52, 173-74.) Plaintiffs also assert that the NCAA's Bylaws address "recruitment, eligibility, hours of participation, duration of eligibility and discipline." (Id. ¶ 170.) Plaintiffs also rely on the allegations that as many as 24 NCAA D1 member schools may have representatives on the D1 Committee on Infractions and that five D1 member schools may have representatives on the D1 Infractions Appeal Committee (along with members of the public and representatives from conferences). (Id. ¶¶ 177-78.)

The district court rejected a similar argument in Livers v. National Collegiate Athletic Association, Civ. A. No. 17-4271, 2018 WL 2291027 (E.D. Pa. May 17, 2018). The plaintiff in Livers contended that the NCAA, Villanova University (for which he played football), "and dozens of other NCAA member schools, violated his right to be paid as an employee of the Defendants, acting jointly, for his participation on the Villanova football team as a Scholarship Athlete." Id.

at *1.  The <u>Livers</u> court granted a motion to dismiss brought by the NCAA member schools that were not attended by the Plaintiff.  While the complaint in <u>Livers</u>, like the Complaint in the instant proceeding, alleged that the NCAA member schools had agreed to impose restrictions on student athlete recruitment, eligibility, compensation, and the number of hours that student athletes could spend in connection with NCAA intercollegiate athletics, and to subject student athletes to discipline by the NCAA Committee on Infractions, the <u>Livers</u> court concluded that the complaint in that case did not plausibly allege that the NCAA member schools that Livers did not attend were his joint employers under either the <u>Enterprise</u> test or <u>North American Soccer League</u>.  <u>Id.</u> at *5-6, 11-12. After first noting that the Fifth's Circuit's decision in <u>North American Soccer League</u> is not controlling in the Eastern District of Pennsylvania, the <u>Livers</u> court rejected the plaintiff's argument that <u>North American Soccer League</u> demanded a conclusion that the NCAA member schools that he did not attend were his joint employers, observing that <u>North American Soccer League</u> was not an FLSA case, did not involve student athletes, and, most importantly, involved facts that "demonstrated a more significant management role for each individual soccer team in the management of the League as a whole, by virtue of their membership in the League, than Plaintiff alleges with respect to NCAA member schools." <u>Id.</u> at *12 (citing <u>North American Soccer League</u>, 613 F.2d at 1382.)

We conclude that the same is true in the case before us.  In <u>North American Soccer League</u>, the commissioner was selected and compensated by the clubs, and the League's board of directors was made up of one representative of each club. <u>North American Soccer League</u>, 613 F.2d at 1382. In contrast, the Complaint in this case does not allege that the president of the NCAA is selected by and paid by the member schools, that any of the NASD are members of the NCAA D1 Committee on Infractions or the D1 Infractions Appeal Committee, or that any of the NASD are

involved in day-to-day decision making in the NCAA D1.  We conclude, accordingly, that the Complaint does not plausibly allege that the NASD are joint employers of Plaintiffs under the "Sports League Joint Employment Theory" described in North American Soccer League.  Based on this conclusion and our prior analysis under the Enterprise test, we further conclude that the Complaint does not plausibly allege that the NASD are joint employers of Plaintiffs and, accordingly, that Plaintiffs lack standing to sue the NASD for violations of the FLSA. We thus grant the instant Motion to Dismiss as to Plaintiffs' FLSA claim in Count I of the Complaint as against the NASD.

       C.     <u>Plaintiffs' State Statutory Law Claims</u>

Counts II through VIII assert claims under state statutory and common law.  The Moving Defendants ask us to dismiss Plaintiffs' "state law wage claims," i.e., their claims under the PMWA, the NYLL, and the CMWA, because those "claims are analyzed under the same standards as [Plaintiffs'] FLSA claims."  (Moving Defs.' Mem. at 1 n.3.)  The PMWA, the NYLL and the CMWA all define the term employer similarly to the FLSA.  See Razak, 951 F.3d at 142 ("Pennsylvania state courts have looked to federal law regarding the FLSA for guidance in applying the PMWA." (citing Pa. Dep't of Labor & Indus. v. Stuber, 822 A.2d 870, 873 (Pa. Commw. Ct. 2003), aff'd 859 A.2d 1253 (Pa. 2004))); Verma v. 3001 Castor, Inc., 937 F.3d 221, 229 (3d Cir. 2019) (stating that the Pennsylvania courts use the test developed by the Third Circuit to determine whether a worker is an employee under the FLSA to determine whether a worker is an employee under the PMWA (citing Stuber, 822 A.2d at 873)); Sethi v. Narod, 974 F. Supp. 2d 162, 188 (E.D.N.Y. 2013) ("District courts in [the Second] Circuit 'have interpreted the definition of "employer" under the New York Labor Law coextensively with the definition used by the FLSA.'" (quoting Spicer v. Pier Sixty LLC, 269 F.R.D. 321, 335 n. 13 (S.D.N.Y. 2010) (citation

omitted)); <u>Dixon v. Zabka</u>, Civ. A. No. 11-982, 2014 WL 6084351, at *17 (D. Conn. Nov. 13, 2014) (stating that the CMWA "defines 'employer,' much like the FLSA" and noting that "employ" is defined identically by the CMWA and the FLSA (citing Conn. Gen. Stat. § 31-58 and 29 U.S.C. § 203(d)).  Accordingly, because we have determined that the Complaint does not plausibly allege that the NASD are joint employers of Plaintiffs for purposes of the FLSA and that Plaintiffs thus lack standing to sue the NASD under the FLSA, we also conclude that the Complaint does not plausibly allege that the NASD are joint employers of Plaintiffs for purposes of the PMWA, the NYLL, and the CMWA and that Plaintiffs lack standing to sue the NASD for the violations of those statutes alleged in Counts II, IV, V, and VII.  Consequently, we grant the Motion to Dismiss with respect to Plaintiffs' state statutory law claims[7] as follows:  (1) we grant the Motion as to Plaintiffs' claims brought pursuant to the PMWA in Count II of the Complaint as against the Pennsylvania-based Defendants identified in footnote two, with the exception of Attended School Defendants Lafayette College and Villanova University;  (2) we grant the Motion as to Plaintiffs' claims brought pursuant to the NYLL in Counts IV and V of the Complaint as against the New York-based Defendants identified in footnote three, with the exception of Attended Schools Defendants Cornell University and Fordham University; and (3) we grant the Motion as to Plaintiffs' claim brought pursuant to the CMWA in Count VII of the Complaint as against the Connecticut-based Defendants identified in footnote four, with the exception of Attended School Defendant Sacred Heart University.

---

[7] The Complaint also asserts state common law unjust enrichment claims against the Pennsylvania-based Defendants in Count III, against the New York-based Defendants in Count VI, and against the Connecticut-based Defendants in Count VIII.  The Moving Defendants do not mention these claims in their Motion to Dismiss.  Accordingly, we take no action with respect to those claims.

III.    CONCLUSION

For the foregoing reasons, we deny the Motion to Dismiss as to the NCAA and grant the Motion to Dismiss as to the NASD.  Accordingly, we dismiss Count I as against the following Non Attended School Defendants with prejudice:  Bucknell University, Duquesne University, Fairleigh Dickinson University, La Salle University, Lehigh University, Monmouth University, Princeton University, Rider University, Robert Morris University, Seton Hall University, Saint Francis University, Saint Joseph's University, Saint Peter's University, the University of Delaware, Pennsylvania State University, the University of Pittsburgh, Rutgers State University of New Jersey, and Temple University.  As Plaintiffs have indicated their intent to file a Second Amended Complaint adding as Named Plaintiffs individuals who participated in NCAA intercollegiate athletics at the University of Pennsylvania and Drexel University, and which will assert claims against those two universities as Attended Schools Defendants, we dismiss Count I of the Complaint as against the University of Pennsylvania and Drexel University without prejudice to Plaintiffs' assertion of that claim against them as Attended Schools Defendants in the Second Amended Complaint.[8]  We also dismiss Counts II, IV, V, and VII as against the Non Attended School Defendants as follows:  Count II is dismissed as against the Pennsylvania-based Defendants identified in footnote two, with the exception of Attended School Defendants Lafayette College and Villanova University;[9] Counts IV and V are dismissed as against the New York-based

---

[8] The parties entered into a Stipulation in which Defendants state that they do not oppose Plaintiffs' motion to file a Second Amended Complaint and the parties agreed that "the proposed Second Amended Complaint (ECF 59-1) that is the subject of the Motion to Amend has no effect on the issues in the pending Motion to Dismiss filed by the NCAA and Non-Attended School defendants (ECF 26), and that the Court should proceed to rule on the latter."  (See Docket No. 60.)  We ordered the entry of the Stipulation on September 10, 2021.  (See Docket No. 61.)

[9] As with Count I, Count II is dismissed without prejudice as against Drexel University and the University of Pennsylvania.

Defendants identified in footnote three, with the exception of Attended School Defendants Cornell University and Fordham University; Count VII is dismissed as against the Connecticut-based Defendants identified in footnote four, with the exception of Attended School Defendant Sacred Heart University.  An appropriate order follows.[10]

BY THE COURT:

/s/ John R. Padova

_____

John R. Padova, J.

---

[10] In accordance with the instant Memorandum and its accompanying Order, and our Memorandum and Order dated August 25, 2021, denying the ASD's Motion to Dismiss, Plaintiffs may proceed on the following claims:  Count I, which alleges violations of the FLSA, as against the ASD and the NCAA; Count II, which alleges violations of the PMWA, as against Villanova University and Lafayette College; Count III, which alleges a claim of unjust enrichment under Pennsylvania common law, as against the Pennsylvania-based Defendants; Counts IV and V, which allege violations of the NYLL, as against Fordham University and Cornell University; Count VI, which alleges a claim of unjust enrichment under New York common law, as against the New York-based Defendants; Count VII, which alleges violations of the CMWA, as against Sacred Heart University; and Count VIII, which alleges a claim of unjust enrichment under Connecticut common law, as against the Connecticut-based Defendants.