## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

RALPH "TREY" JOHNSON,
STEPHANIE KERKELES,
NICHOLAS LABELLA,
CLAUDIA RUIZ,
JACOB WILLEBEEK-LEMAIR,
ALEXA COOKE,
RHESA FOSTER,
LAURA HAMILTON,
ZACHARY HARRIS,
MATTHEW SCHMIDT,
TAMARA SCHOEN,
GINA SNYDER,
ESTEBAN SUAREZ and
LIAM WALSH,
individually and on behalf of all persons
similarly situated,

     Plaintiffs,

 v.

THE NATIONAL COLLEGIATE ATHLETIC
ASSOCIATION, a/k/a the NCAA, and the
following NCAA Division I Member Schools
as representatives of a Defendant Class of
all private and semi-public NCAA Division I
Member Schools:[i]

CORNELL UNIVERSITY,
DREXEL UNIVERSITY,
FORDHAM UNIVERSITY,
LAFAYETTE COLLEGE,
SACRED HEART UNIVERSITY,
VILLANOVA UNIVERSITY,
UNIVERSITY OF PENNSYLVANIA,
UNIVERSITY OF OREGON,
TULANE UNIVERSITY,
UNIVERSITY OF NOTRE DAME,
UNIVERSITY OF ARIZONA,
PURDUE UNIVERSITY,
DUKE UNIVERSITY and

Civil Action No. 19-cv-5230 (JP)

**SECOND AMENDED COMPLAINT –
Class and Collective Action**

**Jury Trial Demanded**

---

[i] NCAA Division I Member Schools are sued in their respective incorporated name and/or in the name of their respective Board of Regents, Board of Trustees or governing body.

MARIST COLLEGE,

Defendants.

www.StudentAthletePay.com

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................... 1

JURISDICTION AND VENUE ...................................................................................... 3

THE PARTIES ................................................................................................................. 5

FACTS ............................................................................................................................... 8

I.     WORK STUDY PROGRAMS AND GUIDELINES ...................................................... 8

II.    STUDENT ATHLETES ARE EMPLOYEES THE SAME AS, IF NOT MORE SO THAN,
       PARTICIPANTS IN WORK STUDY PROGRAMS ....................................................... 8

       A.    The "Special Circumstances" of Unpaid Prison Labor in
             *Vanskike v. Peters*, 974 F.2d 806 (7th Cir. 1992), Are *Not* Comparable,
             or Relevant, to NCAA Sports .................................................................. 8

       B.    Employee Tests Apply to NCAA Sports ...................................................... 10

       C.    The Applicable Employee Tests ................................................................... 11

             1.    The *Glatt* Student Employee Test ...................................................... 12

             2.    The *Donovan* Independent Contractor v. Employee Test ..................... 42

III.   DEFENDANTS ARE JOINT EMPLOYERS OF STUDENT ATHLETES............................ 57

       A.    NCAA Bylaws Apply to *All* Student Athletes on An Equal Basis ............... 57

       B.    The Role(s) of NCAA Member Schools in
             *Handing Down* NCAA Bylaws ................................................................... 57

       C.    The Role(s) of NCAA Member Schools in
             *Enforcing* NCAA Bylaws ......................................................................... 59

       D.    The Role(s) of NCAA Staff in *Enforcing* NCAA Bylaws ............................. 61

       E.    The Applicable Joint Employment Test ...................................................... 67

             1.    The *Enterprise Rent-A-Car* Joint Employment Test ........................... 68

IV.    STUDENT ATHLETES ARE *NOT* EXEMPT FROM THE PROTECTIONS
       OF WAGE AND HOUR LAWS ................................................................................ 78

V.     DEFENDANTS' VIOLATIONS OF THE WAGE AND HOUR LAWS ARE WILLFUL ............. 81

       A.    The *Livers v. NCAA* Willfulness Test ...................................................... 81

www.StudentAthletePay.com

　　1.　Defendants *Never* Relied upon DOL FOH § 10b03(e)
　　　　in Failing to Classify and Pay Student Athletes As Employees ..............83

　　2.　At All Relevant Times, Defendants Understood
　　　　That FOH § 10b03(e) Applies to Student-Run Groups
　　　　(incl. Interscholastic Club Sports), *But Not to NCAA Sports* ...............83

　　3.　At All Relevant Times, Defendants Understood
　　　　That Student Athletes Meet Employee Criteria
　　　　*More* Than Students Employed in Work Study ....................................90

PLAINTIFFS' PROPOSED FLSA COLLECTIVE ACTION ALLEGATIONS ..................90

PLAINTIFFS' PROPOSED PMWA CLASS ACTION ALLEGATIONS ..........................93

PLAINTIFFS' PROPOSED NYLL CLASS ACTION ALLEGATIONS............................100

PLAINTIFFS' PROPOSED CMWA CLASS ACTION ALLEGATIONS.........................107

PLAINTIFFS' PROPOSED NCWHA CLASS ACTION ALLEGATIONS.......................113

PLAINTIFFS' PROPOSED OMWEC CLASS ACTION ALLEGATIONS......................120

PLAINTIFFS' PROPOSED LLWCL CLASS ACTION ALLEGATIONS.......................126

PLAINTIFFS' PROPOSED AMWA CLASS ACTION ALLEGATIONS.......................133

PLAINTIFFS' PROPOSED IMWL CLASS ACTION ALLEGATIONS.......................139

COUNT I | VIOLATIONS OF THE FLSA ......................................................145

COUNT II | VIOLATIONS OF THE PENNSYLVANIA MINIMUM WAGE ACT ........................147

COUNT III | PENNSYLVANIA UNJUST ENRICHMENT ..............................................148

COUNT IV | VIOLATIONS OF THE NEW YORK LABOR LAW ........................................149

COUNT V | FAILURE TO PAY WAGES FOR ALL HOURS WORKED................................150

COUNT VI | NEW YORK UNJUST ENRICHMENT................................................152

COUNT VII | VIOLATIONS OF THE CONNECTICUT MINIMUM WAGE ACT........................153

COUNT VIII | CONNECTICUT UNJUST ENRICHMENT ..............................................154

COUNT IX | VIOLATIONS OF THE NORTH CAROLINA WAGE AND HOUR ACT ....................155

COUNT X | NORTH CAROLINA UNJUST ENRICHMENT .....................................................156

COUNT XI | VIOLATIONS OF THE OREGON MINIMUM WAGE AND EMPLOYMENT CONDITIONS
LAW ...................................................................................................................157

COUNT XII | Oregon Unjust Enrichment ...............................................................158

COUNT XIII | Violations of the Louisiana's Labor and Worker's Compensation Laws  .................................................................................................................159

COUNT XIV | Louisiana Unjust Enrichment...........................................................161

COUNT XV | Violations of the Arizona Minimum Wage Act.................................162

COUNT XVI | Arizona Unjust Enrichment..............................................................163

COUNT XVII | Violations of the Indiana Minimum Wage Law..............................164

COUNT XVIII | Indiana Unjust Enrichment............................................................165

PRAYER FOR RELIEF ......................................................................................  166

JURY DEMAND ................................................................................................  168

## INTRODUCTION

1.      The crux of this Complaint is that Student Athletes – engaged in athletic work that is unrelated to academics; supervised by full-time, well-paid coaching and training staff; and integral to the billion dollar Big Business of NCAA sports – are student employees as much as, and arguably more than, fellow students employed in Work Study programs.[1]

2.      In fact, under NCAA rules, NCAA Division I ("D1") member schools treat Student Athletes *like* students employed in Work Study programs by, among other things, **requiring adult supervisors to maintain timesheets for *both***.  *See* NCAA D1 Bylaw 17.1.7.3.4.  NCAA D1 member schools just do **not** pay Student Athletes the same as students employed in Work Study.

3.      Notably, student ticket takers, seating attendants and food concession workers at NCAA contests are paid on a minimum wage scale averaging $10.53 to $13.36 per hour under Work Study.[2]  At the same time, the Student Athletes, whose athletic work creates *those* Work Study jobs at the ticket gate, in the seats and at concession stands, are paid **nothing**.

4.      Every time that the NCAA has been required to defend its unlawful policy of refusing to pay Student Athletes, it has relied heavily on drawing an offensive analogy between Student Athletes and *prisoners*, who may be required to work without pay because the *Thirteenth Amendment* permits involuntary servitude as punishment for crime. *See, e.g.*, Sally Jenkins, "Are college athletes the same as prisoners? These judges seem to think so," Washington Post, Jan. 5, 2017; Shaun King, "The NCAA Says Student-Athletes Shouldn't

---

[1]      "Work study," as herein referenced, includes *all* student employment by a college or university, whether federally subsidized or not and irrespective of student financial need or assistance.

[2]      *See* Bureau of Labor Statistics, May 2018 National Industry-Specific Occupational Employment and Wage Estimates – NAICS 611300 – Colleges, Universities, and Professional Schools, *e.g.*, Occupation Codes 35-3020, 39-3000, 39-3031 and 39-3090.

[Be Paid Because the 13th Amendment Allows Unpaid Prison Labor," TheIntercept.com, Feb. 22, 2018](); [Elie Mystal, "NCAA Doubles Down on Comparing Student Athletes to Prisoners," AboveTheLaw.com, Feb. 23, 2018](); [Brandi Collins-Dexter, "NCAA's amateurism rule exploits black athletes as slave labor," The Undefeated.com (ESPN), Mar. 27, 2018]().

5.      While the NCAA may wish to treat Student Athletes as *prisoners*, **there is *no* legal basis for the decision to do so**.

6.      Accordingly, Plaintiffs Ralph "Trey" Johnson, Stephanie Kerkeles, Nicholas Labella, Claudia Ruiz, Jacob Willebeek-Lemair, Alexa Cooke, Rhesa Foster, Laura Hamilton, Zachary Harris, Matthew Schmidt, Tamara Schoen, Gina Snyder, Esteban Suarez and Liam Walsh (together, "Plaintiffs") through undersigned counsel, individually and on behalf of all persons similarly situated, files this Class and Collective Action Complaint against Defendants NCAA and private and semi-public NCAA D1 member schools seeking all available relief under the Fair Labor Standards Act, 29 U.S.C. §§ 201 *et seq.* ("FLSA"), the Pennsylvania Minimum Wage Act, 43 P.S. §§ 333.101 *et seq.* ("PMWA"),the New York Labor Law, N.Y. Lab. Law §§ 191 *et. seq.* ("NYLL"), the Connecticut Minimum Wage Act, C.G.S.A. §§ 31-58, *et. seq.* ("CMWA"), the North Carolina Wage and Hour Act, N.C.G.S.A. Ch. 95, Art. 2A, *et. seq.* ("NCWHA"), Oregon Minimum Wage and Employment Conditions Law, ORS §653.010, *et. seq.* ("OMWEC"), Lousiana's Labor and Worker's Compensation Laws, La. Stat. Ann. § 23:631, *et. seq.* ("LLWCL"), the Arizona Minimum Wage Act, A.R.S. §23-362, *et. seq.* ("AMWA") and the Indiana Minimum Wage Law Indiana Code Chapter 22–2–2 ("IMWL").

7.      The allegations herein are made based upon: (i) federal regulations governing Work Study; (ii) NCAA and Villanova policies published in their own documents and websites *which, upon information and belief, are representative of **all** NCAA D1 member schools*;

-2-

www.StudentAthletePay.com

(iii) NCAA and Villanova admissions in *Livers (Phillips) v. NCAA*, 2:17-cv-4271 (E.D. Pa. Sept. 26, 2017),[3] *which, upon information and belief, are representative of **all** NCAA D1 member schools*; (iv) NCAA President Mark Emmert's 2014 testimony before a U.S. Senate Committee; and (v) personal knowledge or information and belief.

8.      To be clear, like most Student Athletes, Plaintiffs thoroughly enjoy(ed) and deeply value(d) the experience of playing for their coaches and schools.  This Complaint does **not** disparage that experience, people closely associated with that experience or the school.

9.      This Complaint merely recognizes that the NCAA athletic experience, by comparison to Work Study, constitutes work for which Student Athletes deserve to be paid under federal and state laws that overrule the NCAA's *self*-defined amateurism.

## JURISDICTION AND VENUE

10.      This Court has subject matter jurisdiction over Plaintiffs' FLSA claim under 29 U.S.C. § 216(b) and 28 U.S.C. § 1331.

11.      This Court has supplemental jurisdiction over Plaintiffs' state law claims under 28 U.S.C. § 1367 because those claims derive from the same nucleus of operative facts as Plaintiffs' FLSA claim.

12.      Venue is proper in this District pursuant to 28 U.S.C. § 1391.  Each of the Defendants can be found, resides, has an agent, or transacts business in this District, and the unlawful conduct has been, or will be, carried on in part by one or more of the Defendants within this District.

13.      Four (4) NCAA D1 member schools are in this District: Drexel University, Lafayette College, University of Pennsylvania and Villanova University.  Other member

---

[3]      The parties in *Livers (Phillips) v. NCAA* stipulated to voluntary dismissal entered April 2, 2019 (ECF 138).

schools compete against those located in this District in the recruitment of Student Athletes residing in this District, and in NCAA contests held in this District.

14.     The NCAA has entered into multi-year, multi-billion dollar agreements with ESPN, CBS and Turner Sports to broadcast NCAA contests between NCAA D1 member schools, including broadcasts from and into this District, and the NCAA has distributed, and is to distribute, shares of these broadcasting fees to NCAA D1 member schools, including to those in this District.

15.     In addition to shares of fees from the NCAA's broadcasting agreements, NCAA D1 member schools, including those in this District, receive shares of fees from multi-year, multi-million dollar agreements entered into jointly as part of an NCAA conference, or individually, with television and radio networks to broadcast NCAA contests between NCAA D1 member schools, including broadcasts from and into this District.

16.     NCAA D1 member schools aim to increase applications from prospective students from this District through promotion of their NCAA sports programs, and through advertisements during broadcasts of NCAA contests into this District.

17.     In this decade, the NCAA has conducted, and NCAA member schools have participated in, NCAA D1 post-season and championship segments in this District, including:  Men's Basketball (2013 Second and Third Rounds, and 2016 East Regional); Women's Basketball (2011 Regional); Men's Hockey (2014 Championship); Men's Soccer (2013 and 2017 Championships); Men's Lacrosse (2013, 2015, 2016 and 2019 Championships); Women's Lacrosse (2015 and 2016 Championships); and Wrestling (2011 Championship). Furthermore, NCAA member schools annually participate in the Penn Relays, the oldest track and field competition in the nation.

18.     NCAA member schools engage in other commercial conduct in this District, including: (i) application pitches to prospective students in this District; (ii) collection of

www.StudentAthletePay.com

application fees, tuition and room and board from residents of this District; (iii) fundraising

appeals to, and collections from, alumni and donors in this District; and (iv) in-store and

internet sales of collegiate- and NCAA-licensed products in this District.

## THE PARTIES

19.     Plaintiff Ralph "Trey" Johnson is an individual residing in Tampa, Florida.

Johnson worked for Defendants as a Student Athlete on Villanova's NCAA Football Team

from June 2013 to November 18, 2017.  Johnson subsequently worked for the Pittsburgh

Steelers, and then Denver Broncos, of the National Football League, and currently works for

the Winnipeg Blue Bombers of the Canadian Football League.  Johnson's written consent to

be a Plaintiff in this action pursuant to 29 U.S.C. § 216(b) is attached hereto as Exhibit A.

20.     Plaintiff Stephanie Kerkeles is an individual residing in Arnold, Maryland.

Kerkeles worked for Defendants as a Student Athlete on Fordham University's NCAA

Swimming and Diving Team from 2016 to 2020.  Kerkeles's written consent to be a Plaintiff

in this action pursuant to 29 U.S.C. § 216(b) is attached hereto as Exhibit A.

21.     Plaintiff Nicholas Labella is an individual residing in New York, New York.

Labella worked for Defendants as a Student Athlete on Fordham University's NCAA

Baseball Team from 2018 to 2019.  Labella's written consent to be a Plaintiff in this action

pursuant to 29 U.S.C. § 216(b) is attached hereto as Exhibit A.

22.     Plaintiff Claudia Ruiz is an individual residing in Glen Head, New York.  Ruiz

worked for Defendants as a Student Athlete on Sacred Heart University's NCAA Tennis

Team from 2014 to 2018.  Ruiz's written consent to be a Plaintiff in this action pursuant to

29 U.S.C. § 216(b) is attached hereto as Exhibit A.

23.     Plaintiff Jacob Willebeek-Lemair is an individual residing in Ithaca, New

York.  Willebeek-Lemair worked for Defendants as a Student Athlete on Cornell University's

www.StudentAthletePay.com

NCAA Soccer Team from 2017 to 2018.  Willebeek-Lemair's written consent to be a Plaintiff in this action pursuant to 29 U.S.C. § 216(b) is attached hereto as Exhibit A.

24.    Plaintiff Alexa Cooke is an individual residing in Easton, Pennsylvania. Cooke worked for Defendants as a Student Athlete on Lafayette College's NCAA Tennis Team from 2017 to 2021.  Cooke's written consent to be a Plaintiff in this action pursuant to 29 U.S.C. § 216(b) is attached hereto as Exhibit A.

25.    Plaintiff Rhesa Foster is an individual residing in Clovis, California.  Foster worked for Defendants as a Student Athlete on the University of Oregon's NCAA Track and Field Team from 2016 to 2021.  Foster's written consent to be a Plaintiff in this action pursuant to 29 U.S.C. § 216(b) is attached hereto as Exhibit B.

26.    Plaintiff Laura Hamilton is an individual residing in New York, New York. Hamilton worked for Defendants as a Student Athlete on Drexel University's NCAA Soccer Team from 2016 to 2017 and the University of Pennsylvania's NCAA Soccer Team from 2017 to 2020.  Hamilton's written consent to be a Plaintiff in this action pursuant to 29 U.S.C. § 216(b) is attached hereto as Exhibit B.

27.    Plaintiff Zachary Harris is an individual residing in New Orleans, Louisiana. Harris worked for Defendants as a Student Athlete on Tulane University's NCAA Football Team from 2014 to 2018.  Harris's written consent to be a Plaintiff in this action pursuant to 29 U.S.C. § 216(b) is attached hereto as Exhibit B.

28.    Plaintiff Matthew Schmidt is an individual residing in Chicago, Illinois. Schmidt worked for Defendants as a a Student Athlete on the University of Notre Dame's NCAA Lacrosse Team from 2017 to 2021.  Schmidt's written consent to be a Plaintiff in this action pursuant to 29 U.S.C. § 216(b) is attached hereto as Exhibit B.

29.    Plaintiff Tamara Schoen is an individual residing in Phoenix, Arizona. Schoen worked for Defendants as a Student Ahlete on the University of Arizona's Softball

Team from 2015 to 2019.  Schoen's written consent to be a Plaintiff in this action pursuant to 29 U.S.C. § 216(b) is attached hereto as Exhibit B.

30.   Plaintiff Gina Snyder is an individual residing in Jacksonville, Florida. Snyder worked for Defendants as a Student Ahlete on Purdue University's Softball Team from 2014 to 2017 and University of Arizona's Softball Team from 2017 to 2019.  Snyder's written consent to be a Plaintiff in this action pursuant to 29 U.S.C. § 216(b) is attached hereto as Exhibit B.

31.   Plaintiff Esteban Suarez is an individual residing in Los Angeles, California. Suarez worked for Defendants as a Student Athlete on Duke University's Track and Field Team from 2016 to 2020.  Suarez's written consent to be a Plaintiff in this action pursuant to 29 U.S.C. § 216(b) is attached hereto as Exhibit B.

32.   Plaintiff Liam Walsh is an individual residing in New York, New York.  Walsh worked for Defendants as a Student Athlete on Marist College's NCAA Lacrosse Team from 2014 to 2018.  Walsh's written consent to be a Plaintiff in this action pursuant to 29 U.S.C. § 216(b) is attached hereto as Exhibit B.

33.   Defendants NCAA and NCAA D1 member schools maintain principal offices as identified in Exhibit C attached hereto.  Defendants jointly operate the billion dollar Big Business of NCAA sports.

34.   Defendants jointly employed Plaintiffs and have jointly employed, and continue to jointly employ, similarly situated persons within the meaning of 29 U.S.C. § 203(g).

35.   Defendants have been, and continue to be, enterprises engaged in commerce within the meaning of 29 U.S.C. §§ 203(r) and (s), which employ individuals engaged in commerce and to which minimum wage provisions of 29 U.S.C. § 206(a) apply.  *See* 29 U.S.C. § 202(a).

## FACTS

I. **WORK STUDY PROGRAMS AND GUIDELINES**

36.     Student participants in Work Study (including academic scholarship recipients who participate in Work Study) are classified as employees under the FLSA.

37.     Work Study guidelines are set forth in the U.S. Department of Education Federal Student Aid Handbook ("FSA HB"), Chapter 2: The Federal Work-Study Program. *See, e.g.,* the 2017-18 FSA HB, Ch. 2, available at:

https://ifap.ed.gov/fsahandbook/attachments/1718FSAHdbkVol6Ch2.pdf.

38.     Services performed by students employed in Work Study are **not** considered professional services and are **not** subject to FICA (Social Security and Medicare) taxes.  *See* FSA HB, Ch. 2, at 6-50 ("Student Exception to FICA Tax").

39.     The policies and practices of NCAA D1 member schools, like Villanova,[4] comply with guidelines set forth in the FSA HB.

---

[4]     Villanova's practices are highlighted herein only because they are emblematic of the policies and practices in place at all NCAA D1 member schools.  Upon information and belief, the policies of Villanova described in this action are substantially similar to those at every school in the NCAA.  *See* Paragraph 7, *supra.*

II.   STUDENT ATHLETES ARE EMPLOYEES THE SAME AS, IF NOT MORE SO THAN, PARTICIPANTS IN WORK STUDY PROGRAMS

A.   The "Special Circumstances" of Unpaid Prison Labor in *Vanskike v. Peters*, 974 F.2d 806 (7th Cir. 1992), Are *Not* Comparable, or Relevant, to NCAA Sports

40.   The NCAA has *thrice* relied on *Vanskike v. Peters*, 974 F.2d 806 (7th Cir. 1992) to argue that, as a threshold matter, courts should not even consider – *i.e.*, should not apply a test to determine – whether Student Athletes are employees under the FLSA.  *See Berger v. NCAA,* 843 F.3d 285 (7th Cir. 2016); *Dawson v. NCAA*, 250 F.Supp.3d 401 (N.D. Cal. 2017); *Livers v. NCAA*, No. 17-4271, 2018 U.S. Dist. LEXIS 83655 (E.D. Pa. May 17, 2018).

41.   As explained by the *Livers* Court:

> Both *Berger* and *Dawson* **relied heavily** on *Vanskike v. Peters*, 974 F.2d 806 (7th Cir. 1992) as precedent for, and an example of, the rejection of a multi-factor test to evaluate the "economic reality" of alleged employment relationships in **special circumstances**…. The [*Vanskike*] court observed that **"the *Thirteenth Amendment* excludes convicted criminals from the prohibition of involuntary servitude, so prisoners may be required to work."** *Vanskike*, 974 F.2d at 809.

*Livers*, 2018 U.S. Dist. LEXIS 83655, at \*45-46. (emphasis supplied).

42.   The courts in *Berger v. NCAA* and *Dawson v. NCAA* had "relied heavily on *Vanskike v. Peters*" because the NCAA had relied solely on *Vanskike* in those cases in support of its argument that "special circumstances" – in this case, NCAA *self*-defined amateurism, *which is **not** codified in any act of Congress* – exist to justify refusal to pay Student Athletes despite the provisions of the FLSA and state wage and hour laws.

43.   The NCAA's reliance on *Vanskike* to analogize Student Athletes to *prisoners*, who may be required to work without pay because the *Thirteenth Amendment* permits involuntary servitude as punishment for crime, is both offensive and misplaced.

44.     To be clear, the *Vanskike* Court described the "special circumstances" thusly:

> [T]he relationship between the DOC [Department of Corrections] and a prisoner is far different from a traditional employer-employee relationship, because … inmate labor belongs to the institution. The ***Thirteenth Amendment*** excludes convicted criminals from the prohibition of involuntary servitude, so prisoners may be required to work ….

> [L]iteral application of the *Bonnette* factors [*i.e.*, a multi-factor employee test] in the present context …. fail to capture the true nature of the relationship for essentially they presuppose a free labor situation. Put simply, the DOC's "control" over Vanskike [stems] from incarceration itself. The control that the DOC exercises over a prisoner is nearly total, and control over his work is merely incidental to that general control. Indeed, the ***Thirteenth Amendment****'s* specific exclusion of prisoner labor supports the idea that a prisoner performing required work for the prison is actually engaged in involuntary servitude, not employment ….

> When [prisoners] are assigned work within the prison for purposes of training and rehabilitation …. they are working as part of their sentences of incarceration. Because Vanskike's allegations reveal that he worked in the prison and for the DOC pursuant to penological work assignments, the economic reality is that he was not an "employee" under the FLSA.

974 F.2d at 809-810. (emphasis supplied).

45.     The NCAA's reliance upon *Vanskike* as legal justification for classifying Student Athletes as unpaid laborers rather than employees was rejected by the *Livers* Court and has been denounced. *See, e.g.*, Sally Jenkins, "Are college athletes the same as prisoners? These judges seem to think so," WASHINGTON POST, Jan. 5, 2017; Shaun King, "The NCAA Says Student-Athletes Shouldn't Be Paid Because the 13th Amendment Allows Unpaid Prison Labor," TheIntercept.com, Feb. 22, 2018; Elie Mystal, "NCAA Doubles Down on Comparing Student Athletes to Prisoners," AboveTheLaw.com, Feb. 23, 2018; Brandi Collins-Dexter, "NCAA's amateurism rule exploits black athletes as slave labor," The Undefeated.com (ESPN), Mar. 27, 2018.

-10-

46.    While the NCAA may wish to treat Student Athletes as *prisoners*, **there is no legal basis for the decision to do so**.

**B.    Employee Tests Apply to NCAA Sports**

47.    The *Livers* Court recognized that "standard FLSA cases" – and tests – are applicable to NCAA sports:

> Congress hasn't made any special provision for the colleges who have -- give out athletic scholarships.  And I don't know where a Court has the right to adopt a special test for student athletes …. I mean, that's usually not how we decide cases.  We look at a standard … the only exception for that is organized baseball [Major League Baseball's *limited* antitrust exemption] …. so I don't know why colleges that give out athletic scholarships should expect to have some special rule of law that only applies to them.

*Livers v. NCAA*: Mot. Hr'g Tr., Apr. 19, 2018 (ECF 58), at 35:22-36:11.

**C.    The Applicable Employee Tests**

48.    There are two relevant tests that courts use in determining whether an individual is an "employee" for the purposes of coverage under the FLSA (and, in this case, the PMWA, the NYLL, and the CMWA):

> i.    the student employee test in ***Glatt v. Fox Searchlight Pictures, Inc.***, 811 F.3d 528 (2d Cir. 2016), which, as the Court in *Livers v. NCAA* recognized, "[the NCAA and Villanova] concede that among those multi-factor tests that have been used … is the most relevant to the facts presented in this case," ***Livers v. NCAA***, No. 17-4271, 2018 U.S. Dist. LEXIS 124780, at 16 n.2 (E.D. Pa. July 25, 2018); and
>
> ii.    the independent contractor v. employee test in ***Razak v. Uber Techs., Inc.***, No. 16-573, 2018 U.S. Dist. LEXIS 61230 (E.D. Pa. Apr. 11, 2018) (relying upon ***Donovan v. DialAmerica Marketing, Inc.***, 757 F.2d 1376 (3d Cir. 1985)).

49.    An analysis under both of these tests demonstrates that Plaintiffs and the members of the Proposed FLSA Collective (as defined at Paragraph 264 *infra*,) the Proposed

-11-

Pennsylvania Class (as defined at Paragraph 275, *infra*), the Proposed New York Class (as defined at Paragraph 306, *infra*), the Proposed Connecticut Class (as defined at Paragraph 337, *infra*), the Proposed North Carolina class (as defined at Paragraph 368, *infra*), the Proposed Oregon Class (as defined at Paragraph 399, *infra*), the Proposed Louisiana Class (as defined at Paragraph 430, *infra*), the Proposed Arizona Class (as defined at Paragraph 461, *infra*), and the Proposed Indiana Class (as defined at Paragraph 492, *infra*) are all "employees" of Defendants (as defined at Paragraph 523, *infra*) under the applicable law.

### 1. The *Glatt* Student Employee Test

50. The student employee test in *Glatt* includes, among its factors:

    i. The extent to which the student and the employer clearly understand that there is no expectation of compensation;

    ii. The extent to which the position provides training that would be similar to that which would be given in an educational environment;

    iii. The extent to which the position is tied to the student's formal education program by integrated coursework or the receipt of academic credit;

    iv. The extent to which the position accommodates the student's academic commitments by corresponding to the academic calendar [or does **not** interfere with scheduled classes or the pursuit of academic degrees];

    v. The extent to which the position's duration is limited to the period in which the position provides the student with beneficial learning;

    vi. The extent to which the student's work complements, rather than displaces, the work of paid employees while providing significant educational benefits to the student [or to which the alleged employer is the primary beneficiary]; and

    vii. The extent to which the student and the employer understand that the assignment is conducted without

entitlement to a paid job at the conclusion of the
assignment.

*Glatt*, 811 F.3d at 536-37.

### i.   *Glatt* Factor No. 1
The extent to which the student and the employer clearly
<u>understand that there is no expectation of compensation</u>

51.     For reasons set forth in Paragraphs 52 through 68, *infra*, Student Athletes do

**not** have any options to choose any opportunities to play NCAA sports for wages at any

NCAA D1 member school.  Student Athletes also do **not** have any options to bargain for

such wages with any such school.

52.     In the United States, three associations of colleges and universities regulate

intercollegiate Varsity sports, *i.e.*, sports which are sponsored by the school, supervised by

school staff and funded through the school's budget, and from which the school derives

school branding benefits and revenues: the NCAA, National Association of Intercollegiate

Athletics ("NAIA"), and National Junior College Athletic Association ("NJCAA").  *See*

www.NCAA.org; www.NAIA.org; www.NJCAA.org.

53.     The NCAA has jurisdiction over some 1,117 four-year colleges and universities

and nearly 500,000 student athletes.  *See* What Is the NCAA?, available on NCAA.org at:

www.NCAA.org/about/resources/media-center/ncaa-101/what-ncaa.

54.     NCAA D1 bylaws are set forth in the NCAA D1 Manual.  *See, e.g.,* the 2017-18

NCAA Division I Manual, available on NCAApublications.com at:

www.NCAApublications.com/DownloadPublication.aspx?download=D118.pdf.

55.     The NAIA has jurisdiction over some 250 four-year colleges and universities

and 65,000 student athletes.  *See* www.NAIA.org.

56.     NAIA bylaws are set forth in the NAIA Official & Policy Handbook available

at: www.NAIA.org/fls/27900/1NAIA/pubs/legislative/NAIA_Official_Handbook.pdf.

-13-

57.     The NJCAA has jurisdiction over some 515 two-year junior colleges and

60,000 student athletes.  *See* Member College Directory, available at:

www.NJCAA.org/member_colleges/college-directory; Student-Athlete Participation Statistics,

available at: www.NJCAA.org/about/history/SA_Participation/index.

58.     NJCAA bylaws are set forth in the NJCAA Handbook & Casebook.  *See, e.g.*,

the 2017-18 NJCAA Handbook & Casebook, available at:

https://d2o2figo6ddd0g.cloudfront.net/a/1/o4bxsuaw8aflcy/2017-

18_NJCAA_Handbook_Jan_4_2018.pdf.

59.     All schools in each of the NCAA, NAIA and NJCAA have mutually agreed **not**

to offer wages for participation in intercollegiate Varsity sports, and they have adopted bylaws

prohibiting schools from offering wages and Student Athletes from accepting wages.  *See,*

*e.g.*, NCAA D1 Bylaw 12.1.2; NAIA Bylaw VII; NJCAA Bylaw V.4.A.

60.     To enforce their mutual agreements and bylaws prohibiting schools from

offering wages and Student Athletes from accepting wages, all schools in each of the NCAA,

NAIA and NJCAA have adopted bylaws prescribing sanctions for infractions, including, but

not limited to, suspension or termination of the student athlete's eligibility; reduction of the

letters of intent that the school is permitted to accept from high school recruits and/or

athletic scholarships that the school is permitted to offer; suspension of coaching staff;

and/or school team disqualification from regular season competition and/or post-season and

championship segments.  *See, e.g.*, NCAA D1 Bylaws 19.1, 19.9.5, 19.9.7 and 19.9.8; NAIA

Bylaws VI.B and VI.C; NJCAA Bylaws I.3.A.1, V.3.D, V.4.B.4 and V.4.E.

61.     In the NCAA, "[c]ash payment or other benefits provided by a coach,

administrator or representative of the institution's athletics interests" are considered a

Severe Breach of Conduct (Level I Violation) subject to the highest penalties, including, for

the Student Athlete, suspension or termination of eligibility, and for the member school,

competition penalties (*e.g.*, postseason bans), financial penalties, scholarship reductions, head coach restrictions and recruiting restrictions.  *See* NCAA D1 Bylaws 19.1.1(f), 19.9.5 and 19.9.7.

62.     In 2010, ESPN's docuseries "30 for 30" featured NCAA sanctions imposed against Southern Methodist University in 1987 for prohibited cash payments, including a two year ban on football regular and post-season referred to as the "death penalty" and reductions in scholarships.  *See Pony Excess*. (2010). [documentary] Directed by T. Matula. ESPN; Major Infractions Case | Southern Methodist University (Feb. 25, 1987), available on NCAA.org at https://web3.NCAA.org/lsdbi/search/miCaseView?id=44.

63.     In 2015, ESPN's docuseries "30 for 30" featured NCAA sanctions imposed against the University of Southern California in 2010, for prohibited cash payments, including a two year ban on football post-season, reductions in scholarships and a $206,020 fine.  *See Trojan War*. (2015). [documentary] Directed by A. Thomas. ESPN; Major Infractions Case | University of Southern California (June 10, 2010), available on NCAA.org at https://web3.NCAA.org/lsdbi/search/miCaseView?id=691.

64.     In the NCAA, the only circumstance under which a Student Athlete is permitted to receive payment based upon athletic performance and retain NCAA eligibility is through the U.S. Olympic Committee's ("USOC") Operation Gold program.  *See* NCAA D1 Bylaw 12.1.2.1.5.1.

65.     In Olympic Games competition, the USOC Operation Gold program currently pays NCAA-eligible Student Athletes the following amounts for each medal won:  $37,500

for each Gold, $22,500 for each Silver and $15,000 for each Bronze.  *See* Athlete Services /

Financial Resources, available on TeamUSA.org at:

www.teamusa.org/Home/Team%20USA%20Athlete%20Services/Financial%20Resources.

      66.    In 2016, USA TODAY reported that the USOC Operation Gold program offers

NCAA-eligible Student Athletes *additional* pay through USA sport governing bodies and

organizations, *e.g.*, USA Swimming and USA Wrestling, in *non*-Olympic Games competition:

> Kyle Snyder couldn't get much more than an athletic scholarship from Ohio State this past school year, when he won an NCAA wrestling title for the Buckeyes as a sophomore.
>
> But he did get paid by somebody else to wrestle.
>
> In addition to $50,000 for winning a world championship in September, USA Wrestling has been giving Snyder $1,000 a month to cover training expenses — both without running afoul of NCAA rules.
>
> *****
>
> Ohio State's Snyder — the youngest world champion in American wrestling history — will be at the Games, and as with any U.S. wrestler, a gold medal will bring him a total of $250,000 from USA Wrestling and the USOC, a silver $50,000 and a bronze $25,000 ….
>
> But as the NCAA creates more opportunities for prospective Olympians to get money based on their athletic skills, it continues to fight several legal battles to restrict what football and basketball players can receive ….
>
> *****
>
> World record-setting swimmer Katie Ledecky, who is slated to enter three individual events and two relays in Rio, could pocket $125,000 from the USOC and keep her commitment to begin competing for Stanford this school year.  She also will be able to keep additional money from USA Swimming under Operation Gold, although Scott Leightman, a spokesman for the organization, declined to provide the amounts available.

*See* Steve Berkowitz, "Olympics offer rare chance for NCAA athletes to be paid," USA TODAY,

Aug. 2, 2016.

www.StudentAthletePay.com

67.     By contrast to Student Athletes, *non*-student athletes have the option to apply for paid positions in NCAA D1 member school Athletic Departments.  For example, the Villanova Athletic Department hires unpaid and paid student interns.  Some internships in the Business Office, Marketing & Promotions (Spring and Summer), Facilities & Operations (Position 2), and Video Production (Volunteer Intern) are unpaid.  But, other internships in Academic Support, the Athletic Director's Office, Compliance and Student Services, Facilities & Operations (Position 1), Marketing & Promotions (Fall/Spring), Media Relations, Strength & Conditioning, the Ticket Office and Video Production are paid $1400 per month. *See* Athletic Department Internship Program, attached hereto as Exhibit L and available on Villanova.com at: https://Villanova.com/sports/2018/6/18/internships.aspx.[5]

68.     If injury or illness prevents a Student Athlete from playing NCAA sports, s/he is "expected to assist the athletics department in other operational activities (i.e. coaching and/or support staff duties" without pay.  *See, e.g.,* Athletic Financial Aid Agreement, attached hereto as Exhibit M and available on NCAA.org at https://www.NCAA.org/sites/default/files/FinAidForm_0.pdf.[6]

69.     By contrast to Student Athletes, *non*-student athletes who perform operational activities in NCAA D1 member school Athletic Department are paid at least minimum wage.  *See, e.g., Livers (Phillips) v. NCAA*: Answer (ECF 130), at ¶ 67; Villanova Athletic Department Internship Program (Ex. L) (Athletic Director's Office Interns are paid

---

[5]   For ease of filing, Plaintiff has not included Exhibits L-U with the initial mailing in this case. However, Plaintiff will, of course, provide the Court with a copy of Exhibits L-U upon the Court's request.

[6]   All Student Athletes are expected to assist the athletics department in this manner without pay.  The NCAA admits there is **no** principled distinction between scholarship athletes and walk-ons, and that the only policies and practices that apply to scholarship athletes exclusively are bylaws that set the number of scholarships schools may award and that permit revocation of scholarships for misconduct (as opposed to revocation of athletic eligibility, which applies to scholarship athletes and walk-ons alike). *See* Paragraphs 178, 267 and 268, *infra*.

$1400 per month to support "day-to-day coordination of operational activities … answering the phone, typing memos and letters, preparing HR forms, maintaining the Athletic Director's email account, compiling a monthly calendar and the department personnel directory [and] assisting with special projects")

> ### ii.   *Glatt* Factor No. 2
> The extent to which the position provides training that would be similar to that which would be given in an educational <u>environment</u>

70.     For reasons set forth in Paragraphs 61 through 68, *infra*, Work Study provides training similar to that given in an educational environment *more* than NCAA sports; thus, NCAA sports meet employee criteria under *Glatt* Factor No. 2 **more** than Work Study.

71.     Various Work Study guidelines require NCAA D1 member schools, like Villanova, to offer Work Study jobs providing training similar to that which would be given in an educational environment and/or beneficial learning. *See* FSA HB, Ch. 2.

72.     Pursuant to Work Study guidelines:

> To the maximum extent practicable, a school must provide FWS ["Federal Work Study"] jobs that **complement and reinforce each recipient's educational program or career goals**.

*Id.*, at 6-39.  (emphasis supplied).

73.     NCAA D1 member schools, like Villanova, offer jobs through Work Study that complement and reinforce student employees' respective educational program.  *See, e.g.*, *Livers (Phillips) v. NCAA*: Villanova's Resp. to Pl.'s Second Set of Reqs. for Admis. (Ex. D), at No. 34.

74.     Pursuant to Work Study guidelines:

> Job descriptions for all FWS positions should be a part of the control procedures included in your school's policies and procedures manual…. [A] written job description provides students with the information they need to

-18-

> determine whether they qualify for the job, **whether the job is related to their educational or career objectives**, and whether the job is of interest to them.

FSA HB, Ch. 2, at 6-45. (emphasis supplied).

75.     Pursuant to Work Study guidelines:

> At any type of postsecondary institution, including proprietary schools, **an FWS student may be assigned to assist a professor** if the student is doing work the school would normally support under its own employment program. Having a student serve as a **research assistant to a professor** is appropriate, as long as the work is in line with the professor's official duties and is considered work for the school itself.

*Id*., at 6-68. (emphasis supplied).

76.     NCAA D1 member schools, like Villanova, offer jobs through Work Study that assist academic faculty.  *See, e.g., Livers (Phillips) v. NCAA*: Villanova's Resp. to Pl.'s Second Set of Req. for Admis. (Ex. D), at No. 35.

77.     Pursuant to Work Study guidelines:

> **If a student's skill level depends on his or her academic advancement**, the school may pay a student on that basis. For example, a junior or third-year lab student may be paid a higher rate than a sophomore or second-year lab student.

FSA HB, Ch. 2, at 6-47. (emphasis supplied).

78.     In response to an Interrogatory asking the NCAA and Villanova to describe all academic or learning benefits from Student Athletes' performances in NCAA sports, the NCAA and Villanova identified **no academic benefits**.  *See Livers (Phillips) v. NCAA*: Defs.' Resp. to Pl.'s First Set of Interrogs., at No. 3, attached hereto as Exhibits H and I. ("Learning benefits from participation in NCAA athletics include, but are not limited to:

discipline, work ethic, strategic thinking, time management, leadership, goal-setting, and

teamwork.[7])

>        ### iii.   *Glatt* Factor No. 3
>        The extent to which the position is tied to the student's formal
>        education program by integrated coursework or the receipt of
>        <u>academic credit</u>

79.     For reasons set forth in Paragraphs 80 through 83, *infra*, Work Study is

integrated into coursework, *e.g.*, through receipt of academic credit, *more* than NCAA sports;

thus, NCAA sports meet employee criteria under *Glatt* Factor No. 3 ***more*** than Work Study.

80.     Work Study guidelines permit NCAA D1 member schools, like Villanova, to

offer Work Study jobs tied to the student's formal education program by integrated

coursework and/or the receipt of academic credit.  *See* FSA HB, Ch. 2; *Livers (Phillips) v.*

*NCAA*: Villanova's Resp. to Pl.'s Second Set of Req. for Admis. (Ex. D), at No. 36.

81.     Pursuant to Work Study guidelines:

>        **A student may earn academic credit as well as**
>        **compensation for FWS jobs.** Such jobs include but
>        are not limited to internships, practica, or assistantships
>        (e.g., research or teaching assistantships).

FSA HB, Ch. 2, at 6-44. (emphasis supplied).

82.     Similarly, the NCAA operates a Postgraduate Internship Program for which a

student employed by the NCAA may receive academic credit at a graduate school:

---

[7]     *Compare, also*, these alleged "learning benefits" to former Northwestern University quarterback
Theodis Kain Colter's testimony in *In re Northwestern Univ. and College Athletes Players Ass'n*, Case
No. 13-RC-121359, NLRB Tr., Feb. 18, 2014 ("Colter Test.") on NLRB.gov at
http://apps.nlrb.gov/link/document.aspx/09031d4581603b6a:

>        Q:  But you've heard from the University that playing football helps
>            build character. You've heard that kind of thing before?
>
>        A:  Performing any type of job helps build, you know, these human
>            values. You know, character, perseverance, anything like that.
>            Those values don't help us, you know, obtain a college degree.
>            They didn't help me get my psychology degree.

Colter Test. at 174:15-23.

www.StudentAthletePay.com

> **NCAA postgraduate interns are nonexempt employees with benefits …. [W]ith graduate school approval, an intern can be eligible to earn graduate degree credit.**

NCAA Postgraduate Internship Program, available on NCAA.org at:

www.NCAA.org/about/resources/leadership-development/postgraduate-internship-program.

(emphasis supplied).

83.     Similarly, Villanova operates an Internship Program that ties employment of students by third parties to Villanova's formal education program by integrated coursework *and* the receipt of academic credit:

> **Credit Approval**
>
> Students must secure academic credit approval before the internship begins. Students must schedule a meeting with the Director of the Internship Program. **Academic credit is not awarded retroactively for an internship. A maximum of 15 total credits may be earned through the Internship Program.**
>
> **Compensation**
>
> Monetary compensation for an internship does not affect eligibility to receive academic credit. A student may receive both monetary compensation and academic credit for an internship.
>
> **Course Requirements**
>
> To earn academic credit for an internship, a student agrees to complete the following requirements:
>
> - **Work Hours:** The student must complete a minimum of 150 work hours within a single semester to be eligible to earn three (3) credits. The student must track the number of hours worked each week in the Activity Journal, to be signed weekly by their internship supervisor.
>
> - **Student Internship Agreement:** The student must meet with a representative from the Internship Program or attend a group meeting prior to the start of the Internship. The student must sign the Student Internship Agreement as part of the application process and abide by all conditions outlined therein during their internship experience.

- **Learning Objectives:** At the beginning of the internship, the student will meet with the site supervisor to establish three to five learning objectives. The student will record the objectives on the Learning Objectives Agreement and both the intern and the site supervisor will sign the Agreement. The Learning Objectives Agreement is due no later than the third week of the internship.

- **Academic Paper:** A student who completes an internship through a major, minor, or concentration must follow the Academic Paper/Research guidelines required by that department. A student who completes an internship as a Liberal Arts elective is required to complete the online course requirements.

**Activity Journal Requirements (Rev Nov 2015).pdf**

Interns must maintain an Activity Journal that recounts the specific jobs and functions that he or she has performed. These entries should include the relationship of the projects and tasks performed, the relationship of the activity to the goals and objectives set forth in the Learning Objectives Agreement. The Intern should complete entries for each day at work and indicate the number of hours worked per day. To ensure the intern remains focused on the learning objectives, the site supervisor will review and initial the Activity Journal weekly.

Office for Undergraduate Students / Internships / General Policies, available on

Villanova.edu at:

https://www1.Villanova.edu/villanova/artsci/undergrad/ous/internship/policies.html.

(emphasis in original)

84.     The NCAA and Villanova admit that NCAA sports are not tied to the

student's formal education program by integrated coursework or receipt of academic credit.

*See Livers (Phillips) v. NCAA*: Defs.' Resp. to Pl.'s Second Set of Reqs. for Admis. (Exs. D

and E), at No. 37.

       **iv.**    ***Glatt* Factor No. 4**
               The extent to which the position accommodates the student's academic commitments by corresponding to the academic

> calendar [or does **not** interfere with scheduled classes or the
> <u>pursuit of academic degrees</u>]

85.     For reasons set forth in Paragraphs 86 through 119, *infra*, Work Study accommodates students' preferred/chosen classes and academic degree programs *more* than NCAA sports and hinders their academic progress *less* than NCAA sports; thus, NCAA sports meet employee criteria under *Glatt* Factor No. 4 ***more*** than Work Study.

86.     Villanova requires all undergraduate students to complete five (5) specified Core Foundational Courses:

- Augustine and Culture Seminars (ACS) 1000 **and** ACS 1001;
- Theology (THL) 1000: Faith, Reason and Culture;
- Philosophy (PHI) 1000: Knowledge, Reality and Self; and
- Ethics (ETH) 2050: The Good Life: Ethics and Contemporary Moral Problems

College of Liberal Arts and Sciences / Undergraduate Programs / Core Curriculum, available on Villanova.edu at:

https://www1.Villanova.edu/content/villanova/artsci/undergrad/core.html.

87.     To accommodate all student schedules, required Core Foundational Courses are offered multiple times – at different morning, afternoon, and evening hours – throughout the academic week.  *See, e.g.,* Fall 2016 and Spring 2017 Core Foundational Course schedules, attached hereto at Exhibit N and generated using NOVASIS Master Schedule of Classes on Villanova.edu at:

https://novasis.Villanova.edu/pls/bannerprd/bvckschd.p_disp_dyn_sched.

88.     For example, in Fall Semester 2016:

- ACS 1000 was listed 113 times, including classes starting as early as 8:30 a.m. and starting as late as 6:10 p.m.
- THL 1000 was listed 46 times, including classes starting as early as 8:30 a.m. and starting as late as 6:10 p.m.

-23-

- PHI 1000 was listed 41 times, including classes starting as early as 8:00 a.m. and starting as late as 8:00 p.m.

- ETH 2050 was listed 35 times, including classes starting as early as 8:30 a.m. and starting as late as 6:10 p.m.

*Id.*

89.    For example, in Spring Semester 2017:

- ACS 1001 was listed 113 times, including classes starting as early as 8:30 a.m. and starting as late as 6:10 p.m.

- THL 1000 was listed 31 times, including classes starting as early as 8:30 a.m. and starting as late as 8:00 p.m.

- PHI 1000 was listed 31 times, including classes starting as early as 8:00 a.m. and starting as late as 6:10 p.m.

- ETH 2050 was listed 23 times, including classes starting as early as 8:30 a.m. and starting as late as 6:10 p.m.

*Id.*

90.    Other than the required Core Foundational Courses, students are generally permitted to select their preferred classes, from a broad range of topics and times available on the NOVASIS Master Schedule of Classes, to attain credits in Additional Core Courses, Major Course and Free Electives (subject to enrollment limitations related to class size, completion of prerequisite classes, and Major prioritization).  *See* College of Liberal Arts and Sciences / Undergraduate Programs / Core Curriculum, available on Villanova.edu at: https://www1.Villanova.edu/content/villanova/artsci/undergrad/core.html; NOVASIS Master Schedule of Classes on Villanova.edu at: https://novasis.Villanova.edu/pls/bannerprd/bvckschd.p_disp_dyn_sched.

91.    Various Work Study guidelines require NCAA D1 member schools, like Villanova, to offer Work Study jobs that accommodate the student employee's academic commitments, *i.e.*, do **not** conflict with the student employee's preferred/chosen classes and

academic degree program and do **not** hinder the student employee's academic progress.  *See* FSA HB, Ch. 2.

       92.     Pursuant to Work Study guidelines:

> **Working During Scheduled Class Time Is Prohibited.**  In general, students are not permitted to work in FWS [Federal Work Study] positions during scheduled class times. Exceptions are permitted if an individual class is cancelled, if the instructor has excused the student from attending for a particular day, and if the student is receiving credit for employment in an internship, externship, or community work study experience. Any such exemptions must be documented.

*Id*., at 6-43. (emphasis in original)

       93.     Villanova admits that student employees are **not** permitted to work in Work Study jobs during scheduled class times.  *See Livers (Phillips) v. NCAA*: Villanova's Resp. to Pl.'s Second Set of Req. for Admis. (Ex. D), at No. 38.

       94.     Pursuant to Work Study guidelines:

> A school should determine the number of hours a student is allowed to work based on … how the combination of work and study hours will affect the student's health and academic progress.

FSA HB, Ch. 2, at 6-46.

       95.     NCAA D1 member schools, like Villanova, limit hours that a student employee is allowed to work in Work Study to 20 hours per week during academic periods.  For example, in the Villanova Student Employment Program:

> **Eligibility**
>
> The Student Employment Program allows currently enrolled students, excluding University faculty and staff employees, to work up to 20 hours per week during the Fall and Spring semesters and 35 hours per week during the Summer semester and academic breaks to earn funds to help pay for their educational expenses. Departments with 40 hour workweeks may allow

www.StudentAthletePay.com

> students to work up to 40 hours during breaks and the Summer semester.
>
> If a student holds multiple jobs on campus, the hours restriction applies across all University student employment. That is, no student may work more than a total of 20 hours per week during academic periods cumulative between all University student jobs. The student employee is responsible for notifying his or her supervisor in each job of all other University student employment positions held, along with information regarding scheduled hours of work in each.

Villanova Student Employment Program Handbook, available on Villanova.edu at:

https://www1.Villanova.edu/villanova/hr/employment/student-employment/student-handbook.html.

96.     Villanova permits student employees in Work Study to schedule work weeks of 10 hours or fewer.  *See Livers (Phillips) v. NCAA*: Villanova's Resp. to Pl.'s Second Set of Req. for Admis. (Ex. D), at No. 27.

97.     To accommodate preferred/chosen classes and academic degree programs of student employees in Work Study and manage their combination of work and study hours, NCAA D1 member schools, like Villanova:

- offer Work Study jobs at multiple times – during morning hours (6:00 a.m. to 12:00 p.m.), afternoon hours (12:00 p.m. to 5:00 p.m.), and evening hours (5:00 p.m. to 12:00 a.m.) – throughout the academic week and on the weekend.  *Id.*, at Nos. 19-22 and 26.

- offer Work Study jobs having variable hours that permit a student employee to schedule different shifts on different days of the academic week.  *Id.,* at No. 23.

- offer a range of Work Study jobs at different hourly rates.  *Id.*, at No. 50.

- permit a student employee to work in up to two different Work Study jobs, having different duties, work hours, hourly rates and work days, provided s/he does **not** exceed the maximum 20 work hours per week.  *Id.*, at Nos. 24 and 50.

- offer Work Study jobs that permit a student employee to schedule a day(s) off from working during the academic week. *Id.*, at No. 25.

98.     By contrast to Work Study, Student Athletes are **obligated** to schedule classes around required NCAA athletically related activities – and **not** permitted to (re)schedule required NCAA athletically related activities to accommodate their preferred/chosen classes and academic degree programs.

99.     Villanova only excuses a Student Athlete from participating in required athletically related activities "if there is a conflict between practice and a class that a student is required to take," *i.e.*, the required Core Foundational Courses *already* offered multiple times – at different morning, afternoon and evening hours – throughout the academic week to accommodate all student schedules. *See Livers (Phillips) v. NCAA*: Villanova's Resp. to Pl.'s Second Set of Reqs. for Admis. (Ex. D), at Nos. 11-12, 14, 16 and 40; Paragraphs 85 through 89, *supra*.

100.     In NCAA football playing and practice seasons during Johnson's tenure at Villanova, required NCAA athletically related activities and activities incidental thereto (*e.g.*, medical treatment before and/or after practice, dress for practice, showering, dress for class, and travel to class) occurred on weekdays from 5:45 a.m. to 11:30 a.m. – **precluding** Johnson from enrolling in any of the hundreds of *non*-required, *non*-Core Foundational, classes offered during that time period including prerequisites for academic degree programs. *See, e.g.,* Fall 2016 Courses conflicting with NCAA football practice between 5:45 a.m. to 11:30 a.m., attached hereto in Exhibit P and generated using the NOVASIS Master Schedule of Classes on Villanova.edu at:

https://novasis.Villanova.edu/pls/bannerprd/bvckschd.p_disp_dyn_sched.  (incl. undergraduate level courses and graduate level courses available pursuant to NCAA D1 Bylaw 14.6 Graduate Student / Postbaccalaureate Participation)

www.StudentAthletePay.com

101.    NCAA D1 member schools, like Villanova, require Student Athlete participation in Countable Athletically Related Activities (CARA) recorded on timesheets under NCAA D1 Bylaw 17.1.7.3.4, including, but not limited to:

> Activities considered as practice shall be considered to have occurred if one or more coaches and one of more student-athletes engage in any of the following activities:
>
> - Team conditioning or physical-fitness activities
> - Field, floor or on-court activity
> - Setting up offensive or defensive alignments
> - Chalk talk
> - Lecture on or discussion of strategy relating to the sport
> - Activities utilizing equipment relating to the sport
> - Discussions or review of game films, motion pictures or videotapes relating to the sport
> - Required weight-training and conditioning activities held at the direction of or supervised by an institutional staff member
> - Film or videotape reviews of athletic practices or contests that are required, supervised or monitored by institutional staff members
> - Meetings initiated by coaches or other institutional staff members on athletically related matters
> - Individual workouts required or supervised by a member of the coaching staff
> - On-court or on-field activities called by any member or members of a team and confined primarily to members of that team that are considered as requisite for participation in that sport (e.g., captain's practices)

Villanova University Athletics Department Student-Athlete Handbook and Planner, at 28 (pdf page, because document is unnumbered), attached hereto as Exhibit O and available at: https://s3.amazonaws.com/villanova.com/documents/2018/6/22/201718Handbook.pdf.

102.    Under NCAA bylaws, Student Athletes are also required to participate in the

following Required Athletically Related Activities:

> (a)  Compliance meetings;
>
> (b)  Organized team promotional activities;
>
> (c)  Recruiting activities;
>
> (d)  Media activities;
>
> (e)  Fundraising events;
>
> (f)  Community service events;
>
> (g)  Team-building activities; and
>
> (h)  Travel to and from away-from-home competition.

NCAA D1 Bylaw 17.02.14.

103.    If a Student Athlete fails to attend squad or individual meetings and

participate in athletic practice sessions and scheduled contests as specified by the sport coach,

s/he can be disciplined, including suspension or dismissal from the team.  *See, e.g.,* Athletic

Financial Aid Agreement (Ex. M), at ¶ 2.e.[8]

104.    Because Student Athletes are obligated to schedule classes around required

athletically related activities – and **not** permitted to (re)schedule NCAA sports activities to

accommodate their preferred/chosen classes – considerable percentages of Student Athletes

reported in the NCAA Growth, Opportunities, Aspirations and Learning of Students in

College ("GOALS") Study (2015) that participation in NCAA D1 sports prevented them from

taking classes they wanted to take:

> Football Bowl Subdivision | 50%
>
> Football Championship Subdivision | 42%

---

[8]    All Student Athletes are expected to attend squad or individual meetings and participate in athletic practice sessions and scheduled contests as specified by the sport coach.  The NCAA admits that there is **no** principled distinction between scholarship athletes and walk-ons, and that the only policies and practices that apply to scholarship athletes exclusively are bylaws that set the number of scholarships schools may award and that permit revocation of scholarships for misconduct (as opposed to revocation of athletic eligibility, which applies to scholarship athletes and walk-ons alike). *See* Paragraphs 178, 267 and 268, *infra.*

Men's Basketball | 34%

Women's Basketball | 51%

Baseball | 41%

All Other Men's Sports | 48%

All Other Women's Sports | 53%

*See* Results from the 2015 GOALS Study of the Student-Athlete Experience, Findings on

Academic Experiences, at 13 (pdf page, because document is unnumbered),

http://www.NCAA.org/sites/default/files/GOALS_convention_slidebank_jan2016_public.pdf.

105.    Because Student Athletes are obligated to schedule classes in academic degree

programs around required athletically related activities – and **not** permitted to (re)schedule

NCAA sports activities to accommodate their preferred/chosen academic degree programs –

considerable percentages of Student Athletes reported in the NCAA GOALS Study (2015) that

participation in NCAA D1 sports prevented them from majoring in what they really wanted:

Football Bowl Subdivision | 36%

Football Championship Subdivision | 28%

Men's Basketball | 29%

Women's Basketball | 32%

Baseball | 32%

All Other Men's Sports | 23%

All Other Women's Sports | 25%

*Id*., at 15 (pdf page, because document is unnumbered).

106.    In addition to Countable Athletically Related Activities (CARA) recorded on

timesheets under NCAA D1 Bylaw 17.1.7.3.4, Student Athletes at Villanova are required to

participate in the following activities **not** considered CARA:

The following are considered non-countable athletically
related activities and are not counted in the weekly or
daily time limitations:

- Training table or competition related meals
- Physical rehabilitation
- Dressing, showering or taping ….

-30-

- Travel to and from practice and competition
- Medical examinations or treatments ....

Villanova University Athletics Department Student-Athlete Handbook and Planner (Ex. O), at 29 (pdf page, because document is unnumbered).

107.    In addition to Countable Athletically Related Activities (CARA) recorded on timesheets under NCAA D1 Bylaw 17.1.7.3.4, Student Athletes at Villanova are *encouraged* to participate in the following activities **not** considered CARA:

- *Voluntary* individual workouts ...
- Individual consultation with a coaching staff member initiated *voluntarily* by a student-athlete ....

*Id.* (emphasis supplied).

108.    In the NCAA GOALS Study (2015), medians of Student Athlete reported hours spent per week on all athletically related activities – Countable Athletically Related Activities (CARA) recorded on timesheets and *non*-CARA – demonstrate a full-time commitment to NCAA D1 sports that exceeds the (maximum) 20 hour per week, part-time commitment of student employees in Work Study:

> Football Bowl Subdivision | 42 hours per week
>
> Football Championship Subdivision | 41 hours per week
>
> Men's Basketball | 34 hours per week
>
> Women's Basketball | 35 hours per week
>
> Baseball | 40 hours per week
>
> All Other Men's Sports | 32 hours per week
>
> All Other Women's Sports | 32 hours per week

*See* Results from the 2015 GOALS Study of the Student-Athlete Experience, Findings on Student-Athlete Time Commitments, at 33 (pdf page, because document is unnumbered).

109.    The taxation and rigidity of Student Athlete schedules are exemplified by the 15-hour daily schedule that the University of Florida lays out for its football players during

playing and practice season.  Reporting about a June 8, 2015 tweet from Florida head coach Jim McElwain – "All Gators, All Day.  Here's an inside look at a typical day for our players. #NoTimeToLose #GoGators" – SBNation observed:

> Here's that itinerary, stripped of the bright colors and ads:
>
> - 6:00 – 7:00 a.m.:      Wake up
> - 7:00 – 7:45 a.m.:      Eat breakfast
> - 8:00 – 11:30 a.m.:    Class
> - 12:00 – 12:30 p.m.:   Eat lunch
> - 12:30 – 1:30 p.m.:    Lift
> - 1:30 – 2:30 p.m.:     Fuel and recover
> - 2:30 – 3:30 p.m.:     Meetings
> - 3:30 – 5:30 p.m.:     Practice
> - 6:00 – 6:30 p.m.:     Fuel and recover
> - 6:30 – 7:00 p.m.:     Eat
> - 7:30 – 9:00 p.m.:     Study
>
> Savor those 30-minute breaks between the end of class and lunch and the end of dinner and study hall, kids: They're all you're going to get ….
>
> [W]e rarely get as clear a delineation of the extraordinary effort put forth by "student-athletes" to play sports (and to be college students) ….
>
> For a Florida football player, waking up at 6 a.m. is a fact of life.  So is a three-hour block of classes beginning at 8 a.m. that was plotted out by advisors.  So is spending four hours of every afternoon on mandatory football duties – the maximum allowed to be mandated by the NCAA in season, though extra work is always encouraged and typically praised – and so is the hour and a half of studying after the completion of a 13-hour day.
>
> **This schedule is a work schedule.**  The work done by "student-athletes" is hard work.  There is "no time to lose," of course, because inefficiency is the bane of businesses.

Andy Hutchins, "Florida details football players' 15-hour days with daily schedule graphic."

SB Nation, June 9, 2015.  (emphasis supplied).

110.    Considerable percentages of Student Athletes reported in the NCAA GOALS

Study (2015) that they felt less than positive about their ability to keep up with classes in

NCAA D1 playing and practice season:

> Football Bowl Subdivision | 40%
>
> Football Championship Subdivision | 45%
>
> Men's Basketball | 38%
>
> Women's Basketball | 44%
>
> Baseball | 44%
>
> All Other Men's Sports | 40%
>
> All Other Women's Sports | 39%

*Id.*, Findings on Academic Experiences, at 11 (pdf page, because document is unnumbered).

111.    The findings reported in the NCAA GOALS Study (2015) are consistent with

former Northwestern University quarterback Theodis Kain Colter's testimony in *In re*

*Northwestern Univ. and College Athletes Players Ass'n*, Case No. 13-RC-121359, NLRB Tr.,

Feb. 18, 2014 on NLRB.gov at http://apps.nlrb.gov/link/document.aspx/09031d4581603b6a:

> Q:  Can you tell us how you view yourself?
>
> A:  We are first and foremost an athlete, an employee of the school who provides an athletic service.
>
> Q:  And why do you say that?
>
> A:  Everything that we do is scheduled around football, what classes you can take, what major  you could really participate in. It's all  depending on football and your schedule.
>
> *****
>
> Q:  And in terms of the academic calendar  year, when are the  chemistry  and  physics  classes  generally scheduled?
>
> A:  Chemistry and organic chemistry were offered in the mornings, only in the mornings.
>
> Q:  And so were you able to take any of those in the fall or the winter?
>
> A:  I tried to take it the fall of my sophomore year. But I think class began at 10:00 in the morning, and we

www.StudentAthletePay.com

were going to still be in practice, so I would have to miss, you know, a little bit towards the end of practice. And they informed me -- the athletic department and coaches, my advisers, that, you know, Kain -- you know I was taking a big role as the team starting quarterback and I was playing a lot. And they informed me that, you know, Kain, you can't schedule this class. You can't miss practice. So...

*****

Q: How does the playing of football affect or impact academic studies?

A: It makes it hard for you to succeed. You know every year we do an exit interview with all the seniors after, you know, they've went through their time at Northwestern.

And this year in our exit interview the number one thing said was, Due to the time demands, you can't ever reach your academic potential. You're merely just surviving. There's so much time demand towards football and being a great football player that you have to sacrifice one, and we're not allowed to sacrifice football. So...

*****

Q: Do you consider playing football, as the attorney for the University mentioned, part of your, quote, educational experience?

A: Absolutely not. They're completely separate.

Q: Why do you say they're completely separate?

A: You know if they were together, you know, we would get academic credit for playing sports, but we don't. Really, the amount of time that we dedicate towards football, it really makes it harder for us to, you know, be great academically. So it's just a testament to the type of kids that we have at Northwestern, that they're able to, you know, time manage and, you know, do fairly good academically while also having this huge time demand for football.

Q: Do you see that being a student and an athlete are necessarily connected or are they separate?

A: They are completely separate.

Q: But you've heard from the University that playing football helps build character. You've heard that kind of thing before?

www.StudentAthletePay.com

A: Performing any type of job helps build, you know, these human values. You know, character, perseverance, anything like that. Those values don't help us, you know, obtain a college degree. They didn't help me get my psychology degree.

\*\*\*\*\*

Q: And in terms of the amount of time you spent studying and attending classes, how would that compare to the time you spent performing the various obligations as a football player?

A: We spent a lot more time dedicating ourselves to football, performing football activities.

Q: Than being -- than academics?

A: Than academics.

Q: Why is that?

A: Because I believe it just shows that we're brought there to play football. That's our first priority. We must do our football requirement. And then if you can, you know, fit in the academics.

Colter Test. at 166:14-25; 169:1-18; 170:3-15; 173:18-174:23; and 177:7-21.

112.    In recognition that participation in NCAA sports hinders academic progress, NCAA D1 member schools, like Villanova, provide *exclusive* academic support services to Student Athletes that *exceed* academic support services offered to other students.

113.    Villanova, for example, operates an *exclusive* Office of Academic Support for Athletics "to provide supplemental academic support for all varsity student-athletes at Villanova University in a manner that addresses their unique academic needs." *See* Office of the Provost / Academic Support for Athletics, available on Villanova.edu at: https://www1.Villanova.edu/villanova/provost/academicsupport.html.

114.    Villanova does **not** operate any academic support office specific to the needs of student employees in Work Study that is **not** generally available to all students. *See Livers (Phillips) v. NCAA*: Villanova's Resp. to Pl.'s Second Set of Reqs. for Admis. (Ex. D), at No. 9.

www.StudentAthletePay.com

115.    In the Office of Academic Support for Athletics, Villanova employs a Director,

Assistant Director, two Athletic Academic Advisors and an academic support staff person.

*Id.*, at No. 5.

116.    As part of the Office of Academic Support for Athletics, Villanova operates a

Tutorial Assistance Program and employs *non*-student athletes as tutors for Student Athletes:

> The Tutorial Assistance Program was created in order to provide supplemental instruction to classroom lectures for student-athletes at Villanova University ….
>
> **Becoming a Tutor**
>
> Thank you for showing an interest in tutoring for the Office of Academic Support for Athletics. For many of our student-athletes, the Tutorial Assistance Program is a fundamental component of their academic needs and helps them achieve their goal of graduation. Below is some basic information that you will need to consider prior to applying for this position.
>
> **Tutorial Position Minimum Requirements**
>
> **Academic Requirements:**
>
> * Students with a 3.0 cumulative GPA or above with Sophomore, Junior, or Senior standing. We also hire Graduate students.
>
> **Our Tutors:**
>
> * On average, we employ 70-80 qualified tutors to help our student-athletes in a variety of coursework.
>
> * Hours vary and are flexible. Hours are based on the needs of the student-athletes and the subject being tutored ….
>
> * Compensation varies and is based on the courses tutored as well as the education level of the tutor (i.e.: undergraduate vs graduate student). Contact Krista Chmielewski for more information on pay rates …
>
> **Expectations of Student-Athletes Receiving Tutorial Services:**
>
> * Be prepared to ask questions! Tutors are not expected to teach the course and do not take the place of the professor. Tutors are there to

-36-

> supplement what you're learning and can help clarify any confusion you may have about the course content …
>
> - Expect the tutor to challenge you to become an independent learner who will answer your questions along the way in an effort to help you reach your academic goals.
>
> - Be patient! Learning new material takes time and practice!

Academic Support for Athletics / Support Services / Tutorial Assistance Program, available on Villanova.edu at:

https://www1.Villanova.edu/villanova/provost/academicsupport/services/tutor.html.

117.    In its Office of Academic Support for Athletics, Villanova's Athletic Department employs Academic Support Interns at $1400 per month.  *See* Athletic Department Internship Program (Ex. L).

118.    In response to Findings on Student-Athlete Time Commitment in the NCAA GOALS Study (2015), the "Power Five" NCAA D1 conferences, *i.e.*, Atlantic Coast, Big 12, Big Ten, Pacific-12 and Southeastern, approved proposals during the 2017 NCAA Convention: (i) requiring a time management plan for each sport, and an annual review of that plan; (ii) prohibiting athletically related activities during a continuous 8 hour period between 9 p.m. and 6 a.m.; and (iii) requiring a 7 day break after a season and 14 more days off during the academic year.  Other NCAA D1 conferences and/or member schools can individually decide whether to adopt these proposals.  *See* Michelle Brutlag Hosick, "Conferences refer time demands proposals for further study," NCAA.org, Jan. 15, 2016; Michelle Brutlag Hosick, "DI student-athletes to have more time away from sports," NCAA.org, Jan. 20, 2017; NCAA D1 Bylaws 17.1.7.8; 17.1.7.9.6, 17.1.7.9.7, and 17.1.8.

119.    Regarding the various NCAA proposals approved by the "Power Five" during the 2017 NCAA Convention in response to Findings on Student-Athlete Time Commitment in

www.StudentAthletePay.com

the NCAA GOALS Study (2015), former University of Oklahoma football player Ty Darlington,

"whose impassioned pleas on the [NCAA convention] floor [in 2016] were credited in part

with spurring action," remarked:

> Coaches need to understand that student-athletes aren't
> on call at all times.

Brutlag Hosick, "DI student-athletes to have more time away from sports."

### v. *Glatt* Factor No. 5
The extent to which the position's duration is limited to the period in which the position provides the student with <u>beneficial learning</u>

120.    For reasons set forth in Paragraphs 51 through 119, *supra*, Work Study

provides beneficial learning *more* than NCAA sports; thus, NCAA sports meet employee

criteria under *Glatt* Factor No. 5 ***more*** than Work Study.

### vi. *Glatt* Factor No. 6
The extent to which the student's work complements, rather than displaces, the work of paid employees while providing significant educational benefits to the student [or to which the <u>alleged employer is the primary beneficiary</u>]

121.    For reasons set forth in Paragraphs 122 through 138, *infra*, Student Athlete

performance is integral to the billion dollar Big Business of NCAA sports while student

performance in Work Study merely complements the work of *non*-student employees; thus,

NCAA sports meet employee criteria under *Glatt* Factor No. 6 ***more*** than Work Study.

122.    For reasons set forth in Paragraphs 70 through 119, *supra*, NCAA sports do

**not** provide any of the educational benefits that Work Study provides to students.

123.    Work Study guidelines prohibit NCAA D1 member schools, like Villanova,

from displacing *non*-student employees with the work of students in Work Study; instead,

NCAA D1 member schools are only permitted to use Work Study to complement the work of

*non*-student employees. *See* FSA HB, Ch. 2.

www.StudentAthletePay.com

124.    Pursuant to Work Study guidelines:

> FWS employment must not displace employees (including those on strike) or impair existing service contracts. Also, if the school has an employment agreement with an organization in the private sector, the organization's employees must not be replaced with FWS students.
>
> **Replacement is interpreted as displacement.** Therefore, replacing a full-time employee whose position was eliminated (for any reason) with a student employee paid with FWS funds is prohibited. Moreover, this prohibition extends to instances where a school first
>
> replaces the full-time employee with a student position paid with college funds.

*Id.*, at 6-43. (emphasis in original)

125.    The NCAA and Villanova admit that NCAA member schools employ students in Work Study to complement tasks performed by *non*-student employees in campus departments and offices, libraries, dining halls, facilities and stores.  *See Livers (Phillips) v. NCAA*: Defs.' Resp. to Pl.'s First Set of Reqs. for Admis., at No. 5, attached hereto as Exhibits F and G; Answer (ECF 130), at ¶¶ 66 and 98.

126.    Villanova, for example, employs Athletic Director's Office Interns, whose prime duties are to support "day-to-day coordination of operational activities in the Athletic Director's Office including: answering the phone, typing memos and letters, preparing HR forms, maintaining the Athletic Director's email account, compiling a monthly calendar and the department personnel directory [and] assisting with special projects" and who are paid $1400 per month.  *See* Athletic Department Internship Program (Ex. L).

127.    NCAA bylaws permit NCAA D1 member schools to employ Student Athletes through Work Study to complement tasks performed by coaches in Sports Camps and Clinics.  *See* NCAA D1 Bylaws 12.4.3 and 13.12.

www.StudentAthletePay.com

128.    The use of Student Athletes to assist coaches in Sports Camps and Clinics is optional, **not** integral, as Sports Camps and Clinics can, and often do, operate without Student Athlete employees.

129.    The NCAA and Villanova admit that sports contests **cannot** take place without athletes.  *See Livers (Phillips) v. NCAA*: Answer (ECF 130), at ¶ 134.

130.    The NCAA and Villanova admit that the NCAA permits only Student Athletes eligible under NCAA bylaws to participate on teams in NCAA-governed sports.  *See Livers (Phillips) v. NCAA*: Defs.' Resp. to Pl.'s First Set of Reqs. for Admis. (Exs. F and G), at No. 5.

131.    The NCAA and Villanova admit the NCAA does **not** permit athletic contests to take place if a participating school **cannot** field a team with the minimum number of competitors required under the rules of the sport.  *Id.*

132.    While students (including academic scholarship recipients) in ticket taker, seating attendant and food concession positions at NCAA contests are classified as employees and paid at least the minimum wage by NCAA D1 member schools, the Student Athletes, without whose performance there would be **no** NCAA contests, are **not** similarly classified and paid.  *See Livers (Phillips) v. NCAA*: Answer (ECF 130), at ¶¶ 4 and 67.

133.    While the NCAA and Villanova admit that Student Athletes participate in promotion of NCAA sports through use of their names, images and likenesses in advertising and interaction with the community of sports consumers, sports donors and sports media, only NCAA D1 member schools and conferences are permitted to financially benefit from such promotion by, for example, entering into licensing, marketing, sponsorship, advertising, broadcast and other commercial agreements that involve use of Student Athlete names and likenesses.  *Id.*, at ¶ 135; *also see* NCAA D1 Constitution 3.2.4.21 and 3.3.4.6.

134.    The NCAA and Villanova admit that NCAA member schools derive benefits from school branding, identity and spirit related to NCAA sport mascots, and secure tangible gross revenues, as a result of Student Athletes competing in NCAA sports.  *See Livers (Phillips) v. NCAA*: Defs.' Resp. to Pl.'s First Set of Reqs. for Admis. (Exs. F and G), at No. 2.

135.    For the Fiscal Year that ended August 31, 2018, the NCAA reported total revenues of $1,064,403,240 – mostly from television and marketing rights fees, championships and tournaments, and sales.  *See* 2017-18 NCAA Financial Statements, at 4, available at https://ncaaorg.s3.amazonaws.com/ncaa/finance/2017-18NCAAFin_NCAAFinancialStatement.pdf.

136.    For Fiscal Year 2016, NCAA D1 schools reported median total revenues for NCAA sports of:

>                Football Bowl Subdivision "Power Five" | $97,276,000
>                Football Bowl Subdivision | $33,470,000
>                Football Championship Subdivision | $17,409,000
>                Sans Football | $16,018,000

*See* NCAA Revenues / Expenses Division I Report 2004 – 2016, at 12, available on NCAA.org at http://www.NCAA.org/sites/default/files/2017RES_D1-RevExp_Entire_2017_Final_20180123.pdf.

137.    For the Fiscal Year that ended May 31, 2018, Villanova reported total revenue for NCAA sports of $48,977,278.  *See* U.S. Department of Education Equity in Athletics Data Analysis (OPE ID: 00338800), available at: https://ope.ed.gov/athletics/#/.

138.    By contrast to Student Athletes competing in NCAA sports, the NCAA and Villanova admit that some college employees, including student employees in Work Study, perform work that does **not** generate revenue for the school for which they work.  *See Livers (Phillips) v. NCAA*: Answer (ECF 130), at ¶ 130.

139.    **Neither** the NCAA **nor** Villanova contends that the "learning benefits" that they claim accrue to Student Athletes from participation in NCAA sports (*i.e.*, "discipline, work ethic, strategic thinking, time management, leadership, goal-setting, and teamwork") are comparable to the benefits that they admit accrue to NCAA member schools as a result of Student Athletes competing in NCAA sports (*i.e.*, "tangible gross revenues" and "benefits related to school branding, identity and spirit related to an athletic mascot"). *See Livers (Phillips) v. NCAA*: Defs.' Resp. to Pl.'s First Set of Reqs. for Admis. (Exs. F and G), at No. 2; Defs.' Resp. to Pl.'s First Set of Interrogs. (Exs. H and I), at No. 3.

> **vii.    *Glatt* Factor No. 7**
> The extent to which the student and the employer understand that the assignment is conducted without entitlement to a paid <u>job at the conclusion of the assignment</u>

140.    **Neither** student employees in Work Study, **nor** Student Athletes in the NCAA sports program, are entitled to a paid job at their respective NCAA D1 member school after graduation.[9] *See, e.g., Livers (Phillips) v. NCAA*: Villanova's Resp. to Pl.'s Second Set of Reqs. for Admis. (Ex. D), at No. 53.

## 2.    The *Donovan* Independent Contractor v. Employee Test

141.    The independent contractor/employee test in ***Donovan*** includes, among its factors:

> i.    The degree of the alleged employer's right to control the manner in which the work is to be performed
>
> ii.    The alleged employee's opportunity for profit or loss depending upon his managerial skill, *i.e.*, permission to work as much or as little as he would like and to work during whichever hours he chooses

---

[9]    In effect, *Glatt* Factor No. 7 *only* applies to corporations and similar employers – **not** to colleges, universities or proprietary schools.

     iii.   The alleged employee's investment in required equipment or materials

     iv.   Whether the service rendered requires a special skill

     v.   The degree of permanence of the working relationship

     vi.   Whether service rendered is integral to the alleged employer's business

*Razak*, 2018 U.S. Dist. LEXIS 61230, at *21-22.

          **i.**     ***Donovan* Factor No. 1**
                  The degree of the alleged employer's right to control the <u>manner in which the work is to be performed</u>

142.    For reasons set forth in Paragraphs 143 through 155, and 178 through 239, *infra*, NCAA D1 member schools exercise *more* authority to control the performance and conduct of Student Athletes in NCAA sports than of student employees in Work Study; thus, NCAA sports meet employee criteria under *Donovan* Factor No. 1 ***more*** than Work Study.

143.    The NCAA and Villanova admit that all Student Athletes who participate in NCAA sports are supervised by coaching and training staff.  *See Livers (Phillips) v. NCAA*: Answer (ECF 130), at ¶ 154.

144.    Both Work Study and NCAA D1 sports require adult supervisors to maintain timesheets for participants.  *See* FSA HB, Ch. 2, at 6-48 and NCAA D1 Bylaw 17.1.7.3.4.

145.    Work Study at NCAA D1 member schools is governed by **38 pages** of the FSA HB, Chapter 2.[10]  *See* FSA HB, Ch. 2, at 6-39 to 6-68; 6-71 to 6-72; and 6-83 to 6-88.

146.    NCAA D1 member schools typically publish shorter, supplemental handbooks articulating standards controlling student employee performance and conduct in Work Study.

---

[10]   Excluding 12 pages addressing Proprietary Schools, Apprenticeships, the Job Location and Development Program and Work Colleges.

*See, e.g.*, the **6-page** Villanova University Student Employment Program Handbook[11] available on Villanova.edu at: https://www1.Villanova.edu/villanova/hr/employment/student-employment/student-handbook.html.

147.    NCAA D1 sports are governed by the **415-page** NCAA D1 Manual *and* the NCAA Rule Books *for each sport* (available on NCAA.org at: www.NCAApublications.com).

148.    In addition to the Rule Book *for each NCAA sport* that defines related work, NCAA D1 member schools exercise authority, and discretion, to control Student Athlete performance and conduct under threat of discipline, including suspension or dismissal from the team, if a Student Athlete:

- "Renders himself/herself ineligible for intercollegiate competition," *i.e.*, is suspected or determined to have run afoul of any of the myriad of bylaws in the NCAA D1 Manual

- "Engages in serious misconduct … or manifest disobedience," *i.e.*, is suspected or determined to have run afoul of "Rules and regulations of the Department of Intercollegiate Athletics and specific rules of the recipient's sport as defined by the head coach as they apply"

- "Fails to attend … squad or individual meetings … and participate in athletic practice sessions and scheduled contests, as specified by the sport coach"

- "Does not comply with expected personal conduct, appearance and dress, both on and off the University campus, and accepted uniform for athletic contests, when such violations bring discredit to the athletic program"

- "Fails to adhere to training rules and regulations"

---

[11]    The online handbook prints out as 6 pages after expanding headings, which headings include Eligibility, International Students, On-Campus Employment, Off-Campus Employment, Completing Employment Paperwork, Pay Policies, Employment of Relatives, Operation of Vehicles, Employment Verifications, Resignations and Terminations, Sexual Violence Policy and Additional University Policies.

- "Engages in gambling activities on intercollegiate activities prohibited by NCAA legislation"

*See, e.g.,* Athletic Financial Aid Agreement (Ex. M), at ¶ 2.[12]

149.   NCAA D1 member schools publish supplemental handbooks articulating standards controlling Student Athlete performance and conduct on, and off, the field.  For example, the **44-page** Villanova University Athletic Department Student-Athlete Handbook and Planner states, among other things:

> **AGENTS**
>
> It is essential that student-athletes know the NCAA rules related to professional sports. A violation of the rules concerning agents could have severe negative consequences for the student-athlete and the University. To remain eligible for intercollegiate competition, NCAA rules stipulate that a student-athlete <u>may not</u>:
>
> 1. Agree, either orally or in writing, to be represented by an agent or organization in the marketing of his/her athletic ability or reputation until after completion of his/her collegiate eligibility. In addition, representation by an agent may not be arranged until after the last intercollegiate contest, including post-season games.
>
> 2. Negotiate or sign a playing contract in any sport in which the student-athlete intends to compete.
>
> 3. Ask to be placed on a professional league's draft list. There are sport specific exceptions. Please contact the Compliance Office for more information.
>
> **\*\*\*\*\***

---

[12]   All Student Athletes are subject to discipline, including suspension or dismissal from the team, for the enumerated reasons.  The NCAA admits that there is **no** principled distinction between scholarship athletes and walk-ons, and that the only policies and practices that apply to scholarship athletes exclusively are bylaws that set the number of scholarships schools may award and that permit revocation of scholarships for misconduct (as opposed to revocation of athletic eligibility, which applies to scholarship athletes and walk-ons alike).  *See* Paragraphs 178, 267 and 268, *infra*.

www.StudentAthletePay.com

## AMATEURISM

The following are NCAA guidelines for maintaining athletic amateur status:

*WITHIN YOUR SPORT, YOU MAY NOT:*

1. Accept payment, or a promise of payment (in cash, prizes, gifts, or travel) for participation in your sport.

2. Enter into an agreement of any kind to compete in professional athletics (you cannot negotiate a verbal or written professional contract).

3. Request that your name be put on a draft list for professional sports. In basketball, you may try out during the summer and retain your eligibility so long as you receive no more than actual and necessary expenses from the professional organization ….

*IN ANY SPORT, YOU MAY NOT:*

1. Agree to have your picture or name used to promote a commercial product ….

3. Be represented by an agent or organization to market your athletic skill or reputation …

\*\*\*\*\*

## GAMBLING

Student-athletes shall not knowingly ….

- Participate in any gambling activity through a bookmaker, a parlay, or any other method employed by organized gambling;

- Participate in any gambling activity involving collegiate or professional sports.

INVOLVEMENT IN ANY OF THESE ACTIVITIES WILL RESULT IN YOUR IMMEDIATE LOSS OF ELIGIBILITY, DISMISSAL FROM THE ATHLETICS PROGRAM, AND/OR CANCELLATION OF YOUR ATHLETIC SCHOLARSHIP.

Sports that cannot be bet on are:

- All sports sponsored by the NCAA (including all NCAA Tournament Pools)

- Professional Sports

- Amateur sports

www.StudentAthletePay.com

- Fantasy sports

Sports that can be bet on if you are of age (21) include: Horse Racing and Casino Games.

\*\*\*\*\*

## SOCIAL NETWORKING

Villanova University Athletics Department recognizes and supports its student-athletes' rights to freedom of speech and expression, including the use of online social networks. However, each student-athlete must remember that being a student-athlete at Villanova University is a privilege, not a right. As a student-athlete you represent not only yourself, your team, and this department, but the University as a whole. As such, you are expected to portray yourself, your team, and the University in an appropriate manner at all times. Therefore, any online postings must be consistent with the Villanova University mission, Federal and State laws, as well as Team, Department, University, Conference, and NCAA rules, regulations and policies.

\*\*\*\*\*

## Social Media: Non-permissive online activity

Inappropriate or offensive activities or behaviors on online communities that could lead to student-athletes facing the penalties outlined below include but are not limited to:

- Photos, videos, comments or posts showing the personal use of alcohol, drugs and tobacco e.g., no holding cups, cans, shot glasses etc. ….
- Content online that is unsportsmanlike, derogatory, demeaning or threatening toward any other individual or entity
  - Example: derogatory comments regarding another institution; taunting comments aimed at a student athlete, coach or team at this or any other institution ….
- Content online that would constitute a violation of Conference or NCAA rules
  - Examples: commenting publicly about a prospective student-athlete …

Ex. O, at 21-25 (pdf pages, because document is unnumbered).

www.StudentAthletePay.com

150.    The National Labor Relations Board has determined that certain restrictions

on Student Athlete speech and use of social networks constitute unfair labor practices.  *See*

NLRB Advice Memo Re: Northwestern University, Case 13-CA-157467, Sept. 22, 2016;

Lester Munson, "Free to Tweet: Northwestern's restrictions on football players ruled

unlawful," ESPN.com, Oct. 10, 2016.

151.    NCAA D1 member schools, like Villanova, publish NCAA team policies that

restrict the *legal* consumption of alcohol and *legal* use of nicotine products.

152.    NCAA bylaws also restrict a Student Athlete's self-employment:

> A student-athlete may establish his or her own business,
> provided the student-athlete's name, photograph,
> appearance or athletics reputation are not used to
> promote the business.

NCAA D1 Bylaw 12.4.4.

153.    In 2017, the ASSOCIATED PRESS reported on the NCAA's investigation of

University of Central Florida kicker Donald De La Haye for his receipt of advertising revenue

from his YouTube channel as part of YouTube's policies applicable to video content creators:

> [De La Haye] could be violating NCAA rules by receiving
> money from the advertising revenue off his YouTube
> videos that chronicle his life as a college student and as a
> college football player.
>
> De La Haye has nearly 56,000 subscribers on YouTube
> and his latest video detailing his battle to keep his
> channel going had 113,042 views as of Wednesday
> afternoon. YouTube pays video creators a percentage of
> the ad revenue profits ….
>
> NCAA rules prohibit student-athletes from profiting
> from their likeness or status as student-athletes because
> it violates amateur guidelines. NCAA bylaw 12.4.4
> regarding self-employment states a student-athlete may
> establish his or her own business, provided the student-
> athlete's name, photograph, appearance or athletics
> reputation are not used to promote the business.
>
> De La Haye, a marketing major, said in that video posted
> Monday that he created the channel as a way to further

www.StudentAthletePay.com

his career. He went on to say it is means to make a little extra money, money the Costa Rica native said his family needs.

"Basically, I'm not allowed to make any money off my YouTube videos," he said. "So I'm working hard — basically like a job filming, editing, creating ideas — and I'm not allowed to make any money. And if I do bad things will happen."

"UCF kicker's YouTube profits may be violation of NCAA rules," AP, June 14, 2017.

154.    FOX Business reported the decision to remove De La Haye's NCAA eligibility:

Donald De La Haye, a backup kicker, has a YouTube channel with more than 100,000 subscribers that has generated over five million total viewers. The National Collegiate Athletic Association (NCAA) ruled the kicker ineligible because he earns advertising revenue from his YouTube page, which chronicles his life as a college student and a UCF football player.

In interview with FOX Business' Stuart Varney, De La Haye said the NCAA should change the rules to allow student-athletes to earn an income while in college.

[T]he reason we go to college is to learn how to make money, and an entrepreneur like myself should have the right to profit off his own business, he said.

According to the NCAA amateur guidelines, the rules prohibit student-athletes from profiting from their likeness. NCAA bylaw 12.4.4 regarding self-employment states that "a student-athlete may establish his or her own business, provided the student-athlete's name, photograph, appearance or athletics reputation are not used to promote the business. 

"They offer[ed] me some conditions that you know the NCAA didn't really state too clearly. The waiver they offered me to sign [] says, I can't even post unmonetized footage of me playing football. I can't be at the beach tossing up footballs with my friends. I can't even mention quarterbacks, nothing like that." De La Haye said.

The former UCF football player noted it is unfair that any other person or non-student-athlete is able to make a profit off advertising revenue from a YouTube page.

"[A] student, you know, with the same aspirations and goals and works as hard as me would be praised for what he is doing, but you know the NCAA kicked me out."

Henry Fernandez, "NCAA rules UCF kicker Donald De La Haye ineligible over YouTube profits," FOX Business, Aug. 2, 2017.

155.    There are **no** comparable school rules restricting a *non*-student athlete's or Work Study participant's pursuit of career options; use of her/his name, image, likenesses or skill set (*also see* Paragraph 133, *supra*); use of social media; *legal* gambling; *legal* consumption of alcohol; or *legal* use of nicotine products.

> **ii.    *Donovan* Factor No. 2**
> The alleged employee's opportunity for profit or loss depending upon his managerial skill, *i.e.*, permission to work as much or as little as he would like and to work during whichever hours <u>he chooses</u>

156.    For reasons set forth in Paragraph 157, *infra*, Work Study provides options for a student to work as much or as little as s/he would like, to work during whichever hours s/he chooses and to work for whichever hourly rate s/he chooses *more* than NCAA sports; thus, NCAA sports meet employee criteria under *Donovan* Factor No. 2 **more** than Work Study.

157.    The same Work Study guidelines that permit a student employee to flexibly schedule hours, days and different jobs at different hourly rates to accommodate preferred/ chosen classes and academic degree programs also permit a student employee to manage her/his profit (or loss)**.**  *See* Paragraphs 95 through 97**,** *supra*; *compare with* Paragraphs 98 through 111, 118 and 119, *supra*.

> **iii.    *Donovan* Factor No. 3**
> The alleged employee's investment in required equipment or <u>materials</u>

158.    For the reasons set forth in Paragraphs 159 through 167, *infra*, NCAA D1 member schools invest substantially *more* in equipment, materials and personnel required to field NCAA teams than do the Student Athlete participants; thus, NCAA sports meet

employee criteria under *Donovan* Factor No. 3 – and **more** than Work Study to the extent member schools spend less on equipment, materials and personnel required for Work Study.

159.     For Fiscal Year 2016, NCAA D1 schools reported median total expenses and investments in Athletic Department personnel and equipment to field NCAA teams of:

> Football Bowl Subdivision "Power Five"  |  $98,913,000
>
> Football Bowl Subdivision  |  $33,113,000
>
> Football Championship Subdivision  |  $17,290,000
>
> Sans Football  |  $15,956,000

*See* NCAA Revenues / Expenses Division I Report 2004 – 2016, at 12.

160.     NCAA D1 member schools, like Villanova, invest substantially more on equipment, materials and personnel required to field NCAA teams than on equipment, materials and personnel required to operate Work Study.

161.     In 2015, THE WASHINGTON POST examined NCAA D1 member school spending on professional-grade facilities and on professional-level staffing and coaching salaries in a series of investigative reports, including:

- Will Hobson and Steven Rich, "Playing in the Red," THE WASHINGTON POST, Nov. 23, 2015.

- Will Hobson and Steven Rich, "The latest extravagances in the college sports arms race? Laser tag and mini golf." THE WASHINGTON POST, Dec. 15, 2015.

162.     From Hobson and Rich, "The latest extravagances in the college sports arms race? Laser tag and mini golf":

> A decade of rampant athletics construction across the country has redefined what it takes to field a competitive top-tier college sports program. Football stadiums and basketball arenas now must be complemented by practice facilities, professional-quality locker rooms, players' lounges with high-definition televisions and video game systems, and luxury suites to coax more money from boosters.
>
> *****

On April 19, 2013, the University of Tennessee dedicated its new $45 million Anderson Training Center, a 145,000-square-foot home for its football team with a two-story weight room, hydrotherapy room, amphitheater-style team meeting room and a public entrance featuring a waterwall and museum commemorating Volunteers football history.

At the dedication ceremony, Tennessee Athletic Director Dave Hart told donors that professional football scouts had offered unanimous praise.

"They have all told me this is the best facility, college or professional, that they've ever seen," Hart said. "Quite a tribute and quite a legacy to all of you who helped make this possible."

*****

The facilities arms race is not solely benefiting football teams. In the past decade, many athletic departments in the wealthy Power Five conferences – the Atlantic Coast Conference, Southeastern Conference, Big 12, Big Ten and Pacific-12 –have built baseball stadiums, volleyball courts, soccer fields, golf practice facilities and ice hockey arenas ….

*****

Some collegiate players now enjoy facilities superior to those offered by some professional teams. Florida State and the University of Florida have indoor football practice facilities. The NFL's Jacksonville Jaguars do not.

163.   From Hobson and Rich, "Playing in the Red":

Auburn Athletics Chief Operating Officer David Benedict explained in an interview how his department lost more money in 2014 than it did in 2004, even though its income nearly doubled during that time ….

In 2004, Auburn athletics nearly broke even on earnings of $57.5 million. (All 2004 figures are adjusted for inflation.)

By 2014, income had risen to $109.3 million, but spending soared to $126.5 million ….

Coaches' pay more than doubled (from $9.3 million to $20.4 million). Facilities spending tripled (from $8.6 million to $27.8 million), thanks to a building boom including a new basketball arena and practice facility ($89.4 million), a new indoor football practice facility

-52-

($23.1 million) and a new soccer-track facility ($17.7 million).

Some purchases, Benedict acknowledged, were optional, like two new twin-engine jets: a six-seat 2008 Cessna Citation CJ2+ ($6.4 million) and a seven-seat 2009 Cessna Citation CJ3 ($7.8 million), each bearing a blue and orange "AU" insignia on its tail.

The jets are used primarily by coaches to criss-cross the country meeting with recruits, contributing to Auburn's recruiting costs nearly doubling in a decade, from $1.6 million to $2.7 million ….

That new [$13.9 million] video board, the largest in college sports, was also optional. Auburn has a history of trend-setting electronics displays. In 2007, it installed the first high-definition video board in the SEC, a $2.9 million purchase Athletic Director Jacobs decided was obsolete eight years later.

164.    For the Fiscal Year that ended May 31, 2018, Villanova reported total expenses and investments in Athletic Department personnel and equipment to field NCAA teams of $48,977,278.  *See* U.S. Department of Education Equity in Athletics Data Analysis (OPE ID: 00338800), available at: https://ope.ed.gov/athletics/#/.

165.    NCAA D1 member schools, like Villanova, provide Student Athletes with *all* equipment and materials required to participate in NCAA sports – *only excluding incidental, nonessential and minimal expenses.*

166.    For example, the *only* "Charges Not Paid By the Athletics Department," for which Villanova Student Athletes are *personally responsible*, include:

- All phone charges;
- Consumable charges (i.e. lab fees for breakage, non-required field trips, Lab Coats, etc.);
- Library fines, parking fines or fines for damage to University property, including residence halls;
- Key deposits or the costs of key replacements;
- Replacement costs for lost student I.D.'s;
- School supplies, dictionaries, reference books, pens, notebooks, paper, etc. unless specified on students syllabus;
- Vehicle registration fees or parking stickers;

- University breakage deposit;
- Use of institutional phones to call off campus is strictly prohibited.

Villanova University Athletics Department Student-Athlete Handbook and Planner (Ex. O), at 24 (pdf page, because document is unnumbered).

167.    None of the "Charges Not Paid By the Athletics Department," for which Villanova Student Athletes are personally responsible, reflects or relates to an investment in equipment or materials required to participate in NCAA sports.  *Id.*

### iv.    *Donovan* Factor No. 4
#### Whether the service rendered requires a special skill

168.    For reasons set forth in Paragraphs 121 through 139, *supra*, Student Athlete performance, which is integral to the billion dollar Big Business of NCAA sports, requires *more* specialized skill than student performance in Work Study, which merely complements the work of *non*-student employees (*e.g.*, answering the phone and typing memos in offices; serving food and washing dishes in dining halls; checking IDs and re-stacking books in libraries; selling merchandise in bookstores; and cleaning facilities); thus, NCAA sports meet employee criteria under *Donovan* Factor No. 4 *more* than Work Study.

169.    NCAA sports are Varsity sports – *i.e.*, sports which are sponsored by the school, supervised by school staff and funded through the school's budget, and from which the school derives school branding benefits and revenues – and, as Varsity sports, require much *more* specialized skill than *recreational* student-run interscholastic Club Sports or student-run intramural sports.

### v.    *Donovan* Factor No. 5
#### The degree of permanence of the working relationship

170.    For the reasons set forth in Paragraphs 171 through 176, *infra*, NCAA D1 member schools have *more* authority, and discretion, to deny, or impose conditions upon,

-54-

the transfer to another member school of a Student Athlete than of a student employee in Work Study; thus, NCAA sports meet employee criteria under *Donovan* Factor No. 5 ***more*** than Work Study.

171.   NCAA D1 member schools, **cannot** deny, or impose conditions upon, the transfer of a student employed in Work Study to another college.  *See, e.g., Livers (Phillips) v. NCAA*: Villanova's Resp. to Pl.'s Second Set of Reqs. for Admis. (Ex. D), at Nos. 45 and 46.

172.   Through the 2017-18 academic year, NCAA bylaws permitted a member school to enforce the permanence of its relationship to a Student Athlete by blocking her/him from accepting an athletic scholarship offer to transfer to another member school of her/his choice and play for that school the same or following season.  *See* 2017-18 NCAA D1 Bylaw 13.1.1.3.

173.   The NCAA and Villanova admit that, after the 2017-18 academic year, member schools may still separately adopt NCAA member conference rules that permit Student Athlete transfers to be blocked.  *See* Defs.' Resp. to Pl.'s Second Set of Reqs. for Admis. (Exs. D and E), at No. 48; Michelle Brutlag Hosick, "New transfer rule eliminates permission-to-contact process," NCAA.org, June 13, 2018 ("Conferences, however, still can make rules that are more restrictive than the national rule.")

174.   In 2013, The NEW YORK TIMES described the saga of Oklahoma State quarterback Wes Lunt, who decided he wanted to transfer after losing his starting position in the aftermath of a knee injury and a concussion:

> [T]he transfer process started, producing the latest and perhaps an extreme example of what is occurring throughout the country this time of year as many college athletes try to move to different universities.
>
> The Oklahoma State coach, Mike Gundy, ruled out nearly 40 universities as transfer options for quarterback Wes Lunt, an apparent show of gamesmanship and punishment toward a college athlete who wanted to take his skills elsewhere.

The forces at work were not new, but Gundy, like a growing number of coaches, chose to harness them to eliminate many, if not all, of Lunt's preferred options and to keep a potential rival from gaining the services of a highly regarded quarterback entering his sophomore season.   It was a powerful illustration of the big-business mind-set of college sports and the control that coaches have over players.

*****

Coaches cannot fully prevent athletes like Lunt from transferring to any university they want. **But if a coach does not grant an athlete a release, the player must forfeit any scholarship opportunity, pay his own way to the new university and sit out the next season.** Meanwhile, Gundy, whose contract pays him $30.3 million over eight years, and other coaches can routinely move from one college to another with minimal consequence, often for bigger contracts after arranging a buyout with the first college.

Greg Bishop, "Want to Play at a Different College?  O.K., but Not There or There,"

NEW YORK TIMES, June 7, 2013 (emphasis supplied); *also see* Will Hobson and Steven Rich,

"College sports' fastest-rising expense: Paying coaches not to work," THE WASHINGTON POST,

Dec. 11, 2015 (regarding the economic freedom of coaches to routinely move from one college

to another with minimal consequence, often for bigger contracts after arranging a buyout

with the first college).

175.    In 2017, ESPN described the transfer sagas of University of Pittsburgh

shooting guard Cameron Johnson, initially blocked from transferring to any other school in

the Atlantic Coast Conference or school on the University of Pittsburgh's schedule, and

Kansas State University wide receiver Corey Sutton, initially blocked from transferring to

any of 35 schools on his preferred list:

[H]ow can any institution complain when a student decides to leave the school to pursue his or her education elsewhere? Whether on scholarship or not, there is no restriction for any non-athlete student leaving one school and attending another and being able to receive aid or participate in any extracurricular activity.

-56-

Yet, with athletes (and only athletes), the school the athlete is leaving has the power to limit to where an athlete can transfer and receive aid and participate in varsity athletics. **That is the equivalent of a "noncompete" provision in an employment contract. If not employees, how can NCAA rules allow any school to restrict the choice and movement of any student?**

Jay Bilas, "Cameron Johnson is the perfect example of the transfer rule gone wrong," ESPN.com, June 13, 2017. (emphasis supplied).

176.    If a Student Athlete is cleared to transfer to another NCAA D1 member school, that Student Athlete s*till* **cannot** participate in NCAA sports the *same* season, and typically must forego participating in NCAA sports the *following* season, *i.e.*, sit out one full season. *See* NCAA D1 Bylaw 14.5.5.

> ### vi.   *Donovan* Factor No. 6
> Whether service rendered is integral to the alleged employer's <u>business</u>

177.    For reasons set forth in Paragraphs 121 through 139, *supra*, Student Athlete performance is integral to the billion dollar Big Business of NCAA sports while student performance in Work Study merely complements the work of *non*-student employees; thus, NCAA sports meet employee criteria under *Donovan* Factor No. 6 ***more*** than Work Study.

## III.   DEFENDANTS ARE JOINT EMPLOYERS OF <u>STUDENT ATHLETES</u>

### A.   <u>NCAA Bylaws Apply to *All* Student Athletes on An Equal Basis</u>

178.    The NCAA and Villanova admit that NCAA rules apply to all Student Athletes in NCAA sports on an equal basis, and that these bylaws address, among other subjects, Student Athlete recruitment, eligibility, hours of participation, duration of eligibility and discipline. *See Livers (Phillips) v. NCAA*: Answer (ECF 130), at ¶ 30.

**B.**   **The Role(s) of NCAA Member Schools in *Handing Down* NCAA Bylaws**

179.   "What Is the NCAA?," attached hereto as Exhibit Q and available on

NCAA.org at www.NCAA.org/about/resources/media-center/ncaa-101/what-ncaa, states,

among other things:

> WHAT IS THE NCAA?
>
> The National Collegiate Athletic Association is a **member-led organization** …
>
> WHOSE RANKS INCLUDE
>
> **College Presidents** lead their schools and the NCAA
>
> *****
>
> **WHO MAKES THE RULES?**
>
> **Member representatives serve on committees that propose rule and policies surrounding college sports.   Members ultimately decide which rules to adopt** – everything from recruiting and compliance to academics and championships – and implement them on campus.
>
> WHAT DOES THE NATIONAL OFFICE DO?
>
> The 500 employees at the NCAA's Indianapolis headquarters interpret and support member legislation, run all championships and manage programs that benefit student athletes.

(emphasis supplied).

180.   "How the NCAA Works: Division I," attached hereto as Exhibit R and available

on NCAA.org at www.NCAA.org/sites/default/files/2018DINCAA-HowTheNCAAWorks-

DI_20180313.pdf, states, among other things:

> **Rule-making starts with the schools and athletics conferences that belong to Division I.**
>
> If an athletics director wants to change recruiting legislation, for example, the idea could be introduced through the committee structure.
>
> *****

www.StudentAthletePay.com

**Representatives serve on NCAA committees that determine the division's direction and develop legislation.**

\*\*\*\*\*

DIVISION I COUNCIL

Made up of practitioners who work daily in Division I college sports[13] …

40 members, including one from each of the 32 conferences

BOARD OF DIRECTORS

The Board of Directors is the top governing body for Division I, responsible for strategy and policy and overseeing legislation and management of the division

24 members: 20 presidents, 1 from each FBS conference and 10 seats rotating among the remaining 22 conferences

(emphasis supplied).

181.    NCAA D1 Constitution Article 5. Legislative Authority and Process states, among other things:

**5.01.1 Basis of Legislation.** All legislation of the Association that governs the conduct of the intercollegiate athletics programs of its member institutions shall be adopted by the membership in Convention assembled, or by the divisional governance structures as set forth in Constitution 4, as determined by the constitution and bylaws governing each division, and shall be consistent with the purposes and fundamental policy set forth in Constitution 1, and shall be designed to advance one or more principles such as those set forth in Constitution 2.

\*\*\*\*\*

**5.1.3 Annual or Special Convention Delegates ….**

---

[13]    *See, also*, Division I Council available on NCAA.org at: www.NCAA.org/governance/committees/division-i-council ("**The Division I Council is a high-level group responsible for the day-to-day decision-making for Division I**. Athletics directors, athletics administrators, senior women administrators, faculty athletics representatives and student-athletes serve on the Council.") (emphasis supplied)

www.StudentAthletePay.com

>**5.1.3.1.1 With Voting Privileges.** Each active member and each member conference with voting privileges, as specified in Constitution 3.3.2.2, shall be entitled to one vote.

182.     In a U.S. Senate hearing on NCAA sports, NCAA President Mark Emmert explained:

>[I]t's important to understand that the NCAA is a democratically governed, membership-led association …. Members make rules through a representative process much as you do in Congress.

*Promoting the Well-Being and Academic Success of College Athletes*: *Hearing Before the Senate Comm. on Commerce, Sci. and Transp.*, 113th Cong. 40 (2014) (statement of Mark Emmert, President, NCAA).

### C.     The Role(s) of NCAA Member Schools in *Enforcing* NCAA Bylaws

183.     As discussed in detail in **Section III.D. The Role(s) of NCAA Staff in Enforcing NCAA Bylaws**, *infra*, the NCAA Enforcement staff is tasked with investigating potential violations of NCAA bylaws and bringing charges.  *See* NCAA Division I Infractions Annual Report | 2017-18, at Infractions Snapshot, available on NCAA.org at: http://www.NCAA.org/sites/default/files/18-00697%20NCAA%20Infractions%20Annual%20Report_Final_150dpi.pdf.

184.     The NCAA D1 Committee on Infractions decides cases brought by the NCAA Enforcement Staff.  *Id.*

185.     The NCAA D1 Committee on Infractions:

>**is structured around a peer-review model and is composed of as many as 24 (currently 22) qualified representatives from member schools, conferences and the public**. This can include university presidents, conference commissioners, athletics directors, campus administrators, faculty athletics representatives, former coaches, high-profile members of the public and more. Members of the

www.StudentAthletePay.com

> committee deliberate, conclude if violations occurred, prescribe appropriate penalties, then issue a written decision. The committee also monitors schools on probation.

*Id.*, at 5. (emphasis supplied).

186.    The D1 Infractions Appeal Committee is also **peer-reviewed** and composed of five (5) representatives from member schools, conferences and the public. *Id.*, at 28-29.

187.    Under NCAA D1 bylaws, NCAA member schools have "Shared Responsibility" to report all potential violations regarding any Student Athlete, and to cooperate in the investigation of any Student Athlete, including those attending another member school:

> **19.2 Expectations and Shared Responsibility ….**
>
> **19.2.2 Member Responsibility to Report Noncompliance.** Each institution has an affirmative obligation to report all instances of noncompliance to the Association in a timely manner.
>
> **19.2.3 Responsibility to Cooperate.** Current and former institutional staff members or prospective or enrolled student-athletes of member institutions have an affirmative obligation to cooperate fully with and assist the NCAA enforcement staff, the Committee on Infractions and the Infractions Appeals Committee to further the objectives of the Association and its infractions program. The responsibility to cooperate requires institutions and individuals to protect the integrity of investigations and to make a full and complete disclosure of any relevant information, including any information requested by the enforcement staff or relevant committees. Current and former institutional staff members or prospective or enrolled student-athletes of member institutions have an affirmative obligation to report instances of noncompliance to the Association in a timely manner and assist in developing full information to determine whether a possible violation has occurred and the details thereof.

188.    Failure to cooperate in an NCAA enforcement investigation is considered a Severe Breach of Conduct (Level I Violation) subject to the highest penalties, including competition penalties (*e.g.*, postseason bans), financial penalties, scholarship reductions,

www.StudentAthletePay.com

head coach restrictions, and recruiting restrictions.  *See* NCAA D1 Bylaws 19.1.1(c), 19.9.5 and 19.9.7.

    **D.**    **The Role(s) of NCAA Staff in *Enforcing* NCAA Bylaws**

    189.    In a U.S. Senate hearing on NCAA sports, NCAA President Mark Emmert explained:

> Nearly 1,100 NCAA member colleges and universities work together to create rules …. **Those rules are administered by NCAA national office staff**, which also organize 89 national championships in 23 sports and provides other resources to support student-athletes and the schools they attend.

*Promoting the Well-Being and Academic Success of College Athletes*: *Hearing Before the Senate Comm. on Commerce, Sci. and Transp.*, 113th Cong. 45 (2014) (emphasis supplied).

    190.    In the same U.S. Senate hearing, NCAA President Emmert further explained:

> college and university members have given the NCAA the responsibility to explore potential NCAA violations.

*Id.*, at 49.

    191.    In its 2017-18 Division I Infractions Annual Report, the NCAA described roles of NCAA staff in investigating and prosecuting NCAA rules violations and in supporting peer-review adjudicative and appellate committees:

> **ENFORCEMENT**
>
> **The enforcement staff, tasked with investigating cases and bringing charges,** has streamlined its processes in recent years. Investigations into Level I and II violations are moving more swiftly, all while **the enforcement staff processes a significantly higher volume of violations each year**. The enforcement staff also has worked to make informed projections about cases earlier, meaning that unsubstantiated or less significant matters can be closed or processed faster. **Outside of cases, the enforcement staff continues to develop relationships with institutions, coaches and others in a continuing**

www.StudentAthletePay.com

**effort to address threats to college sports proactively**.

**COMMITTEE ON INFRACTIONS**

**The Division I Committee on Infractions, which decides cases brought by the enforcement group**, has focused on improving efficiencies in several areas. **The committee and staff who support it** have made efforts to educate members about the process at regional rules seminars and conference meetings. They have heightened focus on timeliness and docket management and have increasingly relied on guidelines and data to drive decisions and streamline processes. The committee also has heightened its focus on consistency. Not only has it operated within prescribed penalty guidelines, but also it has engaged in ongoing efforts to review violation and penalty data.

**INFRACTIONS APPEALS COMMITTEE**

The Infractions Appeals Committee is undergoing important change as well. **In the spring, the NCAA office serving the committee appointed its first managing director. The office soon will expand by two staffers, who will be able to offer committee members unprecedented support**.

NCAA Division I Infractions Annual Report | 2017-18, at Infractions Snapshot, available on NCAA.org at: http://www.NCAA.org/sites/default/files/18-00697%20NCAA%20Infractions%20Annual%20Report_Final_150dpi.pdf. (emphasis supplied).

192.     The NCAA employs a Vice President for Enforcement.  *Id.*

193.     58 percent of NCAA Enforcement Staff hold law degrees.  *Id.*, at 12.

194.     30 percent of NCAA Enforcement Staff have prior experience in a professional investigative role.  *Id.*

195.     In addition to three NCAA staff members supporting the NCAA D1 Infractions Appeal Committee referenced in the Infractions Snapshot, *see* Paragraph 191, *supra*, the NCAA D1 Committee on Infractions is supported by eight NCAA staff members

-63-

who "provide the group case management support, research, drafting, strategic planning and administrative support, and other duties as assigned by the committee chair." *Id.,* at 17.

196.    The NCAA D1 Manual describes investigative and prosecutorial duties of NCAA Enforcement Staff in detail, including, among others duties:

> **19.5.1 Enforcement Staff to Receive Information and Conduct Investigations.**  Information regarding an alleged failure to comply with the NCAA constitution and bylaws or to meet the conditions and obligations of membership shall be provided to the enforcement staff. The enforcement staff shall determine whether an investigation is warranted or whether the matter may be resolved without a formal investigation.  If an investigation is warranted, the enforcement staff shall conduct an investigation on behalf of the entire membership to develop, to the extent reasonably possible, all relevant information ....
>
> *****
>
> **19.7.1 Notice of Allegations.**  If the enforcement staff determines after an investigation that there is sufficient information to conclude that a hearing panel of the Committee on Infractions could conclude that a violation occurred, it shall issue a cover letter and notice of allegations to the chancellor or president of the institution involved (with copies to the faculty athletics representative, the director of athletics and the executive officer of the conference of which the institution is a member). The institution and/or involved individuals, if applicable, shall be given notice of the alleged violation(s), the details of the allegations, the possible level of each alleged violation, the processing level of the case, the available hearing procedures and the opportunity to answer the allegations. The notice of allegations shall also identify the factual information and aggravating and/or mitigating factors on which the enforcement staff may rely in presenting the case ....
>
> **19.7.3 Submissions by Enforcement Staff.**  Within 60 days after the institution and involved individuals, if any, submit written responses to the notice of allegations, the enforcement staff shall submit a written reply to the hearing panel, and pertinent portions to an involved individual or institution. In addition to submitting its reply and after the prehearing conference, the enforcement staff shall prepare a

www.StudentAthletePay.com

statement of the case, which shall set forth a brief history of the case, summary of the parties' positions on each allegation and a list of any remaining items of disagreement. An involved individual will be provided those portions of the statement in which he or she is named.

**19.7.4 Prehearing Conference.**  Within 60 days after the institution and involved individuals, if any, submit written responses to the notice of allegations, the enforcement staff shall consult with institutional representatives and other involved individuals in order to clarify the issues to be discussed during the hearing, make suggestions regarding additional investigation or interviews that should be conducted to supplement a response and identify allegations that the staff intends to amend or withdraw. The enforcement staff shall conduct independent prehearings with the institution and/or any involved individuals, unless mutually agreed by all parties to do otherwise.

\*\*\*\*\*

**19.7.7.5 Appearance of Individuals at Hearings.**  Except as otherwise provided herein or as ordered by the chief hearing officer, hearing attendees shall be limited to institutional representatives (Bylaw 19.7.7.5.2), involved individuals, enforcement staff representatives, hearing panel members, representatives from the office of the Committees on Infractions, representatives from the NCAA office of legal affairs, the audio recorder, court reporter and other technical/support staff as permitted by the chief hearing officer.

\*\*\*\*\*

**19.10.3 Written Materials on Appeal ….**

**19.10.3.2   Response   by   Committee   Appeals Advocate.**  Within 30 days after receipt of an initial submission in support of its appeal by an institution or involved individual, the committee appeals advocate shall submit a response to the Infractions Appeals Committee ….

**19.10.3.4 Enforcement Staff Statement.**  Within 10 days after the deadline for submission of all rebuttals, the enforcement staff may provide a written statement to the Infractions Appeals Committee regarding perceived new information, errors, misstatements and omissions relating to the initial submission(s), the

www.StudentAthletePay.com

committee appeals advocate's response and/or rebuttal documents.

**19.10.5 Appeal Arguments.**  If one or more of the appealing parties request an appeal oral argument, an appeal oral argument may be conducted as set forth below, subject to procedures promulgated by the Infractions Appeals Committee or as otherwise directed by the committee.

(a) Only those individuals identified in Bylaw 19.7.7.5 may attend the appeal oral argument ….

197.    The NCAA Enforcement Staff has authority to enter into "plea deals" as to

Level I and II violations,[14] and to prescribe, or waive, penalties as to Level III violations:[15]

---

[14]    Level I and Level II violations include:

**19.1.1 Severe Breach of Conduct (Level I Violation).**  A severe breach of conduct is one or more violations that seriously undermine or threaten the integrity of the NCAA Collegiate Model, as set forth in the constitution and bylaws, including any violation that provides or is intended to provide a substantial or extensive recruiting, competitive or other advantage, or a substantial or extensive impermissible benefit. Among other examples, the following, in appropriate circumstances, may constitute a severe breach of conduct:

(a)  Lack of institutional control;

(b)  Academic misconduct;

(c)  Failure to cooperate in an NCAA enforcement investigation;

(d)  Individual unethical or dishonest conduct, regardless of whether the underlying institutional violations are considered Level I;

(e)  A Bylaw 11.1.1.1 violation by a head coach resulting from an underlying Level I violation by an individual within the sports program;

(f)  Cash payment or other benefits provided by a coach, administrative or representative of the institution's athletics interests intended to secure, or which resulted in, enrollment of a prospective student-athlete;

(g)  Third-party involvement in recruiting violations in which institutional officials knew or should have known about the involvement;

(h)  Intentional violations or reckless indifference to the NCAA constitution and bylaws; or

(i)  Collective Level II and/or Level III violations.

**19.1.2 Significant Breach of Conduct (Level II Violation).**  A significant breach of conduct is one or more violations that provide or are intended to provide more than

-66-

**19.6.1 Summary Disposition Election.**   In a case involving Level I or Level II violations, the institution, involved individuals and the enforcement staff may elect to use the summary disposition procedures specified below. To invoke the summary disposition procedures, the enforcement staff, involved individuals, if participating, and the institution must agree to summary disposition ….

\*\*\*\*\*

**19.11.3 Authority to Prescribe Penalties.**   As authorized by the Committee on Infractions, upon a conclusion that one or more Level III violations occurred, the vice president of enforcement, or his or her designee, may determine whether a penalty is warranted and, if

---

a minimal but less than a substantial or extensive recruiting, competitive or other advantage; include more than a minimal but less than a substantial or extensive impermissible benefit; or involve conduct that may compromise the integrity of the NCAA Collegiate Model as set forth in the constitution and bylaws. Among other examples, the following may constitute a significant breach of conduct:

    (a) Violations that do not rise to the level of Level I violations and are more serious than Level III violations

    (b) Failure to monitor (such violations will be presumed Level II but may be deemed to be of a Level I nature if the failure is substantial or egregious);

    (c) Systemic violations that do not amount to a lack of institutional control;

    (d) Multiple recruiting, financial aid, or eligibility violations that do not amount to a lack of institutional control;

    (e) A Bylaw 11.1.1.1 violation by a head coach resulting from an underlying Level II violation by an individual within the sport program; or

    (f) Collective Level III violations.

[15]   Level III violations include:

**19.1.3 Breach of Conduct (Level III Violation).**   A breach of conduct is one or more violations that are isolated or limited in nature; provide no more than a minimal recruiting, competitive or other advantage; and provide no more than a minimal impermissible benefit. Among other examples, the following may constitute a breach of conduct:

    (a) Inadvertent violations that are isolated or limited in nature; or

    (b) Extra-benefit, financial aid, academic eligibility and recruiting violations, provided they do not create more than minimal advantages.

www.StudentAthletePay.com

so, prescribe and announce an appropriate penalty pursuant to Bylaw 19.9.8.

*Id*.

### E.   The Applicable Joint Employment Test

198.    The relevant test that courts use in determining whether multiple defendants jointly employ an individual under the FLSA (and, in this case, the PMWA, the NYLL and the CMWA) is set forth in *In re Enterprise Rent-A-Car Wage & Hour Emp't Practices Litig.*, 683 F.3d 462 (3d Cir. 2012).[16]

### 1.   The *Enterprise Rent-A-Car* Joint Employment Test

199.    The joint employment test in *Enterprise Rent-A-Car* includes, among its factors:

    i.   The alleged employer's authority to hire and fire the relevant employees;

    ii.   The alleged employer's authority to promulgate work rules and assignments and to set the employees' conditions of employment: compensation, benefits, and work schedules, including the rate and method of payment;

    iii.   The alleged employer's involvement in day-to-day employee supervision, including employee discipline; and

    iv.   The alleged employer's actual control of employee records, such as payroll, insurance, or taxes.

---

[16]    *But see, also, North American Soccer League v. NLRB*, 613 F.2d 1379, 1382 (5th Cir. 1980) (finding joint employment under the National Labor Relations Act in a sports league where, "the League exercises a significant degree of control over essential aspects of the [member] clubs' labor relations, including but not limited to the selection, retention, and termination of the players, the terms of individual player contracts, dispute resolution and player discipline," and "each [member] club granted the [League] authority over not only its own labor relations but also, on its behalf, authority over the labor relations of the other member clubs.")  The National Labor Relations Act applied in *North American Soccer League* actually defines employer more narrowly than the FLSA. *See Enterprise Rent-A-Car*, 683 F.3d at 467-68 ("the FLSA defines employer 'expansively,' and with 'striking breadth.'  The Supreme Court has even gone so far as to acknowledge that the FLSA's definition of an employer is 'the broadest definition that has ever been included in any one act.'")

www.StudentAthletePay.com

*Enterprise Rent-A-Car*, 683 F.3d at 469.

200.    An analysis under this test demonstrates that Plaintiffs and the members of the Proposed FLSA Collective (as defined at Paragraphs 264 and 265, *infra*) the Proposed Pennsylvania Class (as defined at Paragraph 275, *infra*), the Proposed New York Class (as defined at Paragraph 306, *infra*), the Proposed Connecticut Class (as defined at Paragraph 337, *infra*), the Proposed North Carolina class (as defined at Paragraph 368, *infra*), the Proposed Oregon Class (as defined at Paragraph 399, *infra*), the Proposed Louisiana Class (as defined at Paragraph 430, *infra*), the Proposed Arizona Class (as defined at Paragraph 461, *infra*), and the Proposed Indiana Class (as defined at Paragraph 492, *infra*) are all "employees" of Defendants under the applicable law.

### i.    *Enterprise Rent-A-Car* Factor No. 1

> The alleged employer's authority to hire and fire the relevant employees

201.    An NCAA D1 member school does **not** have unilateral discretion to recruit, hire, suspend or fire Student Athletes pursuant to a myriad of NCAA bylaws set forth in the NCAA D1 Manual, including:

- NCAA D1 Bylaw Article 10 Ethical Conduct
- NCAA D1 Bylaw Article 12 Amateurism and Athletics Eligibility
- NCAA D1 Bylaw Article 13 Recruiting
- NCAA D1 Bylaw Article 14 Academic Eligibility
- NCAA D1 Bylaw Article 15 Financial Aid
- NCAA D1 Bylaw Article 17 Playing and Practice Seasons

*See, e.g.*, Summary of NCAA Eligibility Regulations – NCAA Division I, attached hereto as Exhibit S.

-69-

202.    NCAA D1 member schools are required to use the **NCAA Eligibility Center** to determine the initial eligibility of a prospective Student Athlete.  *See* NCAA D1 Bylaws 12.1.1.1 Amateurism Certification Process and 14.1.2.5 NCAA Eligibility Center.

203.    Recruitment of prospective Student Athletes by NCAA D1 member schools is subject to numerical limitations on, among other things:

- Contacts, defined as "any face to face encounter between a prospective student-athlete or the prospective student-athlete's parents, relatives or legal guardians … regardless of whether any conversation occurs.  *See, e.g.*, NCAA D1 Bylaws 13.02.4 and 13.1.5.

- Evaluations, defined as "any off-campus activity designed to assess the academic qualifications or athletics ability of a prospective student-athlete."  *See, e.g.*, NCAA D1 Bylaws 13.02.7 and 13.1.7.

- Telephone Calls.  *See, e.g.*, NCAA D1 Bylaw 13.1.3.1.8 ("Once an institution reaches the applicable limit on telephone calls to a prospective student-athlete [] for a particular time period [], the institution may not initiate an additional telephone call during the same time period, even if no direct conversation occurs during the additional call (e.g., voicemail message).")

204.    Recruiting Contacts, Evaluations and Telephone Calls are further restricted to "Periods of Recruiting Activities," including:

**Contact Period**.  A contact period is a period of time when it is permissible for authorized athletics department staff members to make in-person, off-campus recruiting contacts and evaluations.

**Evaluation Period**. An evaluation period is a period of time when it is permissible for authorized athletics department staff members to be involved in off-campus activities designed to assess the academic qualifications and playing ability of prospective student-athletes. No in-person, off-campus recruiting contacts shall be made with the prospective student-athlete during an evaluation period.

**Quiet Period**.  A quiet period is a period of time when it is permissible to make in-person recruiting contacts only on the institution's campus. No in-person, off-campus recruiting contacts or evaluations may be made

www.StudentAthletePay.com

> during the quiet period.
>
> **Dead Period**. A dead period is a period of time when it is not permissible to make in-person recruiting contacts or evaluations on or off the institution's campus or to permit official or unofficial visits by prospective student-athletes to the institution's campus. It remains permissible, however, for an institutional staff member
>
> to write or telephone a prospective student-athlete during a dead period.

NCAA D1 Bylaw 13.02.5.

205.    NCAA D1 member schools are prohibited from offering certain inducements to recruit prospective Student Athletes.  *See* NCAA D1 Bylaw 13.2.1.1.

206.    NCAA D1 member schools are subject to annual limitations on the total number and value (equivalencies) of athletic scholarships, per sport, that can be offered to recruit prospective Student Athletes or retain Student Athletes.  *See* NCAA D1 Bylaw 15.5.

207.    Through the 2017-18 academic year, an NCAA D1 member school had to request permission to recruit a prospective transfer Student Athlete attending another school – *from the attended school*.  *See* 2017-18 NCAA D1 Bylaw 13.1.1.3.

208.    Through the 2017-18 academic year, permission to recruit a prospective transfer Student Athlete attending another school could be denied by the attended school, or conditioned by the attended school on the inability to offer an athletic scholarship to the prospective transfer Student Athlete for one academic year.  *Id*.

209.    After the 2017-18 academic year, NCAA D1 member schools may still separately adopt NCAA member conference rules that require permission to recruit a prospective transfer Student Athlete.  *See* Paragraph 173, *supra*.

210.    Even if an NCAA D1 member school is cleared to hire a transfer Student Athlete, the transfer Student Athlete ordinarily is **not** permitted to work for her/his new school for one academic year after the transfer. *See* NCAA D1 Bylaw 14.5.5.

-71-

211.     NCAA D1 member schools are *continually* "responsible for certifying the eligibility of student-athletes under the terms of the constitution, bylaws or other legislation of the Association before permitting a student-athlete to represent the institution in intercollegiate competition."  *See* NCAA D1 (Constitution) Bylaw 3.2.4.3.

212.     As part of their *continual* responsibility for certifying Student Athlete eligibility, NCAA D1 member schools are "obligated immediately to apply all applicable rules and withhold ineligible student-athletes from all intercollegiate competition."  *Id.*

213.     Failure to comply with NCAA bylaws related to recruiting, hiring, suspending or firing Student Athletes, or to the *continual* responsibility to certify Student Athlete eligibility, ordinarily constitutes a Level III violation.  *See* NCAA D1 Bylaw 19.1.3 (b).

214.     For a Level III violation, NCAA Enforcement Staff may seek, or prescribe, the following penalties:

- Preclude Hiring ("Termination of the recruitment of a prospective student-athlete by the institution …"); or
- Require Suspension or Firing ("not allow the student-athlete to participate in intercollegiate athletics unless and until his or her eligibility is restored by the Committee on Student-Athlete Reinstatement …")

*See* NCAA D1 Bylaws 19.9.8(a) and 19.11.3.

215.     Multiple violations of NCAA bylaws related to recruiting, hiring, suspending or firing Student Athletes, or to the *continual* responsibility to certify Student Athlete eligibility, could constitute either a Level I or II violation.  *See* NCAA D1 Bylaws 19.1.1(i) and 19.1.2(d).

216.     For Level I or II violations, NCAA Enforcement Staff may seek, or agree to, penalties including, but not limited to:

- Competition Penalties (*i.e.*, limitations on postseason)
- Financial Penalties

www.StudentAthletePay.com

- Scholarship Reductions
- Head Coach Restrictions
- Recruiting Restrictions

*See* NCAA D1 Bylaw 19.9.5.

### ii.   *Enterprise Rent-A-Car* Factor No. 2

The alleged employer's authority to promulgate work rules and assignments and to set the employees' conditions of employment: compensation, benefits, and work schedules, including the rate and <u>method of payment</u>

217.   An NCAA D1 member school does **not** have unilateral discretion to set conditions of Student Athlete employment, *e.g.*, pay, benefits, rules, assignments, schedules and tenure, pursuant to a myriad of NCAA bylaws set forth in the NCAA D1 Manual, including:

- NCAA D1 Bylaw Article 12 Amateurism and Athletics Eligibility
- NCAA D1 Bylaw Article 16 Awards, Benefits and Expenses for Enrolled Student-Athletes
- NCAA D1 Bylaw Article 17 Playing and Practice Seasons

218.   NCAA D1 member schools are prohibited from offering a salary, gratuity or compensation, or division or split of surplus (*e.g.*, bonuses, game receipts), to Student Athletes. *See* NCAA D1 Bylaw 12.1.2.1.

219.   Permissible benefits (*e.g.*, participation awards of limited value not for resale; complimentary tickets not for resale; snacks and nutritional supplements; and entertainment) and *non*-permissible benefits (*e.g.*, loan; automobile or use of one; and transportation) are enumerated in NCAA D1 Bylaw Article 16.

220.   Mandatory benefits are also enumerated, including academic counseling/ support services; life skills programs; medical treatment by a designated team physician;

-73-

and insurance coverage for medical expenses resulting from athletically related injuries of equal or greater value than the deductible of the NCAA catastrophic injury insurance program.  *See* NCAA D1 Bylaw 16.3.1 and (Constitution) Bylaws 3.2.4.8 and 3.2.4.16.

221.   NCAA D1 member schools are required to administer a drug testing program for Student Athletes.  *See* NCAA D1 (Constitution) Bylaw 3.2.4.7.

222.   Playing and Practice Seasons and Off-Seasons, for all sports, are regulated under NCAA D1 Bylaw Article 17, including, among other regulations:

- Enumeration of Required Athletically Related Activities:
  - (a) Compliance meetings
  - (b) Organized team promotional activities
  - (c) Recruiting activities
  - (d) Media activities
  - (e) Fundraising events
  - (f) Community service events
  - (g) Team-building activities
  - (h) Travel to and from away-from-home competition.

  *See* NCAA D1 Bylaw 17.02.14.

- Limitations on Countable Athletically Related Activities (CARA) (*i.e.*, activities supervised by school staff):
  - 4 hours per day and 20 hours per week during Playing and Practice Season
  - 8 hours per week during the Off-Season
  - Prohibiting CARA during a continuous 8 hours between 9 p.m. and 6 a.m.
  - Requiring one day off during a 7 day week in Playing and Practice Season
  - Requiring a 7 day break after Playing and Practice Season and 14 more days off during the academic year

  *See* NCAA D1 Bylaws 17.7.7.1, 17.1.7.2, 17.1.7.4, 17.1.7.8, 17.1.7.9.6, and 17.1.7.9.7.

- Recording of CARA hours on timesheets maintained by supervising school staff.

-74-

*See* NCAA D1 Bylaw 17.1.7.3.4.

223.    An NCAA D1 member school may **not** permit a Student Athlete to represent it in an NCAA sport once the Student Athlete has participated in that NCAA sport four seasons; moreover, the Student Athlete must complete those four seasons within five years from the first semester or quarter s/he first registered at a school (*i.e.*, the "Five Year Rule"). *See* NCAA D1 Bylaw 12.8.

224.    Failure to comply with NCAA bylaws related to work rules, assignments, schedules and tenure ordinarily may constitute a Level II or III violation.  *See* NCAA D1 Bylaws 19.1.2(a), (b), (c), and (f), and 19.1.3; Paragraphs 213 through 216, *supra*, regarding penalties that the NCAA Enforcement Staff may seek, agree to, or prescribe.

225.    Cash payment or other benefits provided by a coach, administrative or representative of the institution's athletics interests is considered a Severe Breach of Conduct and Level I violation.  *See* NCAA D1 Bylaw 19.1.1(f); Paragraph 215, *supra*, regarding penalties that the NCAA Enforcement Staff may seek or agree to.

        **iii.**    ***Enterprise Rent-A-Car* Factor No. 3**
              The alleged employer's involvement in day-to-day employee
              <u>supervision, including employee discipline</u>

226.    An NCAA D1 member school does **not** have unilateral discretion to discipline Student Athletes because NCAA bylaws: (i) restrict the grounds for a school to reduce or cancel an athletic scholarship during the period of its award to only disciplinary reasons; (ii) require suspension or firing of a Student Athlete if s/he has violated any bylaw related to eligibility; and (iii) subject a school's "home team" Student Athletes to discipline meted out by NCAA Enforcement Staff and/or panels of the peer-review NCAA D1 Committees on Infractions and Infractions Appeals composed of representatives from competing schools.

www.StudentAthletePay.com

*See* NCAA D1 Bylaws 12.11.1, 15.3.4.2, 15.3.4.3, 19.3.4 and 19.4.3; and Paragraphs 183 through 197, *supra*.

227.    An NCAA D1 member school may reduce or cancel an athletic scholarship during the period of its award for the following disciplinary reasons if the recipient:

> (a) "Renders himself or herself ineligible for intercollegiate competition"
>
> (b) "Fraudulently misrepresents any information on an application, letter of intent or financial aid agreement"
>
> (c) "Engages in serious misconduct warranting substantial disciplinary penalty (e.g., "found to have engaged in misconduct by the university's regular student disciplinary authority, even if the loss-of-aid requirement does not apply to the student body in general")"

*See* NCAA D1 Bylaws 15.3.4.2 and 15.3.4.2.4.

228.    An NCAA D1 member school may **not** reduce or cancel an athletic scholarship during the period of its award on the basis of the Student Athlete's athletics ability, performance or contribution to a team's success.  *See* NCAA D1 Bylaw 15.3.4.3.

229.    NCAA D1 member schools are required to *continually* verify and certify the eligibility of Student Athletes under NCAA bylaws before permitting them to participate in NCAA competition, and are obligated to immediately suspend or fire Student Athletes determined to be ineligible *by the school*, subject to penalties sought, agreed to, or prescribed by NCAA Enforcement Staff.  *See* Paragraphs 211 through 216, *supra*.

230.    If a Student Athlete is determined to be ineligible through action brought by the NCAA Enforcement Staff, the attended NCAA D1 member school is required to suspend or fire that Student Athlete upon notice of the violation.  *See* NCAA D1 Bylaw 19.9.11.

231.    If, after notice, an NCAA D1 member school fails to suspend or fire a Student Athlete determined to be ineligible through action brought by the NCAA Enforcement Staff, the attended NCAA D1 member school is "required to show cause to the Committee on

-76-

Infractions why additional penalties should not be prescribed for a failure to abide by the conditions and obligations of membership." *Id*.

232.    A Show-Cause Order for failure to suspend or fire a Student Athlete determined to be ineligible through action brought by the NCAA Enforcement Staff constitutes a Level I or II violation and penalty.  *See* NCAA D1 Bylaw 19.9.5.4.

233.    In addition to the suspension or firing of a Student Athlete determined to be ineligible through action brought by the NCAA Enforcement Staff, the individual records and performances of the ineligible Student Athlete may be vacated and individual awards of the ineligible Student Athlete may be required to be returned.   *See* NCAA D1 Bylaw 19.9.7(g)(1) and (3).

234.    Furthermore, an NCAA D1 member school's "home team" Student Athletes are subject to discipline meted out by NCAA Enforcement Staff and/or panels of the peer-review NCAA D1 Committees on Infractions and Infractions Appeals composed of representatives from competing schools having no conflicts of interest, *i.e.*, not "directly connected with an institution under investigation."  *See* Paragraphs 183 through 197, *supra*; NCAA D1 Bylaws 19.3.4 and 19.4.3.

           **iv.**    ***Enterprise Rent-A-Car* Factor No. 4**
                  The alleged employer's actual control of employee records, such as
                  payroll, insurance, or taxes

235.    The **NCAA Eligibility Center** maintains all records related to the initial determination of Student Athlete eligibility.  *See, e.g.,* NCAA D1 Bylaws 12.1.1.1 Amateurism Certification Process and 14.1.2.5 NCAA Eligibility Center.

236.    An NCAA D1 member school is required to provide the NCAA Eligibility Center with any additional information if the school "has cause to believe that a prospective student-athlete's amateur status has been jeopardized" and report to the Eligibility Center

www.StudentAthletePay.com

"all discrepancies in information related to a student-athlete's amateurism certification." *See* NCAA D1 Bylaws 12.1.1.1.2.2.

237.    Pursuant to a Student Athlete consent form, the NCAA receives, and maintains, records regarding any injury, illness, or medical treatment related to or affecting a Student Athlete's training for and participation in NCAA sports. *See* NCAA Student-Athlete Authorization/Consent for Disclosure of Protected Health Information for NCAA-Related Research Purposes, attached hereto as Exhibit T.

238.    NCAA D1 member schools are required to make certain records available for examination upon request to the NCAA, including:

- Student-Athlete Statement.

    Prior to participation in intercollegiate competition each academic year, a student-athlete shall sign a statement in a form prescribed by the Council in which the student-athlete submits information related to eligibility, recruitment, financial aid, amateur status, previous positive-drug tests administered by any other athletics organization and involvement in organized gambling activities related to intercollegiate or professional athletics competition under the Association's governing legislation. Failure to complete and sign the statement shall result in the student-athlete's ineligibility for participation in all intercollegiate competition.

    *See* NCAA D1 Bylaws 12.7.2 and 12.7.2.2(b)

- Drug-Testing Consent Form.

    *See* NCAA D1 Bylaws 12.7.3 and 12.7.3.2(c).

- Squad List.

    To be eligible to represent an institution in intercollegiate athletics competition, a student-athlete shall be included on the institution's squad-list form.

    *See* NCAA D1 Bylaws 15.5.11 and 15.5.11.2.1(a).

239.    Furthermore, as part of "Expectations and Shared Responsibility" under the NCAA D1 Bylaw Article 19 Infractions Program, NCAA D1 member schools are required to

produce all Student Athlete records relevant to, or are requested for, any investigation

conducted by NCAA Enforcement Staff and/or panels of the peer-reviewed NCAA D1

Committees on Infractions and Infractions Appeals composed of representatives from

competing schools having no conflicts of interest, *i.e.*, not "directly connected with an

institution under investigation."  *See* Paragraphs 183 through 197, *supra*; NCAA D1

Bylaws 19.2.3, 19.3.4 and 19.4.3.

**IV.**   **STUDENT ATHLETES ARE *NOT* EXEMPT FROM THE PROTECTIONS OF**
        **WAGE AND HOUR LAWS**

       240.    The FLSA does **not** include, among its employee exemptions, any reference to

"amateurism," "amateur," "athletic," "athlete" or "student athlete."  *See* 29 U.S.C. § 213.

www.StudentAthletePay.com

241.     Student Athletes do **not** meet criteria for volunteer status under the FLSA.

*See* 29 U.S.C. § 203(e)(4);[17] 29 U.S.C. § 203(e)(5);[18] FOH § 10b03(c).[19]

---

[17]     29 U.S.C. § 203(e)(4) exempts:

> any individual who **volunteers** to perform services for a public agency which is a State, a political subdivision of a State, or an interstate governmental agency, if the individual receives no compensation or is paid expenses, reasonable benefits, or a nominal fee to perform the services for which the individual **volunteered**; and such services are not the same type of services which the individual is employed to perform for such public agency.

(emphasis supplied).

The Code of Federal Regulations further elaborates:

> An individual who performs hours of service for a public agency for civic, charitable, or humanitarian reasons, without promise, expectation or receipt of compensation for services rendered, is considered to be a **volunteer** during such hours ….

29 CFR § 553.101. (emphasis supplied).

[18]     29 U.S.C. § 203(e)(5) exempts:

> individuals who **volunteer** their services solely for humanitarian purposes to private non-profit food banks and who receive from the food banks groceries.

(emphasis supplied).

[19]     FOH § 10b03(c) states, in relevant part:

> In many cases the nature of **religious, charitable, and similar nonprofit organizations and schools** is such that individuals may **volunteer** their services in one capacity or another, usually on a part-time basis, **not as employees or in contemplation of pay for the services rendered.** For example, members of civic organizations may help out in a sheltered workshop; women's organizations may send members or students into hospitals or nursing homes to provide certain personal services for the sick or the elderly; mothers may assist in a school library or cafeteria as a public duty to maintain effective services for their children; or fathers may drive a school bus to carry a football team or band on a trip. Similarly, individuals may volunteer to perform such tasks as driving vehicles or folding bandages for the Red Cross; working with children with disabilities or disadvantaged youth; helping in youth programs as camp counselors, scoutmasters, or den mothers; providing child care assistance for needy working mothers; soliciting contributions or participating in benefit programs for such organizations; and **volunteering other services needed to carry out their charitable, educational, or religious programs**. The fact that services are performed under such circumstances is not sufficient to create an employer-employee relationship.

www.StudentAthletePay.com

## V.   DEFENDANTS' VIOLATIONS OF THE WAGE AND HOUR LAWS ARE WILLFUL

### A.   The *Livers v. NCAA* Willfulness Test

242.    The *Livers* Court articulated a two-step test for evaluating the willfulness of

NCAA and NCAA member school conduct:

> 1. Did Defendants rely on the U.S. Department of Labor Field
> Operations Handbook ("FOH") § 10b03(e) in failing to classify and
> pay Student Athletes as employees?
>
> 2. If the Answer to No. 1 is "Yes," had such reliance been reasonable
> in light of:
>
> (a) the requirement in FOH § 10b03(e) that an activity be
> "conducted primarily for the benefit of the participants
> as part of the educational opportunities provided to the
> students by the school" in order for the activity not to be
> work of the kind contemplated by the FLSA, *e.g.*,
> student-run groups, such as student-run, interscholastic
> Club Sports; and/or
>
> (b) similarities between Student Athlete performance
> outside the classroom and that of students involved in
> Work Study.

*Livers*, 2018 U.S. Dist. LEXIS 124780, at *11-13.[20]

---

(emphasis supplied).  *See, e.g.*, *Acosta v. Cathedral Buffet, Inc.*, 887 F.3d 761, 766-69 (6th Cir. 2018)
("[W]hen a **religious organization** undertakes a commercial endeavor, its workers are only covered
under the FLSA if they 'engage in those activities in expectation of compensation.' *Tony & Susan
Alamo Found. v. Sec'y of Labor*, 471 U.S. 290, 302 (1985) …. The [FLSA] does not go so far as to regulate
when, where, and how a person may volunteer her time to her church. After all, the giving of one's
time and money through religious obligation is a common tenet of many faiths …. *[S]piritual coercion*
cannot stand in for the economic coercion that the FLSA and the *Alamo* decision require.") (emphasis
supplied) *Tony & Susan Alamo Found.* ("volunteers" for a **religious foundation** – former "drug
addicts, derelicts, or criminals before their conversion and rehabilitation by the Foundation" – were
economically coerced to perform services in order to continue receiving in-kind benefits upon which they
were dependent, incl. food, clothing and shelter; thus, these "volunteers" were in fact employees.)

[20]    The *Livers* Court concluded, in relevant part:

> **The Amended Complaint plausibly states a willful FLSA
> violation sufficient to survive at the Motion to Dismiss stage.**
> Plaintiff has added an allegation to the Amended Complaint that
> NCAA member schools understood that Scholarship Athletes are
> directly comparable to students employed in work study programs,
> individuals who are classified as employees under the FLSA. The
> Amended Complaint includes detailed factual allegations comparing
> and contrasting Scholarship Athletes and students involved in work

www.StudentAthletePay.com

243.    An analysis under this test demonstrates that Defendants have been violating wage and hour laws ***willfully***.

---

study programs in order to demonstrate that Scholarship Athletes' performance outside the classroom is similar in many ways to that of students involved in work study, and in fact that it is more arduous and time consuming. The Amended Complaint also includes detailed factual allegations contrasting the experience of Scholarship Athletes and students involved in work study programs to that of students involved in student-run groups, to demonstrate that this latter group is subject to much less discretionary control by college supervisory staff, and **that members of student-run groups often engage in activity related to educational programming in the course of participation in these groups whereas the Scholarship Athlete and work study experience is strictly non-academic in nature. Finally, Villanova's website, like the websites of many other NCAA member schools, excludes NCAA athletics from its directory of student-run groups.**

**These allegations permit the plausible inferences that Scholarship Athletes, like their work study counterparts, fall within employee status under the FLSA, and that Defendants Villanova and the NCAA were aware of this when they chose not to pay them, suggesting reckless disregard of the alleged duty.**

In his Amended Complaint Plaintiff also alleges new facts dealing with willfulness and the FOH guidance at issue. Plaintiff's allegation that over the course of a decade-plus public debate during which college administrators, athletic directors, and coaches have publicly asserted reasons for the refusal to pay student athletes a wage, no such person has ever professed reliance on Section 10b03(e) as one such justification, casts doubt on the argument that the existence of the FOH guidance makes Defendants' decision in this regard reasonable.

**More specifically, these allegations permit a plausible inference that Defendants did not rely on the FOH guidance in making this decision. As such, at the Motion to Dismiss stage it remains an open fact question what impact, if any, the FOH guidance had on Defendants' thought process and reasoning behind the decision not to pay Plaintiff and other student athletes. This Court cannot say, at this stage, that the existence of the FOH guidance renders Defendants' decision reasonable, and therefore not a willful violation of the FLSA, as a matter of law.**

(emphasis supplied).

1.     **Defendants *Never* Relied upon DOL FOH § 10b03(e) in Failing
to Classify and Pay Student Athletes As Employees**

244.     In *Livers (Phillips) v. NCAA*, the NCAA and Villanova asserted, during a

"willfulness" hearing on November 1, 2018, that they had relied upon FOH § 10b03(e) in

failing to classify and pay Student Athletes as employees:

> COURT:     Mr. Katz, did your clients rely on the FOH?
> Do you want – can you answer that?
>
> MR. KATZ:     Well, yes, Your Honor.  Certainly the FOH
> is part of the legal background against
> which my clients made their decisions.

*Livers v. NCAA*: Mot. Hr'g Tr., Nov. 1, 2018 (ECF 97), at 16:7-11.

245.     Plaintiff Phillips then served the NCAA and Villanova with Second Requests

for Production of Documents on February 1, 2019, including Request No. 1:

> All Communications and Documents referring or related
> to FOH § 10b03(e) that also refer to or relate in any way
> to classification of student athletes as school employees.

*See* Defs.' Objections to Pl.'s Second Set of Doc. Reqs., at No. 1, attached hereto as Exhibits J

and K.

246.     In response to Plaintiff Phillips' Second Requests for Production of

Documents, No. 1, the NCAA and Villanova admitted that they, ***in truth***, **never** relied upon

FOH § 10b03(e) in failing to classify and pay Student Athletes as employees:

> [A]fter a diligent search and reasonable inquiry,
> **no responsive documents** exist within Defendant's
> possession, custody, or control.

*Id.* (emphasis supplied).

2.     **At All Relevant Times, Defendants Understood That FOH §
10b03(e) Applies to Student-Run Groups (incl. Interscholastic
Club Sports), *But Not to NCAA Sports***

247.     In any event, FOH § 10b03(e) clearly does **not** apply to NCAA Sports.

248.    FOH § 10b03(e) states, in relevant part:

> As part of their overall educational program, public or private schools and institutions of higher learning may permit or require students to engage in activities in connection with dramatics, student publications, glee clubs, bands, choirs, debating teams, radio stations, intramurals and interscholastic athletics and other similar endeavors.    Activities of students in such programs, **conducted primarily for the benefit of the participants as part of the educational opportunities provided to the students** by the school or institution, are not work of the kind contemplated by section 3(g) of the Act and do not result in an employer-employee relationship between the student and the school of institution.

(emphasis supplied).

249.    For the reasons set forth in Paragraphs 70 through 139, *supra*, at all relevant times, Defendants understood that NCAA sports are **not** "conducted primarily for the benefit of the participants as part of the educational opportunities provided to the students" as required to meet the criteria set forth in FOH § 10b03(e).

250.    The NCAA and Villanova admit student-run groups meet the criteria set forth in FOH § 10b03(e). *See Livers (Phillips) v. NCAA*: Answer (ECF 130), at ¶ 119 and 120.

251.    For reasons set forth in Paragraphs 242 through 246, *infra*, student-run groups are "conducted primarily for the benefit of the participants as part of the educational opportunities provided to the students." *See* FOH § 10b03(e).

252.    The NCAA and Villanova admit that student-run groups such as dramatics, publications, glee clubs, bands, choirs, debate and radio stations can be related or relevant to an academic degree program.  *See Livers (Phillips) v. NCAA*: Answer (ECF 130), at ¶ 106.

253.    The NCAA and Villanova admit that students in student-run groups can be solely or principally responsible for leadership, organization and decision-making and faculty involvement in student-run groups can be in an *advisory* capacity.  *Id.*, at ¶ 103.

-84-

254.    NCAA D1 member schools, like Villanova, characterize *student*-leadership, *student*-organizing, and *student*-decision-making in student-run groups as providing educational benefits to participants and also encourage and/or recognize the connection of some student-run groups to academic faculty advisors and/or academic departments. *See, e.g., Livers (Phillips) v. NCAA*: Villanova's Resp. to Pl.'s First Set of Reqs. for Admis. (Ex. F), at No. 6.

255.    In fact, NCAA D1 member schools describe *student*-leadership, *student*-organizing and *student*-decision-making in **student-run interscholastic Club Sports** as educational experiences distinctly different from NCAA sports.  For example (as posted October 28, 2017, and memorialized in *Livers v. NCAA* and Exhibit U attached hereto):

### Lafayette College

> Sports clubs at Lafayette are student-initiated and student-run organizations that depend on a membership. Members are fully involved in the club's leadership, decision-making, and organization. Each club has been founded and is governed by the executive board of that particular club.

> *See* Sports Clubs on Lafayette.edu at https://recreation.lafayette.edu/sportsclubs/.

> Varsity sports [*i.e.*, NCAA sports] are sponsored by the College and funded through the operating budget, NCAA funding, revenue generated through various events, and gifts from generous donors. Sports clubs are not sponsored by the college, but by Student Government in response to student interest and initiative.  The primary sources of funding for sports clubs are student activity fees (distributed at the discretion of Student Government), sport club member dues, fundraising activities, and gifts from generous donors.

> Unlike varsity sports, sport clubs are student-run organizations who decide for themselves their level of competitiveness, whether or not they will hire a coach or instructor, how often they will practice, and if they will continue to exist at all …. [Sport clubs] participate in competitions with clubs from other institutions (in many

www.StudentAthletePay.com

cases as a member of a specific league), and others enter a variety of weekend tournaments.

*See* Sport Clubs Frequently Asked Questions on Lafayette.edu at http://recreation.lafayette.edu/sport-clubs-faqs/.

### Lehigh University

[T]he intention is to offer club competition at the highest level and student commitment, including expanded practice and extramural competitions on a regular and formal basis within the club sport model ….

The primary differences between Club Sports and Varsity Intercollegiate Sports [*i.e.*, NCAA athletics] are the funding sources associated with participation and the wide range of commitment levels regarding time and competitiveness. At the intercollegiate level, the institution has made the commitment to sponsor the sport under NCAA and Patriot League Division I guidelines. A Club Sport is one that is initiated and must be sustained by student interest. The club is self-directed under the Club Sports guidelines with a combination of resources from student senate funds, dues and/or their own fundraising initiatives.

*See* Club Sports-Competitive Levels (Club Varsity) on LehighSports.com at http://www.lehighsports.com/sports/2013/6/3/GEN_0603134752.aspx?id=3.

### Seton Hall University

[Club sports] practice regularly and participate in extramural competition …. [but] should not be mistaken for [NCAA] sports that are also supported by the department.  In a club, the members assume the financial responsibilities and assist in organization. There are no athletic scholarships available for club sport participants.

*See* Club Sports on SHUPirates.com at http://www.shupirates.com/sports/2016/7/10/recreation-seha-club-sports-html.aspx.

Students in each club are responsible for the internal organization and conduct of their club …. **The management and organization of a club sport is an educational experience providing many challenges for students, such as: writing their constitution and by-laws, conducting club meetings, establishing dues to offset club expenditures,**

www.StudentAthletePay.com

> planning fund raising projects, coordinating
> practices, competition and special events,
> publicizing club events ....

*See* Club Sport Manual, at 1, on SHUPirates.com at
http://www.shupirates.com/documents/2016/7/14//club%20sport
%20manual%202011%20final.pdf?id=2336. (emphasis
supplied).

**Saint Joseph's University**

> Voluntarily organized by students, club sports exist for
> the purpose of furthering a common interest in a physical
> activity .... Students elect their own officers, draft their
> own constitution, request facility space, get approval for
> and make travel arrangements, schedule contests with
> other teams, develop contracts with officials, fundraise
> and manage their budget.

*See* Club Sports on SJU.edu at
https://sites.sju.edu/recreation/club-sports/.

(Another member school in the Defendant Class, Mount St. Mary's University, explains that,

"running a club sports team is a lot like running your own business." *See* Club Sports on

MSMary.edu at http://msmary.edu/student-life/recreation/club-sports/.)

256.  The NEW YORK TIMES similarly described **student-run, interscholastic**

**Club Sports** as educational experiences distinctly different from NCAA sports:

> In intercollegiate club sports, there are no athletic
> scholarships, no adoring crowds and minimal adult
> leadership.
>
> Institutional financing is meager and hard work
> abundant, with dozens of volunteer hours required from
> the athletes just to put on a single game or match.
>
> **It's college athletics without the pageantry or**
> **prerogative, and that's the way athletes in club**
> **sports like it.  They devise the practices, make**
> **the team rules, decide whom to play and when,**
> **raise the money for uniforms and game officials,**
> **schedule the hotel and travel arrangements and**
> **manage the paperwork.**

www.StudentAthletePay.com

"It's a ton of work, but we do it because we take ownership of our team," said David Gerstle, the player-coach of Yale's club water polo team, which like most club teams operates largely outside the purview of the university athletic department ….

*****

An estimated two million college students play competitive club sports compared with about 430,000 involved in athletics governed by the National Collegiate Athletic Association and the National Association of Intercollegiate Athletics.

The less restrictive nature of club teams has also been a magnet for the thriving nontraditional sports market …. [C]lub teams are competing for national championships in bass fishing, ballroom dancing and Brazilian martial arts.

Because of this independent and inclusive spirit, competitive club sports have emerged as an alternative to the semiprofessional, regulated, commercial environment of modern, elite college athletics ….

*****

The ability to balance one's academic, athletic and social life is an apparent draw to the club sports model. Chip Spear, a volunteer coach for the Yale water polo team, said that one of his players was a member of the Whiffenpoofs, Yale's celebrated a cappella group.

"He misses some practices for their engagements," said Spear, who played water polo at Yale when it was still a varsity sport. "The team works it out because all practices are not mandatory. I'm not sure how that would have worked on a varsity team." Students say they sometimes choose a club sport (like sailing) for cultural or lifestyle reasons or because it was not available in high school (like Ultimate Frisbee).

In either case, the students shape and influence the makeup and philosophy of the team, and tailor their commitment to it.

**College administrators said they put club sports in the same category as student development.**

Bill Pennington, "Rise of College Club Teams Creates a Whole New Level of Success,"

New York Times, Dec. 2, 2008. (emphasis supplied).

www.StudentAthletePay.com

257.    By contrast to student-run groups, in which NCAA D1 member schools characterize *student*-leadership, *student*-organizing, and *student*-decision-making as educational experiences and benefits for participants, **in Work Study and NCAA sports, full-time school staff *supervise* participants**, *i.e.*, full-time school staff are responsible for managerial leadership, organizing and decision-making.

258.    By contrast to student-run groups and for the reasons set forth in Paragraphs 69 through 138, and 249 through 256, *supra*, at all relevant times, Defendants understood that NCAA sports are **not** "conducted primarily for the benefit of the participants as part of the educational opportunities provided to the students." *See* FOH § 10b03(e).

259.    NCAA D1 member schools, like Villanova, publish student-run group directories on their websites, the hyperlinks to which are incorporated into Defendant NCAA Division I Websites | Student-Run Interscholastic Club Sports v. NCAA-Regulated Sports, attached hereto as Exhibit U.

260.    NCAA D1 member schools' student-run group directories track the list in FOH § 10b03(e), including dramatics, student publications, glee clubs, bands, choirs, debating teams, radio stations, intramurals and **interscholastic Club Sports**. *Id.*

261.    NCAA D1 member school's student-run group directories *expressly* exclude NCAA sports, and *expressly* distinguish **student-run interscholastic Club Sports** from NCAA sports. *Id.*

262.    NCAA D1 member schools' student-run group directories demonstrate that NCAA D1 member schools understood FOH § 10b03(e) to *only* apply to student-run groups *and **not** to NCAA sports. See, also*, Paragraph 250, *supra* (regarding Defendants' admission that student-run groups meet the criteria set forth in FOH § 10b03(e)).

**3.    At All Relevant Times, Defendants Understood That Student Athletes Meet Employee Criteria *More* Than Students Employed in Work Study**

263.    For reasons set forth in Paragraphs 47 through 176, *supra*, at all relevant times, Defendants understood that Student Athletes meet employee criteria ***more*** than students in Work Study, who Defendants classified and paid as employees.

## PLAINTIFFS' PROPOSED FLSA COLLECTIVE ACTION ALLEGATIONS

264.    Plaintiffs bring Count I (FLSA) of this suit pursuant to the FLSA, 29 U.S.C. § 216(b), as a collective action on behalf of themselves and the following similarly situated persons of the Proposed FLSA Collective, defined as:

> All individuals, in all NCAA sports and of both genders, who were identified on any NCAA Squad List maintained by Defendants pursuant to NCAA Division I Bylaws 12.10.2 and/or 15.5.11, at any time within the FLSA statute of limitations and through the date of final judgment (the "Proposed FLSA Collective Period").

265.    The Proposed FLSA Collective, the Proposed Pennsylvania Class, defined at Paragraph 275, *infra*, the Proposed New York Class, defined at Paragraph 306, *infra*, the Proposed Connecticut Class, defined at Paragraph 337, *infra*, the Proposed North Carolina Class, defined at Paragraph 368, *infra,* the Proposed Oregon Class, defined at Paragraph 399, *infra,* the Proposed Arizona Class, defined at Paragraph 492, *infra,* and the Proposed Indiana Class, defined at Paragraph 523, are collectively referred to as "Student Athletes."

266.    At all relevant times, Plaintiffs and the other members of the Proposed FLSA Collective were similarly-situated, had substantially similar job requirements, were not paid any compensation by Defendants under the same common policies, plans and practices, and were subject to Defendants' practice of willfully failing and refusing to pay them at the legally required minimum wage for all hours worked.

www.StudentAthletePay.com

267.    Indeed, Defendants admit that Plaintiffs and the Proposed FLSA Collective were/are similarly-situated:

(a) the NCAA and Villanova "admit that the NCAA bylaws apply to all athletes in NCAA sports on an equal basis, and that these bylaws address, among other subjects, recruitment, eligibility, hours of participation, duration of eligibility, and sanctions for noncompliance;" and

(b) the NCAA and Villanova "admit that NCAA bylaws apply to all member schools and are uniformly interpreted and applied to insure a 'level playing field' under threat of sanction for failure to comply."

*Livers (Phillips) v. NCAA*: Answer (ECF 130), at ¶¶ 28, 30 and 44.

268.    Members of the Proposed FLSA Collective on athletic scholarship and those members not on athletic scholarship, *i.e.*, "walk-ons," are also similarly situated because, *inter alia*, the NCAA and Villanova admit that there is "no principled distinction" between scholarship athletes and walk-ons:

The only "policies and practices" … which apply only to scholarship athletes are bylaws that set the number of scholarships schools may award, and that permit revocation of scholarships for misconduct (as opposed to revocation of athletic eligibility, which applies to scholarship athletes and walk-ons alike).

*Livers (Phillips) v. NCAA*: Defs.' Mem. in Supp. of Mot. to Dismiss Claim of Taurus Phillips (ECF 109-1), at 4-6.  (emphasis supplied).

269.    During the Proposed FLSA Collective Period, Defendants were fully aware of the duties performed by Plaintiffs and the other members of the Proposed FLSA Collective, and that those duties were not exempt from the minimum wage provisions of the FLSA.

270.    As a result of Defendants' conduct as alleged herein, Defendants violated the FLSA by not paying Plaintiffs and the other members of the Proposed FLSA Collective the prevailing minimum wage for all hours worked.

www.StudentAthletePay.com

271.     Defendants' violations of the FLSA were willful, repeated, knowing, intentional and without a good faith basis, and significantly damaged Plaintiffs and the other members of the Proposed FLSA Collective.

272.     As a result of the Defendants' conduct, the Defendants are liable to Plaintiffs and the other members of the Proposed FLSA Collective for the full amount of their unpaid minimum wages, plus an additional equal amount as liquidated damages, plus the attorneys' fees and costs incurred by Plaintiffs and the other members of the Proposed FLSA Collective.

273.     While the exact number of individuals within the Proposed FLSA Collective is unknown at the present time, upon information and belief, there are tens of thousands of persons similarly-situated to Plaintiffs who make up the putative Proposed FLSA Collective during the Proposed FLSA Collective Period.

274.     Pursuant to the Family Educational Rights and Privacy Act, 20 U.S.C. § 1232g ("FERPA"), a/k/a the Buckley Amendment, a student may require a school to not disclose certain "directory information" to third parties, including information necessary to send notice to the tens of thousands of persons similarly-situated to Plaintiffs who make up the putative Proposed FLSA Collective.  Accordingly, in order to ensure FERPA compliance, Defendants should be required to send court-approved notice to the other members of the Proposed FLSA Collective so that each has the opportunity to make an informed decision about whether to participate in this action.

**PLAINTIFFS' PROPOSED PMWA CLASS ACTION ALLEGATIONS**

I.    CLASS DEFINITION

275.    Plaintiffs Johnson, Cooke and Hamilton bring Counts II (PMWA) and III

(Unjust Enrichment) of this suit as a class action pursuant to Fed. R. Civ. P. 23 on behalf of

themselves and the following Proposed Pennsylvania Class, defined as:

> All individuals, in all NCAA sports and of both genders, who were identified on any NCAA Squad List maintained by Pennsylvania-based Defendants[21] and all other Division I schools in Pennsylvania pursuant to NCAA Division I Bylaws 12.10.2 and/or 15.5.11, at any time within the Pennsylvania unjust enrichment statute of limitations and through the date of final judgment (the "Proposed Pennsylvania Class Period").

276.    The unlawful conduct that the NCAA and the Pennsylvania-based

Defendants committed against Plaintiffs Johnson, Cooke, Hamilton and the other members

of the Proposed Pennsylvania Class, includes, but is not limited to:

- Failing to pay Plaintiffs Johnson, Cooke, Hamilton and the other members of the Proposed Pennsylvania Class the prevailing minimum wage under the PMWA;

- Receiving and benefiting from the uncompensated labors of Plaintiffs Johnson, Cooke, Hamilton and the other members of the Proposed Pennsylvania Class such that to retain said benefit without compensation would be inequitable and rise to the level of unjust enrichment;

- Devising and implementing a plan to increase the NCAA's and the Pennsylvania-based Defendants' earnings and profits by fostering a scheme of securing work from Plaintiffs Johnson, Cooke, Hamilton and the other members of the Proposed Pennsylvania Class without properly paying them any compensation;

- Inducing Plaintiffs Johnson, Cooke, Hamilton and the other members of the Proposed Pennsylvania Class to perform work while failing to properly compensate them for all hours worked as required by law;

---

[21]    The Pennsylvania-based Defendants are: Drexel University, Lafayette College, Villanova and University of Pennsylvania.

- Reducing overhead with respect to their labor costs, and therefore realizing additional earnings and profits to their own benefit and to the detriment of Plaintiffs Johnson, Cooke, Hamilton and the other members of the Proposed Pennsylvania Class, by securing the work and efforts of Plaintiff and the members of the Proposed Pennsylvania Class without proper compensation as required by law; and

- Retaining and continuing to retain such benefits contrary to the fundamental principles of justice, equity, and good conscience.

277.   Plaintiffs Johnson, Cooke and Hamilton and the other members of the Proposed Pennsylvania Class have standing to seek the relief sought herein because of the adverse effects that the NCAA's and the Pennsylvania-based Defendants' unlawful patterns, practices and/or policies have had on them individually and generally.

278.   The patterns, practices and/or policies described in this Complaint demonstrate that the NCAA and the Pennsylvania-based Defendants' violations of the PMWA and Pennsylvania common law are not sporadic or unusual; rather, these violations are part and parcel to their standard operating patterns, practices and/or policies.

## II.   NUMEROSITY AND IMPRACTICALITY OF JOINDER

279.   The members of the Proposed Pennsylvania Class are sufficiently numerous to make joinder of their claims impracticable.  While the exact number of Proposed Pennsylvania Class members is unknown because such information is in the exclusive control of the NCAA and the Pennsylvania-based Defendants, upon information and belief there are thousands of current and former Student Athletes who have been the victim of the NCAA's and the Pennsylvania-based Defendants' violations of the PMWA and Pennsylvania common law.

280.   Case in point, upon information and belief, there are currently more than 2,920 Student Athletes at the four Pennsylvania-based Defendants within the four year

statute of limitations for unjust enrichment under Pennsylvania state law.[22]  Because the Proposed Pennsylvania Class also includes Student Athlete alumnae of the NCAA and such Defendants, who graduated within the last four years, the Proposed Pennsylvania Class could total more than 5,840 current and alumnae Student Athletes at the time of filing.

281.    For each year of pendency, another 730 Student Athletes, or more, could be added to the Proposed Pennsylvania Class.

282.    Although precise determination of the number of Proposed Pennsylvania Class members is impossible at this time, it is significant and satisfies the numerosity requirement of FRCP 23(a).

## III.    COMMON QUESTIONS OF LAW AND FACT

283.    The claims alleged on behalf of Plaintiffs Johnson, Cooke, Hamilton and the other members of the Proposed Pennsylvania Class raise questions of law and fact common to all the members of the Proposed Pennsylvania Class, including Plaintiffs Johnson, Cooke and Hamilton. Chief among these questions are as follows:

- Whether the NCAA and the Pennsylvania-based Defendants Failed to pay Plaintiffs Johnson, Cooke, Hamilton and the other members of the Proposed Pennsylvania Class the prevailing minimum wage under the PMWA;
- Whether the NCAA and the Pennsylvania-based Defendants received and benefitted from the uncompensated labors of Plaintiffs Johnson, Cooke, Hamilton and the other members of the Proposed Pennsylvania Class such that to retain said benefit without compensation would be inequitable and rise to the level of unjust enrichment;
- Whether the NCAA and the Pennsylvania-based Defendants devised and implemented a plan to increase

---

[22]    *See, e.g.*, statistics reported under Student Life/Sports on www.CollegeFactual.com (last visited October 14, 2019, as all hyperlinks referenced herein if not otherwise indicated) for Drexel University, Lafayette College, University of Pennsylvania and Villanova.

Defendants' earnings and profits by fostering a scheme of securing work from Plaintiffs Johnson, Cooke, Hamilton and the other members of the Proposed Pennsylvania Class without properly paying them any compensation;

- Whether the NCAA and the Pennsylvania-based Defendants induced Plaintiffs Johnson, Cooke, Hamilton and the other members of the Proposed Pennsylvania Class to perform work while failing to properly compensate them for all hours worked as required by law;

- Whether the NCAA and the Pennsylvania-based Defendants reduced overhead with respect to their labor costs, and therefore realized additional earnings and profits to their own benefit and to the detriment of Plaintiffs Johnson, Cooke, Hamilton and the other members of the Proposed Pennsylvania Class by securing the work and efforts of Plaintiff and the members of the Proposed Pennsylvania Class without proper compensation as required by law; and

- Whether the NCAA and the Pennsylvania-based Defendants retained and continue to retain such benefits contrary to the fundamental principles of justice, equity and good conscience.

284.    Thus, the commonality requirement of FRCP 23(a) is satisfied.

## IV.    TYPICALITY OF CLAIMS AND RELIEF SOUGHT

285.    Plaintiffs Johnson, **C**ooke and Hamilton are members of the Proposed Pennsylvania Class they seek to represent.

286.    The claims of Plaintiffs Johnson, Cooke and Hamilton are typical of claims of the Proposed Pennsylvania Class in that they all arise from the same unlawful patterns, practices and/or policies of the NCAA and the Pennsylvania-based Defendants and are based on the legal theory that these patterns, practices and/or policies violate legal rights protected by state law.

287.    Plaintiffs Johnson, Cooke, Hamilton and the other members of the Proposed Pennsylvania Class all allege that they each were the victim of violations of the PMWA and

www.StudentAthletePay.com

Pennsylvania common law, including a failure to pay the prevailing minimum wage and unjust enrichment.

288.    The relief that Plaintiffs Johnson, Cooke and Hamilton seek for the NCAA's and the Pennsylvania-based Defendants' unlawful patterns, practices and/or policies is typical of the relief which is sought on behalf of the Proposed Pennsylvania Class.

289.    Thus, the typicality requirement of FRCP 23(a) is satisfied.

V.    **ADEQUACY OF REPRESENTATION**

290.    The interests of Plaintiffs Johnson, Cooke and Hamilton are co-extensive with those of the Proposed Pennsylvania Class they seek to represent in the instant case.

291.    Plaintiffs Johnson, Cooke and Hamilton are willing and able to represent the Proposed Pennsylvania Class fairly and vigorously as they pursue their similar individual claims.

292.    Plaintiffs Johnson, Cooke and Hamilton have retained counsel who are qualified and experienced in employment and wage and hour class action litigation and who are subject matter experts with respect to Defendants' operations.  Plaintiffs' counsel are able to meet the time and fiscal demands necessary to litigate a class action of this size and complexity.

293.    The combined interests, experience and resources of Plaintiffs Johnson, Cooke and Hamilton and their counsel to competently litigate the individual and class claims at issue in the instant case satisfy the adequacy of representation requirement of FRCP 23(a).

www.StudentAthletePay.com

## VI.   REQUIREMENTS OF RULE 23(b)

### A.   Rule 23(b)(1)

294.   Without class certification, the same evidence and issues would be subject to re-litigation in a multitude of individual lawsuits with an attendant risk of inconsistent adjudications and conflicting obligations.

295.   Specifically, all evidence of the NCAA's and the Pennsylvania-based Defendants' patterns, practices and/or policies, and the issue of whether they are in violation of state law, would be exchanged and litigated repeatedly.

296.   Accordingly, certification of the Proposed Pennsylvania Class is the most efficient and judicious means of presenting the evidence and arguments necessary to resolve such questions for Plaintiffs Johnson, Cooke, Hamilton and the other members of the Proposed Pennsylvania Class, the NCAA and the Pennsylvania-based Defendants.

297.   By filing this action, Plaintiffs Johnson, Cooke and Hamilton are preserving the rights of the other members of the Proposed Pennsylvania Class with respect to the statute of limitations on their claims.  Therefore, not certifying a class would substantially impair and/or impede the other members' ability to protect their interests.

### B.   Rule 23(b)(2)

298.   The NCAA and the Pennsylvania-based Defendants have acted on grounds, described herein, generally applicable to Plaintiffs Johnson, Cooke, Hamilton and the other members of the Proposed Pennsylvania Class, by adopting and following systemic patterns, practices and/or policies that violate the rights provided to Plaintiffs Johnson, Cooke, Hamilton and the other members of the Proposed Pennsylvania Class under the PMWA and Pennsylvania common law.

www.StudentAthletePay.com

299.    These unlawful acts are fostered by the NCAA and the Pennsylvania-based Defendants' standard patterns, practices and/or policies, are not sporadic or isolated and support the request for final injunctive and declaratory relief with respect to Plaintiffs Johnson, Cooke, Hamilton and the Proposed Pennsylvania Class as a whole.

300.    Declaratory and injunctive relief are the factual and legal predicates for Plaintiffs Johnson, Cooke, Hamilton and the other members of the NCAA and the Proposed Pennsylvania Class' entitlement to monetary and non-monetary remedies for individual losses caused by, and exemplary purposes necessitated by, such systemic wage and hour and common law violations.

301.    Accordingly, injunctive and declaratory relief are among the predominant forms of relief sought in this case.

### C.    Rule 23(b)(3)

302.    The common issues of fact and law affecting Plaintiffs Johnson, Cooke and Hamilton's claims and those of the other members of the Proposed Pennsylvania Class, including, but not limited to, the common issues identified in the Paragraphs above, predominate over issues affecting only individual claims.

303.    A class action is superior to other available means for the fair and efficient adjudication of Plaintiffs Johnson, Cooke, and Hamilton's claims and the claims of the other members of the Proposed Pennsylvania Class.

304.    The cost of proving the NCAA's and the Pennsylvania-based Defendants' pattern and practice of violating the PMWA and Pennsylvania common law makes it impracticable for the members of the Proposed Pennsylvania Class to pursue their claims individually.

305.    The class action will not be difficult to manage given the discrete and ubiquitous violations of the PMWA and common law at issue.

www.StudentAthletePay.com

## PLAINTIFFS' PROPOSED NYLL CLASS ACTION ALLEGATIONS

### I.   CLASS DEFINITION

306.   Plaintiffs Kerkeles, Labella, Willebeek-Lemair and Walsh bring Counts IV

(Failure to Pay the Minimum Wage under NYLL), V (Failure to Pay All Wages under the

NYLL) and VI (New York Unjust Enrichment) of this suit as a class action pursuant to Fed.

R. Civ. P. 23 on behalf of themselves and the following Proposed New York Class, defined as:

> All individuals, in all NCAA sports and of both genders,
> who were identified on any NCAA Squad List maintained
> by New York-based Defendants[23] and all other Division I
> schools in New York pursuant to NCAA Division I Bylaws
> 12.10.2 and/or 15.5.11, at any time within the New York
> unjust enrichment statute of limitations and through the
> date of final judgment (the "Proposed New York Class
> Period").

307.   The unlawful conduct that the NCAA and the New York-based Defendants

committed against Plaintiffs Kerkeles, Labella, Willebeek-Lemair, Walsh and the other

members of the Proposed New York Class, includes, but is not limited to:

- Failing to pay Plaintiffs Kerkeles, Labella, Willebeek-Lemair, Walsh and the other members of the Proposed New York Class the prevailing minimum wage under the NYLL;

- Receiving and benefiting from the uncompensated labors of Plaintiffs Kerkeles, Labella, Willebeek-Lemair, Walsh and the other members of the Proposed New York Class such that to retain said benefit without compensation would be inequitable and rise to the level of unjust enrichment;

- Devising and implementing a plan to increase the NCAA's and the New York-based Defendants' earnings and profits by fostering a scheme of securing work from Plaintiffs Kerkeles, Labella, Willebeek-Lemair, Walsh and the other members of the Proposed New York Class without properly paying them any compensation;

---

[23]   The New York-based Defendants are: Cornell University, Fordham University and Marist College.

www.StudentAthletePay.com

- Inducing Plaintiffs Kerkeles, Labella, Willebeek-Lemair, Walsh and the other members of the Proposed New York Class to perform work while failing to properly compensate them for all hours worked as required by law;

- Reducing overhead with respect to their labor costs, and therefore realizing additional earnings and profits to their own benefit and to the detriment of Plaintiffs Kerkeles, Labella, Willebeek-Lemair, Walsh and the other members of the Proposed New York Class, by securing the work and efforts of Plaintiffs Kerkeles, Labella, Willebeek-Lemair, Walsh and the other members of the Proposed New York Class without proper compensation as required by law; and

- Retaining and continuing to retain such benefits contrary to the fundamental principles of justice, equity, and good conscience.

308.    Plaintiffs Kerkeles, Labella, Willebeek-Lemair, Walsh and the other members of the Proposed New York Class have standing to seek the relief sought herein because of the adverse effects that the NCAA's and the New York-based Defendants' unlawful patterns, practices and/or policies have had on them individually and generally.

309.    The patterns, practices and/or policies described in this Complaint demonstrate that the NCAA's and the New York-based Defendants' violations of the NYLL and/or New York common law are not sporadic or unusual; rather, these violations are part and parcel to their standard operating patterns, practices and/or policies.

## II.    NUMEROSITY AND IMPRACTICALITY OF JOINDER

310.    The members of the Proposed New York Class are sufficiently numerous to make joinder of their claims impracticable.  While the exact number of Proposed New York Class members is unknown because such information is in the exclusive control of the NCAA and the New York-based Defendants, upon information and belief there are thousands of current and former Student Athletes who have been victims of the NCAA's and the New York-based Defendants' violations of the NYLL and New York common law.

-101-

311.    Case in point, upon information and belief, there are currently approximately 2,750 Student Athletes at the three New York-based Defendants within the six year statute of limitations for violations of the NYLL and for unjust enrichment under New York state law.[24]  Because the Proposed New York Class also includes Student Athlete alumnae of such Defendants, who graduated within the last six years, the Proposed New York Class could total more than 6,800 current and alumnae Student Athletes at the time of filing.

312.    For each year of pendency, another 680 Student Athletes, or more, could be added to the Proposed New York Class.

313.    Although precise determination of the number of Proposed New York Class members is impossible at this time, it is significant and satisfies the numerosity requirement of FRCP 23(a).

III.    COMMON QUESTIONS OF LAW AND FACT

314.    The claims alleged on behalf of Plaintiffs Kerkeles, Labella, Willebeek-Lemair, Walsh and the other members of the Proposed New York Class raise questions of law and fact common to all the members of the Proposed New York Class, including Plaintiffs Kerkeles, Labella and Willebeek-Lemair. Chief among these questions are as follows:

- Whether the NCAA and the New York-based Defendants Failed to pay Plaintiffs Kerkeles, Labella, Willebeek-Lemair, Walsh and the other members of the Proposed New York Class the prevailing minimum wage under the NYLL;
- Whether the NCAA and the New York-based Defendants received and benefitted from the uncompensated labors of Plaintiffs Kerkeles, Labella, Willebeek-Lemair, Walsh and the other members of the Proposed New York Class such that to retain said

___

[24]   *See, e.g.*, statistics reported under Student Life/Sports on www.CollegeFactual.com (last visited November 13, 2019, as all hyperlinks referenced herein if not otherwise indicated) for Cornell University, Fordham University and Marist College.

benefit without compensation would be inequitable and rise to the level of unjust enrichment;

- Whether the NCAA and the New York-based Defendants devised and implemented a plan to increase Defendants' earnings and profits by fostering a scheme of securing work from Plaintiffs Kerkeles, Labella, Willebeek-Lemair, Walsh and the other members of the Proposed New York Class without properly paying them any compensation;

- Whether the NCAA and the New York-based Defendants induced Plaintiffs Kerkeles, Labella, Willebeek-Lemair, Walsh and the other members of the Proposed New York Class to perform work while failing to properly compensate them for all hours worked as required by law;

- Whether the NCAA and the New York-based Defendants reduced overhead with respect to their labor costs, and therefore realized additional earnings and profits to their own benefit and to the detriment of Plaintiffs Kerkeles, Labella, Willebeek-Lemair, Walsh and the other members of the Proposed New York Class by securing the work and efforts of Plaintiffs Kerkeles, Labella, Willebeek-Lemair, Walsh and the other members of the Proposed New York Class without proper compensation as required by law; and

- Whether the NCAA and the New York-based Defendants retained and continue to retain such benefits contrary to the fundamental principles of justice, equity and good conscience.

315.    Thus, the commonality requirement of FRCP 23(a) is satisfied.

## IV.    TYPICALITY OF CLAIMS AND RELIEF SOUGHT

316.    Plaintiffs Kerkeles, Labella, Willebeek-Lemair and Walsh are members of the Proposed New York Class they seek to represent.

317.    The claims of Plaintiffs Kerkeles, Labella, Willebeek-Lemair and Walsh are typical of the claims of the Proposed New York Class in that they all arise from the same unlawful patterns, practices and/or policies of the NCAA and the New York-based

Defendants and are based on the legal theory that these patterns, practices and/or policies violate legal rights protected by state law.

318.    Plaintiffs Kerkeles, Labella, Willebeek-Lemair, Walsh and the other members of the Proposed New York Class all allege that they each were the victim of violations of the NYLL and New York common law, including a failure to pay the prevailing minimum wage and unjust enrichment.

319.    The relief that Plaintiffs Kerkeles, Labella, Willebeek-Lemair and Walsh seek for the NCAA's and the New York-based Defendants' unlawful patterns, practices and/or policies is typical of the relief which is sought on behalf of the Proposed New York Class.

320.    Thus, the typicality requirement of FRCP 23(a) is satisfied.

## V.    ADEQUACY OF REPRESENTATION

321.    The interests of Plaintiffs Kerkeles, Labella, Willebeek-Lemair and Walsh are co-extensive with those of the Proposed New York Class they seek to represent in the instant case.

322.    Plaintiffs Kerkeles, Labella, Willebeek-Lemair and Walsh are willing and able to represent the Proposed New York Class fairly and vigorously as they pursue their similar individual claims.

323.    Plaintiffs Kerkeles, Labella, Willebeek-Lemair and Walsh have retained counsel who are qualified and experienced in employment and wage and hour class action litigation and who are subject matter experts with respect to Defendants' operations. Plaintiffs' counsel are able to meet the time and fiscal demands necessary to litigate a class action of this size and complexity.

www.StudentAthletePay.com

324.    The combined interests, experience and resources of Plaintiffs Kerkeles, Labella, Willebeek-Lemair and Walsh and their counsel to competently litigate the individual and class claims at issue in the instant case satisfy the adequacy of representation requirement of FRCP 23(a).

## VI.    REQUIREMENTS OF RULE 23(b)

### A.    Rule 23(b)(1)

325.    Without class certification, the same evidence and issues would be subject to re-litigation in a multitude of individual lawsuits with an attendant risk of inconsistent adjudications and conflicting obligations.

326.    Specifically, all evidence of the NCAA's and the New York-based Defendants' patterns, practices and/or policies, and the issue of whether they are in violation of state law, would be exchanged and litigated repeatedly.

327.    Accordingly, certification of the Proposed New York Class is the most efficient and judicious means of presenting the evidence and arguments necessary to resolve such questions for Plaintiffs Kerkeles, Labella, Willebeek-Lemair, Walsh, the other members of the Proposed New York Class, the NCAA and the New York-based Defendants.

328.    By filing this action, Plaintiffs Kerkeles, Labella, Willebeek-Lemair and Walsh are preserving the rights of the other members of the Proposed New York Class with respect to the statute of limitations on their claims.  Therefore, not certifying a class would substantially impair and/or impede the other members' ability to protect their interests.

### B.    Rule 23(b)(2)

329.    The NCAA and the New York-based Defendants have acted on grounds, described herein, generally applicable to Plaintiffs Kerkeles, Labella, Willebeek-Lemair, Walsh and the other members of the Proposed New York Class, by adopting and following

-105-

systemic patterns, practices and/or policies that violate the rights provided to Plaintiffs Kerkeles, Labella, Willebeek-Lemair, Walsh and the other members of the Proposed New York Class under the NYLL and New York common law.

330.   These unlawful acts are fostered by the NCAA and the New York-based Defendants' standard patterns, practices and/or policies, are not sporadic or isolated and support the request for final injunctive and declaratory relief with respect to Plaintiffs Kerkeles, Labella, Willebeek-Lemair, Walsh and the Proposed New York Class as a whole.

331.   Declaratory and injunctive relief are the factual and legal predicates for Plaintiffs Kerkeles, Labella, Willebeek-Lemair, Walsh and other the members of the Proposed New York Class' entitlement to monetary and non-monetary remedies for individual losses caused by, and exemplary purposes necessitated by, such systemic wage and hour and common law violations.

332.   Accordingly, injunctive and declaratory relief are among the predominant forms of relief sought in this case.

C.   **Rule 23(b)(3)**

333.   The common issues of fact and law affecting Plaintiffs Kerkeles, Labella, Willebeek-Lemair and Walsh's claims and those of the other members of the Proposed New York Class, including, but not limited to, the common issues identified in the Paragraphs above, predominate over issues affecting only individual claims.

334.   A class action is superior to other available means for the fair and efficient adjudication of Plaintiffs Kerkeles, Labella, Willebeek-Lemair and Walsh's claims and the claims of the other members of the Proposed New York Class.

335.   The cost of proving the NCAA's and the New York-based Defendants' pattern and practice of violating the NYLL and New York common law makes it impracticable for the members of the Proposed New York Class to pursue their claims individually.

www.StudentAthletePay.com

336.    The class action will not be difficult to manage given the discrete and

ubiquitous violations of the NYLL and common law at issue.

## PLAINTIFFS' PROPOSED CMWA CLASS ACTION ALLEGATIONS

**I.    CLASS DEFINITION**

337.    Plaintiff Ruiz brings Counts VII (CMWA) and VIII (Unjust Enrichment) of

this suit as a class action pursuant to Fed. R. Civ. P. 23 on behalf of herself and the

following Proposed Connecticut Class, defined as:

> All individuals, in all NCAA sports and of both genders,
> who were identified on any NCAA Squad List maintained
> by Connecticut-based Defendant[25] and all other Division I
> schools in Connecticut pursuant to NCAA Division I
> Bylaws 12.10.2 and/or 15.5.11, at any time within the
> Connecticut unjust enrichment statute of limitations and
> through the date of final judgment (the "Proposed
> Connecticut Class Period").

338.    The unlawful conduct that the NCAA and the Connecticut-based Defendant

committed against Plaintiff Ruiz and the other members of the Proposed Connecticut Class,

includes, but is not limited to:

- Failing to pay Plaintiff Ruiz and the other members of
  the Proposed Connecticut Class the prevailing minimum
  wage under the PMWA;

- Receiving and benefiting from the uncompensated labors
  of Plaintiff Ruiz and the other members of the Proposed
  Connecticut Class such that to retain said benefit without
  compensation would be inequitable and rise to the level of
  unjust enrichment;

- Devising and implementing a plan to increase the
  NCAA's and the Connecticut-based Defendant's earnings
  and profits by fostering a scheme of securing work from
  Plaintiff Ruiz and the other members of the Proposed
  Connecticut Class without properly paying them any
  compensation;

---

[25]    The Connecticut-based Defendant is: Sacred Heart University.

www.StudentAthletePay.com

- Inducing Plaintiff Ruiz and the other members of the Proposed Connecticut Class to perform work while failing to properly compensate them for all hours worked as required by law;

- Reducing overhead with respect to their labor costs, and therefore realizing additional earnings and profits to their own benefit and to the detriment of Plaintiff Ruiz and the other members of the Proposed Connecticut Class, by securing the work and efforts of Plaintiff and the members of the Proposed Connecticut Class without proper compensation as required by law; and

- Retaining and continuing to retain such benefits contrary to the fundamental principles of justice, equity, and good conscience.

339.    Plaintiff Ruiz and the other members of the Proposed Connecticut Class have standing to seek the relief sought herein because of the adverse effects that the NCAA's and the Connecticut-based Defendant's unlawful patterns, practices and/or policies have had on them individually and generally.

340.    The patterns, practices and/or policies described in this Complaint demonstrate that the NCAA's and the Connecticut-based Defendant's violations of the CMWA and Connecticut common law are not sporadic or unusual; rather, these violations are part and parcel to their standard operating patterns, practices and/or policies.

## II.    NUMEROSITY AND IMPRACTICALITY OF JOINDER

341.    The members of the Proposed Connecticut Class are sufficiently numerous to make joinder of their claims impracticable.  While the exact number of Proposed Connecticut Class members is unknown because such information is in the exclusive control of the NCAA and the Connecticut-based Defendants, upon information and belief there are thousands of current and former Student Athletes who have been the victim of the NCAA's and the Connecticut-based Defendant's violations of the CMWA and Connecticut common law.

www.StudentAthletePay.com

342. Case in point, upon information and belief, there are currently more than 940 Student Athletes at the Connecticut-based Defendant within the six year statute of limitations for unjust enrichment under Connecticut state law.[26]  Because the Proposed Connecticut Class also includes Student Athlete alumnae of such Defendants, who graduated within the last six years, the Proposed Connecticut Class could total more than 2,350 current and alumnae Student Athletes at the time of filing.

343. For each year of pendency, another 235 Student Athletes, or more, could be added to the Proposed Connecticut Class.

344. Although precise determination of the number of Proposed Connecticut Class members is impossible at this time, it is significant and satisfies the numerosity requirement of FRCP 23(a).

III.   COMMON QUESTIONS OF LAW AND FACT

345. The claims alleged on behalf of Plaintiff Ruiz and the members of the Proposed Connecticut Class raise questions of law and fact common to all the members of the Proposed Connecticut Class, including Plaintiff Ruiz. Chief among these questions are as follows:

- Whether the NCAA and the Connecticut-based Defendant failed to pay Plaintiff Ruiz and the other members of the Proposed Connecticut Class the prevailing minimum wage under the CMWA;

- Whether the NCAA and the Connecticut-based Defendant received and benefitted from the uncompensated labors of Plaintiff Ruiz and the other members of the Proposed Connecticut Class such that to retain said benefit without compensation would be inequitable and rise to the level of unjust enrichment;

- Whether the NCAA and the Connecticut-based Defendant devised and implemented a plan to increase Defendants' earnings and profits by fostering a scheme of

---

[26]  *See, e.g.*, statistics reported under Student Life/Sports on www.CollegeFactual.com (last visited October 14, 2019, as all hyperlinks referenced herein if not otherwise indicated).

www.StudentAthletePay.com

securing work from Plaintiff Ruiz and the other members of the Proposed Connecticut Class without properly paying them any compensation;

• Whether the NCAA and the Connecticut-based Defendant induced Plaintiff Ruiz and the other members of the Proposed Connecticut Class to perform work while failing to properly compensate them for all hours worked as required by law;

• Whether the NCAA and the Connecticut-based Defendant reduced overhead with respect to their labor costs, and therefore realized additional earnings and profits to their own benefit and to the detriment of Plaintiff Ruiz and the other members of the Proposed Connecticut Class by securing the work and efforts of Plaintiff and the members of the Proposed Connecticut Class without proper compensation as required by law; and

• Whether the NCAA and the Connecticut-based Defendant retained and continue to retain such benefits contrary to the fundamental principles of justice, equity and good conscience.

346.    Thus, the commonality requirement of FRCP 23(a) is satisfied.

## IV.   TYPICALITY OF CLAIMS AND RELIEF SOUGHT

347.    Plaintiff Ruiz is a member of the Proposed Connecticut Class she seeks to represent.

348.    Plaintiff Ruiz's claims of are typical of claims of the Proposed Connecticut Class in that they all arise from the same unlawful patterns, practices and/or policies of the NCAA and the Connecticut-based Defendant and are based on the legal theory that these patterns, practices and/or policies violate legal rights protected by state law.

349.    Plaintiff Ruiz and the members of the Proposed Connecticut Class all allege that they each were the victim of violations of the CMWA and Connecticut common law, including a failure to pay the prevailing minimum wage and unjust enrichment.

350.    The relief that Plaintiff Ruiz seeks for the NCAA's and the Connecticut-based Defendant's unlawful patterns, practices and/or policies is typical of the relief which is sought on behalf of the Proposed Connecticut Class.

351.    Thus, the typicality requirement of FRCP 23(a) is satisfied.

## V.    ADEQUACY OF REPRESENTATION

352.    Plaintiff Ruiz's interests are co-extensive with those of the Proposed Connecticut Class she seeks to represent in the instant case.

353.    Plaintiff Ruiz is willing and able to represent the Proposed Connecticut Class fairly and vigorously as she pursues her similar individual claims.

354.    Plaintiff Ruiz has retained counsel who are qualified and experienced in employment and wage and hour class action litigation and who are subject matter experts with respect to Defendant's operations.  Plaintiffs' counsel are able to meet the time and fiscal demands necessary to litigate a class action of this size and complexity.

355.    The combined interests, experience and resources of Plaintiff Ruiz and her counsel to competently litigate the individual and class claims at issue in the instant case satisfy the adequacy of representation requirement of FRCP 23(a).

## VI.   REQUIREMENTS OF RULE 23(b)

### A.    Rule 23(b)(1)

356.    Without class certification, the same evidence and issues would be subject to re-litigation in a multitude of individual lawsuits with an attendant risk of inconsistent adjudications and conflicting obligations.

357.    Specifically, all evidence of the NCAA and the Connecticut-based Defendant's patterns, practices and/or policies, and the issue of whether they are in violation of state law, would be exchanged and litigated repeatedly.

358.    Accordingly, certification of the Proposed Connecticut Class is the most efficient and judicious means of presenting the evidence and arguments necessary to resolve such questions for Plaintiff Ruiz, the other members of the Proposed Connecticut Class, the NCAA and the Connecticut-based Defendant.

359.    By filing this action, Plaintiff Ruiz is preserving the rights of the other members of the Proposed Connecticut Class with respect to the statute of limitations on their claims.  Therefore, not certifying a class would substantially impair and/or impede the other members' ability to protect their interests.

### B.    Rule 23(b)(2)

360.    The NCAA and the Connecticut-based Defendant has acted on grounds, described herein, generally applicable to Plaintiff Ruiz and the members of the Proposed Connecticut Class, by adopting and following systemic patterns, practices and/or policies that violate the rights provided to Plaintiff Ruiz and the other members of the Proposed Connecticut Class under the CMWA and Connecticut common law.

361.    These unlawful acts are fostered by the NCAA and the Connecticut-based Defendant's standard patterns, practices and/or policies, are not sporadic or isolated and support the request for final injunctive and declaratory relief with respect to Plaintiff Ruiz and the Proposed Connecticut Class as a whole.

362.    Declaratory and injunctive relief are the factual and legal predicates for Plaintiff Ruiz and the members of the Proposed Connecticut Class' entitlement to monetary and non-monetary remedies for individual losses caused by, and exemplary purposes necessitated by, such systemic wage and hour and common law violations.

363.    Accordingly, injunctive and declaratory relief are among the predominant forms of relief sought in this case.

www.StudentAthletePay.com

**C.** **Rule 23(b)(3)**

364.    The common issues of fact and law affecting Plaintiff Ruiz's claims and those of the other members of the Proposed Connecticut Class, including, but not limited to, the common issues identified in the Paragraphs above, predominate over issues affecting only individual claims.

365.    A class action is superior to other available means for the fair and efficient adjudication of Plaintiff Ruiz's claims and the claims of the members of the Proposed Connecticut Class.

366.    The cost of proving the NCAA and the Connecticut-based Defendant's pattern and practice of violating the CMWA and Connecticut common law makes it impracticable for the members of the Proposed Connecticut Class to pursue their claims individually.

367.    The class action will not be difficult to manage given the discrete and ubiquitous violations of the CMWA and common law at issue.

### PLAINTIFFS' PROPOSED NCWHA CLASS ACTION ALLEGATIONS

**I.**    **CLASS DEFINITION**

368.    Plaintiff Suarez brings Counts IX (NCWHA) and X (Unjust Enrichment) of this suit as a class action pursuant to Fed. R. Civ. P. 23 on behalf of himself and the following Proposed North Carolina Class, defined as:

> All individuals, in all NCAA sports and of both genders, who were identified on any NCAA Squad List maintained by North Carolina-based Defendant[27] and all other Division I schools in North Carolina pursuant to NCAA Division I Bylaws 12.10.2 and/or 15.5.11, at any time within the North Carolina unjust enrichment statute of limitations and through the date of final judgment (the "Proposed North Carolina Class Period").

---

[27]    The North Carolina-based Defendant is: Duke University.

www.StudentAthletePay.com

369.    The unlawful conduct that the NCAA and the North Carolina-based Defendant committed against Plaintiff Suarez and the other members of the Proposed North Carolina Class, includes, but is not limited to:

- Failing to pay Plaintiff Suarez and the other members of the Proposed North Carolina Class the prevailing minimum wage under the NCWHA;

- Receiving and benefiting from the uncompensated labors of Plaintiff Suarez and the other members of the Proposed North Carolina Class such that to retain said benefit without compensation would be inequitable and rise to the level of unjust enrichment;

- Devising and implementing a plan to increase the NCAA's and the North Carolina-based Defendant's earnings and profits by fostering a scheme of securing work from Plaintiff Suarez and the other members of the Proposed North Carolina Class without properly paying them any compensation;

- Inducing Plaintiff Suarez and the other members of the Proposed North Carolina Class to perform work while failing to properly compensate them for all hours worked as required by law;

- Reducing overhead with respect to their labor costs, and therefore realizing additional earnings and profits to their own benefit and to the detriment of Plaintiff Suarez and the other members of the Proposed North Carolina Class, by securing the work and efforts of Plaintiff and the members of the Proposed North Carolina Class without proper compensation as required by law; and

- Retaining and continuing to retain such benefits contrary to the fundamental principles of justice, equity, and good conscience.

370.    Plaintiff Suarez and the other members of the Proposed North Carolina Class have standing to seek the relief sought herein because of the adverse effects that the NCAA's and the North Carolina-based Defendant's unlawful patterns, practices and/or policies have had on them individually and generally.

371.    The patterns, practices and/or policies described in this Complaint demonstrate that the NCAA's and the North Carolina-based Defendant's violations of the

-114-

NCWHA and North Carolina common law are not sporadic or unusual; rather, these violations are part and parcel to their standard operating patterns, practices and/or policies.

## II.   NUMEROSITY AND IMPRACTICALITY OF JOINDER

372.   The members of the Proposed North Carolina Class are sufficiently numerous to make joinder of their claims impracticable.  While the exact number of Proposed North Carolina Class members is unknown because such information is in the exclusive control of the NCAA and the North Carolina-based Defendant, upon information and belief there are thousands of current and former Student Athletes who have been the victim of the NCAA's and the North Carolina-based Defendant's violations of the CMWA and North Carolina common law.

373.   Case in point, upon information and belief, there are currently more than 650 Student Athletes at the North Carolina-based Defendant within the three year statute of limitations for unjust enrichment under North Carolina state law.[28]  Because the Proposed North Carolina Class also includes Student Athlete alumnae of such Defendant, who graduated within the last three years, the Proposed North Carolina Class could total more than 1,130 current and alumnae Student Athletes at the time of filing.

374.   For each year of pendency, another 160 Student Athletes, or more, could be added to the Proposed North Carolina Class.

375.   Although precise determination of the number of Proposed North Carolina Class members is impossible at this time, it is significant and satisfies the numerosity requirement of FRCP 23(a).

---

[28]   *See, e.g.*, statistics reported under Student Life/Sports on www.CollegeFactual.com (last visited August 27, 2021) as all hyperlinks referenced herein if not otherwise indicated).

www.StudentAthletePay.com

III.     COMMON QUESTIONS OF LAW AND FACT

376.     The claims alleged on behalf of Plaintiff Suarez and the members of the

Proposed North Carolina Class raise questions of law and fact common to all the members of

the Proposed North Carolina Class, including Plaintiff Suarez. Chief among these questions

are as follows:

- Whether the NCAA and the North Carolina-based Defendant failed to pay Plaintiff Suarez and the other members of the Proposed North Carolina Class the prevailing minimum wage under the NCWHA;

- Whether the NCAA and the North Carolina-based Defendant received and benefitted from the uncompensated labors of Plaintiff Suarez and the other members of the Proposed North Carolina Class such that to retain said benefit without compensation would be inequitable and rise to the level of unjust enrichment;

- Whether the NCAA and the North Carolina-based Defendant devised and implemented a plan to increase Defendants' earnings and profits by fostering a scheme of securing work from Plaintiff Suarez and the other members of the Proposed North Carolina Class without properly paying them any compensation;

- Whether the NCAA and the North Carolina-based Defendant induced Plaintiff Suarez and the other members of the Proposed North Carolina Class to perform work while failing to properly compensate them for all hours worked as required by law;

- Whether the NCAA's and the North Carolina-based Defendant reduced overhead with respect to their labor costs, and therefore realized additional earnings and profits to their own benefit and to the detriment of Plaintiff Suarez and the other members of the Proposed North Carolina Class by securing the work and efforts of Plaintiff and the members of the Proposed North Carolina Class without proper compensation as required by law; and

- Whether the NCAA and the North Carolina-based Defendant retained and continue to retain such benefits contrary to the fundamental principles of justice, equity and good conscience.

www.StudentAthletePay.com

377.   Thus, the commonality requirement of FRCP 23(a) is satisfied.

## IV.   TYPICALITY OF CLAIMS AND RELIEF SOUGHT

378.   Plaintiff Suarez is a member of the Proposed North Carolina Class he seeks to represent.

379.   Plaintiff Suarez's claims of are typical of claims of the Proposed North Carolina Class in that they all arise from the same unlawful patterns, practices and/or policies of the NCAA and the North Carolina-based Defendant and are based on the legal theory that these patterns, practices and/or policies violate legal rights protected by state law.

380.   Plaintiff Suarez and the members of the Proposed North Carolina Class all allege that they each were the victim of violations of the NCWHA and North Carolina common law, including a failure to pay the prevailing minimum wage and unjust enrichment.

381.   The relief that Plaintiff Suarez seeks for the NCAA and the North Carolina-based Defendant's unlawful patterns, practices and/or policies is typical of the relief which is sought on behalf of the Proposed North Carolina Class.

382.   Thus, the typicality requirement of FRCP 23(a) is satisfied.

## V.   ADEQUACY OF REPRESENTATION

383.   Plaintiff Suarez's interests are co-extensive with those of the Proposed North Carolina Class he seeks to represent in the instant case.

384.   Plaintiff Suarez is willing and able to represent the Proposed North Carolina Class fairly and vigorously as he pursues her similar individual claims.

385.   Plaintiff Suarez has retained counsel who are qualified and experienced in employment and wage and hour class action litigation and who are subject matter experts

with respect to Defendant's operations.  Plaintiffs' counsel are able to meet the time and fiscal demands necessary to litigate a class action of this size and complexity.

386.    The combined interests, experience and resources of Plaintiff Suarez and his counsel to competently litigate the individual and class claims at issue in the instant case satisfy the adequacy of representation requirement of FRCP 23(a).

## VI.    REQUIREMENTS OF RULE 23(b)

### A.    Rule 23(b)(1)

387.    Without class certification, the same evidence and issues would be subject to re-litigation in a multitude of individual lawsuits with an attendant risk of inconsistent adjudications and conflicting obligations.

388.    Specifically, all evidence of the NCAA's and the North Carolina-based Defendant's patterns, practices and/or policies, and the issue of whether they are in violation of state law, would be exchanged and litigated repeatedly.

389.    Accordingly, certification of the Proposed North Carolina Class is the most efficient and judicious means of presenting the evidence and arguments necessary to resolve such questions for Plaintiff Suarez, the other members of the Proposed North Carolina Class, the NCAA and the North Carolina-based Defendant.

390.    By filing this action, Plaintiff Suarez is preserving the rights of the other members of the Proposed North Carolina Class with respect to the statute of limitations on their claims.  Therefore, not certifying a class would substantially impair and/or impede the other members' ability to protect their interests.

### B.    Rule 23(b)(2)

391.    The NCAA and the North Carolina-based Defendant has acted on grounds, described herein, generally applicable to Plaintiff Suarez and the members of the Proposed

www.StudentAthletePay.com

North Carolina Class, by adopting and following systemic patterns, practices and/or policies that violate the rights provided to Plaintiff Suarez and the other members of the Proposed North Carolina Class under the NCWHA and North Carolina common law.

392.    These unlawful acts are fostered by the NCAA's and the North Carolina-based Defendant's standard patterns, practices and/or policies, are not sporadic or isolated and support the request for final injunctive and declaratory relief with respect to Plaintiff Suarez and the Proposed North Carolina Class as a whole.

393.    Declaratory and injunctive relief are the factual and legal predicates for Plaintiff Suarez and the members of the Proposed North Carolina Class' entitlement to monetary and non-monetary remedies for individual losses caused by, and exemplary purposes necessitated by, such systemic wage and hour and common law violations.

394.    Accordingly, injunctive and declaratory relief are among the predominant forms of relief sought in this case.

C.    **Rule 23(b)(3)**

395.    The common issues of fact and law affecting Plaintiff Suarez's claims and those of the other members of the Proposed North Carolina Class, including, but not limited to, the common issues identified in the Paragraphs above, predominate over issues affecting only individual claims.

396.    A class action is superior to other available means for the fair and efficient adjudication of Plaintiff Suarez's claims and the claims of the members of the Proposed North Carolina Class.

397.    The cost of proving the NCAA's and the North Carolina-based Defendant's pattern and practice of violating the NCWHA and North Carolina common law makes it impracticable for the members of the Proposed North Carolina Class to pursue their claims individually.

-119-

398.    The class action will not be difficult to manage given the discrete and
ubiquitous violations of the NCWHA and common law at issue.

**PLAINTIFFS' PROPOSED OMWEC CLASS ACTION ALLEGATIONS**

**I.    CLASS DEFINITION**

399.    Plaintiff Foster brings Counts XI (OMWEC) and XII (Unjust Enrichment) of
this suit as a class action pursuant to Fed. R. Civ. P. 23 on behalf of herself and the
following Proposed Oregon Class, defined as:

> All individuals, in all NCAA sports and of both genders,
> who were identified on any NCAA Squad List maintained
> by Oregon-based Defendant[29] and all other Division I
> schools in Oregon pursuant to NCAA Division I Bylaws
> 12.10.2 and/or 15.5.11, at any time within the Oregon
> unjust enrichment statute of limitations and through the
> date of final judgment (the "Proposed Oregon Class
> Period").

400.    The unlawful conduct that the NCAA and the Oregon-based Defendant
committed against Plaintiff Foster and the other members of the Proposed Oregon Class,
includes, but is not limited to:

- Failing to pay Plaintiff Foster and the other members of
the Proposed Oregon Class the prevailing minimum
wage under the OMWEC;

- Receiving and benefiting from the uncompensated labors
of Plaintiff Foster and the other members of the Proposed
Oregon Class such that to retain said benefit without
compensation would be inequitable and rise to the level of
unjust enrichment;

- Devising and implementing a plan to increase the
NCAA's and the Oregon-based Defendant's earnings and
profits by fostering a scheme of securing work from
Plaintiff Foster and the other members of the Proposed
Oregon Class without properly paying them any
compensation;

---

[29]    The Oregon-based Defendant is: the University of Oregon.

www.StudentAthletePay.com

- Inducing Plaintiff Foster and the other members of the Proposed Oregon Class to perform work while failing to properly compensate them for all hours worked as required by law;

- Reducing overhead with respect to their labor costs, and therefore realizing additional earnings and profits to their own benefit and to the detriment of Plaintiff Foster and the other members of the Proposed Oregon Class, by securing the work and efforts of Plaintiff and the members of the Proposed Oregon Class without proper compensation as required by law; and

- Retaining and continuing to retain such benefits contrary to the fundamental principles of justice, equity, and good conscience.

401.    Plaintiff Foster and the other members of the Proposed Oregon Class have standing to seek the relief sought herein because of the adverse effects that the NCAA's and the Oregon-based Defendant's unlawful patterns, practices and/or policies have had on them individually and generally.

402.    The patterns, practices and/or policies described in this Complaint demonstrate that the NCAA's and the Oregon-based Defendant's violations of the OMWEC and Oregon common law are not sporadic or unusual; rather, these violations are part and parcel to their standard operating patterns, practices and/or policies.

## II.    NUMEROSITY AND IMPRACTICALITY OF JOINDER

403.    The members of the Proposed Oregon Class are sufficiently numerous to make joinder of their claims impracticable.  While the exact number of Proposed Oregon Class members is unknown because such information is in the exclusive control of the NCAA and the Oregon-based Defendant, upon information and belief there are thousands of current and former Student Athletes who have been the victim of the NCAA's and the Oregon-based Defendant's violations of the OMWEC and Oregon common law.

www.StudentAthletePay.com

404.    Case in point, upon information and belief, there are currently more than 560 Student Athletes at the NCAA and the Oregon-based Defendant within the six year statute of limitations for unjust enrichment under Oregon state law.[30]  Because the Proposed Oregon Class also includes Student Athlete alumnae of such Defendant, who graduated within the last six years, the Proposed Oregon Class could total more than 1,400 current and alumnae Student Athletes at the time of filing.

405.    For each year of pendency, another 140 Student Athletes, or more, could be added to the Proposed Oregon Class.

406.    Although precise determination of the number of Proposed Oregon Class members is impossible at this time, it is significant and satisfies the numerosity requirement of FRCP 23(a).

III.    **COMMON QUESTIONS OF LAW AND FACT**

407.    The claims alleged on behalf of Plaintiff Foster and the members of the Proposed Oregon Class raise questions of law and fact common to all the members of the Proposed Oregon Class, including Plaintiff Foster. Chief among these questions are as follows:

- Whether the NCAA and the Oregon-based Defendant failed to pay Plaintiff Foster and the other members of the Proposed Oregon Class the prevailing minimum wage under the OMWEC;

- Whether the NCAA and the Oregon-based Defendant received and benefitted from the uncompensated labors of Plaintiff Foster and the other members of the Proposed Oregon Class such that to retain said benefit without compensation would be inequitable and rise to the level of unjust enrichment;

- Whether the NCAA and the Oregon-based Defendant devised and implemented a plan to increase Defendants' earnings and profits by fostering a scheme of securing

---

[30]    *See, e.g.*, statistics reported under Student Life/Sports on www.CollegeFactual.com (last visited August 27, 2021).

work from Plaintiff Foster and the other members of the Proposed Oregon Class without properly paying them any compensation;

- Whether the NCAA and the Oregon-based Defendant induced Plaintiff Foster and the other members of the Proposed Oregon Class to perform work while failing to properly compensate them for all hours worked as required by law;

- Whether the NCAA and the Oregon-based Defendant reduced overhead with respect to their labor costs, and therefore realized additional earnings and profits to their own benefit and to the detriment of Plaintiff Foster and the other members of the Proposed Oregon Class by securing the work and efforts of Plaintiff and the members of the Proposed Oregon Class without proper compensation as required by law; and

- Whether the NCAA and the Oregon-based Defendant retained and continue to retain such benefits contrary to the fundamental principles of justice, equity and good conscience.

408.    Thus, the commonality requirement of FRCP 23(a) is satisfied.

## IV.    TYPICALITY OF CLAIMS AND RELIEF SOUGHT

409.    Plaintiff Foster is a member of the Proposed Oregon Class she seeks to represent.

410.    Plaintiff Foster's claims of are typical of claims of the Proposed Oregon Class in that they all arise from the same unlawful patterns, practices and/or policies of the NCAA and the Oregon-based Defendant and are based on the legal theory that these patterns, practices and/or policies violate legal rights protected by state law.

411.    Plaintiff Foster and the members of the Proposed Oregon Class all allege that they each were the victim of violations of the OMWEC and Oregon common law, including a failure to pay the prevailing minimum wage and unjust enrichment.

412.    The relief that Plaintiff Foster seeks for the NCAA and the Oregon-based Defendant's unlawful patterns, practices and/or policies is typical of the relief which is sought on behalf of the Proposed Oregon Class.

413.    Thus, the typicality requirement of FRCP 23(a) is satisfied.

## V.    ADEQUACY OF REPRESENTATION

414.    Plaintiff Foster's interests are co-extensive with those of the Proposed Oregon Class she seeks to represent in the instant case.

415.    Plaintiff Foster is willing and able to represent the Proposed Oregon Class fairly and vigorously as she pursues her similar individual claims.

416.    Plaintiff Foster has retained counsel who are qualified and experienced in employment and wage and hour class action litigation and who are subject matter experts with respect to Defendants' operations.  Plaintiffs' counsel are able to meet the time and fiscal demands necessary to litigate a class action of this size and complexity.

417.    The combined interests, experience and resources of Plaintiff Foster and her counsel to competently litigate the individual and class claims at issue in the instant case satisfy the adequacy of representation requirement of FRCP 23(a).

## VI.    REQUIREMENTS OF RULE 23(b)

### A.    Rule 23(b)(1)

418.    Without class certification, the same evidence and issues would be subject to re-litigation in a multitude of individual lawsuits with an attendant risk of inconsistent adjudications and conflicting obligations.

419.    Specifically, all evidence of the NCAA and the Oregon-based Defendant's patterns, practices and/or policies, and the issue of whether they are in violation of state law, would be exchanged and litigated repeatedly.

www.StudentAthletePay.com

420.    Accordingly, certification of the Proposed Oregon Class is the most efficient and judicious means of presenting the evidence and arguments necessary to resolve such questions for Plaintiff Foster, the other members of the Proposed Oregon Class, the NCAA and the Oregon-based Defendant.

421.    By filing this action, Plaintiff Foster is preserving the rights of the other members of the Proposed Oregon Class with respect to the statute of limitations on their claims.  Therefore, not certifying a class would substantially impair and/or impede the other members' ability to protect their interests.

**B.    Rule 23(b)(2)**

422.    The NCAA and the Oregon-based Defendant has acted on grounds, described herein, generally applicable to Plaintiff Foster and the members of the Proposed Oregon Class, by adopting and following systemic patterns, practices and/or policies that violate the rights provided to Plaintiff Foster and the other members of the Proposed Oregon Class under the OMWEC and Oregon common law.

423.    These unlawful acts are fostered by the NCAA's and the Oregon-based Defendant's standard patterns, practices and/or policies, are not sporadic or isolated and support the request for final injunctive and declaratory relief with respect to Plaintiff Foster and the Proposed Oregon Class as a whole.

424.    Declaratory and injunctive relief are the factual and legal predicates for Plaintiff Foster and the members of the Proposed Oregon Class' entitlement to monetary and non-monetary remedies for individual losses caused by, and exemplary purposes necessitated by, such systemic wage and hour and common law violations.

425.    Accordingly, injunctive and declaratory relief are among the predominant forms of relief sought in this case.

www.StudentAthletePay.com

C.   **Rule 23(b)(3)**

426.   The common issues of fact and law affecting Plaintiff Foster's claims and those of the other members of the Proposed Oregon Class, including, but not limited to, the common issues identified in the Paragraphs above, predominate over issues affecting only individual claims.

427.   A class action is superior to other available means for the fair and efficient adjudication of Plaintiff Foster's claims and the claims of the members of the Proposed Oregon Class.

428.   The cost of proving the NCAA's and the Oregon-based Defendant's pattern and practice of violating the OMWEC and Oregon common law makes it impracticable for the members of the Proposed Oregon Class to pursue their claims individually.

429.   The class action will not be difficult to manage given the discrete and ubiquitous violations of the OMWEC and common law at issue.

## PLAINTIFFS' PROPOSED LLWCL CLASS ACTION ALLEGATIONS

I.   **CLASS DEFINITION**

430.   Plaintiff Harris brings Counts XIII (LLWCL) and XIV (Unjust Enrichment) of this suit as a class action pursuant to Fed. R. Civ. P. 23 on behalf of himself and the following Proposed Louisiana Class, defined as:

> All individuals, in all NCAA sports and of both genders, who were identified on any NCAA Squad List maintained by Louisiana-based Defendant[31] and all other Division I schools in Louisiana pursuant to NCAA Division I Bylaws 12.10.2 and/or 15.5.11, at any time within the Louisiana unjust enrichment statute of limitations and through the date of final judgment (the "Proposed Louisiana Class Period").

---

[31]   The Lousiana-based Defendant is: Tulane University.

www.StudentAthletePay.com

431.    The unlawful conduct that the NCAA and the Louisiana-based Defendant committed against Plaintiff Harris and the other members of the Proposed Louisiana Class, includes, but is not limited to:

- Failing to pay Plaintiff Harris and the other members of the Proposed Louisiana Class the prevailing minimum wage under the LLWCL;

- Receiving and benefiting from the uncompensated labors of Plaintiff Harris and the other members of the Proposed Louisiana Class such that to retain said benefit without compensation would be inequitable and rise to the level of unjust enrichment;

- Devising and implementing a plan to increase the NCAA's and the Louisiana-based Defendant's earnings and profits by fostering a scheme of securing work from Plaintiff Harris and the other members of the Proposed Louisiana Class without properly paying them any compensation;

- Inducing Plaintiff Harris and the other members of the Proposed Louisiana Class to perform work while failing to properly compensate them for all hours worked as required by law;

- Reducing overhead with respect to their labor costs, and therefore realizing additional earnings and profits to their own benefit and to the detriment of Plaintiff Harris and the other members of the Proposed Louisiana Class, by securing the work and efforts of Plaintiff and the members of the Proposed Louisiana Class without proper compensation as required by law; and

- Retaining and continuing to retain such benefits contrary to the fundamental principles of justice, equity, and good conscience.

432.    Plaintiff Harris and the other members of the Proposed Louisiana Class have standing to seek the relief sought herein because of the adverse effects that the NCAA's ans the Louisiana-based Defendant's unlawful patterns, practices and/or policies have had on them individually and generally.

433.    The patterns, practices and/or policies described in this Complaint demonstrate that the NCAA's and the Louisiana-based Defendant's violations of the

www.StudentAthletePay.com

LLWCL and Louisiana common law are not sporadic or unusual; rather, these violations are part and parcel to their standard operating patterns, practices and/or policies.

## II.   NUMEROSITY AND IMPRACTICALITY OF JOINDER

434.   The members of the Proposed Louisiana Class are sufficiently numerous to make joinder of their claims impracticable.  While the exact number of Proposed Louisiana Class members is unknown because such information is in the exclusive control of the NCAA and the Louisiana-based Defendant, upon information and belief there are thousands of current and former Student Athletes who have been the victim of the NCAA's and the Louisiana-based Defendant's violations of the LLWCL and Louisiana common law.

435.   Case in point, upon information and belief, there are currently more than 430 Student Athletes at the NCAA and the Louisiana-based Defendant within the 10 year statute of limitations for unjust enrichment under Louisiana state law.[32]  Because the Proposed Louisiana Class also includes Student Athlete alumnae of such Defendant, who graduated within the last 10 years, the Proposed Louisiana Class could total more than 1,400 current and alumnae Student Athletes at the time of filing.

436.   For each year of pendency, another 100 Student Athletes, or more, could be added to the Proposed Louisiana Class.

437.   Although precise determination of the number of Proposed Louisiana Class members is impossible at this time, it is significant and satisfies the numerosity requirement of FRCP 23(a).

---

[32]   *See, e.g.*, statistics reported under Student Life/Sports on www.CollegeFactual.com (last visited August 27, 2021).

www.StudentAthletePay.com

### III.   COMMON QUESTIONS OF LAW AND FACT

438.   The claims alleged on behalf of Plaintiff Harris and the members of the

Proposed Louisiana Class raise questions of law and fact common to all the members of the

Proposed Louisiana Class, including Plaintiff Harris. Chief among these questions are as

follows:

- Whether the NCAA and the Louisiana-based Defendant failed to pay Plaintiff Harris and the other members of the Proposed Louisiana Class the prevailing minimum wage under the LLWCL;

- Whether the NCAA and the Louisiana-based Defendant received and benefitted from the uncompensated labors of Plaintiff Harris and the other members of the Proposed Louisiana Class such that to retain said benefit without compensation would be inequitable and rise to the level of unjust enrichment;

- Whether the NCAA and the Louisiana-based Defendant devised and implemented a plan to increase Defendants' earnings and profits by fostering a scheme of securing work from Plaintiff Harris and the other members of the Proposed Louisiana Class without properly paying them any compensation;

- Whether the NCAA and the Louisiana-based Defendant induced Plaintiff Harris and the other members of the Proposed Louisiana Class to perform work while failing to properly compensate them for all hours worked as required by law;

- Whether the NCAA and the Louisiana-based Defendant reduced overhead with respect to their labor costs, and therefore realized additional earnings and profits to their own benefit and to the detriment of Plaintiff Harris and the other members of the Proposed Louisiana Class by securing the work and efforts of Plaintiff and the members of the Proposed Louisiana Class without proper compensation as required by law; and

- Whether the NCAA and the Louisiana-based Defendant retained and continue to retain such benefits contrary to the fundamental principles of justice, equity and good conscience.

439.   Thus, the commonality requirement of FRCP 23(a) is satisfied.

**IV.    TYPICALITY OF CLAIMS AND RELIEF SOUGHT**

440.    Plaintiff Harris is a member of the Proposed Louisiana Class he seeks to represent.

441.    Plaintiff Harris's claims of are typical of claims of the Proposed Louisiana Class in that they all arise from the same unlawful patterns, practices and/or policies of the NCAA and the Louisiana-based Defendant and are based on the legal theory that these patterns, practices and/or policies violate legal rights protected by state law.

442.    Plaintiff Harris and the members of the Proposed Louisiana Class all allege that they each were the victim of violations of the LLWCL and Louisiana common law, including a failure to pay the prevailing minimum wage and unjust enrichment.

443.    The relief that Plaintiff Harris seeks for the NCAA's and the Louisiana-based Defendant's unlawful patterns, practices and/or policies is typical of the relief which is sought on behalf of the Proposed Louisiana Class.

444.    Thus, the typicality requirement of FRCP 23(a) is satisfied.

**V.    ADEQUACY OF REPRESENTATION**

445.    Plaintiff Harris's interests are co-extensive with those of the Proposed Louisiana Class he seeks to represent in the instant case.

446.    Plaintiff Harris is willing and able to represent the Proposed Louisiana Class fairly and vigorously as he pursues her similar individual claims.

447.    Plaintiff Harris has retained counsel who are qualified and experienced in employment and wage and hour class action litigation and who are subject matter experts with respect to Defendant's operations.  Plaintiffs' counsel are able to meet the time and fiscal demands necessary to litigate a class action of this size and complexity.

www.StudentAthletePay.com

448.     The combined interests, experience and resources of Plaintiff Harris and her counsel to competently litigate the individual and class claims at issue in the instant case satisfy the adequacy of representation requirement of FRCP 23(a).

## VI.     REQUIREMENTS OF RULE 23(b)

### A.     Rule 23(b)(1)

449.     Without class certification, the same evidence and issues would be subject to re-litigation in a multitude of individual lawsuits with an attendant risk of inconsistent adjudications and conflicting obligations.

450.     Specifically, all evidence of the NCAA's and the Louisiana-based Defendant's patterns, practices and/or policies, and the issue of whether they are in violation of state law, would be exchanged and litigated repeatedly.

451.     Accordingly, certification of the Proposed Louisiana Class is the most efficient and judicious means of presenting the evidence and arguments necessary to resolve such questions for Plaintiff Harris, the other members of the Proposed Louisiana Class, the NCAA and the Louisiana-based Defendant.

452.     By filing this action, Plaintiff Harris is preserving the rights of the other members of the Proposed Louisiana Class with respect to the statute of limitations on their claims.  Therefore, not certifying a class would substantially impair and/or impede the other members' ability to protect their interests.

### B.     Rule 23(b)(2)

453.     The NCAA and the Louisiana-based Defendant has acted on grounds, described herein, generally applicable to Plaintiff Harris and the members of the Proposed Louisiana Class, by adopting and following systemic patterns, practices and/or policies that

www.StudentAthletePay.com

violate the rights provided to Plaintiff Harris and the other members of the Proposed Louisiana Class under the LLWCL and Louisiana common law.

454.   These unlawful acts are fostered by the NCAA's and the Louisiana-based Defendant's standard patterns, practices and/or policies, are not sporadic or isolated and support the request for final injunctive and declaratory relief with respect to Plaintiff Harris and the Proposed Louisiana Class as a whole.

455.   Declaratory and injunctive relief are the factual and legal predicates for Plaintiff Harris and the members of the Proposed Louisiana Class' entitlement to monetary and non-monetary remedies for individual losses caused by, and exemplary purposes necessitated by, such systemic wage and hour and common law violations.

456.   Accordingly, injunctive and declaratory relief are among the predominant forms of relief sought in this case.

### C.   Rule 23(b)(3)

457.   The common issues of fact and law affecting Plaintiff Harris's claims and those of the other members of the Proposed Louisiana Class, including, but not limited to, the common issues identified in the Paragraphs above, predominate over issues affecting only individual claims.

458.   A class action is superior to other available means for the fair and efficient adjudication of Plaintiff Harris's claims and the claims of the members of the Proposed Louisiana Class.

459.   The cost of proving the NCAA's and the Louisiana-based Defendant's pattern and practice of violating the LLWCL and Louisiana common law makes it impracticable for the members of the Proposed Louisiana Class to pursue their claims individually.

460.   The class action will not be difficult to manage given the discrete and ubiquitous violations of the LLWCL and common law at issue.

www.StudentAthletePay.com

**PLAINTIFFS' PROPOSED AMWA CLASS ACTION ALLEGATIONS**

I.   C<span>LASS</span> D<span>EFINITION</span>

461.    Plaintiffa Schoen and Snyder bring Counts XV (AMWA) and XVI (Unjust

Enrichment) of this suit as a class action pursuant to Fed. R. Civ. P. 23 on behalf of

themselves and the following Proposed Arizona Class, defined as:

>            All individuals, in all NCAA sports and of both genders,
>            who were identified on any NCAA Squad List maintained
>            by Arizona-based Defendant[33] and all other Division I
>            schools in Arizona pursuant to NCAA Division I Bylaws
>            12.10.2 and/or 15.5.11, at any time within the Arizona
>            unjust enrichment statute of limitations and through the
>            date of final judgment (the "Proposed Arizona Class
>            Period").

462.    The unlawful conduct that the NCAA and the Arizona-based Defendant

committed against Plaintiffs Schoen, Snyder and the other members of the Proposed

Arizona Class, includes, but is not limited to:

- Failing to pay Plaintiffs Schoen, Snyder and the other members of the Proposed Arizona Class the prevailing minimum wage under the AMWA;

- Receiving and benefiting from the uncompensated labors of Plaintiffs Schoen, Snyder and the other members of the Proposed Arizona Class such that to retain said benefit without compensation would be inequitable and rise to the level of unjust enrichment;

- Devising and implementing a plan to increase the NCAA's and the Arizona-based Defendant's earnings and profits by Schoening a scheme of securing work from Plaintiff Schoen and the other members of the Proposed Arizona Class without properly paying them any compensation;

- Inducing Plaintiffs Schoen, Snyder and the other members of the Proposed Arizona Class to perform work while failing to properly compensate them for all hours worked as required by law;

---

[33]   The Arizona-based Defendant is: the University of Arizona.

www.StudentAthletePay.com

- Reducing overhead with respect to their labor costs, and therefore realizing additional earnings and profits to their own benefit and to the detriment of Plaintiffs Schoen, Snyder and the other members of the Proposed Arizona Class, by securing the work and efforts of Plaintiff and the members of the Proposed Arizona Class without proper compensation as required by law; and

- Retaining and continuing to retain such benefits contrary to the fundamental principles of justice, equity, and good conscience.

463.    Plaintiffs Schoen, Snyder and the other members of the Proposed Arizona Class have standing to seek the relief sought herein because of the adverse effects that the NCAA's and the Arizona-based Defendant's unlawful patterns, practices and/or policies have had on them individually and generally.

464.    The patterns, practices and/or policies described in this Complaint demonstrate that the NCAA's and the Arizona-based Defendant's violations of the AMWA and Arizona common law are not sporadic or unusual; rather, these violations are part and parcel to their standard operating patterns, practices and/or policies.

## II.    NUMEROSITY AND IMPRACTICALITY OF JOINDER

465.    The members of the Proposed Arizona Class are sufficiently numerous to make joinder of their claims impracticable.  While the exact number of Proposed Arizona Class members is unknown because such information is in the exclusive control of the NCAA and the Arizona-based Defendant, upon information and belief there are thousands of current and former Student Athletes who have been the victim of the NCAA's and the Arizona-based Defendant's violations of the AMWA and Arizona common law.

466.    Case in point, upon information and belief, there are currently more than 500 Student Athletes at the Arizona-based Defendant within the four year statute of limitations

for unjust enrichment under Arizona state law.[34]  Because the Proposed Arizona Class also includes Student Athlete alumnae of such Defendant, who graduated within the last four years, the Proposed Arizona Class could total more than 1,000 current and alumnae Student Athletes at the time of filing.

467.    For each year of pendency, another 125 Student Athletes, or more, could be added to the Proposed Arizona Class.

468.    Although precise determination of the number of Proposed Arizona Class members is impossible at this time, it is significant and satisfies the numerosity requirement of FRCP 23(a).

## III.    COMMON QUESTIONS OF LAW AND FACT

469.    The claims alleged on behalf of Plaintiffs Schoen, Snyder and the members of the Proposed Arizona Class raise questions of law and fact common to all the members of the Proposed Arizona Class, including Plaintiffs Schoen and Snyder. Chief among these questions are as follows:

- Whether the NCAA and the Arizona-based Defendant failed to pay Plaintiffs Schoen, Snyder and the other members of the Proposed Arizona Class the prevailing minimum wage under the AMWA;

- Whether the NCAA and the Arizona-based Defendant received and benefitted from the uncompensated labors of Plaintiff Schoen, Snyder and the other members of the Proposed Arizona Class such that to retain said benefit without compensation would be inequitable and rise to the level of unjust enrichment;

- Whether the NCAA and the Arizona-based Defendant devised and implemented a plan to increase Defendants' earnings and profits by fostering a scheme of securing work from Plaintiffs Schoen, Snyder and the other

---

[34]    *See, e.g.*, statistics reported under Student Life/Sports on www.CollegeFactual.com (last visited August 27, 2021).

members of the Proposed Arizona Class without properly paying them any compensation;

- Whether the NCAA and the Arizona-based Defendant induced Plaintiffs Schoen, Snyder and the other members of the Proposed Arizona Class to perform work while failing to properly compensate them for all hours worked as required by law;

- Whether the NCAA and the Arizona-based Defendant reduced overhead with respect to their labor costs, and therefore realized additional earnings and profits to their own benefit and to the detriment of Plaintiffs Schoen, Snyder and the other members of the Proposed Arizona Class by securing the work and efforts of Plaintiff and the members of the Proposed Arizona Class without proper compensation as required by law; and

- Whether the NCAA and the Arizona-based Defendant retained and continue to retain such benefits contrary to the fundamental principles of justice, equity and good conscience.

470.    Thus, the commonality requirement of FRCP 23(a) is satisfied.

## IV.    TYPICALITY OF CLAIMS AND RELIEF SOUGHT

471.    Plaintiffs Schoen and Snyder are members of the Proposed Arizona Class they seek to represent.

472.    Plaintiffs Schoen and Snyder's claims of are typical of claims of the Proposed Arizona Class in that they all arise from the same unlawful patterns, practices and/or policies of the NCAA and the Arizona-based Defendant and are based on the legal theory that these patterns, practices and/or policies violate legal rights protected by state law.

473.    Plaintiffs Schoen and Snyder and the members of the Proposed Arizona Class all allege that they each were the victim of violations of the AMWA and Arizona common law, including a failure to pay the prevailing minimum wage and unjust enrichment.

474.    The relief that Plaintiffs Schoen and Snyder seek for the NCAA and the Arizona-based Defendant's unlawful patterns, practices and/or policies is typical of the relief which is sought on behalf of the Proposed Arizona Class.

www.StudentAthletePay.com

475.    Thus, the typicality requirement of FRCP 23(a) is satisfied.

## V.    ADEQUACY OF REPRESENTATION

476.    Plaintiffs Schoen and Snyder's interests are co-extensive with those of the Proposed Arizona Class she seeks to represent in the instant case.

477.    Plaintiffs Schoen and Snyder are willing and able to represent the Proposed Arizona Class fairly and vigorously as she pursues her similar individual claims.

478.    Plaintiffs Schoen and Snyder have retained counsel who are qualified and experienced in employment and wage and hour class action litigation and who are subject matter experts with respect to Defendant's operations.  Plaintiffs' counsel are able to meet the time and fiscal demands necessary to litigate a class action of this size and complexity.

479.    The combined interests, experience and resources of Plaintiffs Schoen, Snyder and their counsel to competently litigate the individual and class claims at issue in the instant case satisfy the adequacy of representation requirement of FRCP 23(a).

## VI.    REQUIREMENTS OF RULE 23(b)

### A.    Rule 23(b)(1)

480.    Without class certification, the same evidence and issues would be subject to re-litigation in a multitude of individual lawsuits with an attendant risk of inconsistent adjudications and conflicting obligations.

481.    Specifically, all evidence of the NCAA and the Arizona-based Defendant's patterns, practices and/or policies, and the issue of whether they are in violation of state law, would be exchanged and litigated repeatedly.

482.    Accordingly, certification of the Proposed Arizona Class is the most efficient and judicious means of presenting the evidence and arguments necessary to resolve such

www.StudentAthletePay.com

questions for Plaintiff Schoen, the other members of the Proposed Arizona Class, the NCAA and the Arizona-based Defendant.

483.    By filing this action, Plaintiff Schoen is preserving the rights of the other members of the Proposed Arizona Class with respect to the statute of limitations on their claims.  Therefore, not certifying a class would substantially impair and/or impede the other members' ability to protect their interests.

**B.    Rule 23(b)(2)**

484.    The NCAA and the Arizona-based Defendant has acted on grounds, described herein, generally applicable to Plaintiff Schoen and the members of the Proposed Arizona Class, by adopting and following systemic patterns, practices and/or policies that violate the rights provided to Plaintiff Schoen and the other members of the Proposed Arizona Class under the AMWA and Arizona common law.

485.    These unlawful acts are fostered by the NCAA and the Arizona-based Defendant's standard patterns, practices and/or policies, are not sporadic or isolated and support the request for final injunctive and declaratory relief with respect to Plaintiffs Schoen and Snyder and the Proposed Arizona Class as a whole.

486.    Declaratory and injunctive relief are the factual and legal predicates for Plaintiffs Schoen and Snyder and the members of the Proposed Arizona Class' entitlement to monetary and non-monetary remedies for individual losses caused by, and exemplary purposes necessitated by, such systemic wage and hour and common law violations.

487.    Accordingly, injunctive and declaratory relief are among the predominant forms of relief sought in this case.

www.StudentAthletePay.com

C.    **Rule 23(b)(3)**

488.    The common issues of fact and law affecting Plaintiffs Schoen and Snyder's claims and those of the other members of the Proposed Arizona Class, including, but not limited to, the common issues identified in the Paragraphs above, predominate over issues affecting only individual claims.

489.    A class action is superior to other available means for the fair and efficient adjudication of Plaintiffs Schoen and Snyder's claims and the claims of the members of the Proposed Arizona Class.

490.    The cost of proving the NCAA's and the Arizona-based Defendant's pattern and practice of violating the AMWA and Arizona common law makes it impracticable for the members of the Proposed Arizona Class to pursue their claims individually.

491.    The class action will not be difficult to manage given the discrete and ubiquitous violations of the AMWA and common law at issue.

## PLAINTIFFS' PROPOSED IMWL CLASS ACTION ALLEGATIONS

I.    CLASS DEFINITION

492.    Plaintiffs Schmidt and Snyder brings Counts XVII (IMWL) and XVIII (Unjust Enrichment) of this suit as a class action pursuant to Fed. R. Civ. P. 23 on behalf of themselves and the following Proposed Indiana Class, defined as:

> All individuals, in all NCAA sports and of both genders, who were identified on any NCAA Squad List maintained by Indiana-based Defendants[35] and all other Division I schools in Indiana pursuant to NCAA Division I Bylaws 12.10.2 and/or 15.5.11, at any time within the Indiana unjust enrichment statute of limitations and through the date of final judgment (the "Proposed Indiana Class Period").

---

[35]    The Indiana-based Defendants are: University of Notre Dame and Purdue University.

493.   The unlawful conduct that the NCAA and the Indiana-based Defendants committed against Plaintiffs Schmidt and Snyder and the other members of the Proposed Indiana Class, includes, but is not limited to:

- Failing to pay Plaintiffs Schmidt and Snyder and the other members of the Proposed Indiana Class the prevailing minimum wage under the IMWL;

- Receiving and benefiting from the uncompensated labors of Plaintiffs Schmidt and Snyder and the other members of the Proposed Indiana Class such that to retain said benefit without compensation would be inequitable and rise to the level of unjust enrichment;

- Devising and implementing a plan to increase the NCAA's and the Indiana-based Defendants' earnings and profits by fostering a scheme of securing work from Plaintiffs Schmidt and Snyder and the other members of the Proposed Indiana Class without properly paying them any compensation;

- Inducing Plaintiffs Schmidt and Snyder and the other members of the Proposed Indiana Class to perform work while failing to properly compensate them for all hours worked as required by law;

- Reducing overhead with respect to their labor costs, and therefore realizing additional earnings and profits to their own benefit and to the detriment of Plaintiffs Schmidt and Snyder and the other members of the Proposed Indiana Class, by securing the work and efforts of Plaintiff and the members of the Proposed Indiana Class without proper compensation as required by law; and

- Retaining and continuing to retain such benefits contrary to the fundamental principles of justice, equity, and good conscience.

494.   Plaintiffs Schmidt and Snyder and the other members of the Proposed Indiana Class have standing to seek the relief sought herein because of the adverse effects that the NCAA's and the Indiana-based Defendants' unlawful patterns, practices and/or policies have had on them individually and generally.

495.   The patterns, practices and/or policies described in this Complaint demonstrate that the NCAA's and the Indiana-based Defendants' violations of the IMWL

www.StudentAthletePay.com

and Indiana common law are not sporadic or unusual; rather, these violations are part and parcel to their standard operating patterns, practices and/or policies.

## II.    NUMEROSITY AND IMPRACTICALITY OF JOINDER

496.    The members of the Proposed Indiana Class are sufficiently numerous to make joinder of their claims impracticable.  While the exact number of Proposed Indiana Class members is unknown because such information is in the exclusive control of the NCAA and the Indiana-based Defendants, upon information and belief there are thousands of current and former Student Athletes who have been the victim of the NCAA and the Indiana-based Defendants' violations of the IMWL and Indiana common law.

497.    Case in point, upon information and belief, there are currently more than 1,470 Student Athletes at the two Indiana-based Defendants within the two year statute of limitations for unjust enrichment under Indiana state law.[36]  Because the Proposed Indiana Class also includes Student Athlete alumnae of such Defendants, who graduated within the last two years, the Proposed Indiana Class could total more than 2,190 current and alumnae Student Athletes at the time of filing.

498.    For each year of pendency, another 360 Student Athletes, or more, could be added to the Proposed Indiana Class.

499.    Although precise determination of the number of Proposed Indiana Class members is impossible at this time, it is significant and satisfies the numerosity requirement of FRCP 23(a).

---

[36]    *See, e.g.*, statistics reported under Student Life/Sports on www.CollegeFactual.com (last visited August 27, 2021) for University of Notre Dame and Purdue University.

www.StudentAthletePay.com

### III.   COMMON QUESTIONS OF LAW AND FACT

500.     The claims alleged on behalf of Plaintiffs Schmidt and Snyder and the

members of the Proposed Indiana Class raise questions of law and fact common to all the

members of the Proposed Indiana Class, including Plaintiffs Schmidt and Snyder. Chief

among these questions are as follows:

- Whether the NCAA and the Indiana-based Defendants failed to pay Plaintiffs Schmidt and Snyder and the other members of the Proposed Indiana Class the prevailing minimum wage under the IMWL;

- Whether the NCAA and the Indiana-based Defendants received and benefitted from the uncompensated labors of Plaintiffs Schmidt and Snyder and the other members of the Proposed Indiana Class such that to retain said benefit without compensation would be inequitable and rise to the level of unjust enrichment;

- Whether the NCAA and the Indiana-based Defendants devised and implemented a plan to increase Defendants' earnings and profits by fostering a scheme of securing work from Plaintiffs Schmidt and Snyder and the other members of the Proposed Indiana Class without properly paying them any compensation;

- Whether the NCAA and the Indiana-based Defendants induced Plaintiffs Schmidt and Snyder and the other members of the Proposed Indiana Class to perform work while failing to properly compensate them for all hours worked as required by law;

- Whether the NCAA and the Indiana-based Defendants reduced overhead with respect to their labor costs, and therefore realized additional earnings and profits to their own benefit and to the detriment of Plaintiffs Schmidt and Snyder and the other members of the Proposed Indiana Class by securing the work and efforts of Plaintiff and the members of the Proposed Indiana Class without proper compensation as required by law; and

- Whether the NCAA and the Indiana-based Defendants retained and continue to retain such benefits contrary to the fundamental principles of justice, equity and good conscience.

501.     Thus, the commonality requirement of FRCP 23(a) is satisfied.

## IV.   TYPICALITY OF CLAIMS AND RELIEF SOUGHT

502.   Plaintiffs Schmidt and Snyder are members of the Proposed Indiana Class they seek to represent.

503.   Plaintiffs Schmidt and Snyder's claims of are typical of claims of the Proposed Indiana Class in that they all arise from the same unlawful patterns, practices and/or policies of the NCAA and the Indiana-based Defendants and are based on the legal theory that these patterns, practices and/or policies violate legal rights protected by state law.

504.   Plaintiffs Schmidt and Snyder and the members of the Proposed Indiana Class all allege that they each were the victim of violations of the IMWL and Indiana common law, including a failure to pay the prevailing minimum wage and unjust enrichment.

505.   The relief that Plaintiffs Schmidt and Snyder seeks for the NCAA's and the Indiana-based Defendants' unlawful patterns, practices and/or policies is typical of the relief which is sought on behalf of the Proposed Indiana Class.

506.   Thus, the typicality requirement of FRCP 23(a) is satisfied.

## V.   ADEQUACY OF REPRESENTATION

507.   Plaintiffs Schmidt and Snyder's interests are co-extensive with those of the Proposed Indiana Class they seek to represent in the instant case.

508.   Plaintiffs Schmidt and Snyder is willing and able to represent the Proposed Indiana Class fairly and vigorously as they pursue their similar individual claims.

509.   Plaintiffs Schmidt and Snyder has retained counsel who are qualified and experienced in employment and wage and hour class action litigation and who are subject matter experts with respect to Defendants' operations.  Plaintiffs' counsel are able to meet the time and fiscal demands necessary to litigate a class action of this size and complexity.

510.    The combined interests, experience and resources of Plaintiffs Schmidt and Snyder and her counsel to competently litigate the individual and class claims at issue in the instant case satisfy the adequacy of representation requirement of FRCP 23(a).

## VI.    REQUIREMENTS OF RULE 23(b)

### A.    Rule 23(b)(1)

511.    Without class certification, the same evidence and issues would be subject to re-litigation in a multitude of individual lawsuits with an attendant risk of inconsistent adjudications and conflicting obligations.

512.    Specifically, all evidence of the NCAA's and the Indiana-based Defendants' patterns, practices and/or policies, and the issue of whether they are in violation of state law, would be exchanged and litigated repeatedly.

513.    Accordingly, certification of the Proposed Indiana Class is the most efficient and judicious means of presenting the evidence and arguments necessary to resolve such questions for Plaintiffs Schmidt and Snyder, the other members of the Proposed Indiana Class, the NCAA and the Indiana-based Defendants.

514.    By filing this action, Plaintiffs Schmidt and Snyder is preserving the rights of the other members of the Proposed Indiana Class with respect to the statute of limitations on their claims.  Therefore, not certifying a class would substantially impair and/or impede the other members' ability to protect their interests.

### B.    Rule 23(b)(2)

515.    The NCAA and the Indiana-based Defendants have acted on grounds, described herein, generally applicable to Plaintiffs Schmidt and Snyder and the members of the Proposed Indiana Class, by adopting and following systemic patterns, practices and/or

www.StudentAthletePay.com

policies that violate the rights provided to Plaintiffs Schmidt and Snyder and the other members of the Proposed Indiana Class under the IMWL and Indiana common law.

516.    These unlawful acts are fostered by the NCAA and the Indiana-based Defendants' standard patterns, practices and/or policies, are not sporadic or isolated and support the request for final injunctive and declaratory relief with respect to Plaintiffs Schmidt and Snyder and the Proposed Indiana Class as a whole.

517.    Declaratory and injunctive relief are the factual and legal predicates for Plaintiffs Schmidt and Snyder and the members of the Proposed Indiana Class' entitlement to monetary and non-monetary remedies for individual losses caused by, and exemplary purposes necessitated by, such systemic wage and hour and common law violations.

518.    Accordingly, injunctive and declaratory relief are among the predominant forms of relief sought in this case.

C.    **Rule 23(b)(3)**

519.    The common issues of fact and law affecting Plaintiffs Schmidt and Snyder's claims and those of the other members of the Proposed Indiana Class, including, but not limited to, the common issues identified in the Paragraphs above, predominate over issues affecting only individual claims.

520.    A class action is superior to other available means for the fair and efficient adjudication of Plaintiffs Schmidt and Snyder's claims and the claims of the members of the Proposed Indiana Class.

521.    The cost of proving the NCAA and the Indiana-based Defendants' pattern and practice of violating the IMWL and Indiana common law makes it impracticable for the members of the Proposed Indiana Class to pursue their claims individually.

522.    The class action will not be difficult to manage given the discrete and ubiquitous violations of the IMWL and common law at issue.

-145-

**COUNT I**
**Violations of the FLSA**
**(On Behalf of Plaintiffs and the Proposed FLSA Collective)**

523.    All previous Paragraphs are incorporated as though fully set forth herein.

524.    The Minimum Wage provisions in the FLSA apply to Defendants and protect Plaintiffs and the members of the Proposed FLSA Collective.  *See* 29 U.S.C. § 206.

525.    Defendants have been, and continue to be, enterprises engaged in commerce within the meaning of 29 U.S.C. §§ 203(r) and (s), and to which the Minimum Wage provisions of 29 U.S.C. § 206(a) apply.

526.    Plaintiffs have been, and/or continue to be, employees of Defendants within the meaning of 29 U.S.C. § 203(e).

527.    Defendants have jointly employed, and/or continue to jointly employ, Plaintiffs within the meaning of 29 U.S.C. § 203(g).

528.    By operation of NCAA bylaws, Defendants have jointly agreed to engage in a widespread pattern, policy and practice of misclassifying Plaintiffs and the members of the Proposed FLSA Collective as unpaid labor rather than employees, prohibiting payment of minimum wages to them for any, and all, hours that Defendants suffered or permitted Plaintiffs and the members of the Proposed FLSA Collective to perform work integral to the billion dollar Big Business of NCAA sports.

529.    Defendants were aware, or should have been aware, that Student Athletes, like fellow students in Work Study, fall within employee status under the FLSA when Defendants willfully chose not to classify and pay Student Athletes as employees with reckless disregard of employer duties under the FLSA.

530.    Plaintiffs and the members of the Proposed FLSA Collective have suffered damages, and are entitled to recovery of unpaid wages, an additional equal amount as liquidated damages, attorneys' fees, costs and other relief under 29 U.S.C. § 216(b).

www.StudentAthletePay.com

**COUNT II**
**Violations of the Pennsylvania Minimum Wage Act**
**(On Behalf of Plaintiffs Johnson, Cooke, Hamilton and**
**the Proposed Pennsylvania Class)**

531.    All previous Paragraphs are incorporated as though fully set forth herein.

532.    The Minimum Wage provisions in the Pennsylvania Minimum Wage Act, 43

P.S. §§ 333.101 *et seq.* ("PMWA") apply to the NCAA and the Pennsylvania-based

Defendants and protect Plaintiffs Johnson, Cooke, Hamilton and the other members of the

Proposed Pennsylvania Class. *See* 43 P.S. § 333.104(e).

533.    The NCAA and the Pennsylvania-based Defendants have been, and continue

to be, employers within the meaning of 43 P.S. § 333.103(g), and to which the Minimum

Wage provisions of 43 P.S. § 333.104(e) apply.

534.    Plaintiffs Johnson, Cooke, Hamilton and the other members of the Proposed

Pennsylvania Class have been, and/or continue to be, employees of the NCAA and the

Pennsylvania-based Defendants within the meaning of 43 P.S. § 333.103(h).

535.    The NCAA and the Pennsylvania-based Defendants have jointly employed,

and/or continue to jointly employ, Plaintiffs Johnson, Cooke, Hamilton and the other

members of the Proposed Pennsylvania Class within the meaning of 43 P.S. § 333.103(f).

536.    By operation of NCAA bylaws, the NCAA and the Pennsylvania-based

Defendants have jointly agreed to engage in a widespread pattern, policy and practice of

misclassifying Plaintiffs Johnson, Cooke, Hamilton and the other members of the Proposed

Pennsylvania Class as unpaid labor rather than employees, prohibiting payment of

minimum wages to them for any, and all, hours that the NCAA and the Pennsylvania-based

Defendants suffered or permitted Plaintiffs Johnson, Cooke, Hamilton and the other members

of the Proposed Pennsylvania Class to perform work integral to the billion dollar Big

Business of NCAA sports.

www.StudentAthletePay.com

537.    The NCAA and the Pennsylvania-based Defendants were aware, or should have been aware, that Student Athletes, like fellow students in Work Study, fall within employee status under the PMWA when the NCAA and the Pennsylvania-based Defendants willfully chose not to classify and pay Student Athletes as employees with reckless disregard of employer duties under the PMWA.

538.    Plaintiffs Johnson, Cooke, Hamilton and the other members of the Proposed Pennsylvania Class have suffered damages, and are entitled to recovery of unpaid wages, attorneys' fees, costs and other relief under 43 P.S. § 333.113.

**COUNT III**
**Pennsylvania Unjust Enrichment**
**(On Behalf of Plaintiffs Johnson, Cooke, Hamilton and the Proposed**
**Pennsylvania Class)**

539.    All previous Paragraphs are incorporated as though fully set forth herein.

540.    The NCAA and the Pennsylvania-based Defendants received and benefited from the uncompensated labors of Plaintiffs Johnson, Cooke, Hamilton and the Proposed Pennsylvania Class such that to retain said benefit without compensation would be inequitable and rise to the level of unjust enrichment.

541.    At all relevant times, the NCAA and the Pennsylvania-based Defendants devised and implemented a plan to increase their earnings and profits by fostering a scheme of securing work from Plaintiffs Johnson, Cooke, Hamilton and the Proposed Pennsylvania Class without properly paying compensation.

542.    Contrary to all good faith and fair dealing, the NCAA and the Pennsylvania-based Defendants induced Plaintiffs Johnson, Cooke, Hamilton and the Proposed Pennsylvania Class to perform work while failing to properly compensate them for all hours worked as required by law.

www.StudentAthletePay.com

543.    By reason of having secured the work and efforts of Plaintiffs Johnson, Cooke and the Proposed Pennsylvania Class without proper compensation as required by law, the NCAA and the Pennsylvania-based Defendants enjoyed reduced overhead with respect to their labor costs, and therefore realized additional earnings and profits to their own benefit and to the detriment of Plaintiffs Johnson, Cooke, Hamilton and the Proposed Pennsylvania Class.  The NCAA and the Pennsylvania-based Defendants retained and continue to retain such benefits contrary to the fundamental principles of justice, equity and good conscience.

544.    Accordingly, Plaintiffs Johnson, Cooke, Hamilton and the Proposed Pennsylvania Class are entitled to judgment in an amount equal to the benefits unjustly retained by the NCAA and the Pennsylvania-based Defendants.

**COUNT IV**
**Failure to Pay Minimum Wage Under the New York Labor Law**
**(On Behalf of Plaintiffs Kerkeles, Labella, Willebeek-Lemair, Walsh and the Proposed New York Class)**

545.    All previous Paragraphs are incorporated as though fully set forth herein.

546.    The NYLL requires covered employers, such as the NCAA and the New York-based Defendants, to pay all non-exempt employees the prevailing minimum wage for all hours worked and protects Plaintiffs Kerkeles, Labella, Willebeek-Lemair, Walsh and the other members of the Proposed New York Class.

547.    The NCAA and the New York-based Defendants have been, and continue to be, employers within the meaning of the New York Labor Law.

548.    Plaintiffs Kerkeles, Labella, Willebeek-Lemair, Walsh and the other members of the Proposed New York Class have been, and/or continue to be, employees of the NCAA and the New York-based Defendants within the meaning of the New York Labor Law.

549.    The NCAA and the New York-based Defendants have jointly employed, and/or continue to jointly employ, Plaintiffs Kerkeles, Labella, Willebeek-Lemair, Walsh

-149-

and the other members of the Proposed New York Class within the meaning of the New York Labor Law.

550.     By operation of NCAA bylaws, the NCAA and the New York-based Defendants have jointly agreed to engage in a widespread pattern, policy and practice of misclassifying Plaintiffs Kerkeles, Labella, Willebeek-Lemair, Walsh and the other members of the Proposed New York Class as unpaid labor rather than employees, prohibiting payment of minimum wages to them for any, and all, hours that the NCAA and the New York-based Defendants suffered or permitted Plaintiffs Kerkeles, Labella, Willebeek-Lemair, Walsh and the other members of the Proposed New York Class to perform work integral to the billion dollar Big Business of NCAA sports.

551.     The NCAA and the New York-based Defendants were aware, or should have been aware, that Student Athletes, like fellow students in Work Study, fall within employee status under the NYLL when the NCAA and the New York-based Defendants willfully chose not to classify and pay Student Athletes as employees with reckless disregard of employer duties under the NYLL.  Plaintiffs Kerkeles, Labella, Willebeek-Lemair, Walsh and the other members of the Proposed New York Class have suffered damages, and are entitled to recovery of unpaid wages, liquidated damages, attorneys' fees, costs and other relief.

**COUNT V**
**Failure to Pay Wages for All Hours Worked in Violation of NYLL §191**
**(On Behalf of Plaintiffs Kerkeles, Labella, Willebeek-Lemair, Walsh and the Proposed New York Class)**

552.     All previous Paragraphs are incorporated as though fully set forth herein.

553.     The NYLL requires covered employers, such as the NCAA and the New York-based Defendants, to pay employees for all hours worked.  Plaintiffs Kerkeles, Labella, Willebeek-Lemair, Walsh and the other members of the Proposed New York Class were not exempt from the requirement that they be paid for all hours worked under the NYLL.

554.    However, based on the reasons set forth herein, the NCAA and the New York based Defendants did not pay Plaintiffs Kerkeles, Labella, Willebeek-Lemair, Walsh and the other members of the Proposed New York Class for any of the hours that they worked.

555.    The NCAA and the New York-based Defendants have been, and continue to be, employers within the meaning of the New York Labor Law.

556.    Plaintiffs Kerkeles, Labella, Willebeek-Lemair, Walsh and the other members of the Proposed New York Class have been, and/or continue to be, employees of the NCAA and the New York-based Defendants within the meaning of the New York Labor Law.

557.    The NCAA and the New York-based Defendants have jointly employed, and/or continue to jointly employ, Plaintiffs Kerkeles, Labella, Willebeek-Lemair, Walsh and the other members of the Proposed New York Class within the meaning of the New York Labor Law.

558.    As a result of the NCAA's and the New York-based Defendants' failure to pay Plaintiffs Kerkeles, Labella, Willebeek-Lemair, Walsh and the other members of the Proposed New York Class their wages for all hours worked, the NCAA and the New York-based Defendants violated the NYLL.

559.    The NCAA's and the New York-based Defendants' violations of the NYLL have significantly damaged Plaintiffs Kerkeles, Labella, Willebeek-Lemair, Walsh and the other members of the Proposed New York Class and entitle them to recover the total amount of their unpaid straight-time wages, an additional amount in liquidated damages and attorneys' fees and costs and interest.

**COUNT VI**
**New York Unjust Enrichment**
**(On Behalf of Plaintiffs Kerkeles, Labella, Willebeek-Lemair, Walsh and**
**the Proposed New York Class)**

560.    All previous Paragraphs are incorporated as though fully set forth herein.

561.    The NCAA and the New York-based Defendants received and benefited from the uncompensated labors of Plaintiffs Kerkeles, Labella, Willebeek-Lemair, Walsh and the Proposed New York Class such that to retain said benefit without compensation would be inequitable and rise to the level of unjust enrichment.

562.    At all relevant times, the NCAA and the New York-based Defendants devised and implemented a plan to increase their earnings and profits by fostering a scheme of securing work from Plaintiffs Kerkeles, Labella, Willebeek-Lemair, Walsh and the Proposed New York Class without properly paying compensation.

563.    Contrary to all good faith and fair dealing, the NCAA and the New York-based Defendants induced Plaintiffs Kerkeles, Labella, Willebeek-Lemair, Walsh and the Proposed New York Class to perform work while failing to properly compensate them for all hours worked as required by law.

564.    By reason of having secured the work and efforts of Plaintiffs Kerkeles, Labella, Willebeek-Lemair, Walsh and the Proposed New York Class without proper compensation as required by law, the NCAA and the New York-based Defendants enjoyed reduced overhead with respect to their labor costs, and therefore realized additional earnings and profits to their own benefit and to the detriment of Plaintiffs Kerkeles, Labella, Willebeek-Lemair, Walsh and the Proposed New York Class.  The NCAA and the New York-based Defendants retained and continue to retain such benefits contrary to the fundamental principles of justice, equity and good conscience.  Accordingly, Plaintiffs Kerkeles, Labella, Willebeek-Lemair, Walsh and the Proposed New York Class are entitled to judgment in an

www.StudentAthletePay.com

amount equal to the benefits unjustly retained by the NCAA and the New York-based Defendants.

## COUNT VII
## Violations of the Connecticut Minimum Wage Act
## (On Behalf of Plaintiff Ruiz and the Proposed Connecticut Class)

565.    All previous Paragraphs are incorporated as though fully set forth herein.

566.    The Minimum Wage provisions in the Connecticut Minimum Wage Act, CGSA §§32- 58, *et seq*. apply to the NCAA and the Connecticut-based Defendant and protect Plaintiff Ruiz and the other members of the Proposed Connecticut Class.

567.    The NCAA and the Connecticut-based Defendant have been, and continue to be, employers within the meaning of the CMWA, and to which the CMWA provisions apply.

568.    Plaintiff Ruiz and the other members of the Proposed Connecticut Class have been, and/or continue to be, employees of the NCAA and the Connecticut-based Defendant within the meaning of the CMWA.

569.    The NCAA and the Connecticut-based Defendant have jointly employed, and/or continue to jointly employ, Plaintiff Ruiz and the other members of the Proposed Connecticut Class within the meaning of the CMWA.

570.    By operation of NCAA bylaws, the NCAA and the Connecticut-based Defendant have jointly agreed to engage in a widespread pattern, policy and practice of misclassifying Plaintiff Ruiz and the other members of the Proposed Connecticut Class as unpaid labor rather than employees, prohibiting payment of minimum wages to them for any, and all, hours that the NCAA and the Connecticut-based Defendant suffered or permitted Plaintiff Ruiz and the other members of the Proposed Connecticut Class to perform work integral to the billion dollar Big Business of NCAA sports.

www.StudentAthletePay.com

571.    The NCAA and the Connecticut-based Defendant were aware, or should have been aware, that Student Athletes, like fellow students in Work Study, fall within employee status under the CMWA when the NCAA and the Connecticut-based Defendant willfully chose not to classify and pay Student Athletes as employees with reckless disregard of employer duties under the CMWA.

572.    Plaintiff Ruiz and the members of the Proposed Connecticut Class have suffered damages, and are entitled to recovery of unpaid wages, liquidated damages, attorneys' fees, costs and other relief.

### COUNT VIII
### Connecticut Unjust Enrichment
### (On Behalf of Plaintiff Ruiz and the Proposed Connecticut Class)

573.    All previous Paragraphs are incorporated as though fully set forth herein.

574.    The NCAA and the Connecticut-based Defendant received and benefited from the uncompensated labors of Plaintiff Ruiz and the Proposed Connecticut Class such that to retain said benefit without compensation would be inequitable and rise to the level of unjust enrichment.

575.    At all relevant times, the NCAA and the Connecticut-based Defendant devised and implemented a plan to increase their earnings and profits by fostering a scheme of securing work from Plaintiff Ruiz and the Proposed Connecticut Class without properly paying compensation.

576.    Contrary to all good faith and fair dealing, the NCAA and the Connecticut-based Defendant induced Plaintiff Ruiz and the Proposed Connecticut Class to perform work while failing to properly compensate them for all hours worked as required by law.

577.    By reason of having secured the work and efforts of Plaintiff Ruiz and the Proposed Connecticut Class without proper compensation as required by law, the NCAA and

the Connecticut-based Defendant enjoyed reduced overhead with respect to their labor costs, and therefore realized additional earnings and profits to their own benefit and to the detriment of Plaintiff Ruiz and the Proposed Connecticut Class.  The NCAA and the Connecticut-based Defendant retained and continue to retain such benefits contrary to the fundamental principles of justice, equity and good conscience.

578.    Accordingly, Plaintiff Ruiz and the Proposed Connecticut Class are entitled to judgment in an amount equal to the benefits unjustly retained by the NCAA and the Connecticut-based Defendant.

## COUNT IX
## Violations of the North Carolina Wage and Hour Act
## (On Behalf of Plaintiff Suarez and the Proposed North Carolina Class)

579.    All previous Paragraphs are incorporated as though fully set forth herein.

580.    The Minimum Wage provisions in the NCWHA apply to the NCAA and the North Carolina-based Defendant and protect Plaintiff Suarez and the other members of the Proposed North Carolina Class.

581.    The NCAA and the North Carolina-based Defendant have been, and continue to be, employers within the meaning of the NCWHA, and to which the NCWHA provisions apply.

582.    Plaintiff Suarez and the other members of the Proposed North Carolina Class have been, and/or continue to be, employees of the NCAA and the North Carolina-based Defendant within the meaning of the NCWHA.

583.    The NCAA and the North Carolina-based Defendant have jointly employed, and/or continue to jointly employ, Plaintiff Suarez and the other members of the Proposed North Carolina Class within the meaning of the NCWHA .

www.StudentAthletePay.com

584.     By operation of NCAA bylaws, the NCAA and the North Carolina-based Defendant have jointly agreed to engage in a widespread pattern, policy and practice of misclassifying Plaintiff Suarez and the other members of the Proposed North Carolina Class as unpaid labor rather than employees, prohibiting payment of minimum wages to them for any, and all, hours that NCAA and the North Carolina-based Defendant suffered or permitted Plaintiff Suarez and the other members of the Proposed North Carolina Class to perform work integral to the billion dollar Big Business of NCAA sports.

585.     The NCAA and the North Carolina-based Defendant were aware, or should have been aware, that Student Athletes, like fellow students in Work Study, fall within employee status under the NCWHA when the NCAA and the North Carolina-based Defendant willfully chose not to classify and pay Student Athletes as employees with reckless disregard of employer duties under the NCWHA .

586.     Plaintiff Suarez and the members of the Proposed North Carolina Class have suffered damages, and are entitled to recovery of unpaid wages, liquidated damages, attorneys' fees, costs and other relief.

## COUNT X
### North Carolina Unjust Enrichment
### (On Behalf of Plaintiff Suarez and the Proposed North Carolina Class)

587.     All previous Paragraphs are incorporated as though fully set forth herein.

588.     The NCAA and the North Carolina-based Defendant received and benefited from the uncompensated labors of Plaintiff Suarez and the Proposed North Carolina Class such that to retain said benefit without compensation would be inequitable and rise to the level of unjust enrichment.

589.     At all relevant times, the NCAA and the North Carolina-based Defendant devised and implemented a plan to increase their earnings and profits by fostering a scheme

www.StudentAthletePay.com

of securing work from Plaintiff Suarez and the Proposed North Carolina Class without properly paying compensation.

590.     Contrary to all good faith and fair dealing, the NCAA and the North Carolina-based Defendant induced Plaintiff Suarez and the Proposed North Carolina Class to perform work while failing to properly compensate them for all hours worked as required by law.

591.     By reason of having secured the work and efforts of Plaintiff Suarez and the Proposed North Carolina Class without proper compensation as required by law, the NCAA and the North Carolina-based Defendant enjoyed reduced overhead with respect to their labor costs, and therefore realized additional earnings and profits to their own benefit and to the detriment of Plaintiff Suarez and the Proposed North Carolina Class.  The NCAA and the North Carolina-based Defendant retained and continue to retain such benefits contrary to the fundamental principles of justice, equity and good conscience.

592.     Accordingly, Plaintiff Suarez and the Proposed North Carolina Class are entitled to judgment in an amount equal to the benefits unjustly retained by the NCAA and the North Carolina-based Defendant.

## COUNT XI
## Violations of the Oregon Minimum Wage and Employment Conditions Law
### (On Behalf of Plaintiff Suarez and the Proposed Oregon Class)

593.     All previous Paragraphs are incorporated as though fully set forth herein.

594.     The Minimum Wage provisions in the OMWEC apply to the NCAA and the Oregon-based Defendant and protect Plaintiff Foster and the other members of the Proposed Oregon Class.

595.     The NCAA and the Oregon-based Defendant have been, and continue to be, employers within the meaning of the OMWEC, and to which the OMWEC provisions apply.

www.StudentAthletePay.com

596.     Plaintiff Foster and the other members of the Proposed Oregon Class have been, and/or continue to be, employees of the NCAA and the Oregon-based Defendant within the meaning of the OMWEC.

597.     The NCAA and the Oregon-based Defendant have jointly employed, and/or continue to jointly employ, Plaintiff Foster and the other members of the Proposed Oregon Class within the meaning of the OMWEC.

598.     By operation of NCAA bylaws, the NCAA and the Oregon-based Defendant have jointly agreed to engage in a widespread pattern, policy and practice of misclassifying Plaintiff Foster and the other members of the Proposed Oregon Class as unpaid labor rather than employees, prohibiting payment of minimum wages to them for any, and all, hours that the NCAA and the Oregon-based Defendant suffered or permitted Plaintiff Foster and the other members of the Proposed Oregon Class to perform work integral to the billion dollar Big Business of NCAA sports.

599.     The NCAA and the Oregon-based Defendant were aware, or should have been aware, that Student Athletes, like fellow students in Work Study, fall within employee status under the OMWEC when the NCAA and the Oregon-based Defendant willfully chose not to classify and pay Student Athletes as employees with reckless disregard of employer duties under the OMWEC.

600.     Plaintiff Foster and the members of the Proposed Oregon Class have suffered damages, and are entitled to recovery of unpaid wages, liquidated damages, attorneys' fees, costs and other relief.

### COUNT XII
### Oregon Unjust Enrichment
### (On Behalf of Plaintiff Foster and the Proposed Oregon Class)

601.     All previous Paragraphs are incorporated as though fully set forth herein.

602.    The NCAA and the Oregon-based Defendant received and benefited from the uncompensated labors of Plaintiff Foster and the Proposed Oregon Class such that to retain said benefit without compensation would be inequitable and rise to the level of unjust enrichment.

603.    At all relevant times, the NCAA and the Oregon-based Defendant devised and implemented a plan to increase their earnings and profits by fostering a scheme of securing work from Plaintiff Foster and the Proposed Oregon Class without properly paying compensation.

604.    Contrary to all good faith and fair dealing, the NCAA and the Oregon-based Defendant induced Plaintiff Foster and the Proposed Oregon Class to perform work while failing to properly compensate them for all hours worked as required by law.

605.    By reason of having secured the work and efforts of Plaintiff Foster and the Proposed Oregon Class without proper compensation as required by law, the NCAA and the Oregon-based Defendant enjoyed reduced overhead with respect to their labor costs, and therefore realized additional earnings and profits to their own benefit and to the detriment of Plaintiff Foster and the Proposed Oregon Class.  The NCAA and the Oregon-based Defendant retained and continue to retain such benefits contrary to the fundamental principles of justice, equity and good conscience.

606.    Accordingly, Plaintiff Foster and the Proposed Oregon Class are entitled to judgment in an amount equal to the benefits unjustly retained by the NCAA and the Oregon-based Defendant.

## COUNT XIII
### Violations of the Lousiana's Labor and Worker's Compensation Laws
### (On Behalf of Plaintiff Harris and the Proposed Louisiana Class)

607.    All previous Paragraphs are incorporated as though fully set forth herein.

www.StudentAthletePay.com

608.    The Minimum Wage provisions in the LLWCL apply to the NCAA and the Louisiana-based Defendant and protect Plaintiff Harris and the other members of the Proposed Louisiana Class.

609.    The NCAA and the Louisiana-based Defendant have been, and continue to be, employers within the meaning of the LLWCL, and to which the CMWA provisions apply.

610.    Plaintiff Harris and the other members of the Proposed Louisiana Class have been, and/or continue to be, employees of the NCAA and the Louisiana-based Defendant within the meaning of the LLWCL.

611.    The NCAA and the Louisiana-based Defendant have jointly employed, and/or continue to jointly employ, Plaintiff Harris and the other members of the Proposed Louisiana Class within the meaning of the LLWCL.

612.    By operation of NCAA bylaws, the NCAA and the Louisiana-based Defendant have jointly agreed to engage in a widespread pattern, policy and practice of misclassifying Plaintiff Harris and the other members of the Proposed Louisiana Class as unpaid labor rather than employees, prohibiting payment of minimum wages to them for any, and all, hours that NCAA and the Louisiana-based Defendant suffered or permitted Plaintiff Harris and the other members of the Proposed Louisiana Class to perform work integral to the billion dollar Big Business of NCAA sports.

613.    The NCAA and the Louisiana-based Defendant were aware, or should have been aware, that Student Athletes, like fellow students in Work Study, fall within employee status under the LLWCL when the NCAA and the Louisiana-based Defendant willfully chose not to classify and pay Student Athletes as employees with reckless disregard of employer duties under the LLWCL.

614.     Plaintiff Harris and the members of the Proposed Louisiana Class have suffered damages, and are entitled to recovery of unpaid wages, liquidated damages, attorneys' fees, costs and other relief.

### COUNT XIV
### Louisiana Unjust Enrichment
### (On Behalf of Plaintiff Harris and the Proposed Louisiana Class)

615.     All previous Paragraphs are incorporated as though fully set forth herein.

616.     The NCAA and the Louisiana-based Defendant received and benefited from the uncompensated labors of Plaintiff Harris and the Proposed Louisiana Class such that to retain said benefit without compensation would be inequitable and rise to the level of unjust enrichment.

617.     At all relevant times, the NCAA and the Louisiana-based Defendant devised and implemented a plan to increase their earnings and profits by fostering a scheme of securing work from Plaintiff Harris and the Proposed Louisiana Class without properly paying compensation.

618.     Contrary to all good faith and fair dealing, the NCAA and the Louisiana-based Defendant induced Plaintiff Harris and the Proposed Louisiana Class to perform work while failing to properly compensate them for all hours worked as required by law.

619.     By reason of having secured the work and efforts of Plaintiff Harris and the Proposed Louisiana Class without proper compensation as required by law, the NCAA and the Louisiana-based Defendant enjoyed reduced overhead with respect to their labor costs, and therefore realized additional earnings and profits to their own benefit and to the detriment of Plaintiff Harris and the Proposed Louisiana Class.  The NCAA and the Louisiana-based Defendant retained and continue to retain such benefits contrary to the fundamental principles of justice, equity and good conscience.

620.     Accordingly, Plaintiff Harris and the Proposed Louisiana Class are entitled to judgment in an amount equal to the benefits unjustly retained by the NCAA and the Louisiana-based Defendant.

## COUNT XV
### Violations of the Arizona Minimum Wage Act
### (On Behalf of Plaintiffs Schoen, Snyder and the Proposed Arizona Class)

621.     All previous Paragraphs are incorporated as though fully set forth herein.

622.     The Minimum Wage provisions in the AMWA apply to the NCAA and the Arizona-based Defendant and protect Plaintiff Schoen and the other members of the Proposed Arizona Class.

623.     The NCAA and the Arizona-based Defendant have been, and continue to be, employers within the meaning of the AMWA , and to which the AMWA provisions apply.

624.     Plaintiffs Schoen, Snyder and the other members of the Proposed Arizona Class have been, and/or continue to be, employees of the NCAA and the Arizona-based Defendant within the meaning of the AMWA.

625.     The NCAA and the Arizona-based Defendant have jointly employed, and/or continue to jointly employ, Plaintiff Schoen and the other members of the Proposed Arizona Class within the meaning of the AMWA.

626.     By operation of NCAA bylaws, the NCAA and the Arizona-based Defendant have jointly agreed to engage in a widespread pattern, policy and practice of misclassifying Plaintiffs Schoen, Snyder and the other members of the Proposed Arizona Class as unpaid labor rather than employees, prohibiting payment of minimum wages to them for any, and all, hours that the NCAA and the Arizona-based Defendant suffered or permitted Plaintiffs Schoen, Snyder and the other members of the Proposed Arizona Class to perform work integral to the billion dollar Big Business of NCAA sports.

627.     The NCAA and the Arizona-based Defendant were aware, or should have been aware, that Student Athletes, like fellow students in Work Study, fall within employee status under the AMWA when the NCAA and the Arizona-based Defendant willfully chose not to classify and pay Student Athletes as employees with reckless disregard of employer duties under the AMWA.

628.     Plaintiffs Schoen, Snyder and the members of the Proposed Arizona Class have suffered damages, and are entitled to recovery of unpaid wages, liquidated damages, attorneys' fees, costs and other relief.

**COUNT XVI**
**Arizona Unjust Enrichment**
**(On Behalf of Plaintiffs Schoen, Snyder and the Proposed Arizona Class)**

629.     All previous Paragraphs are incorporated as though fully set forth herein.

630.     The NCAA and the Arizona-based Defendant received and benefited from the uncompensated labors of Plaintiffs Schoen, Snyder and the Proposed Arizona Class such that to retain said benefit without compensation would be inequitable and rise to the level of unjust enrichment.

631.     At all relevant times, the NCAA and the Arizona-based Defendant devised and implemented a plan to increase their earnings and profits by fostering a scheme of securing work from Plaintiffs Schoen, Snyder and the Proposed Arizona Class without properly paying compensation.

632.     Contrary to all good faith and fair dealing, the NCAA and the Arizona-based Defendant induced Plaintiffs Schoen, Snyder and the Proposed Arizona Class to perform work while failing to properly compensate them for all hours worked as required by law.

633.     By reason of having secured the work and efforts of Plaintiff Schoen and the Proposed Arizona Class without proper compensation as required by law, the NCAA and the

-163-

Arizona-based Defendant enjoyed reduced overhead with respect to their labor costs, and therefore realized additional earnings and profits to their own benefit and to the detriment of Plaintiff Schoen, Snyder and the Proposed Arizona Class.  The NCAA and the Arizona-based Defendant retained and continue to retain such benefits contrary to the fundamental principles of justice, equity and good conscience.

634.    Accordingly, Plaintiffs Schoen, Snyder and the Proposed Arizona Class are entitled to judgment in an amount equal to the benefits unjustly retained by the NCAA and the Arizona-based Defendant.

### COUNT XVII
### Violations of the Indiana Minimum Wage Law
### (On Behalf of Plaintiff Schmidt, Snyder and the Proposed Indiana Class)

635.    All previous Paragraphs are incorporated as though fully set forth herein.

636.    The Minimum Wage provisions in the AMWA apply to the NCAA and the Indiana-based Defendants and protect Plaintiffs Schmidt, Snyder and the other members of the Proposed Indiana Class.

637.    The NCAA and the Indiana-based Defendants have been, and continue to be, employers within the meaning of the IMWL , and to which the IMWL provisions apply.

638.    Plaintiffs Schmidt, Snyder and the other members of the Proposed Indiana Class have been, and/or continue to be, employees of the NCAA and the Indiana-based Defendants within the meaning of the IMWL.

639.    The NCAA and the Indiana-based Defendants have jointly employed, and/or continue to jointly employ, Plaintiffs Schmidt, Snyder and the other members of the Proposed Indiana Class within the meaning of the IMWL.

640.    By operation of NCAA bylaws, the NCAA and the Indiana-based Defendants have jointly agreed to engage in a widespread pattern, policy and practice of misclassifying

Plaintiffs Schmidt, Snyder and the other members of the Proposed Indiana Class as unpaid labor rather than employees, prohibiting payment of minimum wages to them for any, and all, hours that NCAA and the Indiana-based Defendants suffered or permitted Plaintiffs Schmidt, Snyder and the other members of the Proposed Indiana Class to perform work integral to the billion dollar Big Business of NCAA sports.

641.   The NCAA and the Indiana-based Defendants were aware, or should have been aware, that Student Athletes, like fellow students in Work Study, fall within employee status under the IMWL when the NCAA and the Indiana-based Defendants willfully chose not to classify and pay Student Athletes as employees with reckless disregard of employer duties under the IMWL.

642.   Plaintiffs Schmidt, Snyder and the members of the Proposed Indiana Class have suffered damages, and are entitled to recovery of unpaid wages, liquidated damages, attorneys' fees, costs and other relief.

## COUNT XVIII
### Indiana Unjust Enrichment
### (On Behalf of Plaintiffs Schmidt, Snyder and the Proposed Indiana Class)

643.   All previous Paragraphs are incorporated as though fully set forth herein.

644.   The NCAA and the Indiana-based Defendants received and benefited from the uncompensated labors of Plaintiffs Schmidt, Snyder and the Proposed Indiana Class such that to retain said benefit without compensation would be inequitable and rise to the level of unjust enrichment.

645.   At all relevant times, the NCAA and the Indiana-based Defendants devised and implemented a plan to increase their earnings and profits by fostering a scheme of securing work from Plaintiffs Schmidt, Snyder and the Proposed Indiana Class without properly paying compensation.

www.StudentAthletePay.com

646.     Contrary to all good faith and fair dealing, the NCAA and the Indiana-based Defendants induced Plaintiffs Schmidt, Snyder and the Proposed Indiana Class to perform work while failing to properly compensate them for all hours worked as required by law.

647.     By reason of having secured the work and efforts of Plaintiffs Schmidt, Snyder and the Proposed Indiana Class without proper compensation as required by law, the NCAA and the Indiana-based Defendants enjoyed reduced overhead with respect to their labor costs, and therefore realized additional earnings and profits to their own benefit and to the detriment of Plaintiffs Schmidt, Snyder and the Proposed Indiana Class.  The NCAA and the Indiana-based Defendants retained and continue to retain such benefits contrary to the fundamental principles of justice, equity and good conscience.

648.     Accordingly, Plaintiffs Schmidt, Snyder and the Proposed Indiana Class are entitled to judgment in an amount equal to the benefits unjustly retained by the NCAA and the Indiana-based Defendants.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs seek the following relief on behalf of themselves and all others similarly situated:

(a)     An order certifying this litigation to proceed as an FLSA collective action pursuant to 29 U.S.C. 216(b);

(b)     Prompt notice, pursuant to 29 U.S.C. 216(b), of this litigation to all potential members of the Proposed FLSA Collective;[37]

(c)     An order certifying this litigation to proceed as a class action pursuant to Fed. R. Civ. P. 23 on behalf of the Proposed Pennsylvania Class, the Proposed New York Class, the Proposed Connecticut Class, the Proposed Oregon Class,

---

[37]     Pursuant to the Family Educational Rights and Privacy Act, 20 U.S.C. § 1232g ("FERPA"), a/k/a the Buckley Amendment, a student may require a school to not disclose certain "directory information" to third parties, including information necessary to send notice to FLSA Class members such as names; permanent home addresses and/ or temporary local or campus addresses; and email addresses.  To ensure FERPA compliance and efficient case management, Plaintiff requests that the Court order Defendant NCAA member schools to send notice.

the Proposed Oregon Class, the Proposed Louisiana Class, the Proposed Indiana Class, and the Proposed Indiana Class;

(d)      Economic damages and prejudgment interest to the fullest extent permitted under the law;

(e)      Disgorgement of any monies that have caused Defendants to become unjustly enriched;

(f)      Non-economic damages, including compensatory and punitive damages, to the fullest extent permitted by law;

(g)      Liquidated damages to the fullest extent permitted under the law;

(h)      Litigation costs, expenses and attorneys' fees to the fullest extent permitted under the law;

(i)      A declaration that NCAA bylaws, as uniformly interpreted and applied by Defendants to prohibit the proper classification and compensation of Student Athletes, violate wage and hour laws; and

(j)      Such other and further relief as this Court deems just and proper.

**JURY DEMAND**

Plaintiffs demand a jury trial on all triable claims and issues of fact.

Dated: September 23, 2021                    Respectfully submitted,

                                             **WIGDOR LLP**

                                             _____

                                             Michael J. Willemin (Admitted *Pro Hac Vice*)
                                             Renan F. Varghese (admitted *Pro Hac Vice* )
                                             85 Fifth Avenue
                                             New York, NY   10003
                                             Tel:      (212) 257-6800
                                             Fax:      (212) 257-6845
                                             mwillemin@wigdorlaw.com
                                             rvarghese@wigdorlaw.com

                                             AND

                                             Paul L. McDonald (PA Bar No. 84856)
                                             **P L McDonald Law LLC**
                                             1800 JFK Boulevard, Suite 300
                                             Philadelphia, PA   19103
                                             Tel:      (267) 238-3835
                                             Fax:      (267) 238-3801
                                             paul@plmcdonaldlaw.com

                                             *Counsel for Plaintiffs and*
                                             *Proposed Counsel for the Members of*
                                             *the Proposed FLSA Collective,*
                                             *the Proposed Pennsylvania Class,*
                                             *the Proposed New York Class,*
                                             *the Proposed Connecticut Class,*
                                             *the Proposed North Carolina Class,*
                                             *the Proposed Oregon Class,*
                                             *the Proposed Louisiana Class,*
                                             *the Proposed Arizona Class, and*
                                             *the Proposed Indiana Class.*

www.StudentAthletePay.com