**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| RALPH "TREY" JOHNSON, STEPHANIE KERKELES, NICHOLAS LABELLA, CLAUDIA RUIZ, JACOB WILLEBEEK-LEMAIR, ALEXA COOKE, RHESA FOSTER, ZACHARY HARRIS, MATTHEW SCHMIDT, TAMARA SCHOEN STATMAN, GINA SNYDER, ESTEBAN SUAREZ and LIAM WALSH, individually and on behalf of all persons similarly situated,

Plaintiffs,

v.

THE NATIONAL COLLEGIATE ATHLETIC ASSOCIATION, a/k/a the NCAA, CORNELL UNIVERSIY, FORDHAM UNIVERSITY, LAFAYETTE COLLEGE, SACRED HEART UNIVERSITY, VILLANOVA UNIVERSITY, UNIVERSITY OF OREGON, TULANE UNIVERSITY, UNIVERSITY OF NOTRE DAME, UNIVERSITY OF ARIZONA, PURDUE UNIVERSITY, DUKE UNIVERSITY, and MARIST COLLEGE,

Defendants. | Civil Action No. 19-cv-5230 (JP) |

**PLAINTIFFS' OMNIBUS MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS THE THIRD AMENDED COMPLAINT**

**WIGDOR LLP**

Michael J. Willemin (Admitted *Pro Hac Vice*)
William R. Baker (Admitted *Pro Hac Vice*)
85 Fifth Avenue
New York, NY   10003
Tel: (212) 257-6800
Fax: (212) 257-6845
mwillemin@wigdorlaw.com

wbaker@wigdorlaw.com

Paul L. McDonald (PA Bar No. 84856)
**P L McDonald Law LLC**
1800 JFK Boulevard, Suite 300
Philadelphia, PA   19103
Tel: (267) 238-3835
Fax: (267) 238-3801
paul@plmcdonaldlaw.com

*Counsel for Plaintiffs and*
*Proposed Counsel for the Members of*
*the Proposed FLSA Collective,*
*the Proposed Pennsylvania Class,*
*the Proposed New York Class,*
*the Proposed Connecticut Class,*
*the Proposed North Carolina Class,*
*the Proposed Oregon Class,*
*the Proposed Louisiana Class,*
*the Proposed Arizona Class, and*
*the Proposed Indiana Class.*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ iv

PRELIMINARY STATEMENT ...........................................................................................1

STATEMENT OF FACTS ....................................................................................................3

I.       BACKGROUND ........................................................................................................3

      A.     The NCAA, its Member Schools, and its Bylaws .................................................3

      B.     NCAA Athletics and Student Athletes ..................................................................5

II.      PROCEDURAL HISTORY.........................................................................................7

LEGAL ARGUMENT ..........................................................................................................7

I.       STANDARD OF REVIEW ........................................................................................7

      A.     Federal Rule of Civil Procedure 12(b)(1) .............................................................7

      B.     Federal Rule of Civil Procedure 12(b)(2) .............................................................8

      C.     Federal Rules of Civil Procedure 12(b)(3) ............................................................9

      D.     Federal Rules of Civil Procedure 12(b)(6) ............................................................9

II.      COLLEGIATE ATHLETES ARE EMPLOYEES OF THE NCAA
      AND ITS MEMBER INSTITUIONS.........................................................................9

      A.     Plaintiffs Sufficiently Allege FLSA Violations...................................................11

      B.     Plaintiffs are Employees Pursuant to the Third Circuit's Test .............................11

             i.       Each Plaintiff "Performed Services for" a NCAA
                   Member School and the NCAA ...............................................................12

             ii.     Each Plaintiff Performed Services "Necessarily
                   and Primarily for the Benefit" of a NCAA Member School
                   and the NCAA .........................................................................................14

             iii.    Each Plaintiff Performed Services "Under the
                   Control or Right of Control" of a NCAA
                     Member School and the NCAA ...............................................................20

iv.    Plaintiffs are also Employees of their NCAA Member
School and the NCAA Pursuant to the Common-Law
Agency Doctrine ......................................................................27

v.    Each Plaintiff Performed Services in Return for Express or
Implied Compensation or In-Kind Benefits................................32

C.    Plaintiffs Sufficiently Plead That They Worked in Interstate Commerce ............35

D.    Plaintiffs Sufficiently Plead They Were Not Paid Minimum Wage in
Violation of the FLSA ........................................................................36

III.    COLLEGIATE ATHLETES ARE SUBJECT TO THE MINIMUM
WAGE LAWS OF VARIOUS STATES...............................................................38

A.    Connecticut ........................................................................................38

B.    Indiana  ...............................................................................................38

C.    New York............................................................................................39

D.    North Carolina ...................................................................................40

E.    Oregon  ...............................................................................................40

F.    Pennsylvania ......................................................................................40

IV.    PLAINTIFFS HAVE SUFFICIENTLY PLEADED UNJUST ENRICHMENT CLAIMS
AGAINST THE NCAA AND ITS MEMBER SCHOOLS............................................41

A.    Defendants' Case Law is Inapposite...................................................43

B.    Unjust Enrichment Claims are not Automatically Precluded by the Existence of
Contract or the Availability of a Statutory Claim...................................44

i.    Preclusion by Statute ................................................................44

ii.    Preclusion by Contract .............................................................48

V.    SOVEREIGN IMMUNITY ........................................................................50

A.    Basic Framework of Public-Entity Sovereign Immunity.......................50

B.    The Third Circuit Applies a Unique Sovereign Immunity Standard ....................51

   i.  Purdue University is Not Entitled to Sovereign Immunity ......................52

   ii.  The University of Oregon is Not Entitled to Sovereign Immunity ..........56

   iii.  The University of Arizona is Not Entitled to Sovereign Immunity .........58

VI. THIS COURT HAS PERSONAL JURISDICTION OVER ALL DEFENDANTS ........60

  A.  Legal Standard ....................................................................................................61

  B.  Defendant Universities Direct and Manage the NCAA, a Nationwide Entity......62

   i.  Duke, Tulane, Notre Dame and Marist's Long-Standing Involvement with the NCAA ....................................................................................................62

   ii.  The NCAA's Member Schools Control the NCAA and its Governance of NCAA Athletes ....................................................................................63

   iii.  The NCAA Conceded That It Has a Nationwide Presence ......................65

   iv.  Member Schools, Like the NCAA, are Subject to This Court's Personal Jurisdiction ....................................................................................66

  C.  Plaintiffs are Entitled to Jurisdictional Discovery to Ascertain Defendant Universities' Contacts With the Forum State ........................................................66

VII. ALL PLAINTIFFS' FLSA CLAIMS ARE TIMELY .......................................................68

  A.  Court Ordered Tolling Agreement Applies to Plaintiff Walsh ..............................68

  B.  Extraordinary Circumstances Merit Equitable Tolling .........................................70

VIII. PLAINTIFFS MAY JOINTLY MAINTAIN A FLSA COLLECTIVE ACTION AND RULE 23 CLASS ACTION....................................................................................................71

IX. PLAINTIFFS HAVE ALLEGED A COGNIZABLE INJURY .......................................72

X. IN THE ALTERNATIVE, PLAINTIFFS SHOULD BE GRANTED LEAVE TO AMEND THE COMPLAINT ..............................................................................................73

CONCLUSION........................................................................................................................75

# TABLE OF AUTHORITIES

**Cases**                                                                            **Page(s)**

Acosta v. Cathedral Buffet, Inc.,
   887 F.3d 761 (6th Cir. 2018) ................................................................. 41

Adams v. Waupaca Foundry,
   No. 17 Civ. 00140, 2017 WL 6493090 (S.D. Ind. Dec. 19, 2017) ........................................... 53

Alvarez v. BI Inc.,
   No. 16 Civ. 2705, 2018 WL 2288286 (E.D. Pa. May 17, 2018) ................................................. 77

Andrade v. Kwon,
   No. 3:08 Civ. 479, 2012 WL 3059616 (D. Conn. Mar. 26, 2012) ................................ 48, 51, 52

Arnette v. S. Oregon Univ.,
   No. 10 Civ. 3025, 2010 WL 3154579 (D. Or. July 2, 2010) ..................................................... 64

Ashcroft v. Iqbal,
   556 U.S. 662 (2009) ................................................................................ 16

Aych v. Univ. of Arizona,
   No. 23 Civ. 07282, 2024 WL 4467608 (C.D. Cal. July 5, 2024) ........................................... 66

Bailey v. Millenium Grp. of Delaware,
   No. 21-1752, 2022 WL 3754617 (3d Cir. Aug. 30, 2022) ....................................................... 17

Bedolla v. Brandolini,
   18 Civ. 146 2018 WL 2291117 (E.D. Pa. May 18, 2018) ........................................................ 44

Bell Atl. Corp. v. Twombly,
   550 U.S. 544 (2007) ......................................................................... 16, 18

Benshoff v. City of Virginia Beach,
   180 F.3d 136 (4th Cir. 1999) .......................................................... 26, 33

Bosley v. Chubb Corp.,
   No. 04 Civ. 4598, 2007 WL 9604965 (E.D. Pa. Feb. 20, 2007) ............................................. 77

Bowers v. Nat'l Collegiate Athletic Ass'n,
   475 F.3d 524 (3d Cir. 2007) ................................................................. 59

Breig v. Covanta Holding Corp.,
   No. 21 Civ. 865, 2022 WL 837242 (E.D. Pa. Mar. 21, 2022) ................................................ 54

Burrell v. Staff,
    60 F.4th 25 (3d Cir. 2023) ............................................................................... 77

California Public Employees' Retirement System v. Chubb Corp.,
    394 F.3d 126 (3d Cir. 2004) ............................................................................ 81

Callahan v. City of Chicago, Illinois,
    813 F.3d 658 (7th Cir. 2016) ............................................................................ 33

Centralized Health Systems, Inc. v. Cambridge Medical Instruments, Inc.,
    No. 89 Civ. 3322, 1989 WL 136277 (E.D. Pa. Nov. 8, 1989) ....................... 74

Chapman v. Yellow Cab Coop.,
    875 F.3d 846 (7th Cir. 2017) ............................................................................ 33

Charles v. Progressions Behav. Health Servs., Inc.,
    No. 17 Civ. 2439, 2018 WL 4924169 (E.D. Pa. Oct. 9, 2018) ...................... 77

Claim of Druc,
    613 N.Y.S.2d 782 (App. Div. 3d Dep't 1994) ................................................ 46

Claim of Mitromaras,
    504 N.Y.S.2d 331 (App. Div. 3d Dep't 1986) ................................................ 46

Committe v. Oregon State Univ.,
    No. 18 Civ. 00328, 2018 WL 4623159 (D. Or. Sept. 26, 2018) .................... 63

Common Cause of Pa. v. Pennsylvania,
    558 F.3d 249 (3d Cir. 2009) ............................................................................ 14

Community for Creative Non-Violence v. Reid,
    490 U.S. 730 (1989) ......................................................................................... 34

Conley v. Gibson,
    355 U.S. 41 (1957) ........................................................................................... 16

Coppolillo v. Cort,
    947 N.E.2d 994 (Ind. Ct. App. 2011) ........................................................ 50, 51

Cornell & Co. v. Occupational Safety & Health Review Comm'n,
    573 F.2d 820 (3d Cir. 1978) ............................................................................ 79

Crowe v. Oregon State Bar,
    112 F.4th 1218 (9th Cir. 2024) ........................................................................ 63

Davis v. Abington Mem'l Hosp.,
   765 F.3d 236 (3d Cir. 2014) ................................................................. 81

DePalma v. Scotts Co. LLC,
   No. 13 Civ. 7740, 2017 WL 1243134 (D.N.J. Jan. 20, 2017) .............................. 77, 78

D'Jamoos ex rel. Weingeroff v. Pilatus Aircraft Ltd.,
   566 F.3d 94 (3d Cir. 2009) ................................................................. 73

Doe v. Oregon State Univ.,
   614 F. Supp. 3d 847 (D. Or. 2022) ......................................................... 64

Dole v. Arco Chem. Co.,
   921 F.2d 484 (3d Cir. 1990) ................................................................ 79

Donaldson v. W. Oregon Univ.,
   No. 23 Civ. 01450, 2023 WL 9289099 (D. Or. Dec. 22, 2023) ............................... 64

Dong v. Ren's Garden,
   No. 09 Civ. 5642, 2010 WL 1133482 (D.N.J. Mar. 22, 2010) ............................... 42

Donovan v. Tony & Susan Alamo Found.,
   567 F. Supp. 556 (W.D. Ark. 1982) ......................................................... 40

Embree Constr. Grp., Inc. v. Rafcor, Inc.,
   411 S.E.2d 916 (Sup. Ct. N.C. 1992) ....................................................... 50

Empire Kosher Poultry, Inc. v. United Food & Commercial Workers Health & Welfare Fund of
   Ne. Pa.,
   285 F. Supp. 3d 573 (M.D. Pa. 2003) ....................................................... 15

Febres v. Camden Bd. of Educ.,
   445 F.3d 227 (3d Cir. 2006) ................................................................ 57

Fitchik v. N.J. Transit Rail Operations, Inc.,
   873 F.2d 655 (3d Cir. 1989) ................................................................ 58

Foman v. Davis,
   371 U.S. 178 (1962) ........................................................................ 80

Fowler v. UPMC Shadyside,
   578 F.3d 203 (3d Cir. 2009) ............................................................. 16, 23

Gasoline Sales, Inc. v. Aero Oil Co.,
   39 F.3d 70 (3d Cir. 1994) .................................................................. 81

Gordon v. Gordon,

    No. 24 Civ. 1820, 2025 WL 1238372 (M.D. Pa. Apr. 29, 2025)............................................... 14

Great W. Mining & Mineral Co. v. ADR Options, Inc.,

    434 F. App'x 83 (3d Cir. 2011)................................................................................................. 16

Hagel v. Portland State Univ.,

    No. 04 Civ. 1770, 2005 WL 1502884 (D. Or. June 9, 2005)..................................................... 64

Hannibal-Fisher v. Grand Canyon Univ.,

    523 F. Supp. 3d 1087 (D. Ariz. 2021)............................................................................... 53, 54

Hans v. Louisiana,

    134 U.S. 1 (1890) .................................................................................................................... 57

Hartig Drug Co. Inc. v. Senju Pharmaceutical Co. Ltd.,

    836 F.3d 261 (3d Cir. 2006)..................................................................................................... 14

Hayes v. Waddell & Reed, Inc.,

    No. 12-293, 2013 WL 5434139 (W.D. Pa. Sept. 26, 2013)...................................................... 17

Holiday v. Bally's Park Place, Inc.,

    No. 06 Civ. 4588, 2007 WL 2600877 (E.D. Pa. Sept. 10, 2007)............................................... 15

In re Automotive Refinishing Paint Antitrust Litigation,

    No. 1426, 2002 WL 31261330 (E. D. Pa. July 31, 2002) ........................................................ 73

In re Chocolate Confectionary Antitrust Litig.,

    749 F. Supp. 2d 224 (M.D. Pa. 2010) ..................................................................................... 53

In re Citizens Bank, N.A.,

    15 F.4th 607 (3d Cir. 2021)..................................................................................................... 78

In re Coll. Athlete NIL Litig.,

    No. 20 Civ. 3919, 2025 WL 1675820 (N.D. Cal. June 6, 2025)............................................... 61

In re Enterprise Rent-A-Car Wage & Hour Emp't Prac. Litig.,

    683 F.3d 462 (3d Cir. 2012)............................................................................................. 17, 30

In re Nyuyen Vu,

    497 B.R. 462 (Bankr. E.D. Pa. 2013)...................................................................................... 53

Ingham ex rel. Cobalt Asset Mgmt., L.P. v. Thompson,

    931 N.Y.S.2d 306 (App. Div. 1st Dep't 2011) ........................................................................ 55

Jessey Sports, LLC v. Intercollegiate Men's Lacrosse Coaches Ass'n, Inc.,
    888 S.E.2d 677 (N.C. Ct. App. 2023) ............................................... 48

Johnson v. Nat'l Collegiate Athletic Ass'n,
    108 F.4th 163 (3d Cir. 2024)........................................................ passim

Kashani v. Purdue Univ.,
    813 F.2d 843 (7th Cir. 1987)............................................................ 60

Kehler v. Albert Anderson, Inc.,
    16 Civ. 5318  2017 WL 1399628 (D.N.J. Apr. 18, 2017).................... 42, 43

Kehr Packages, Inc. v. Fidelcor, Inc.,
    926 F.2d 1406 (3d Cir. 1991) ........................................................... 14

Knepper v. Rite Aid Corp.,
    675 F.3d 249 (3d Cir. 2012).......................................................... 78, 79

Kraus Indus., Inc. v. Moore,
    No. 06 Civ. 00542, 2007 WL 2744194 (W.D. Pa. Sep. 18, 2007)....................... 55, 56

Levy v. World Wrestling Entm't, Inc.,
    No. 08 Civ. 1289, 2009 WL 455258 (D. Conn. 2009)............................ 57

Loiselle v. Cosas Mgmt. Grp., LLC,
    228 P.3d 943 (Ariz. Ct. App. 2010) .................................................. 50

Lugo v. Farmers Pride, Inc.,
    967 A.2d 963 (Super. Ct. Pa. 2009) ................................................... 54

Maliandi v. Montclair State Univ.,
    845 F.3d 77 (3d Cir. 2016) ............................................... 58, 59, 61, 66

Mannino v. Passalacqua,
    101 N.Y.S.3d 381 (App. Div. 2d Dep't 2019) ............................ 48, 51, 54

McEachern v. George Junior Republic in Pennsylvania,
    No. 18 Civ. 395, 2020 WL 1307421 (W.D. Pa. Mar. 19, 2020)............... 54

Meaney v. Connecticut Hosp. Ass'n, Inc.,
    735 A.2d 813 (Sup. Ct. Conn. 1999).............................................. 55, 57

Meehan v. Cheltenham Twp.,
    410 Pa. 446 (Sup. Ct. Pa. 1963) ....................................................... 48

Metcalfe v. Renaissance Marine Inc.,

    566 F.3d 324 (3d Cir. 2009) ................................................................. 67, 68

Miller Yacht Sales, Inc. v. Smith,

    384 F.3d 93 (3d Cir. 2004) ........................................................................ 15

Mitchell v. L.A. Cmty. Coll. Dist.,

    861 F.2d 198 (9th Cir. 1988) ...................................................................... 63

Monahan v. Smyth Auto., Inc.,

    No. 10 Civ. 00048, 2011 WL 379129 (S.D. Ohio Feb. 2, 2011) ............................................. 52

Mortensen v. First Fed. Sav. and Loan Ass'n,

    549 F.2d 884 (3d Cir. 1997) .................................................................. 14, 15

Nationwide Mut. Ins. Co. v. Darden,

    503 U.S. 318 (1992) ............................................................................ 34

Nat'l Collegiate Athletic Ass'n v. Alston,

    594 U.S. 69 (2021) .......................................................................... 12, 19

Pentlong Corp. v. GLS Cap., Inc.,

    573 Pa. 34 (Pa. 2003) ........................................................................... 50

Pinker v. Roche Holdings Ltd.,

    292 F.3d 361 (3d Cir. 2002) ...................................................................... 68

PPG Indus. Inc v. Jiangsu Tie Mao Glass Co. Ltd,

    47 F.4th 156 (3d Cir. 2022) ...................................................................... 52

Provident Nat. Bank v. California Fed. Sav. & Loan Ass'n,

    819 F.2d 434 (3d Cir. 1987) ...................................................................... 15

Razak v. Uber Techs., Inc.,

    No. 16 Civ. 573, 2016 WL 5874822 (E.D. Pa. Oct. 7, 2016) ............................................. 42, 43

Regents of the Univ. of California v. Doe,

    519 U.S. 425 (1997) ...................................................................... 58, 59, 65

Ronwin v. Shapiro,

    657 F.2d 1071 (9th Cir. 1981) .................................................................... 65

Rosario v. First Student Mgmt. LLC,

    247 F. Supp. 3d 560 (E.D. Pa. 2017) .......................................................... 17, 18

Rounds v. Oregon State Bd. of Higher Educ.,
  166 F.3d 1032, 1035 (9th Cir. 1999).................................................................. 62, 63

Santos ex rel. Beato v. United States,
  559 F.3d 189 (3d Cir. 2009) ................................................................................ 77

Scott v. NOW Courier, Inc.,
  No. 10 Civ. 00971, 2011 WL 13350293 (S.D. Ind. Sept. 27, 2011)................... 52, 54

Seminole Tribe of Fla. v. Fla.,
  517 U.S. 44 (1996) ............................................................................................... 57

SeYoung Ra v. Gerhard's, Inc.,
  2019 WL 95473 (E.D. Pa. Jan. 3, 2019) .............................................................. 42, 43

Shuker v. Smith & Nephew, PLC,
  885 F.3d 760 (3d Cir. 2018)................................................................................. 15

Sosnowy v. A. Perri Farms, Inc.,
  764 F. Supp. 2d 457 (E.D.N.Y. 2011)................................................................. 51

Spiro v. Allied Bldg. Prods. Corp.,
  No. Civ. 13 Civ. 1561, 2013 WL 5270772 (E.D. Pa. Sept. 17, 2013) ................ 68, 73

Spokeo, Inc. v. Robins,
  578 U.S. 330 (2016) ............................................................................................. 79

Stern v. Aracari Project,
  No. 24 Civ. 1222, 2025 WL 899320 (E.D. Pa. Mar. 21, 2025) ........................... 15

Arizona Students' Ass'n v. Arizona Bd. of Regents,
  824 F.3d 858 (9th Cir. 2016)................................................................................ 66

Time Share Vacation Club v. Atlantic Resorts, Ltd.,
  735 F.2d 61 (3d Cir. 1984)................................................................................... 15

Tony & Susan Alamo Found. v. Sec'y of Lab.,
  471 U.S. 290 (1985) ....................................................................................... passim

Toys "R" Us, Inc. v. Step Two, S.A.,
  318 F.3d 446 (3d Cir. 2003)................................................................................. 73

Trunzo v. Citi Mortg.,
  43 F. Supp. 3d 517 (W.D. Pa. 2014) ................................................................... 82

Trustmark Ins. Co. v. Bank One, Ariz., NA,

    48 P.3d 485 (Ariz. Ct. App. 2002) ......................................................... 50

U.S. v. Kensington Hosp.,

    760 F.Supp. 1120 (E.D. Pa. 1991) ..................................................... 55, 56

United States ex rel. Schumann v. Astrazeneca Pharms. L.P.,

    769 F.3d 837 (3d Cir. 2014) .................................................................. 80

Vantage Learning (USA), LLC v. Edgenuity, Inc.,

    246 F. Supp. 3d 1097 (E.D. Pa. 2017) ............................................... 55, 57

Verma v. 3001 Castor, Inc.,

    937 F.3d 221 (3d Cir. 2019) .................................................................. 78

Vonbergen v. Liberty Mut. Ins. Co.,

    705 F. Supp. 3d 440 (E. D. Pa. 2023) ............................................... 73, 74

W. Africa Trading & Shipping Co., et al. v. London Int'l Group, et al.,

    968 F. Supp. 996 (D.N.J. 1997) ............................................................ 73

Walters v. MedSouth Rec. Mgmt., LLC,

    38 So.3d 245 (Sup. Ct. La. 2010) ...................................................... 50, 54

Warner v. Orleans Home Builders, Inc.,

    550 F. Supp. 2d 583 (E.D. Pa. 2008) .................................................... 78

Williams v. Tri-County Growers, Inc.,

    747 F.2d 121 (3d Cir. 1984) .................................................................. 44

Wilson v. Gutierrez,

    323 P.3d 974 (Or. Ct. App. 2014) ...................................................... 49, 51

Worldcom, Inc. v. Graphnet, Inc.,

    343 F.3d 651 (3d Cir. 2003) .................................................................. 80

Zebroski v. Gouak,

    No. 09 Civ. 1857, 2009 WL 2950813 (E.D. Pa. Sept. 9, 2009) .............. 42

Zhong v. Aug. Aug. Corp.,

    498 F. Supp. 2d 625 (S.D.N.Y. 2007) ................................................... 43

**Statutes**

28 U.S.C. § 211 .......................................................................................... 44

29 U.S.C. § 206 ..................................................................................... 43, 52

29 U.S.C. § 216 ................................................................................................ 79

29 U.S.C. § 203 ............................................................................................ 42, 43

42 Pa. Cons. Stat. § 5322 ............................................................................... 68

A.R.S. § 41-622 ............................................................................................... 65

Conn. Gen. Stat. § 31-58 ................................................................................ 45

Ind. Code § 21 ............................................................................................ 60, 61

Ind. Code § 22 ................................................................................................. 45

N.C. Gen. Stat. § 95-25.14 .............................................................................. 47

N.Y. Lab. Law § 651 ........................................................................................ 46

N.Y. Lab. Law § 191 ........................................................................................ 46

Or. Rev. Stat. § 352 .............................................................................. 63, 64, 65

Or. Rev. Stat. § 653.010 ................................................................................... 47

**Rules**

Fed. R. Civ. P. 8 ........................................................................................ 16, 53

Fed. R. Civ. P. 15 ............................................................................................ 79

Fed. R. Civ. P. 9 .............................................................................................. 81

Fed. R. Civ. P. 12 .................................................................................. 14, 15, 16

## PRELIMINARY STATEMENT

Plaintiffs Ralph "Trey" Johnson, Stephanie Kerkeles, Nicholas Labella, Claudia Ruiz, Jacob Willebeek-Lemair, Alexa Cooke, Rhesa Foster, Zachary Harris, Matthew Schmidt, Tamara Schoen, Gina Snyder, Esteban Suarez and Liam Walsh (together, "Plaintiffs") respectfully submit this memorandum of law in opposition to Defendants the National Collegiate Athletic Association's ("NCAA"), Cornell University's ("Cornell"), Fordham University's ("Fordham"), Lafayette College's ("Lafayette"), Sacred Heart University's ("Sacred Heart"), Villanova University's ("Villanova"), the University of Oregon's ("Oregon"), Tulane University's ("Tulane"), the University of Notre Dame's ("Notre Dame"), the University of Arizona's ("Arizona"), Purdue University's ("Purdue"), Duke University's ("Duke") and Marist College's ("Marist") (together, "Defendants") several Motions to Dismiss Plaintiffs' Third Amended Complaint ("TAC"). See Dkt. Nos. 196, 198, 200, 201, 203, 204, 207, 208, 214, 215.

At this stage of the litigation, Plaintiffs need only plausibly plead that an employment relationship exists between themselves and the Defendants, taking all reasonable inferences in their favor.  Plaintiffs plead an enormous body of facts in the TAC supporting the inference that an employment relationship exists between themselves, the NCAA and the member schools. Further, the new test handed down by the Third Circuit is far more lenient towards Plaintiffs than the old test.  See generally Johnson v. Nat'l Collegiate Athletic Ass'n, 108 F.4th 163 (3d Cir. 2024) (hereinafter "Johnson").  It acknowledges that collegiate athletes are *sui generis* and excises those elements of the previously-applied Glatt test that were irrelevant – elements that favored Defendants' arguments.  This Court already denied Defendants' previous motion to dismiss under the former heightened standard.  As such, the Court is left with an *easier* job of parsing the relevant factors this time around and determining, again, that Plaintiffs plausibly make out that they are employees of the NCAA and its member schools.

1

To reiterate, this is a motion to dismiss. It is not a motion for summary judgment. We are not asking the Court to determine whether an employment relationship actually exists. The fact that much ink has already been spilled in this case does not complicate things or somehow heighten Plaintiffs' burden at this stage, which is nothing more than to allege that they are Defendants' employees. The **_only_** reason Defendants' initial motions to dismiss were not laughable on their face is because they relied upon the claim that student athletes are automatically exempted from the minimum wage laws because they are "amateurs," a claim that at least had a modicum of support based on non-binding precedent. Since those motions were filed, the Third Circuit and the Supreme Court have roundly rejected the notion that the NCAA is subject to preferential treatment based on the purported "amateur" status of its student athletes. Accordingly, there is nothing special or complicated about Defendants' present motions, which should be swiftly denied so that this case, which has been pending now for five years, can proceed to discovery.

Finally, the Third Circuit, in writing both the majority in the <u>Johnson</u> opinion and its concurrence, clearly understood that Plaintiffs had met their burden at the pleading stage. The majority, for instance, specifically notes that "the educational and vocational benefits of college athletics cited by Appellants as alternative forms of remuneration (increased discipline, a stronger work ethic, improved strategic thinking, time management, leadership, and goal setting skills, and a greater ability to work collaboratively) are all exactly the kinds of skills one would typically acquire in a work environment." <u>Id.</u> at 180. The concurrence leads by noting, "we should not have accepted this interlocutory appeal." <u>Id.</u> at 183 (Porter, J., concurring). It goes on to state that the question of the employment status of collegiate athletes is "overwhelmingly factual." <u>Id.</u> at 184 (Porter, J., concurring). There is only one mechanism for the parties to develop a factual record—discovery.

For these reasons, and for the reasons more fully set forth below, Plaintiffs respectfully request that Defendants' motion be denied in its entirety.

## STATEMENT OF FACTS

## I.    BACKGROUND[1]

### A.    The NCAA, its Member Schools, and its Bylaws

The NCAA is an association of institutions of higher learning that regulates and organizes student athletics among its member schools.  TAC ¶¶ 243-46.  It "is a member-led organization" through which its member schools actively legislate and enforce the NCAA bylaws.  Id. ¶ 243.  "Member representatives serve on committees that propose rule and policies surrounding college sports.  Members ultimately decide which rules to adopt–everything from recruiting and compliance to academics and championships–and implement them on campus."  Id.  In addition to setting the policy agenda, these member schools are also tasked with enforcing these NCAA bylaws.  See, e.g., id. ¶ 249-252.  The NCAA also enters into agreements to broadcast NCAA contests nationally, and promotes those events, generating substantial revenue that is distributed among all NCAA Division I ("D1") institutions.  Id., ¶¶ 17-18.

The NCAA extensively regulates both the conduct of its member schools and the conduct of student athletes playing NCAA sports.  The NCAA's bylaws restrict the means by which NCAA member schools may recruit prospective athletes.  Id. ¶¶ 267-68.  These NCAA bylaws also prohibit member schools from offering certain inducements to recruit student athletes and limit the total number and value of the athletic scholarships that member schools can offer to student athletes.  Id. ¶ 269-70.  Further, they make member schools responsible for certifying the eligibility of student athletes before they can allow the student athletes to represent the school in

---

[1]    The TAC in this case contains approximately 95 pages of factual allegation.  As such, some relevant facts are omitted by necessity.

intercollegiate competitions.  Id. ¶¶ 275-76.  Failure to comply with NCAA bylaws results in penalties for the noncompliant school, some of which are quite severe and coercive.  Id. ¶¶ 277-80.  In addition, the NCAA bylaws require member schools to suspend or fire student athletes who are determined to be ineligible to play by NCAA Enforcement Staff.  Id. ¶¶ 293-297.  The NCAA bylaws also govern amateurism, eligibility, awards, benefits, expenses, and each sport's playing and practice seasons.  Id. ¶ 281.  NCAA D1 bylaw 12 prohibits D1 member schools from paying student athletes.  Id. ¶ 282.  NCAA D1 bylaw 16 governs permissible benefits and non-permissible benefits for student athletes, as well as mandatory benefits for the athletes.  Id. ¶¶ 283-84.  NCAA D1 bylaw 17 lists "Required Athletically Related Activities" that student athletes must participate in, limits the number of hours that student athletes may be required to participate in Countable Required Athletically Related Activities ("CARA"), and requires that CARA hours be recorded by school staff.  Id. ¶ 286.  NCAA D1 bylaw 12 limits the number of seasons a student athlete may compete for a school in a specific sport and limits the time frame in which those seasons may occur.  Id. ¶ 287.

Furthermore, the NCAA bylaws also control the ability of the D1 member schools to discipline their student athletes.  Id. ¶ 290.  The NCAA, through its bylaws, prohibits NCAA D1 member schools from "reduc[ing] or cancel[ing] an athletic scholarship during the period of its award on the basis of the Student Athlete's athletic ability, performance or contribution to a team's success."  Id. ¶ 292.  If NCAA Enforcement Staff find that a student athlete is ineligible, the attended school is *required* to suspend or terminate that athlete.  Id. ¶¶ 293-97.

The NCAA and its member schools also perform record-keeping functions.  The NCAA "maintains all records related to the initial determination of Student Athlete eligibility," and D1 member schools are required to provide the Eligibility Center with additional information if they

"have cause to believe that a prospective student-athlete's amateur status has been jeopardized" and to report any discrepancies to the Eligibility Center. Id. ¶¶ 299-300. The NCAA also receives and maintains records regarding student athletes' injuries, illnesses and medical treatment in connection with their training for, and participation in, NCAA sports. Id. ¶ 301. D1 member schools are also required to make each student athlete's statement, drug testing consent form and squad list available to the NCAA. Id. ¶ 302. D1 schools are further required to produce student athletes' records to the NCAA upon request in connection with investigations conducted by the NCAA Enforcement Staff or the NCAA Committee on Infractions. Id. ¶ 303.

## B.    NCAA Athletics and Student Athletes

Sports are important to the member schools of the NCAA for several reasons. First, and perhaps most obviously, they generate revenue. Id. ¶ 98. Collegiate athletes collectively generate billions of dollars for the NCAA and its member schools by playing sports. Id. ¶¶ 1-2. Sports programs generate more than just revenue through television and streaming deals, ticket sales, sponsorships, sales of branded and promotional items and sports gear, though, they also generate interest in a member school. Id. at ¶ 46. Even collegiate sports that do not generate significant revenue can still result in an increase in applications which can also contribute to producing more revenue, greater selectivity in admissions, improved alumni engagement, fundraising and better faculty recruiting. See, e.g., id. ¶ 92.

In short, NCAA athletes are some of the most elite athletes in the country and the world. Id. ¶¶ 120-132. However, they "are precluded from earning wages" pursuant to NCAA bylaws enforced by each member school. Id. ¶¶165, 174-75. Instead, they receive a wide variety of in-kind benefits, gear and training, and colleges hire staff (who are paid wages) to coach and otherwise support them. Id. ¶¶ 186-90, 201-09. Importantly, college athletes can now also earn money through Name, Image, and Likeness ("NIL") rights. See generally Nat'l Collegiate Athletic

Ass'n v. Alston, 594 U.S. 69, 69 (2021).  As of a few months ago, athletes can now earn this money directly from the member schools.  See, e.g., https://www.jacksonlewis.com/insights/new-era-begins-ncaa-amateurism-out-direct-athlete-compensation-college-sports-commission-enter-arena.  That member schools are now willing to pay players directly for NIL rights demonstrates that their work has significant value to their institutions, yet they continue to be denied a basic minimum wage.

These students were under the control of the NCAA and its member schools.  All the named Plaintiffs were athletes on NCAA sports teams.  Id. ¶¶ 22-34, 43-44.  They were each "recruited or asked to play" collegiate sports at their respective educational institutions.  Id. ¶ 43.  Each of the Plaintiffs played subject to an extensive set of rules and regulations jointly promulgated and enforced by NCAA Member Schools and the NCAA.  Id. ¶¶ 242-61.  They all "had substantially similar job requirements, were not paid any compensation by Defendants under the same common policies, plans and practices, and were subject to Defendants' practice of willfully failing and refusing to pay them at the legally required minimum wage for all hours worked."  Id. ¶ 330.

Plaintiffs were required to schedule classes around their required NCAA athletic activities and could not reschedule their NCAA athletic activities around their academic programs.  Id. ¶ 60.  Student athletes are also required by their schools to participate in CARA recorded on timesheets and in non-countable Required Athletically Related Activities.  Id. ¶¶ 63, 68-69.  Student athletes have reported spending more than 30 hours per week on CARA and non-CARA activities and football players in the bowl and championship subdivisions report spending more than 40 hours per week on these activities.  Id. ¶ 70.  Many student athletes believe that these activities, which are required by the NCAA, prevent them from being able to keep up with their classes during the

playing and practice seasons or have kept them from taking classes they want to take or majoring in their preferred major.  Id. ¶¶ 66-67, 72.

## II.    Procedural History

The first Complaint in this case was filed on November 6, 2019, and the First Amended Complaint was filed on December 12, 2019.  Dkt. Nos. 1-2.  The Defendants moved to dismiss the case on March 9, 2020, and the Court denied that Motion on September 22, 2021.  Dkt. Nos. 25-26, 64.  Plaintiffs filed a Second Amended Complaint, with leave of the Court, on September 23, 2021.  Dkt. No. 67.

On September 23, 2021, Defendants moved for leave to file an interlocutory appeal as to the 'Court's ruling on the first Motion to Dismiss.  Dkt. No. 66.  The Court granted that Motion on December 28, 2021.  Dkt. No. 98.  The Third Circuit subsequently issued a precedential opinion as to this case on July 11, 2024, vacating the Court's Order and remanding the case.  See Johnson, 108 F.4th 163.  Plaintiffs then filed the TAC on November 4, 2024.  Dkt. No. 134.  Defendants moved to dismiss the TAC in numerous motions to dismiss on March 24, 2025.  Dkt. Nos. 196, 198, 200, 201, 203, 204, 207, 208, 214, 215.  Defendants also joined in the NCAA's Motion to Dismiss, which was filed on the same day.  Dkt. No. 203.

## LEGAL ARGUMENT

## I.    STANDARD OF REVIEW

### A.    Federal Rule of Civil Procedure 12(b)(1)

Fordham, Purdue, Oregon and Arizona move to dismiss the TAC for lack of subject matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1) ("Rule 12(b)(1)").  Rule 12(b)(1) motions may be treated as facial or factual challenges to the jurisdiction of a court.  See Mortensen v. First Fed. Sav. and Loan Ass'n, 549 F.2d 884, 891 (3d Cir. 1997).  A facial attack "contest[s] the sufficiency of the pleadings."  Common Cause of Pa. v. Pennsylvania, 558 F.3d 249, 257 (3d

Cir. 2009) (quotation omitted). In such a case, the Court should consider the motion as it does a motion pursuant to Federal Rule of Civil Procedure 12(b)(6) ("Rule 12(b)(6)") and consider the allegations of the complaint as true. See Hartig Drug Co. Inc. v. Senju Pharmaceutical Co. Ltd., 836 F.3d 261, 268 (3d Cir. 2006); see also § I.D, infra (Rule 12(b)(6) standard). "A facial 12(b)(1) motion should be granted only if it appears certain that the assertion of subject matter jurisdiction is improper." Gordon v. Gordon, No. 24 Civ. 1820, 2025 WL 1238372, at *2 (M.D. Pa. Apr. 29, 2025) (citing Kehr Packages, Inc. v. Fidelcor, Inc., 926 F.2d 1406, 1408-09 (3d Cir. 1991)); see also Empire Kosher Poultry, Inc. v. United Food & Commercial Workers Health & Welfare Fund of Ne. Pa., 285 F. Supp. 3d 573, 577 (M.D. Pa. 2003)). A factual challenge, on the other hand, asserts that an allegation in the pleadings is untrue, and that as a result the case falls outside of the Court's jurisdiction. Mortensen, 549 F.2d at 891-92.

## B.     Federal Rule of Civil Procedure 12(b)(2)

Duke, Marist, Tulane and Notre Dame move to dismiss the TAC for lack of personal jurisdiction pursuant to Rule 12(b)(2). "A plaintiff is required to establish a *prima facie* case by demonstrating with 'reasonable particularity sufficient contacts between the defendant and the forum state.'" Stern v. Aracari Project, No. 24 Civ. 1222, 2025 WL 899320, at *2 (E.D. Pa. Mar. 21, 2025) (quoting Provident Nat. Bank v. California Fed. Sav. & Loan Ass'n, 819 F.2d 434, 437 (3d Cir. 1987)). "This burden is not a heavy one" and "a plaintiff is entitled to have all allegations taken as true and factual disputes resolved in their favor." Id. (citing Time Share Vacation Club v. Atlantic Resorts, Ltd., 735 F.2d 61, 66 n.9 (3d Cir. 1984); Shuker v. Smith & Nephew, PLC, 885 F.3d 760, 780 (3d Cir. 2018)); see also Miller Yacht Sales, Inc. v. Smith, 384 F.3d 93, 97 (3d Cir. 2004).

### C.     Federal Rule of Civil Procedure 12(b)(3)

Duke and Notre Dame move to dismiss the TAC for improper venue pursuant to Federal Rule of Civil Procedure 12(b)(3) ("Rule 12(b)(3)").  "All well-pleaded allegations in the complaint are generally taken as true unless contradicted by the defendant's affidavits."  Holiday v. Bally's Park Place, Inc., No. 06 Civ. 4588, 2007 WL 2600877, at *1 (E.D. Pa. Sept. 10, 2007). "Because improper venue is an affirmative defense, the burden of proving lack of proper venue remains—at all times—with the defendant."  Great W. Mining & Mineral Co. v. ADR Options, Inc., 434 F. App'x 83, 86 (3d Cir. 2011).

### D.     Federal Rule of Civil Procedure 12(b)(6)

All Defendants, on their own and through the NCAA's Motion, move to dismiss the TAC for failure to state a claim pursuant to Rule 12(b)(6).  Per Rule 12(b)(6), a plaintiff's pleading obligation is to set forth "a short and plain statement of the claim."  Fed. R. Civ. P. 8(a)(2).  The purpose of the pleading is to give a defendant "'fair notice of what the . . . claim is and the grounds upon which it rests.'"  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (alteration in original) (quoting Conley v. Gibson, 355 U.S. 41, 47 (1957)).  On a motion to dismiss pursuant to Rule (12)(b)(6), a court must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff[s] may be entitled to relief."  Fowler v. UPMC Shadyside, 578 F.3d 203, 210 (3d Cir. 2009).  In other words, a plaintiff must merely show that their claim for relief is plausible.  Id.  (quoting Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009)).

## II.     COLLEGIATE ATHLETES ARE EMPLOYEES OF THE NCAA AND ITS MEMBER INSTITUTIONS

This case fundamentally hinges on the question of the employment status of collegiate athletes.  The Third Circuit, in evaluating the case at hand, described "athletes in the collegiate

context" as "*sui generis*" in this respect.  Johnson, 108 F.4th at 177.  Therefore, the Third Circuit

set forth a new standard "to identify athletes whose play is also work."  Id. at 178.  This new test

incorporates the common-law right of control test in determining whether student athletes playing

collegiate sports are employees for the purpose of the FLSA.  Id.  Under the Third Circuit's

Johnson test, "college athletes may be employees under the FLSA when they (a) perform services

for another party, (b) necessarily and primarily for the other 'party's benefit, (c) under that 'party's

control or right of control, and (d) in return for express or implied compensation or in-kind

benefits."  Id. at 180.  As set forth below, Plaintiffs pleadings meet this standard.

Importantly, granular investigations into the employer-employee relationship (and the

existence of a joint employment relationship) are complex, many-factored inquiries based in fact.

See, e.g., Hayes v. Waddell & Reed, Inc., No. 12-293, 2013 WL 5434139, at *9 (W.D. Pa. Sept.

26, 2013) ("Both the joint employer and the single employer doctrines involve fact-intensive

analyses which are generally inappropriate at the motion to dismiss stage"); Bailey v. Millenium

Grp. of Delaware, No. 21-1752, 2022 WL 3754617, at *2 (3d Cir. Aug. 30, 2022) (noting that such

fact-intensive inquiries in the employment context may be better reserved for resolution at the

summary judgment stage) (quotations omitted).  "Moreover, when the employment relationship is

ambiguous or uncertain, such a fact-intensive analysis is essential, and the plaintiff's claims should

not be dismissed at the pleading stage."  Hayes, 2013 WL 5434139, at *9.  In fact, "almost no

question is as fact-intensive as determining employee status under the FLSA."  Johnson, 108 F.4th

at 183-84.  At this stage, Plaintiffs need only have plausibly made a showing that they were

employed by Defendants—and they have plainly more than done so.  It should also be noted that

the Court already found that a joint employer relationship exists with respect to the NCAA and its

member schools as to collegiate athletes under the test set out in In re Enterprise Rent-A-Car Wage

& Hour Emp't Prac. Litig., 683 F.3d 462 (3d Cir. 2012).  Dkt. No. 64 at 12-21.  That was actually a more intensive test than the one set out by the Third Circuit.

### A. Plaintiffs Sufficiently Allege FLSA Violations

As an initial matter, Defendants repeatedly argue that the TAC should be dismissed because the allegations are not particularized and do not plausibly allege that each named Plaintiff suffered an FLSA violation.  See, e.g., Dkt. No. 203 at 7-8, 13 (citing Rosario v. First Student Mgmt. LLC, 247 F. Supp. 3d 560, 567 (E.D. Pa. 2017)).  However, in that case "only three of the seventy-six named plaintiffs have alleged plausible claims under the FLSA."  Id. at 566.  "The other seventy-three named plaintiffs . . . failed to allege a single workweek in which they worked forty hours and were also not compensated for their overtime."  Id. at 567.  Because most of the plaintiffs in that case were seeking entitlement to overtime compensation as opposed to minimum wage compensation, their inability to allege a single work week in which they worked forty hours and were also not compensated for their overtime was obviously fatal to their claims.  In contrast, the TAC plainly alleges that "Plaintiffs and the other members of the Proposed FLSA Collective were similarly-situated, had substantially similar job requirements, were not paid any compensation by Defendants under the same common policies, plans and practices, and were subject to Defendants' practice of willfully failing and refusing to pay them at the legally required minimum wage for all hours worked."  TAC ¶ 330.  As such, the TAC sufficiently alleges that each Plaintiff "suffered an FLSA violation" because they were all similarly subject to Defendants' unlawful practice of willfully failing and refusing to pay them at the legally required minimum wage for all hours worked.  Rosario, 247 F. Supp. 3d at 567.

### B. Plaintiffs are Employees Pursuant to the Third Circuit's Test

As a threshold matter, it bears reiterating that Defendants' motion is a pre-discovery motion to dismiss.  As such, it is not Plaintiffs' obligation to convince the Court that they are Defendants'

11

employees, or to plead facts that establish the Johnson elements conclusively. Rather, Plaintiffs' *only* burden is to plead facts such that an employment relationship is plausible when those facts are combined with all reasonable inferences in Plaintiffs' favor.

###### i. Each Plaintiff "Performed Services for" a NCAA Member School and the NCAA

The TAC provides that each named Plaintiff was recruited or asked to play collegiate sports at their respective colleges and universities. TAC ¶ 43. Plaintiffs actually did work at their respective colleges and universities through their participation in athletics at the behest of those institutions. Id. ¶ 44. In addition to working for their respective NCAA Member School, Plaintiffs were also performing services for the NCAA through their participation in collegiate sports. Id. ¶ 45. In fact, "[t]he NCAA acknowledges that it controls the market for college athletes." Id. (citing Alston, 594 U.S. at 109 (Kavanaugh, J., concurring)). Specifically, Plaintiffs allowed the NCAA and their respective colleges and universities to make money through television and streaming deals, ticket sales, sponsorships, sales of branded and promotional items and sports gear, among other revenue streams. Id. ¶ 46. Collegiate athletes "collectively generate *billions* of dollars in revenues for colleges every year." Id. (citing Alston, 594 U.S. at 109 (Kavanaugh, J., concurring) (emphasis in the original)). As such, the services that collegiate athletes provide in the form of playing collegiate sports benefit their institutions and the NCAA. Id.

In their moving papers, Defendants argue that Plaintiffs mere involvement in D1 athletics does not establish that they performed a service as distinguished from those college athletes that play sports for "predominantly recreational or noncommercial reasons." Johnson, 108 F.4th at 182. However, the Plaintiffs' involvement in NCAA sports surely constitutes the performance of a service for their school and the NCAA. First, each Plaintiffs' conduct as a member of their respective D1 team was highly regulated. As alleged in the TAC, each named Plaintiff was

12

governed and bound by strict rules jointly promulgated and enforced by NCAA member schools and the NCAA.  See TAC ¶¶ 242-61.  These NCAA bylaws address, among other subjects, recruitment, eligibility, hours of participation, duration of eligibility and sanctions for noncompliance.  Furthermore, these bylaws apply to all athletes in NCAA sports on an equal basis and to all member schools in a uniform fashion under threat of sanction for failure to comply.  Id. ¶ 331.  Second, these bylaws were designed to honor each Plaintiffs athletic prowess in order to secure financial gain for their school and the NCAA through lucrative television and streaming deals, ticket sales, sponsorships, and sales of branded and promotional items and sports gear, among other revenue streams.  Id. ¶ 46.

In contrast, interscholastic club sports are not bound by these NCAA bylaws and are solely or principally led and organized by the students.  Id. ¶¶ 317-21.  In fact, "NCAA D1 member schools describe student-leadership, student-organizing and student-decision-making in student-run interscholastic Club Sports as educational experiences distinctly different from NCAA sports." Id. ¶ 319.  Colleges do not provide professional-style investment and in-kind compensation such as training, practice and game equipment and facilities; preventative care and medical treatment; dieticians and meals; travel and accommodations to interscholastic club sports.  Id. ¶ 83.  They also do not attempt to monetize interscholastic club sports in a manner comparable to professional sports—colleges derive no ticket sales and concessions, sales of related merchandise, licensing and sponsorship deals, or any radio or television broadcast rights related to interscholastic club sports.  Id.  Thus, athletes involved in NCAA sports are performing a service to their school and the NCAA as opposed to student-athletes involved in interscholastic club sports who are primarily playing sports for "predominantly recreational or noncommercial reasons."  Johnson, 108 F.4th at 182.

Finally, Defendants argue that the TAC fails to identify which specific services were provided by each named Plaintiff. This misinterprets a fundamental point of the requirement that a collegiate athlete plead that he or she performed a service. The act of playing the sport, subjecting themselves to the rules and regulations of the NCAA and its member schools and the greater structures those bodies put on their performance relative to their classmates, constitutes a service. College students who play sports put their bodies and educations on the line for the NCAA and its member institutions. Those fundamental facts are certainly sufficiently pleaded in the TAC.

Further, the Third Circuit never required that Plaintiffs allege which specific services they provided to sufficiently plead this factor for purposes of surviving a motion to dismiss. Rather, the Third Circuit held "that college athletes may be employees under the FLSA when they perform services for another party." Johnson, 108 F.4th at 180. Indeed, given that "athletes in the collegiate context are *sui generis*" it is not surprising that the Third Circuit did not require each Plaintiff to allege which specific services they provided. Id. at 177. To hold otherwise would require each named Plaintiff to separately identify which specific television and streaming deals, ticket sales, sponsorships, sales of branded and promotional items and sports gear were generated due to their own efforts. However, that information (if ascertainable), will almost always be within the exclusive control of Defendants and near impossible to allege at the pleading stage. Therefore, Plaintiffs have sufficiently alleged that they performed a service for purposes of plausibly alleging their employment status pursuant to the FLSA.

### ii.    Each Plaintiff Performed Services "Necessarily and Primarily for the Benefit" of a NCAA Member School and the NCAA

Not only did these Plaintiffs perform work, but they did so necessarily and primarily for the benefit of their respective NCAA Member School and the NCAA. Each named Plaintiff had "their academic opportunities curtailed to generate billions in uncompensated revenue through the

work they perform for their schools." TAC ¶ 51. Specifically, Plaintiffs were required to schedule classes around their required NCAA athletic activities and could not reschedule their NCAA athletic activities around their academic programs. Id. ¶ 60. For example, Plaintiff Johnson was required to participate in NCAA athletically related activities on weekdays between 5:45 a.m. and 11:30 a.m. during the football practice and playing seasons and could not enroll in a non-core class during that time, including classes that were "prerequisites for academic degree programs." Id. ¶ 62. In addition, because student athletes are required to schedule their classes around their required athletic activities, many student athletes have reported that participation in NCAA D1 sports has prevented them from taking classes that they want to take and from majoring in their preferred major. Id. ¶¶ 66-67. Student athletes are also required by their schools to participate in CARA recorded on timesheets and in non-countable Required Athletically Related Activities. Id. ¶¶ 63, 68-69. Student athletes have reported spending more than 30 hours per week on CARA and non-CARA activities and football players in the bowl and championship subdivisions report spending more than 40 hours per week on these activities. Id. ¶ 70. Many student athletes believe that these activities, which are required by the NCAA, prevent them from being able to keep up with their classes during the playing and practice seasons. Id. ¶ 72.

Ultimately, Plaintiffs and others similarly situated were highly regulated by the NCAA and its member schools because "student athlete performance is integral to the billion-dollar Big Business of NCAA sports." Id. ¶ 84. As noted by the Third Circuit, "athletic programs [are] higher education's primary form of mass media advertising," to increase applications, which in turn "contribute to a positive feedback loop producing more revenue, greater selectivity in admissions, improved alumni engagement, greater fundraising, and better faculty recruiting." Id. ¶ 92. In its 2018 fiscal year, the NCAA reported total revenues of $1,064,403,240, which was

primarily generated by "television and marketing rights fees, championships, tournaments, and sales." Id. ¶ 97. In their 2016 fiscal year, NCAA D1 schools reported median total revenues from NCAA sports as follows: (1) schools in the football power five subdivision had median total revenues of $97,276,000; schools in the football bowl subdivision had median total revenues of $33,470,000; (3) schools in the football championship subdivision had media total revenues of $17,409,000; and (4) schools that did not have NCAA football teams had median total revenues of $16,018,000. Id. ¶ 98. For these reasons, this Court previously found that "NCAA D1 interscholastic athletics are not conducted primarily for the benefit of the student athletes who participate in them, but for the monetary benefit of the NCAA and the colleges and universities that those student athletes attend." Dkt. No. 55 at 19. Further, the Court previously found that "NCAA D1 interscholastic athletics are not part of the educational opportunities provided to the student athletes by the colleges and universities that they attend but, rather, interfere with the student athletes' abilities to participate in and get the maximum benefit from the academic opportunities offered by their colleges and universities." Id. Accordingly, it cannot reasonably be disputed that the Plaintiffs performed their services necessarily and primarily for the benefit of the NCAA and the institutions they attended.

Defendants argue that Plaintiffs failed to allege whether they were engaged in a revenue generating sport or that their individual participation on their respective team helped generate revenue, increase alumni engagement, or otherwise confer benefits on their school.[2] As an initial matter, the Third Circuit does not require that the athlete in question generate revenue for their

---

[2]    Plaintiffs do, in fact, plead that their work generated alumni engagement, for example. See, e.g., TAC ¶¶ 92-93. Taking this fact in the light most favorable to the Plaintiffs at the pleading stage, as the Court is required to do, Plaintiffs have plainly met the bar of showing that their work conferred (and confers) a benefit upon the NCAA and its member schools. Fowler, 578 F.3d at 210.

school or the NCAA, just that they perform a service necessarily and primarily for the benefit of those institutions. Johnson, 108 F.4th at 180. Employees benefit their employers whether or not they generate revenue. As an example, "there are several recognized college employees in functions that generate either less revenue or no revenue at all. For example, and without limitation, in-house legal, human resources, purchasing, records management, information technology, and facilities maintenance and janitorial services, among others, are 'cost centers' that generate less revenue than any NCAA sport or no revenue at all." TAC ¶ 95. "Importantly, nearly all Work Study-style jobs as staff in campus offices, libraries, and dining halls – and as attendants at event and athletic facilities–generate less revenue than any NCAA sport or generate no revenue at all." Id. ¶ 96. Obviously, an employee who otherwise qualifies for minimum wage under the FLSA still gets paid even if their position does not specifically generate revenue for their employer, and a company will not be excused from paying its employees minimum wage if it does not make a profit or even generate revenue. In fact, Judge Porter's concurring opinion, which Defendants primarily rely upon to support their faulty motion, acknowledges that His Honor "do[es] not suggest that only workers in profitable companies can be employees under the FLSA." Johnson, 108 F.4th at 192. Finally, it should be noted that opportunities for alumni engagement and greater fundraising occur regardless of whether the athlete in question participated in a revenue generating sport. By way of example, women alumni of mis-named "non-revenue" sports who have had success in corporate C-suites have been successfully profiled to the benefit of their schools. TAC ¶ 94.

In addition to the foregoing, Defendants borrow directly from Judge Porter's concurrence and argue that simply because playing NCAA sports took time away from academic pursuits does not mean that these athletes were anything more than student-volunteers. They compare NCAA

D1 athletes to a musician whose scholarship is conditioned on time consuming participation in a band. However, this argument is absurd. Musicians are presumably not subject to the rigorous framework or regulations that NCAA athletes are subjected to, and their time commitment and the level of rigor of their work is unclear.[3] In any event, even if Judge Porter's non-precedential concurrence stands for the proposition that one of the many, many factual allegations pled by Plaintiffs would not be independently sufficient to establish an employment relationship, that would be irrelevant here because taking time away from academic pursuits is only one of literally hundreds of relevant allegations.

Indeed, this analogy does lay plain some important points that show why collegiate athletes are employed by the NCAA and its member schools. For one, participation in NCAA sports does not merely "take time away from academic pursuits." Dkt. No. 203 at 17. As detailed above, D1 athletes are forced to schedule their academic obligations around their highly regulated NCAA athletic activities to the point where they are prevented from taking classes that they want to take and from majoring in their preferred major. TAC ¶¶ 60-72. Second, these athletes are intended to generate national interest necessarily and primarily for the benefit of their schools, which can indirectly benefit their schools or generate revenue. Id. ¶ 46. Even "revenue-negative"[4] sports can still result in an increase in applications which can also contribute to producing more revenue, greater selectivity in admissions, improved alumni engagement, greater fundraising, and better

_____

[3]    Such facts are not in the pleadings and the NCAA makes no effort to put them on the record.

[4]    There may be sports that are revenue-neutral, and there may be sports that do not generate profits, but the term "revenue-negative" is an absurdity. A sport that sold even a single ticket would generate revenue, and even a sport that did not charge for attendance might generate profit for the school by attractive prospective students (and their tuition payments) that would otherwise have chosen to attend school elsewhere. In any event, it is impossible to be revenue-negative.

faculty recruiting.  Id. ¶ 92 (quoting Johnson, 108 F.4th at 169).  In contrast, student-volunteers, even those on scholarships, are not necessarily and primarily dedicated to creating national interest in their respective extracurricular activities for the ultimate benefit of their school.

Lastly, the NCAA argues that as a regulatory body, Plaintiffs cannot plead that they necessarily and primarily performed services for the benefit of their respective NCAA Member School and the NCAA.  Dkt. No. 203 at 18-20 (citing Benshoff v. City of Virginia Beach, 180 F.3d 136 (4th Cir. 1999)).  As an initial matter, Benshoff is a non-precedential out of circuit case discussing FLSA claims in the context of summary judgment based on facts that have been discovered by the parties.  Thus, the Benshoff case has little relevance to this case which concerns whether Plaintiffs have plausibly alleged that they performed services necessarily and primarily for the benefit of the NCAA and their respective schools.  Furthermore, in Benshoff the "plaintiffs [were] primarily motivated by civic, charitable, and humanitarian reasons and did not become rescue squad members with the expectation of compensation for services rendered."  9 F. Supp. 2d at 623, 'aff'd, 180 F.3d 136 (4th Cir. 1999).  As such, the Fourth Circuit held that "plaintiffs were not employees of the City of Virginia Beach for purposes of the FLSA when they performed volunteer emergency services for private, non-profit rescue squads."  Benshoff, 180 F.3d at 149.  In contrast, Plaintiffs did not "volunteer" to work as D1 athletes for civic, charitable or humanitarian reasons.[5]  Rather, they performed their services primarily "for the monetary benefit of the NCAA and the colleges and universities that those student athletes attend" in return for compensation or in-kind benefits.  Dkt. No. 55 at 19.  Accordingly, it cannot reasonably be

---

[5]    The mere fact that these college athletes worked without pay does not make them volunteers, as the Supreme Court has made clear.  Tony & Susan Alamo Found. v. Sec'y of Lab., 471 U.S. 290, 302 (1985).  Whether an individual performed voluntary services is a factual inquiry into the nature of the work done by one party for another, and even if the parties mutually identify workers as volunteers, they may be employees for the purpose of the FLSA.  Id. at 301.

disputed that the Plaintiffs performed their services necessarily and primarily for the benefit of the NCAA and the institutions they attended.

### iii. Each Plaintiff Performed Services "Under the Control or Right of Control" of a NCAA Member School and the NCAA

The NCAA, through its bylaws, exerts enormous control over D1 athletes, and its member schools participate extensively in this regime of control.

The NCAA's bylaws restrict the means by which NCAA member schools may recruit prospective athletes, including limiting face to face encounters with student athletes and their family members, limiting off-campus activities intended to assess the academic and athletic qualifications of a prospective student-athlete, limiting the number of telephone calls that can be made to a prospective student athlete during a defined period of time, and limiting contacts with student athletes to specified periods of time. TAC ¶¶ 267-68. These NCAA bylaws also prohibit member schools from offering certain inducements to recruit student athletes. Id. ¶ 269. NCAA bylaws also limit the total number and value of the athletic scholarships that member schools can offer to student athletes. Id. ¶ 270. NCAA bylaws further make member schools responsible for certifying the eligibility of student athletes before they can allow the student athletes to represent the school in intercollegiate competitions. Id. ¶¶ 275-76. Failure to comply with these bylaws constitutes a Level III violation, for which NCAA Enforcement Staff could seek the following penalties: precluding recruitment of the student athlete and prohibiting the student-athlete from competing for the school until his or her eligibility is restored. Id. ¶¶ 277-78. In fact, multiple violations could result in stronger penalties. Id. ¶¶ 279-80. In addition, the NCAA bylaws require member schools to suspend or fire student athletes who are determined to be ineligible to play by NCAA Enforcement Staff. Id. ¶¶ 293-97. Thus, as the Court previously noted, "the NCAA does more than just impose rules regarding the recruitment of intercollegiate athletes; it also investigates

violations of those rules and imposes penalties, including the firing of student athletes, for those violations."  Dkt. No. 64 at 14.

In addition, the NCAA bylaws govern amateurism, eligibility, awards, benefits, expenses, and each sport's playing and practice seasons.  TAC ¶ 281.  NCAA D1 bylaw 12 prohibits D1 member schools from paying student athletes.  Id. ¶ 282.  D1 bylaw 16 governs permissible benefits and non-permissible benefits for student athletes, as well as mandatory benefits for the athletes.  Id. ¶¶ 283-284.  D1 bylaw 17 lists "Required Athletically Related Activities" that student athletes must participate in, limits the number hours that student athletes may be required to participate in CARA, and requires that CARA hours be recorded by school staff.  Id. ¶ 286.  NCAA D1 bylaw 12 limits the number of seasons a student athlete may compete for a school in a specific sport and limits the time frame in which those seasons may occur.  Id. ¶ 287.  A school's failure to comply with these rules can constitute a Level II or III violation.  Id. ¶ 288.  The NCAA D1 bylaws make payment to a student athlete by a coach or other school representative a Severe Breach of Conduct and a Level I violation.  Id. ¶ 289.  As such, "the NCAA . . . issues work rules that apply to Plaintiffs and imposes conditions not only on the payment of compensation and other benefits to Plaintiffs but also on how much time Plaintiffs may spend in connection with NCAA intercollegiate athletic activities."  Dkt. No. 64 at 15-16.

Furthermore, the NCAA bylaws also control the ability of the D1 member schools to discipline their student athletes: (i) by restricting the grounds for a school to reduce or cancel an athletic scholarship during the period of its award to only disciplinary reasons; (ii) by requiring suspension or firing of a Student Athlete if s/he has violated any bylaw related to eligibility; and (iii) by subjecting a 'school's "home team" Student Athletes to discipline meted out by NCAA Enforcement Staff and/or panels of the peer-review D1 Committees on Infractions and Infractions

Appeals composed of representatives from competing schools.  TAC ¶ 290.  The NCAA, through

its bylaws, also prohibits D1 member schools from "reduc[ing] or cancel[ing] an athletic

scholarship during the period of its award because of the Student Athlete's athletic ability,

performance or contribution to a team's success."  Id. ¶ 292.  If NCAA Enforcement Staff find that

a student athlete is ineligible, the attended school is required to suspend or terminate that athlete.

Id. ¶¶ 293-97.  Ultimately, "the NCAA promulgates rules used in disciplining student athletes, has

some involvement in the discipline of student athletes, can instigate investigations that result in

discipline, and has some control over what discipline is issued to student athletes."  Dkt. No. 64 at

18.

Moreover, the "NCAA Eligibility Center maintains all records related to the initial

determination of Student Athlete eligibility," and D1 member schools are required to provide the

Eligibility Center with additional information if they "have cause to believe that a prospective

student-athlete's amateur status has been jeopardized" and to report any discrepancies to the

Eligibility Center.  TAC ¶¶ 299-300.  The NCAA also receives and maintains records regarding

student athletes' injuries, illnesses and medical treatment in connection with their training for and

participation in NCAA sports.  Id. ¶ 301.  D1 member schools are required to make each student

athlete's statement, drug testing consent form, and squad list available to the NCAA.  Id. ¶ 302.

D1 member schools are further required to produce student athletes' records to the NCAA upon

request in connection with investigations conducted by the NCAA Enforcement Staff or the NCAA

Committee on Infractions.  Id. ¶ 303.  Accordingly, this Court previously held that the same

allegations utilized in the TAC were sufficient to plausibly allege: (i) "that the NCAA exercises

significant control over the hiring and firing of student athletes, including Plaintiffs;" (ii) "that the

NCAA has the 'authority to promulgate work rules and assignments and to set [Plaintiffs']

conditions of employment;'" (iii) "that the NCAA is involved in the day-to-day supervision, including discipline, of student athletes who participate in NCAA sports, including Plaintiffs;" and (iv) "that the NCAA controls records of student athletes involved in NCAA sports, including Plaintiffs."  Dkt. No. 64 at 13-14.

Plaintiffs anticipate Defendants will argue that the Court made these findings in the context of determining that the NCAA was a joint employer of Plaintiffs pursuant to the four-factor test established in In re Enterprise Rent-A-Car Wage & Hour 'Emp't Prac. Litig., 683 F.3d 462 (3d Cir. 2012).  However, those factors all turn on the degree of control exercised by the entity in question.  Specifically, the Third Circuit held that "where two or more employers *exert significant control over the same employees* . . . they constitute joint employers under the FLSA."  Id. at 468 (emphasis added) (quotations omitted).  Further, the Third Circuit noted that their focus on control was "consistent with the FLSA regulations regarding joint employment, which state that a joint employment relationship will generally be considered to exist '[w]here the employers are not completely disassociated with respect to the employment of a particular employee and may be deemed to share control of the employee, directly or indirectly, by reason of the fact that one employer controls, is controlled by, or is under common control with another employer.'"  Id. (citing 29 C.F.R. § 791.2(b)).  As such, this Court's finding that the NCAA jointly employed Plaintiffs based on their level of "significant control" *exceed* the Third Circuit's requirement that they merely controlled or had the right of control over these athletes—the Court already found that Plaintiffs met their burden under a *more stringent* standard.  Id.

These bylaws also show the degree of control NCAA member schools have over athletes. The NCAA "is a member-led organization."  TAC ¶ 243.  "Member representatives serve on committees that propose rule and policies surrounding college sports.  Members ultimately decide

which rules to adopt–everything from recruiting and compliance to academics and championships–and implement them on campus." Id.  In addition to setting the policy agenda, these member schools are also tasked with enforcing these NCAA bylaws.  "The NCAA D1 Committee on Infractions is structured around a peer-review model and is composed of as many as 24 . . . qualified representatives from member schools, conferences and the public." Id. ¶ 249.  "The D1 Infractions Appeal Committee is also peer-reviewed and composed of five (5) representatives from member schools, conferences and the public." Id. ¶ 250.  Furthermore, "NCAA member schools have 'Shared Responsibility' to report all potential violations regarding any Student Athlete, and to cooperate in the investigation of any Student Athlete, including those attending another member school." Id. ¶ 251.  "Failure to cooperate in an NCAA enforcement investigation is considered a Severe Breach of Conduct (Level I Violation) subject to the highest penalties, including competition penalties (e.g., post season bans), financial penalties, scholarship reductions, head coach restrictions, and recruiting restrictions." Id. ¶ 252.  In other words, member schools are not passive affiliates of the NCAA.  They are active participants in legislating and enforcing the NCAA bylaws that this Court previously held demonstrated sufficient control over Plaintiffs to consider the NCAA their employer.  Dkt. No. 64 at 15-16.  These allegations, taken as true, establish that both the NCAA and its member institutions exercised functional control over Plaintiffs.  At this stage, where all reasonable inferences must be drawn in Plaintiffs' favor, dismissal is unwarranted.

In their moving papers, Defendants make several unavailing arguments to support their assertion that they did not control or have the right of control with respect to Plaintiffs.  First, Defendants argue that any control they had over the Plaintiffs is intrinsic to team sports, such that "even high-school athletes" would be considered employees under the FLSA.  Dkt. No. 203 at 21.  This argument completely mischaracterizes the Johnson test.  The Third Circuit never stated that

any party which controls another is automatically deemed their employer.  Rather, the Third Circuit held that college athletes may be employees under the FLSA when they perform services for another party, necessarily and primarily for that party's benefit, under that party's control or right of control in return for compensation or in-kind benefits.  Johnson, 108 F.4th at 180.  There are a host of additional differences between high school and NCAA sports, such as commercial scale, skill level and level of regulation that create enormous differences between players in the two arenas.  High school sports are extracurricular activities and playing those sports does not interfere with a high school student's classes.  High school athletic practices and games are not scheduled during periods in which the athletes might otherwise be in class.  In short, high school athletes play sports for "predominantly recreational or noncommercial reasons."  Id. at 182.

Second, Defendants argue that their regulatory role cannot constitute the requisite level of control to be considered an employer.  Otherwise, "every employee working for a business regulated by a private regulatory authority, such as FINRA would automatically become an employee of FINRA" and "every sports regulating organization including, for example the U.S. and International Olympic Committees ("USOC" and "IOC")" would be considered an employer.  Dkt. No. 203 at 22-23.  As an initial matter, this argument fails for the same reasons as their arguments regarding high school athletes fail.  An employee working for a business regulated by FINRA is not necessarily and primarily working *for the benefit* of FINRA in return for compensation *from* FINRA.  Furthermore, Defendants are simply assuming that American athletes subject to USOC or IOC regulations cannot be considered employees under the FLSA.  However, there is no legitimate reason to assume that these athletes cannot be considered employees if USOC or IOC regulations were as comprehensive and robust as the NCAA bylaws which this Court found

demonstrated sufficient control over Plaintiffs to consider the NCAA their employer. Dkt. No. 64 at 15-16.

In support of their argument, Defendants cite three non-precedential out of circuit cases, two of which discuss FLSA claims in the context of summary judgment rather than a motion to dismiss. However, as detailed below, none of the cases cited by Defendants involved the requisite level of control to establish an employer-employee relationship. In Callahan v. City of Chicago, Illinois, 813 F.3d 658 (7th Cir. 2016), the plaintiff "[did] not own a cab, nor [did] she own a medallion that represents the City's permission to operate a taxi." Id. at 659. Thus, "she does not own a cab, a medallion, or any other asset encumbered by regulatory duties . . . the goal of the Fair Labor Standards Act is to regulate employers, not the many governmental bodies that permit employers to operate." Id. at 661. In contrast, the NCAA does more than merely permit Plaintiffs to work, it controls every aspect of their job. For this reason, this Court previously recognized that Callahan "concerns a different set of factual allegations than are at issue in the instant case." Dkt. No. 64 at 11-12. Similarly, in Chapman v. Yellow Cab Coop., 875 F.3d 846, 847 (7th Cir. 2017), "Edwards owns a taxicab in Milwaukee. Yellow Cab Cooperative refers business to his cab. . . Edwards leased the cab to Parashu Giri, who subleased some of the time to Thomas Chapman." Therefore, because there were no "direct dealings between [plaintiff] and Yellow Cab," the Seventh Circuit considered the case analogous to "an entity several steps removed in a chain of business relations just because that 'entity's decisions may have some effect on income." Id. at 848. Here, the NCAA is not some entity several steps removed from the Plaintiffs, whose decisions "may have some effect on income." Id. In fact, the NCAA directly prohibits member schools from paying their student athletes. TAC ¶¶ 166, 282. Finally, in Benshoff, 180 F.3d at 143, the Fourth Circuit held that "[t]he fact that [plaintiffs] are regulated and licensed by

governmental entities . . . does not change the fact that the rescue squads are private organizations, governed by their own by-laws and policies." In this case, as noted previously by this Court in the context of Callahan, "the NCAA . . . is not a governmental entity." Dkt. No. 64 at 12. They are the organization directly responsible in conjunction with their member schools, for every facet of Division I athletics including recruitment, eligibility, awards, benefits, expenses, each sport's playing and practice seasons, discipline and maintaining student-athlete records. Id. at 15-16.

#### iv. Plaintiffs are also Employees of their NCAA Member School and the NCAA Pursuant to the Common-Law Agency Doctrine

The Third Circuit noted that the "common-law agency doctrine . . . is also a helpful analytical tool in evaluating college athletes' purported employer-employee relationships in . . . the FLSA context." Johnson, 108 F.4th at 179. The common law agency doctrine evaluates a number of non-exhaustive factors in considering whether someone is an employee including: "the skill required; the source of the instrumentalities and tools; the location of the work; the duration of the relationship between the parties; whether the hiring party has the right to assign additional projects to the hired party; the extent of the hired party's discretion over when and how long to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the regular business of the hiring party; whether the hiring party is in business; the provision of employee benefits; and the tax treatment of the hired party." TAC ¶ 119; see also Nationwide Mut. Ins. Co. v. Darden, 503 U.S. 318, 323-324 (1992) (quoting Community for Creative Non-Violence v. Reid, 490 U.S. 730, 751-752 (1989)).

In terms of skill required, "Student Athlete performance, which is integral to the billion dollar Big Business of NCAA sports, requires specialized skills." TAC ¶ 120. "NCAA sports. . . require much more specialized skill than recreational student-run interscholastic Club Sports or student-run intramural sports." Id. ¶ 121. "NCAA sports players perform their sports at the highest

levels and are regularly recruited or drafted to play their sports professionally after graduating." Id. ¶ 123. In fact, "[t]he vast majority of professional sports players in the United States are drafted from D1 schools." Id. ¶ 124. "NCAA D1 collegiate sports players are therefore not merely skilled, they are among the most elite athletes in the United States and the world." Id. ¶ 128. "NCAA athletes, particularly those playing at D1 institutions, are world-class athletes." Id. ¶ 132. The high level of skills required to play D1 athletics supports the finding that these student-athletes are employees.

In terms of the source of the instrumentalities and tools, "[c]olleges provide the tools and means needed for participation in NCAA sports, including training, practice and game equipment and facilities; preventative care and medical treatment; dieticians and meals; travel and accommodations, and more, to all scholarship athletes and walk-ons." Id. ¶ 134. Thus, the fact that these schools provided the tools necessary for Plaintiffs to participate in collegiate sports also supports the finding that these student-athletes are employees.

In terms of the location of the work, "[h]ome games are played in the stadiums, fields or other playing facilities of the college, while away games are played on the facilities of other NCAA member institutions." Id. ¶ 146. Thus, "the location of the work of NCAA D1 athletes is therefore dictated by the NCAA [pursuant to NCAA bylaws] and the institution the athlete attends, and takes place on the property of the member schools." Id. ¶ 147. Therefore, the location of the work is specifically dictated by the NCAA and occurs at each member school, further supporting that these student athletes are employees.

In terms of the duration of the relationship between the parties, "[t]he NCAA dictates the duration of the employment relationship between D1 schools and their athletes." Id. ¶ 148. "This is because the NCAA and its D1 member schools have the authority, and discretion, to deny, or

impose conditions upon, the transfer to another member school of a Student Athlete and also dictate the eligibility of players to participate in collegiate athletics." Id. ¶ 149.  In fact, "[t]hrough the 2017-18 academic year, NCAA bylaws permitted a member school to enforce the permanence of its relationship to a Student Athlete by blocking her/him from accepting an athletic scholarship offer to transfer to another member school of her/his choice and play for that school the same or following season." Id. ¶150.  Thereafter, "member schools may still separately adopt NCAA member conference rules that permit Student Athlete transfers to be blocked." Id. ¶ 151.  "If a Student Athlete is cleared to transfer to another NCAA D1 member school, that Student Athlete still cannot participate in NCAA sports the same season, and typically must forego participating in NCAA sports the following season, i.e., sit out one full season." Id. ¶ 154.  "The NCAA also dictates a large number of rules regarding the eligibility of athletes to play NCAA sports." Id. ¶ 155.  Thus "[t]he NCAA and its D1 member schools . . . dictate the duration of the working relationship between the NCAA, the schools and the collegiate athletes," further supporting a finding that these student-athletes are employees. Id. ¶ 157.

In terms of whether the hiring party can assign additional projects and the hired party's discretion over when and how long to work, "[t]he NCAA and its D1 member schools can assign collegiate athletes a wide variety of projects, tasks, and duties." Id. ¶ 158.  These activities include "practices, training sessions, nutrition programs, reviews of previous games and strategy sessions, media sessions, and competitive events." Id. ¶ 159.  Moreover, "NCAA collegiate athletes are unable to flexibly schedule hours, days and different jobs at different hourly rates to accommodate preferred/chosen classes and academic degree programs." Id. ¶ 162.  Accordingly, both factors weigh towards finding that these student-athletes are employees.

In terms of the method of payment, "[s]tudent athletes are precluded from earning wages" pursuant to NCAA bylaws enforced by each member school. Id. ¶¶165, 174-75. Specifically, "[t]o enforce their mutual agreements and bylaws prohibiting schools from offering wages and Student Athletes from accepting wages, all schools in each of the NCAA, NAIA and NJCAA have adopted bylaws prescribing sanctions for infractions, including, but not limited to, suspension or termination of the student athlete's eligibility; reduction of the letters of intent that the school is permitted to accept from high school recruits and/or athletic scholarships that the school is permitted to offer; suspension of coaching staff; and/or school team disqualification from regular season competition and/or post-season and championship segments. Id. ¶ 175. In the NCAA, "[c]ash payment or other benefits provided by a coach, administrator or representative of the institution's athletics interests" are considered a Severe Breach of Conduct (Level I Violation) subject to the highest penalties, including, for the Student Athlete, suspension or termination of eligibility, and for the member school, competition penalties (e.g., postseason bans), financial penalties, scholarship reductions, head coach restrictions and recruiting restrictions. Id. ¶ 176. Thus, "[t]he NCAA and its D1 schools therefore have complete control over the rate and method of pay for collegiate athletes—and they choose not to pay them at all," further supporting a finding that they are indeed employees of the NCAA and their member schools. Id. ¶ 185.

In terms of the hired party's role in hiring and paying assistants, "[c]ollegiate athletes have no role in hiring or paying assistants." Id. ¶ 186. Further, the "enormous cadre of well-remunerated staff support the work of the unpaid collegiate athletes, and they are hired by the schools and the NCAA, not the athletes." Id. ¶ 190. As such, this factor also weighs towards a determination that student-athletes are employees.

In terms of whether the work is part of the regular business of the hiring party, as detailed throughout the TAC, "student athlete performance is integral to the billion dollar Big Business of NCAA sports." Id. ¶¶ 52-101, 190.  Additionally, because "the NCAA and its D1 schools preclude student athletes from being paid . . . the provision of employee benefits and tax treatment of wages of collegiate athletes are nonexistent or indiscernible." Id. ¶ 193.  Indeed, because "athletes in the collegiate context are *sui generis*" it is not surprising that some of these factors are inapplicable to the present case.  Johnson, 108 F.4th at 177.  Fundamentally, part of the business of colleges in America is sporting contests.

In their motion to dismiss, the NCAA notes that some of these factors seem more applicable to the member schools, rather than the NCAA.  Dkt. No. 203 27-32.  Therefore, the NCAA argues that they did not employ these student athletes.  Id.  However, as discussed above, the aforementioned factors are non-exhaustive, and it is understood that not every factor may be applicable to every employer.  Furthermore, Plaintiffs clearly alleged that they were jointly employed by their respective NCAA member school and the NCAA.  TAC ¶¶ 242-303.  That certain factors directly involve one employer does not preclude a finding that the NCAA also employed these student athletes.  Indeed, it stands to reason that certain factors will be more applicable to these member schools as the organization that directly interacts with these student-athletes and tasked with implementing the NCAA's bylaws.  Accordingly, in considering the totality of the circumstances and that "athletes in the collegiate context are *sui generis*," the common law agency doctrine overwhelmingly supports a finding that these athletes were jointly employed by both their NCAA member school and the NCAA.  Johnson, 108 F.4th at 177.

v.    **Each Plaintiff Performed Services in Return for Express or Implied Compensation or In-Kind Benefits**

Plaintiffs worked for each of their NCAA member schools and the NCAA in return for express or implied compensation or in-kind benefits, satisfying the fourth prong of the Johnson test. Specifically, "[c]olleges provide…training, practice and game equipment and facilities; preventative care and medical treatment; dieticians and meals; travel and accommodations, and 'other benefits'—to all scholarship athletes and walk-ons." TAC ¶ 201. Plaintiffs were provided with clothing such as practice gear, travel wear, and other apparel (which they were allowed to keep after the playing season ended and after graduation) through their participation in collegiate sports. Plaintiffs were also provided with "swag"—assorted branded promotional products— through their participation in collegiate sports." Id. ¶ 203. Further, "Plaintiffs were provided with meal money, travel expenses, and incidentals related to travel for sporting competitions by their schools through their participation in collegiate sports." Id. ¶ 204. "Some of the Plaintiffs were provided with food, including meal card swipes and meals during the playing season, through their participation in collegiate sports." Id. ¶ 205. "Some of the Plaintiffs were provided with free or reduced-cost tickets to collegiate sporting events through their participation in collegiate sports." Id. ¶ 206. "Some of the Plaintiffs were provided with free or reduced-cost on-campus housing through their participation in collegiate sports." Id. ¶ 207. Finally, "many of the Plaintiffs received scholarships to play their D1 sport, and all of the Plaintiff[s] participated in their sport with other athletes who received scholarships to attend their school and play their sport. In other words, they were provided with a particular benefit for their labor—a reduced-cost education." Id. ¶ 208. Accordingly, "[c]ollegiate athletes . . . despite being unpaid, take wages in the form of 'food, clothing, shelter, and other benefits,' particularly through reduced-cost educational experiences." Id. at ¶209 (citing Tony & Susan Alamo Found., 471 U.S. at 290).

In their motions to dismiss, Defendants argue that the TAC does not delineate which benefits were received by each named Plaintiff or that those benefits motivated any of them to play sports.  However, as Defendants themselves acknowledge, the requirement that student athletes must perform services in return for compensation or in-kind benefits "derives from the Supreme Court's decision in Tony & Susan Alamo Foundation v. Secretary of Labor, 471 U.S. 290 (1985)." Dkt. No. 203 at 33.  In that case, the district court made findings of fact and conclusions of law after an evidentiary hearing.  See Donovan v. Tony & Susan Alamo Found., 567 F. Supp. 556, 559 (W.D. Ark. 1982), as modified, Civ. 77-2183, 1983 WL 1982 (W.D. Ark. Feb. 7, 1983), aff'd in part, vacated in part, 722 F.2d 397 (8th Cir. 1983), aff'd sub nom, Tony & Susan Alamo Found. v. Sec'y of Lab., 471 U.S. 290 (1985).  Thereafter, the Supreme Court affirmed the lower court's determination that the associates at issue were employees even though they "expected no compensation for their labors," because their compensation was "implied" and "received primarily in the form of benefits" without a particularized discussion concerning any of the associates or the specific benefits received by each associate.  Tony & Susan Alamo Found., 471 U.S. at 300-301.  Similarly, the Third Circuit never required that Plaintiffs allege which benefits they individually received or that those benefits were a "motivating factor" in their decision to play sports to sufficiently plead this factor for purposes of surviving a motion to dismiss.  In fact, that inquiry is specifically rebutted by Tony & Susan Alamo Found., which held that workers are categorized as employees for the purpose of the FLSA based on the work they *actually* do and the benefits they *actually* receive, not their motivation for doing such work or their self-identification. Id.  Thus, Plaintiffs have sufficiently alleged that they performed a service in return for compensation or in-kind benefits for purposes of plausibly alleging their employment status pursuant to the FLSA.

Additionally, Defendants argue that Plaintiffs cannot plead that they played sports in exchange for compensation or benefits because they were not economically dependent upon the NCAA or their respective member schools. Dkt. No. 203 at 33-36 (citing Tony & Susan Alamo Found., 471 U.S. at 293). As an initial matter, the Third Circuit never stated that student athletes must be economically dependent on the implied compensation they receive in the form of benefits to be considered employees. Johnson, 108 F.4th at 180. Further, in Tony & Susan Alamo Found., the Supreme Court was distinguishing volunteers from "those who engage in [ordinary commercial] activities *in expectation of compensation*." 471 U.S. at 302 (emphasis added). In that instance, the economic dependence of these self-proclaimed volunteers supported "the District Court's finding that the associates must have *expected to receive in-kind benefits—and expected them in exchange for their services*." Id. at 301 (emphasis added). Similarly, in Acosta v. Cathedral Buffet, Inc., 887 F.3d 761, 767 (6th Cir. 2018), another case cited by Defendants to establish that Plaintiffs must plead economic dependence, the "volunteers neither expected nor received any wages or in-kind benefits in exchange for their service." Defendants are incorrectly conflating "economic dependence" with the "expectation of compensation." Employees that are economically dependent on their compensation will necessarily expect that compensation. However, an employee who is not necessarily economically dependent on their compensation, for instance one working in a dual-income household, will still expect their compensation to be paid. The critical issue is whether these student athletes performed services and expected express or implied compensation or in-kind benefits, not whether they were economically dependent on that compensation. Here, these student athletes expected to be provided with a wide variety of compensation and in-kind benefits. TAC ¶¶ 201-09. Further, an "independent contractor or volunteer would have to cover such expenses out of pocket." Id. ¶ 202. Thus, contrary to

34

Defendants' self-serving assertion, these benefits were not "incidental to competition," they were anticipated by Plaintiffs in exchange for their services to the NCAA, their school and their team. Dkt. No. 203 at 35-36.

Finally, the NCAA asserts that the compensation or in-kind benefits described herein were provided by the member schools rather than the NCAA. However, Plaintiffs clearly allege that they were jointly employed by both their school and the NCAA. TAC ¶¶ 242-303. Therefore, the fact that certain benefits were conferred by the member school does not preclude this Court from finding that the NCAA also employed these student athletes. It stands to reason that certain factors will be more applicable to these member schools as the organization that directly interacts with these student-athletes and tasked with implementing the NCAA's bylaws including those which directly govern the pay and benefits that may be offered to student athletes. Id. ¶¶ 281-284.

### C.    Plaintiffs Sufficiently Plead That They Worked in Interstate Commerce

To sustain their FLSA claim, Plaintiffs must also assert that they engaged in interstate commerce or that they were employed by an "enterprise" engaged in interstate commerce. Dkt. No. 203 at 36-37 (citing SeYoung Ra v. Gerhard's, Inc., 2019 WL 95473, at *4 (E.D. Pa. Jan. 3, 2019) (noting that the FLSA covers employees who either (1) are "engaged in commerce or in the production of goods for commerce" or (2) are "employed in an enterprise engaged in commerce or the production of goods for commerce").

However, Defendants glaringly omit that the same case they cited also acknowledges that "[c]ourts in this Circuit frequently hold that an allegation that the defendant was an enterprise engaged in commerce under the FLSA is sufficient for purposes of a motion to dismiss." Id.; see also Dong v. Ren's Garden, No. 09 Civ. 5642, 2010 WL 1133482, at *4 (D.N.J. Mar. 22, 2010); Razak v. Uber Techs., Inc., No. 16 Civ. 573, 2016 WL 5874822, at *5 (E.D. Pa. Oct. 7, 2016) (holding that allegations that defendants were "employers in commerce within the meaning of 29

U.S.C. § 203(e), 203(m), and 206(a)" is sufficient in the Third Circuit); <u>Kehler v. Albert Anderson, Inc.,</u> 16 Civ. 5318 2017 WL 1399628, at *7 (D.N.J. Apr. 18, 2017) (finding sufficient an allegation that plaintiff was "a W-2 employee of an enterprise engaged in commerce"); <u>Zebroski v. Gouak,</u> No. 09 Civ. 1857, 2009 WL 2950813, at *1 (E.D. Pa. Sept. 9, 2009) (noting that alleging that the defendant was an enterprise under the FLSA was sufficient "[f]or purposes of a motion to dismiss [and] . . . discovery will establish the amount of business actually done.").

Here, Plaintiffs clearly allege that "Defendants have been, and continue to be, enterprises engaged in commerce within the meaning of 29 U.S.C. §§ 203(r) and (s), which employ individuals engaged in commerce and to which minimum wage provisions of 29 U.S.C. § 206(a) apply." TAC ¶ 37; <u>see also</u> <u>Zhong v. Aug. Aug. Corp.,</u> 498 F. Supp. 2d 625, 629 (S.D.N.Y. 2007) ("In that §§ 203(r) and 203(s) clearly outline a definition of 'enterprise' that encompasses any entity that is 'engaged in commerce or in the production of goods for commerce,' [plaintiff] has properly alleged this element of a FLSA claim."); <u>see also</u> § VI.B., <u>infra</u> (detailing the relationship between the NCAA and its member schools that give the organization and its affiliates national reach). Therefore, Plaintiffs have sufficiently pled that they worked for enterprises engaged in interstate commerce.

> **D.    Plaintiffs Sufficiently Plead They Were Not Paid Minimum Wage in <u>Violation of the FLSA</u>**

In their motions to dismiss, Defendants argue that Plaintiffs failed to allege "the approximate number of hours worked for which they did not receive proper compensation." Dkt. No. 203 at 37 (citing <u>SeYoung Ra</u>, 2019 WL 95473, at *4). However, that case involved overtime violations which requires greater specificity than a minimum wage claim. In fact, "the Third Circuit has not specifically addressed the level of specificity required to plead a minimum wage claim under the FLSA." <u>Bedolla v. Brandolini</u>, 18 Civ. 146 2018 WL 2291117,

at *6 (E.D. Pa. May 18, 2018); see also Razak, 2016 WL 5874822, at *5 (same); Kehler, 2017 WL 1399628, at *7 (same).

Moreover, "[t]he rationale for why plaintiffs are not required to allege specific facts regarding wages earned and hours worked is that the FLSA requires employers to keep records of the "wages, hours, and other conditions and practice" of its employees. Bedolla, 2018 WL 2291117, at *7 (citing 28 U.S.C. 211(c)). "Indeed, regulations advanced pursuant to Section 11(c) of the FLSA require employers to keep, *inter alia,* payroll records of the following: 1) hours worked per day; 2) total hours worked per week; 3) total daily or weekly straight-time earnings; and 4) total premium pay for overtime hours. Id. (citing 29 C.F.R. 516.2; Williams v. Tri-County Growers, Inc., 747 F.2d 121, 127 (3d Cir. 1984)). "In light of this burden, 'it cannot be the case that a plaintiff must plead specific instances of unpaid overtime or minimum wage violations before being allowed to proceed to discovery to access the 'employer's records.'" Id. (quoting Harris v. Scriptfleet, 11 Civ. 45612011 WL 6072020, at *3 (D.N.J. Dec. 6, 2011).

Here, the TAC plainly alleges that "Plaintiffs and the other members of the Proposed FLSA Collective were similarly-situated, had substantially similar job requirements, were not paid any compensation by Defendants under the same common policies, plans and practices, and were subject to Defendants' practice of willfully failing and refusing to pay them at the legally required minimum wage for all hours worked." TAC ¶ 330. Further, the relevant records of student athletes are held by the NCAA and its member schools. Id. ¶¶ 195, 299-303. Thus, Plaintiffs sufficiently allege adequate factual grounds to support their FLSA claim and Defendants' motion to dismiss must be denied.

III.    **COLLEGIATE ATHLETES ARE SUBJECT TO THE MINIMUM WAGE LAWS OF VARIOUS STATES**

Defendants argue that student athletes are subject to exceptions to the minimum wage laws

of a number of states. For each of these states, Plaintiffs plead adequate facts to show that they are not subject to these exceptions. To be clear, even if any Plaintiff was subject to an exemption under any state law, that particular Plaintiff's FLSA claims against the NCAA and his or her school would not be impacted or subject to dismissal.

### A.    Connecticut

The NCAA, Villanova, Sacred Heart and Lafayette argue that the Connecticut Minimum Wage Law does not apply in this case because the statute contains an exception for "any individual engaged in the activities of an educational . . . or nonprofit organization where . . . the services rendered to such organizations are on a voluntary basis." Conn. Gen. Stat. § 31-58(e). This case turns, in part, on whether student athletes render their services on a voluntary basis. Colleges provide forms of in-kind compensation to their student athletes, such as scholarships, equipment, medical treatment, meals and travel. TAC ¶¶ 200-208. Student athletes therefore perform their duties, earning revenue for their school and the NCAA, with an expectation of various forms of remuneration. Further, it is plain from Supreme Court case law that volunteers working without the expectation of pay must be bona fide volunteers to fall under such an exception. Tony & Susan Alamo Found., 471 U.S. at 300-301. As such, and as set forth in § II.B.v., supra, Plaintiffs are not merely volunteers and Connecticut's statutory exception to its minimum wage law does not apply here.

### B.    Indiana

The NCAA argues that the Indiana Minimum Wage Law excludes "[s]tudents performing services for any school, college, or university in which they are enrolled and are regularly attending classes." Ind. Code § 22-2-2-3, subd. (i). However, student athletes perform their services for the NCAA, not merely their school of enrollment. Further, it is plain from Supreme Court case law

that individuals working without the expectation of pay must be bona fide volunteers to fall under such an exception.  Tony & Susan Alamo Found., 471 U.S. at 300-301.  Indiana's statutory exception to its minimum wage law therefore does not apply to the NCAA or Purdue.

### C.    New York[6]

The NCAA, Cornell, Fordham and Marist argue that the New York Minimum Wage Act does not apply to student athletes because it excludes student workers where such student is employed by "a corporation, unincorporated association, community chest, fund or foundation organized and operated exclusively for . . . educational purposes."  N.Y. Lab. Law § 651(5)(h).  For one, this provision simply does not apply to the NCAA, which is not an exclusively educationally focused organization but an athletic organization.  As to the member schools, in similar contexts, the New York Labor Law's student exclusions "'necessitate[] an inquiry into the nature of the employment relationship to discern whether claimant's main objective was to earn a livelihood or further his education.'"  Claim of Druc, 613 N.Y.S.2d 782, 783 (App. Div. 3d Dep't 1994) (analyzing a similar student exception in the unemployment context) (quoting Claim of Mitromaras, 504 N.Y.S.2d 331, 332 (App. Div. 3d Dep't 1986)).  In this case, as set forth in § II.B.v., supra, athletes playing collegiate sports do not do so to further their education.  Student athletes do not earn credit, and their educational activities are even hampered by their participation in athletics.  See TAC ¶¶ 51-54.  New York's statutory exception to its minimum wage law therefore does not apply to the NCAA or any of its member schools.

### D.    North Carolina

---

[6]    Plaintiffs bring claims under N.Y. Lab. Law §§ 191 et seq.  See TAC ¶ 9.  At Count V of the TAC, Plaintiffs wrote that they bring claims under § 191, omitting the "et seq." but clearly, in Counts IV and V, refer to the whole labor law, not merely § 191 as argued by, for instance, Cornell in its Motion to Dismiss.  See Dkt. No. 207-1 at 8-9.

The NCAA argues that North Carolina's minimum wage law excepts "[b]ona fide volunteers in . . . educational . . . organizations where an employer-employee relationship does not exist." N.C. Gen. Stat. § 95-25.14(a)(5). As set forth in § II.B.v., supra, an employer-employee relationship exists between student athletes, their schools and the NCAA. North Carolina's statutory exception to its minimum wage law therefore does not apply here.

### E.    Oregon

The NCAA asserts that student athletes are excepted from Oregon's minimum wage law because that statute excepts "voluntary or donated services performed for no compensation or without expectation or contemplation of compensation as the adequate consideration for the services performed for a . . . charitable, educational . . . or similar nonprofit corporation." Or. Rev. Stat. § 653.010(2). The NCAA deceptively omits that this clause only applies to volunteer work "for community service, religious or humanitarian reasons." Playing a collegiate sport is plainly not a service performed for any community service, religious or humanitarian reason, and no defendant argues as much, so the exception to Oregon's minimum wage statute is inapplicable in this context.

### F.    Pennsylvania

Villanova, Sacred Heart and Lafayette argue that the Pennsylvania Minimum Wage Act does not apply in this case because it excepts employment "[i]n the activities of an educational, charitable, . . . or nonprofit organization where . . . the services are rendered to such organization gratuitously." 43 Pa. Stat. § 333.105. As an initial point, it is plain from Supreme Court case law that volunteers working without the expectation of pay must be bona fide volunteers to fall under such an exception. Tony & Susan Alamo Found., 471 U.S. at 300-301. As set forth in § II.B.v., supra, Plaintiffs are not merely volunteers. Pennsylvania's statutory exception to its minimum

wage law therefore does not apply here.

## IV.  PLAINTIFFS HAVE SUFFICIENTLY PLEADED UNJUST ENRICHMENT CLAIMS AGAINST THE NCAA AND ITS MEMBER SCHOOLS

As an initial matter, no Defendant made the argument that Plaintiffs' unjust enrichment claims were insufficiently pleaded in their previous motions to dismiss.  Even if the Court does consider their arguments at this stage of the litigation, that this basis for dismissal was not raised before indicates that it is an afterthought.  If Defendants' contentions were well-founded, they would have made them at the first opportunity.

Plaintiffs have sufficiently pleaded the elements of their unjust enrichment claims.  The elements of an unjust enrichment claim are basically common to all jurisdictions.  An unjust enrichment claim requires a plaintiff to plead (1) that a benefit was conferred on Defendant and (2) that injustice would result if Defendant retained the benefit.  See e.g., Meehan v. Cheltenham Twp., 410 Pa. 446, 449 (Sup. Ct. Pa. 1963) (Stating under Pennsylvania law, "[i]n order to recover [under unjust enrichment], there must be both (1) an enrichment, and (2) an injustice resulting if recovery for the enrichment is denied."); Mannino v. Passalacqua, 101 N.Y.S.3d 381, 384 (App. Div. 2d Dep't 2019) (citations omitted) (Stating under New York law, "a plaintiff must allege that (1) the other party was enriched, (2) at that party's expense, and (3) that it is against equity and good conscience to permit the other party to retain what is sought to be recovered"); Andrade v. Kwon, No. 3:08 Civ. 479, 2012 WL 3059616, at *7 (D. Conn. Mar. 26, 2012) (citation omitted) (Stating under Connecticut law, "[t]o prove unjust enrichment, a plaintiff must show that (1) defendants received something of value, (2) defendants unjustly did not pay the plaintiffs for the benefit, and (3) the failure of payment was to the plaintiffs' detriment."); Jessey Sports, LLC v. Intercollegiate Men's Lacrosse Coaches Ass'n, Inc., 888 S.E.2d 677, 681 (N.C. Ct. App. 2023) (citations and quotations omitted) (Stating under North Carolina law, "[u]nder a claim for unjust

41

enrichment, a plaintiff must establish certain essential elements: (1) a measurable benefit was conferred on the defendant, (2) the defendant consciously accepted that benefit, and (3) the benefit was not conferred officiously or gratuitously."); Wilson v. Gutierrez, 323 P.3d 974, 978 (Or. Ct. App. 2014) (Stating under Oregon law, "[t]he elements of the quasi-contractual claim of unjust enrichment are (1) a benefit conferred, (2) awareness by the recipient that she has received the benefit, and (3) it would be unjust to allow the recipient to retain the benefit without requiring her to pay for it.").

Plaintiffs have adequately set forth these elements as to the NCAA and the Defendant member schools. The TAC alleges that that a benefit was conferred, specifically that Defendant member schools "received and benefited from the uncompensated labor of [the corresponding plaintiffs and proposed class]" when they "devised and implemented a plan to increase their earnings and profits by fostering a scheme of securing work of [Plaintiffs and the Proposed class] without properly paying compensation" and "induced Plaintiffs . . . to perform work while failing to properly compensate them." TAC ¶¶ 607-12, 628-32, 641-46, 655-60, 669-74, 683-88, 697-702, 711-716 (the "Unjust Enrichment Counts"); see also ¶¶ 43, 45 (Plaintiffs were recruited or asked to play collegiate sports at their respective universities and performed services for those universities and the NCAA through their participation in collegiate sports). Plaintiffs further allege that injustice will result if Defendants are allowed to retain the benefit, specifically that "[b]y reason of having secured the work and efforts of [Plaintiffs and the Proposed Class] without proper compensation as required by law, [Defendants] enjoyed reduced overhead with respect to their labor costs, and therefore realized additional earnings and profits to their own benefit and to the detriment of [Plaintiffs and the Proposed Class]" and that to "retain such benefit without compensation would be inequitable and rise to the level of unjust enrichment" contrary to

"fundamental principles of justice, equity and good conscience." Id. at Unjust Enrichment Counts; see also id. at ¶ 46 (Plaintiffs' participation in collegiate sports "allowed the NCAA and their respective colleges and universities to make money through television and streaming deals, ticket sales, sponsorships, sales of branded and promotional items and sports gear, among other revenue streams . . . The services that collegiate athletes provide in the form of playing collegiate sports benefit their institutions and the NCAA."). Accordingly, Plaintiffs have set forth the elements of an unjust enrichment claim for all jurisdictions in question.

## A.    Defendants' Case Law is Inapposite

Defendants cite a bulk of cases to support their contention that Plaintiffs' unjust enrichment claims are insufficiently pleaded. None of these citations support dismissal. In their motion to dismiss, the NCAA cites a long string of cases to support its contention that "[u]njust enrichment is an equitable remedy that exists *only* when an adequate remedy at law—including a statutory remedy—is unavailable." Dkt. No. 203 at 53. (emphasis added). However, none of the cases in their string cite support their assertion. Instead, the NCAA lists actions where an unjust enrichment claim has been pleaded alongside contract or tort claims. See Trustmark Ins. Co. v. Bank One, Ariz., NA, 48 P.3d 485, 491 (Ariz. Ct. App. 2002) (discussing relationship between contract and unjust enrichment); Loiselle v. Cosas Mgmt. Grp., LLC, 228 P.3d 943, 947 (Ariz. Ct. App. 2010) (same); Walters v. MedSouth Rec. Mgmt., LLC, 38 So.3d 245, 246 (Sup. Ct. La. 2010) (discussing relationship between tort claims and unjust enrichment); Coppolillo v. Cort, 947 N.E.2d 994, 998 (Ind. Ct. App. 2011) (contract); Embree Constr. Grp., Inc. v. Rafcor, Inc., 411 S.E.2d 916, 920 (Sup. Ct. N.C. 1992) (contract). Further, the citations do not support the proposition that the availability of an alternative remedy automatically results in preclusion, whether by contract or statute. See Pentlong Corp. v. GLS Cap., Inc., 573 Pa. 34, 43-44 (Pa. 2003) (allowing the unjust

enrichment claim to go forward because the other remedy was inadequate); Andrade, 2012 WL 3059616, at *8 (D. Conn. Mar. 26, 2012) (finding plaintiff adequately pleaded FLSA, CMWA, **and** unjust enrichment claims); Mannino, 101 N.Y.S.3d 381 at 385 (allowing unjust enrichment claim to proceed in part since the plaintiffs did not have an adequate remedy at law and concluding that fact issues remained regarding whether the parties were in fact unjustly enriched that were not ripe for resolution at the pleading stage); Coppolillo, 947 N.E.2d at 998 (allowing unjust enrichment claim to proceed even though there was an agreement between the parties, since the parties' "payment arrangements were not fully addressed by the agreement"); Wilson, 323 P.3d at 976 (making no mention of preclusion and affirming lower courts unjust enrichment award).

Further, some of the member schools' motions fail to meaningfully discuss their applicable state's law regarding preclusion of unjust enrichment claims. Sacred Heart, for instance, does not cite a single case from Connecticut to support its arguments regarding statutory preclusion. Duke's brief seeks dismissal of the unjust enrichment claim without citing a single case. Finally, three schools—the University of Arizona, Purdue and Oregon—do not even move to dismiss the unjust enrichment claims themselves, laying bare the weakness of the NCAA's argument.

## B.    Unjust Enrichment Claims are not Automatically Precluded by the Existence of Contract or the Availability of a Statutory Claim
### i.    Preclusion by Statute

The NCAA, Tulane, Fordham, Cornell, Villanova, Lafayette, Sacred Heart and Notre Dame argue that the unjust enrichment claims must be dismissed because they are duplicative of federal and state wage claims. They specifically argue that because the FLSA and some states provide for similar categories of damages, Plaintiffs' unjust enrichment claims are automatically precluded. However, the preclusion of unjust enrichment by statutory claims is limited to remedies that are the same. See, e.g., Sosnowy v. A. Perri Farms, Inc., 764 F. Supp. 2d 457, 468-470

44

(E.D.N.Y. 2011) (dismissal of unjust enrichment claims only to the extent that they overlap with the FLSA remedies); Scott v. NOW Courier, Inc., No. 10 Civ. 00971, 2011 WL 13350293, at *4 (S.D. Ind. Sept. 27, 2011) (declining to dismiss the plaintiffs' unjust enrichment claims because it was not "merely a duplicate of their FLSA claims").

Here, the remedies are not duplicative. Not only is the theory of liability for unjust enrichment premised on an entirely different theory of liability from the minimum wage claims, but the corresponding damages awarded under each theory also differ. Unjust enrichment claims are not based on the failure to pay a minimum wage. They are predicated on a different theory of liability, that the NCAA and their member schools unfairly benefited themselves at the expense of Plaintiffs, without legal justification. Compare, e.g., TAC ¶¶ 591-606 (FLSA and Pennsylvania state wage claims) with ¶¶ 607-12 (Pennsylvania Unjust Enrichment). Further, the remedies are not similar nor coextensive. The damages under federal and state minimum wage laws are well-defined. FLSA allows recovery of unpaid minimum wages of $7.25 per hour, alongside the possibility of liquidated damages, and attorneys' fees and costs. 29 U.S.C. § 206(a)(1)(A). State minimum wage laws provide similar remedies based on the minimum wage of that state. In contrast, unjust enrichment does not entitle you to a certain wage. The remedy, which is based on the amount Defendant was unjustly enriched, is undefined by law. Courts therefore base unjust enrichment damages on numerous sources of enrichment. See, e.g., Andrade, 2012 WL 3059616, at *8 (describing damages for FLSA claims based on federal minimum wage and for unjust enrichment based on lost tips that they never received); PPG Indus. Inc v. Jiangsu Tie Mao Glass Co. Ltd, 47 F.4th 156, 161–62 (3d Cir. 2022) (unjust enrichment damages award based on the costs defendants avoided because of the benefit received from plaintiff); see also Monahan v. Smyth Auto., Inc., No. 10 Civ. 00048, 2011 WL 379129, at *9 (S.D. Ohio Feb. 2, 2011) (allowing

simultaneous pleadings for recovery under FLSA for failure to pay minimum wage and recovery

under unjust enrichment for not paying employees when they worked through lunch breaks). The

differences between the damages available under minimum wage laws and an unjust enrichment

claim are unsurprising. As discussed above, they are completely different claims predicated on

distinct theories of liability. In fact, an unjust enrichment claim does not even require an employer-

employee relationship, which is at the heart of Plaintiffs' minimum wage claims. See, e.g., In re

Chocolate Confectionary Antitrust Litig., 749 F. Supp. 2d 224, 243 (M.D. Pa. 2010) (unjust

enrichment claims allowed to proceed past the motion to dismiss stage to provide equitable relief

for customers from unfair trade practice); In re Nyuyen Vu, 497 B.R. 462, 465 (Bankr. E.D. Pa.

2013) (wife stated unjust enrichment claim against husband who used her money to obtain real

estate); Hannibal-Fisher v. Grand Canyon Univ., 523 F. Supp. 3d 1087, 1098 (D. Ariz. 2021)

(students stated an unjust enrichment claim in suit against university for money paid for housing

during pandemic). As such, Plaintiffs' unjust enrichment claims are not duplicative of their

minimum wage claims.

However, even if these claims were duplicative, Plaintiffs must still be allowed to plead

their unjust enrichment claims in the alternative. Defendants ignore the availability of alternative

pleading as permitted by Federal Rule of Civil Procedure 8. See Fed. R. Civ. P. 8 ("A pleading

that states a claim for relief must contain . . . (3) a demand for the relief sought, **which may include

relief in the alternative or different types of relief**.") (emphasis added). For example, Defendant

NCAA and Notre Dame argue that Plaintiffs' unjust enrichment claims must be precluded because

of their FLSA claims. However, they conveniently neglect to mention that courts regularly allow

unjust enrichment claims to be plead in the alternative. See, e.g., Adams v. Waupaca Foundry,

No. 17 Civ. 00140, 2017 WL 6493090, at *4 (S.D. Ind. Dec. 19, 2017) (concluding that plaintiff

may plead alternative theories of relief under R.8 and allowing both wage and unjust enrichment claims to proceed); Scott, 2011 WL 13350293, at *4 (declining to dismiss the plaintiffs' unjust enrichment claims because it was not "merely a duplicate of their FLSA claims"); Hannibal-Fisher, 523 F. Supp. 3d at 1098 (allowing unjust enrichment pleading in alternative in contract context); Lugo v. Farmers Pride, Inc., 967 A.2d 963, 970 (Super. Ct. Pa. 2009) ("claims under the PMWA, the WPCL, and breach of contract may be pleaded alternatively with a claim of unjust enrichment, although recovery may not be had for both unjust enrichment and the other claims.").  There is nothing precluding Plaintiffs from pleading unjust enrichment in the case at bar simply because they also pleaded FLSA claims.

Finally, Plaintiffs' unjust enrichment claims should be allowed to proceed because it is uncertain whether there is an otherwise adequate remedy at law.  While there are situations in which Courts have precluded unjust enrichment claims based on the availability of another statutory remedy, when there is no other remedy available, unjust enrichment fills the gap. Walters, 38 So.3d at 246; Mannino, 101 N.Y.S.3d 381 at 385 (N.Y. App. Div. 2019) (allowing an unjust enrichment claim to proceed in part because plaintiffs did not have an **adequate remedy** at law).  In the cases cited by Defendants in which unjust enrichment claims were precluded there was no question about whether the statutory scheme applied to the plaintiffs.  For example, both in Brieg and McEachern, the plaintiffs were acknowledged as employees.  Dkt. 214 at 32 (citing Breig v. Covanta Holding Corp., No. 21 Civ. 865, 2022 WL 837242, (E.D. Pa. Mar. 21, 2022) and McEachern v. George Junior Republic in Pennsylvania, No. 18 Civ. 395, 2020 WL 1307421, at *1 (W.D. Pa. Mar. 19, 2020)).  In this case, Defendants are actively arguing that the FLSA does not cover Plaintiffs.  In short, Defendants are trying to have their cake and eat it too.  They argue that Plaintiffs do not qualify as employees under minimum wage laws and at the same time argue

that Plaintiffs are precluded from asserting unjust enrichment claims because they have already pleaded wage claims that are only applicable to employees.

Accordingly, Plaintiffs' unjust enrichment claims must proceed because they are not duplicative of their minimum wage claims. Further, even if they were, they must still be available to plead in the alternative, especially here when it remains unsettled whether they are employees and an adequate remedy at law beyond their unjust enrichment claims exist. Johnson, 108 F.4th at 177.

### ii.    Preclusion by Contract

Villanova, Sacred Heart and Fordham argue that Plaintiffs Johnson (Villanova), Ruiz (Sacred Heart), Kerkles (Fordham), and Labella's (Fordham) unjust enrichment claims are precluded by the existence of a contract, namely, the scholarship agreements between the Plaintiff student athletes and their schools. However, an unjust enrichment claim can proceed when a contract does not define the relationship between parties or does not detail the subject matter at issue in an unjust enrichment claim. See U.S. v. Kensington Hosp., 760 F.Supp. 1120, 1135 (E.D. Pa. 1991) (allowing unjust enrichment claim to stand when the contract at issue only covered the Medicare payments at issue but not the kickbacks); Kraus Indus., Inc. v. Moore, No. 06 Civ. 00542, 2007 WL 2744194, at *8 (W.D. Pa. Sep. 18, 2007) (denying motion to dismiss because while the contract between the parties was for work being done, the dispute at issue centered on future contracts); Ingham ex rel. Cobalt Asset Mgmt., L.P. v. Thompson, 931 N.Y.S.2d 306, 309 (App. Div. 1st Dep't 2011) ("Plaintiff's unjust enrichment claim against Wellington also fails, inasmuch as a valid and enforceable contract governs the **subject matter of the claim**") (emphasis added); Meaney v. Connecticut Hosp. Ass'n, Inc., 735 A.2d 813, 823 (Sup. Ct. Conn. 1999) ("It is often said that an express contract between the parties precludes recognition of an implied-in-law contract **governing the same subject matter**.") (emphasis added). Cf. Vantage Learning (USA),

LLC v. Edgenuity, Inc., 246 F. Supp. 3d 1097, 1100 (E.D. Pa. 2017) (granting summary judgment on unjust enrichment claim because "[t]he Agreement, by its terms, governs the entire relationship of the parties").

In arguing for preclusion by the existence of contract, Villanova and Sacred Heart attach the scholarship agreements of Plaintiffs Johnson and Ruiz. Dkt. 214, Exs. 1. A-E (Johnson); 2-A (Ruiz). Those scholarships do not cover the full extent of the relationship between the parties and thus do not preclude unjust enrichment claims. See Kensington Hosp., 760 F. Supp. at 1135 (allowing unjust enrichment claim to stand when the contract at issue only covered the Medicare payments at issue but not the kickbacks); Kraus, 2007 WL 2744194, at *8 (denying motion to dismiss because while the contract between the parties was for work being done, the dispute at issue centered on future contracts). They do not detail what type of work the student athletes will be doing or purport to provide compensation for the extent of the work over the course of their time in college, which is unsurprising given the NCAA's amateurism provisions (explicitly mentioned in Ruiz's contract). While both contracts limit the other scholarships or financial awards Plaintiffs Johnson and Ruiz can accept to meet the NCAA's requirements, those parameters are limited to financial aid and scholarship offerings. The scholarship agreements are insufficient to preclude an unjust enrichment claim.

In their motion, Fordham does not even attach a contract related to Plaintiffs Kerkles or Labella. They simply note that the TAC states that many of the Plaintiffs received scholarships and therefore conclude that preclusion is warranted. As such, there is no way to determine whether Kerkles' or Labella's scholarship agreements covered the full extent of the relationship between the parties, and dismissal of these claims is not warranted.

Moreover, many of Defendants' citations involve arguments for preclusion because a breach of contract claim is brought simultaneously with an unjust enrichment claim. See Vantage Learning (USA), LLC, 246 F. Supp. 3d at 1100 (unjust enrichment claim and breach of contract both pled); Meaney, 735 A.2d at 823 (same). Preclusion is warranted in those cases because a plaintiff pleaded an unjust enrichment claim alongside a breach of contract claim predicated upon "an express contract. . . [which] delineates the rights and obligations with respect to services to be provided and the compensation to be paid." Levy v. World Wrestling Entm't, Inc., No. 08 Civ. 1289, 2009 WL 455258, at *3 (D. Conn. 2009). However, here, Plaintiffs do not bring a single breach of contract claim and there is no agreement which delineates the extent of the relationship between the parties. Thus, none of those cases are applicable.

Accordingly, since these scholarships do not cover the extent of the parties' relationships nor the subject matter of the dispute at issue and some of these scholarship agreements are not even attached to their moving papers, Defendants' motions to dismiss based on contractual preclusion must be denied.

## V.    SOVEREIGN IMMUNITY

### A.    Basic Framework of Public-Entity Sovereign Immunity

The Eleventh Amendment generally bars lawsuits under federal law against an un-consenting state. See Hans v. Louisiana, 134 U.S. 1, 10-15 (1890); Seminole Tribe of Fla. v. Fla., 517 U.S. 44, 55 (1996) (describing the general bar and the narrow exceptions to it). However, state-created entities do not receive sovereign immunity protection unless they can carry a "burden of production and persuasion" to prove that they are entitled to it. Febres v. Camden Bd. of Educ., 445 F.3d 227, 229 (3d Cir. 2006). The Third Circuit employs a fact-intensive, three-factor inquiry (including 13 total sub-factors) to determine whether an entity is an arm of the state, under a test

articulated in Fitchik v. N.J. Transit Rail Operations, Inc., 873 F.2d 655 (3d Cir. 1989).  See

Maliandi v. Montclair State Univ., 845 F.3d 77, 83 (3d Cir. 2016) (applying the Fitchik factors).

The three major factors are (1) whether the state itself will ultimately be obligated to satisfy a

judgment, Fitchik, 873 F.2d at 660; (2) "whether state law treats an agency as independent, or as

a surrogate for the state," id. at 662; and (3) "the degree of [the entity's] autonomy from the state."

Id. at 663.

> Under factor (1), funding, courts in the Third Circuit weigh:
>
> (1) a State's legal obligation to pay a money judgment entered against the alleged
> arm of the State; (2) alternative sources of funding (i.e., monies not appropriated
> by the State) from which the entity could pay such judgments; and (3) specific
> statutory provisions that immunize the State from liability for money judgments.

Maliandi, 845 F.3d at 86.  Under factor (2), status under state law, courts weigh:

> (1) how state law treats the agency generally (2) whether the entity is separately
> incorporated, (3) whether the agency can sue or be sued in its own right . . . (4)
> whether it is immune from state taxation . . . . (5) the entity's authority to exercise
> the power of eminent domain, (6) application of state administrative procedure and
> civil service laws to the entity, (7) the entity's ability to enter contracts and make
> purchases on its own behalf, and (8) whether the entity owns its own real estate.

Maliandi, 845 F.3d at 91 (citations and quotations omitted and numerals added for clarity).  Under

factor (3), degree of autonomy, courts weigh the "(1) entity's governing structure and (2) the

oversight and control exerted by a State's governor and legislature."  Maliandi, 845 F.3d at 96

(citations omitted and numerals added for clarity).

### B.  The Third Circuit Applies a Unique Sovereign Immunity Standard

The Supreme Court's opinion in Regents of the Univ. of California v. Doe, 519 U.S. 425,

426 (1997) caused an important revision of the Third Circuit's multifactorial test that simplified

the factor (1) analysis.  Unlike other Circuits, this Circuit has focused the first factor on the

question of the state's real, legal obligation to pay a judgment.  While Fitchik had set forth a variety

of factors under the funding prong, the Supreme Court described this prong instead as asking, more simply, "whether a money judgment against a state instrumentality or official would be enforceable against the State." Regents of the Univ. of California, 519 U.S. at 430. Following this description, the Third Circuit now looks especially for a "legally enforceable obligation" when analyzing factor (1). Maliandi, F.3d at 87 (so holding, and collecting 3d Circuit cases); see, e.g., Maliandi, 845 F.3d at 87 n.6 (illustrating that the test looks to the real legal obligation even if, for instance, the state treasury could itself be indemnified by a third party, such as the federal government). This Court has reached decisions on the issue of sovereign immunity by analyzing *only* this subfactor. See Bowers v. Nat'l Collegiate Athletic Ass'n, 475 F.3d 524, 547-548 (3d Cir. 2007) (ignoring the other subfactors).

Due to different legal standards across Circuits, and the unique weight placed by this Circuit on the enforceability of a judgment against the state rather than the state-affiliated defendant, the Court should not defer to sister circuit decisions cited by Defendants on the issue of sovereign immunity.

### i.    Purdue University is Not Entitled to Sovereign Immunity

Purdue is not entitled to sovereign immunity because under the Third Circuit's test, it is both financially and operationally independent from the State of Indiana. By Purdue's own admission, an instrumentality of the state will be entitled to Eleventh Amendment immunity when a judgment against it "would have essentially the same practical consequences as a judgment against the State itself." Bowers, 475 F.3d at 545-46. That is not the case for Purdue. As Purdue notes, there is no statutory obligation for the State of Indiana to pay money judgments against public universities. Dkt. No. 202 at 12. Moreover, Purdue is "self-insured" and not insured by a state source. Id. The Third Circuit's test for sovereign immunity looks for decisive, direct liability

to the state, and "if a judgment were awarded against Purdue, the state treasury would not write out a check to [the plaintiff]."  Kashani v. Purdue Univ., 813 F.2d 843, 846 (7th Cir. 1987); see also Ind. Code § 21-23-4-6 (describing control of Purdue funds by the University's own Treasurer).

In addition to the lack of any statutory provision, as a practical matter, any money judgment against Purdue is also unlikely to indirectly come out of the state treasury.  Purdue provided the following breakdown of its 2024 revenue, which we accept as true for the purposes of this argument:

> 37% from tuition and fees; 17% from contracts, grants, and operation; 12% from state appropriations; 10% from investment income; 9% from gifts, 8% from other revenue, and 7% from auxiliary enterprises (such as athletics, housing, food services, etc.).

Dkt. No. 202 at 12.  Purdue's argument that the state somehow controls the university's revenue is unavailing.  Purdue argues that the state manages gifts to the university in a trust and invests endowments, but gifts account for less than 10% of total revenue.  Purdue also contends that the state limits the tuition it can charge, but the reality is that tuition and fees already account for 37% of revenue, i.e. $1.66 billion in 2024 that it is free to allocate.[7]  Purdue also does not claim that its revenue, other than the portion attributable to gifts, is subject to state control.  Therefore, only the 9% of its revenue attributable to gifts is subject to state control.  Out of the $2.55 billion the university received in revenue in 2024, $2.32 billion is not controlled by the state.[8]  Based on this, the first factor weighs heavily against sovereign immunity.

---

[7]    Purdue Universiy, Financial Report 2024, (October 25, 2024) https://www.purdue.edu/treasurer/finance/wp-content/uploads/2024/12/508_FY2024-Purdue-Financial-Report-BLENDED-FINAL-10_25_24.pdf (hereinafter "Purdue Financial Report").

[8]    Moreover, A federal court recently approved a settlement that not only pledged $2.576 billion in damages for D1 student athletes but also opened the door for D1 student athletes to receive $1.6 billion dollars in new compensation per year, with that amount increasing over the next ten years, by enabling revenue sharing between the NCAA and D1 college student athletes.

As to the second Fitchik factor, not all subfactors support Purdue's claim of sovereign immunity. First, Purdue is an entity that can "sue and be sued in its own right." Maliandi, 845 F.3d at 94. The university's own financial report states that it "is a party in various legal actions" and is "involved in a number of claims."[9] Second, Purdue may engage in real estate transactions in its own name. Ind. Code § 21-36-3-3. The fact that the university may choose to conduct these transactions in the name of the state rather than its own does not suggest that Purdue is "functionally synonymous with the State of Indiana," as Purdue claims, but rather that the university has agency and discretion to choose how to conduct business by weighing many conceivable considerations, including tax and business reasons. Dkt. No. 202 at 15. Third, Purdue has the "ability to enter contracts and make purchases on its own behalf." Maliandi, 845 F.3d at 91. Article VII, Section 2 of Purdue's Bylaws clearly states that contracts may be executed both "in the name of the Corporation," i.e., the Trustees of Purdue University, and "in the name of the University."[10] The second factor leans at most only slightly in favor of sovereign immunity.

The third Fitchik factor weighs against immunity. Indiana law gives the Board of Trustees plenary power to "do all acts necessary and expedient to put and keep Purdue University in operation" and "make all bylaws, rules, and regulations required or proper to conduct and manage Purdue University." Ind. Code §§ 21-27-7-4, 21-27-7-5. The university controls its own finances

---

In re Coll. Athlete NIL Litig., No. 20 Civ. 3919, 2025 WL 1675820, at *1 (N.D. Cal. June 6, 2025). Purdue University has stated that it plans to opt into the settlement. See Nathan Baird, Paying players, private equity, roster limits: What House settlement means for Purdue, indystar.com (June 12, 2025) https://www.indystar.com/story/sports/college/purdue/2025/06/12/purdue-sports-house-settlement-paying-players-revenue-sharing/84154008007/ . This scheme creates an additional source of private funding for any judgment arising out of this case against Purdue.

[9]    Purdue Financial Report at Note 11, "Contingent Liabilities and Commitments."
[10]    The Bylaws of the Trustees of Purdue University, "Art. VII: Contracts and Other Written Instruments," (August 2, 2024) https://www.purdue.edu/bot/about/bylaws.php#article7

without direct oversight of the state treasurer or budget director. Ind. Code § 21-23-4-6 (the 'Board's treasurer "shall manage . . . all stocks and funds belonging to Purdue University"). The Board of Trustees make decisions on virtually all aspects of Purdue's operations, including "university staff, educational policy, research, university construction, contracts, leases, and purchases, gifts, estates, and trusts, tuition, fees, and other charges, scholarships, fellowships, and student loans, related corporations, legislation, [and] university-community relations." [11] The Board itself describes its "most important responsibility" as "electing the University's president," who in turn oversees the university's day to day operations.[12] This creates another level of separation between the university and the state. Purdue University should not be allowed to escape liability by hiding behind the State of Indiana when it operates independently from the state.

### ii.    The University of Oregon Is Not Entitled to Sovereign Immunity

Oregon is not entitled to Eleventh Amendment Immunity pursuant to the Third Circuit's Fitchik test. As an initial matter, the Court should not defer to the case law cited by Oregon because those cases are under-reasoned and outdated, are not binding on this Court and fail to apply the factors the Supreme Court has found relevant to public entity analysis. Rounds v. Oregon State Bd. of Higher Educ. accepts with little discussion that the school is a Department of the State. 166 F.3d 1032, 1035 (9th Cir. 1999). The decision only considered three factual elements: (i) that the University is subject to the jurisdiction of the Board of Higher Education, (ii) that the President of the University acts under the Board's supervision, and (iii) that "the University performs the central governmental function of providing opportunities for 'deserving and qualified citizens to

---

[11]    The Bylaws of the Trustees of Purdue University, "Art. III: Procedure at Meetings," (August 2, 2024) https://www.purdue.edu/bot/about/bylaws.php#article3
[12]    Board of Trustees 101, purdue.edu, (January 2025) https://www.purdue.edu/bot/about/index.php

realize their aspirations for higher education.'" Id.  However, the statute providing for the President's supervision by the Board has since been repealed,[13] and that court's position that the University performs a central governmental function is based on a 1988 case, Mitchell v. L.A. Cmty. Coll. Dist., 861 F.2d 198, 201 (9th Cir. 1988), that is no longer good law.  See Crowe v. Oregon State Bar, 112 F.4th 1218, 1228 (9th Cir. 2024) (describing Mitchell as the outdated, "then-controlling test").

More importantly, Rounds predates a 2011-2013 reorganization of the Oregon State University system.  About the Higher Education Coordinating Commission, Oregon.gov, https://www.oregon.gov/highered/about/Pages/commission.aspx (last visited on July 3, 2025) (describing how the Higher Education Coordinating Commission was established in 2011).  Notably, these reforms established independent governing boards for several public universities, including Oregon.  See Or. Rev. Stat. § 352.029 (defining "governing board").  Thus, while courts continue to follow Rounds, see, e.g., Committe v. Oregon State Univ., No. 18 Civ. 00328, 2018 WL 4623159, at *2 (D. Or. Sept. 26, 2018) (applying Rounds with little analysis), those decisions carry little analytical weight.

Under the Third Circuit's standard, factor (1) of the Fitchik test, which addresses the state's obligation to pay a judgment, weighs decisively against immunity.  Oregon may be "sued in its own name," Or. Rev. Stat. § 352.087(1)(n), and has a separate treasury, Or. Rev. Stat. § 352.102(1) ("Except as set forth in this section, the governing board may authorize, establish, eliminate, collect, manage, use in any manner and expend all revenue derived from tuition and mandatory enrollment fees.").  It may even issue revenue bonds, and these are not considered "an indebtedness

---

[13]    The decision cites Or. Rev. Stat. § 352.004, which was repealed in 2015.  Today, the University President acts under the supervision of an independent governing board of the University.  Or. Rev. Stat. § 352.096.

or obligation of the State of Oregon." Or. Rev. Stat. § 352.408(5). There is no reason to believe that the state would have any obligation to pay a judgment against Oregon.

As to factor (2), several factors cut against immunity: Oregon can sue and be sued and has the power to enter into contracts and agreements. Id. §§ 352.087(1)(n), (1)(c). While state law admittedly treats the school as an arm of the state, virtually all decisions fail to apply the Fitchik test and merely rely on Rounds, which, for previously stated reasons, should not be controlling. See, e.g., Arnette v. S. Oregon Univ., No. 10 Civ. 3025, 2010 WL 3154579, at *1 (D. Or. July 2, 2010), report and recommendation adopted, No. 10 Civ. 3025, 2010 WL 3154584 (D. Or. Aug. 9, 2010) (citing Rounds and relying on the plaintiff's acknowledgement that the university is operated by the State of Oregon to find immunity), Donaldson v. W. Oregon Univ., No. 23 Civ. 01450, 2023 WL 9289099, at *1 (D. Or. Dec. 22, 2023), report and recommendation adopted, No. 23 Civ. 01450, 2024 WL 181861 (D. Or. Jan. 17, 2024) (citing Arnette and Rounds without further analysis), Doe v. Oregon State Univ., 614 F. Supp. 3d 847, 858 (D. Or. 2022) (citing Rounds without further inquiry), Hagel v. Portland State Univ., No. 04 Civ. 1770, 2005 WL 1502884, at *4 (D. Or. June 9, 2005), aff'd in part, rev'd in part, 237 F. App'x 146 (9th Cir. 2007) (same).

Factor (3) also weighs definitively against immunity. Oregon has a great degree of independence. As already discussed, the school is run by an independent governing board and has a totally separate treasury, spending power and ability to issue bonds. Its independent board is given extensive powers, even including a "necessary and proper" clause. See Or. Rev. Stat. § 352.087(3) ("may perform any other acts that in the judgment of the governing board or university are required, necessary or appropriate to accomplish the rights and responsibilities granted to the governing board or university by law."). While the governor appoints most of the board, Or. Rev. Stat. § 352.076(2)(a), board members serve a relatively long four years, may only be removed for

cause, and the state is not otherwise involved in Oregon's day-to-day operations. The board appoints a President, who serves as the "executive and governing officer of the university" and "has authority to direct the affairs of the university," creating another degree of separation from the state. Or. Rev. Stat. § 352.096(2). Therefore, at least two of the three <u>Fitchik</u> factors weigh against immunity, and the Court has subject matter jurisdiction over Oregon.

### iii.    The University of Arizona Is Not Entitled to Sovereign Immunity

Arizona is not entitled to Eleventh Amendment Immunity pursuant to the Third Circuit's <u>Fitchik</u> test. The relevant test for the first factor is "whether a money judgment against a state instrumentality or official would be enforceable against the State." <u>Regents of the Univ. of California</u>, 519 U.S. at 430. The university claims summarily in its brief that "[j]udgments are satisfied through Arizona's permanent liability loss revolving fund as provided in A.R.S. §41-622." Dkt. No. 199 at 12. However, that statute makes no mention of the Arizona Board of Regents ("ABOR"), nor does it specify that ABOR must opt into this insurance policy. Arizona quotes only a 44-year-old case, <u>Ronwin v. Shapiro</u>, 657 F.2d 1071, 1074 (9th Cir. 1981), for the position that "the state would have to pay any judgment against the board of regents." The <u>Ronwin</u> court, in turn, based this decision on the meager ground that "there is no evidence that the Board, acting in its corporate capacity, could satisfy a [] judgment in any way other than by turning to the state of Arizona." <u>Id.</u> at 1073 (emphasis added). Even if this was true in 1981, ABOR has since passed Policy 1-116 (adopted in 1993 and revised in 2024), which provides:

*1-116 Settlement of Claims and Litigation*
A claim or litigation to which the Board is a party and for which self-insurance is not provided through the state risk management program may be settled in accordance with the following guidelines:
 A. If the 'university's contribution to any financial settlement does not exceed $250,000 then the settlement may be approved by the university president without Board approval.
 B. If the 'university's contribution to any proposed financial settlement exceeds $250,000, then the settlement shall be submitted for Board approval.

ABOR Policy Manual, Policy 1-116 (available at

https://public.powerdms.com/ABOR/documents/1491523). By the plain language of the policy,

Arizona has the ability to pay out litigation settlements, sometimes solely in the discretion of the

university president without board approval, contrary to the school's brief. Arizona made no

representation as to the extent of its coverage under the state's liability loss fund, nor does it claim

that Plaintiffs' specific claims are covered by the state risk management program. Accordingly,

the first Fitchik factor weighs heavily in favor of immunity. At the minimum, given the dearth of

publicly available information and Arizona's inability to clearly state its litigation exposure,

Plaintiffs should be entitled to explore in discovery how judgments against it are paid out.

  The same is true as to the other two Fitchik factors. None of the cases cited by Arizona

come close to assessing the 13 subfactors set out in Maliandi, 845 F.3d at 86-96 (3d Cir. 2016).

The school admits as much in its brief, stating that "where, as here, an institution of higher

education was consistently treated as an arm of the state, courts in the Third Circuit have not even

looked to the other Fitchik factors, finding that Eleventh Amendment immunity applies without

further consideration." Dkt. No. 199 at 13. However, the Ninth Circuit cases that Arizona relies

on are glaringly lacking in analysis. Aych v. Univ. of Arizona, No. 23 Civ. 07282, 2024 WL

4467608 (C.D. Cal. July 5, 2024) bases its determination of sovereign immunity on Rounds and

Mitchell, which are not instructive. See § V.B.ii., supra. Arizona Students' Ass'n v. Arizona Bd.

of Regents, 824 F.3d 858 (9th Cir. 2016) relies on <u>Ronwin</u> and is completely devoid of factual analysis.  In other words, Arizona's contention that it has historically been treated as an arm of the state is based on outdated and inaccurate cases that do not merit deference from this Court.  In light of the strong indication that the school will itself be liable to pay money judgments arising out of this case, and because no court has applied this Circuit's legal standard for immunity as to Arizona, Plaintiffs should, at minimum, be entitled to conduct discovery to ascertain the school's financial and operational independence from the state of Arizona.

## VI.    <u>THIS COURT HAS PERSONAL JURISDICTION OVER ALL DEFENDANTS</u>

Several defendants raised lack of personal jurisdiction as an affirmative defense.  Duke, Tulane, Notre Dame and Marist each argue that they should be dismissed from this action because the Court purportedly cannot exercise personal jurisdiction over them.  <u>See</u> Dkt. 197 at 12-19, Dkt. 200 at 8-19, Dkt. 205 at 8-11, Dkt. 208 at 3-7.  But each school's contacts with the forum exceed the level required by the Constitution and Pennsylvania's long-arm statute, and it is those very contacts that caused harm to the named Plaintiffs who attended those schools.  These schools cannot deny their substantial contribution to and oversight over the NCAA, which is a nationwide entity.    Further, the universities' statements regarding their presence in Pennsylvania are uncomprehensive, conclusory and self-serving.  At the very least, Plaintiffs should be entitled to take jurisdictional discovery to assess the universities' presence and contacts with Pennsylvania.

### A.    <u>Legal Standard</u>

A district court sitting in diversity can exercise personal jurisdiction over an out-of-state defendant to the extent permitted by the law of the forum state.  <u>Metcalfe v. Renaissance Marine Inc.</u>, 566 F.3d 324, 330 (3d Cir. 2009).  Establishing personal jurisdiction involves a two-part analysis.  <u>Id.</u>  First, there must be a statutory basis for exercising jurisdiction over the nonresident

defendant in accordance with the forum state's long-arm statute, and second, the nonresident defendant "must have minimum contacts with the [forum state] sufficient to satisfy constitutional due process." Id. Pennsylvania's long-arm statute permits personal jurisdiction "based on the most minimum contacts with this Commonwealth allowed under the Constitution of the United States." 42 Pa. Cons. Stat. § 5322(b). Importantly, "[p]hysical presence within the forum is not required to establish personal jurisdiction over a nonresident defendant. Instead, personal jurisdiction may be based on either a defendant's general contacts or his specific contacts with the forum." Spiro v. Allied Bldg. Prods. Corp., No. Civ. 13 Civ. 1561, 2013 WL 5270772, at *3 (E.D. Pa. Sept. 17, 2013) (internal citations omitted).

Specific jurisdiction exists when the "plaintiff's cause of action is related to or arises out of the defendant's contacts with the forum." Pinker v. Roche Holdings Ltd., 292 F.3d 361, 368 (3d Cir. 2002) (citation omitted). In assessing the sufficiency of a defendant's contacts with the forum, a court should look at "the extent to which the defendant availed himself of the privileges of" the laws of the forum state and "the extent to which he could reasonably anticipate being involved in litigation in the" forum state (quotations omitted). Id. at 370.

A plaintiff may prevail on a motion to dismiss for lack of personal jurisdiction by relying on a theory of agency. Spiro, 2013 WL 5270772 at *4. To prevail, a plaintiff "need only make a prima facie showing of the connection between the actions of the agent and the principal.". Id. "When an agent's activities are of such a character as to amount to *doing business of the principal*, the principal is subject to personal jurisdiction of the state in which the activities occurred.". Id. (internal citations and quotation marks omitted) (emphasis added).

### B.    Defendant Universities Direct and Manage the NCAA, a Nationwide Entity

Duke, Tulane, Notre Dame and Marist each focus their Rule 12(b)(2) arguments on their

alleged lack of contact with Pennsylvania but fail to acknowledge their substantial and long-lasting involvement with the NCAA, a nationwide entity. The TAC contains detailed allegations regarding the NCAA's management and operation by its member schools.[14] The factual allegations in the TAC establish that the NCAA does not act independently, but rather as a creature of its member schools. The NCAA operates as an administrative agent through which its member institutions jointly promulgate, enforce, and administer their own agreed-upon rules and policies. See TAC ¶¶ 243-303. Because these member schools came together to form a nationwide entity that imposes employment-like conditions on student-athletes, it is no surprise that they were hauled into court in this forum. Altogether, the TAC shows that each school's contacts with Pennsylvania are sufficient for the exercise of personal jurisdiction comporting with the Due Process clause.

### i. Duke, Tulane, Notre Dame and Marist's Long-Standing Involvement with the NCAA

Duke has been an NCAA school since 1928, when the school joined the Southern Conference. In 1953, they switched to the Atlantic Coast Conference.[15] Duke currently offers 27 NCAA D1 sports.[16] Notre Dame joined the NCAA's Big East Conference in 1995, transitioning to the Atlantic Coast Conference in 2013.[17] Currently, Notre Dame offers 26 different NCAA D1 teams to students.[18] Marist, a member of the Metro Atlantic Conference, joined the NCAA in

---

[14]    See Dkt. No. 64 denying NCAA's motion to dismiss the First Amended Complaint, holding that the complaint properly pleaded that student athletes are jointly employed by member schools and the NCAA.

[15]    Al Featherston, Duke's Place in the Future Sports Landscape, GoDuke.com (March 12, 2013), https://goduke.com/news/2013/3/12/206722563

[16]    "Highlights," https://facts.duke.edu/ (Last visited on July 1, 2025).

[17]    Scott Dochterman, Why hasn't Notre Dame joined a conference? Former Big Ten commissioner Jim Delany weighs in, nytimes.com (July 13, 2023), https://www.nytimes.com/athletic/4670414/2023/07/13/notre-dame-big-ten-jim-delany/

[18]    Notre Dame Athletics, giving.nd.edu, https://giving.nd.edu/priorities/athletics/ (Last visited on July 1, 2025)

1978.  In 1993, they became a D1 school, [19] and now have 23 D1 varsity teams.[20]  Tulane, with 16

NCAA D1 varsity teams available to students, has been a member of the NCAA since 1895, first

joining the Southern Intercollegiate Athletic Association, and then transferring to the American

Athletic Conference in 2014.[21]

      **ii.**        **The NCAA's Member Schools Control the NCAA and its Governance of NCAA Athletes**

The TAC sets forth in detail the NCAA's governance and operations, and makes clear that

the NCAA serves as a mouthpiece through which the schools act in concert.  First, the member

schools, not the NCAA itself, are responsible for promulgating the rules that govern student-athlete

conduct.  The NCAA's "legislative" power flows directly from its member institutions, all of

which participate in voting on NCAA rules.  TAC ¶¶ 243-246.  Rules are drafted and debated by

committees composed of school representatives, and each institution has a vote in the rulemaking

process.  Id.  By this arrangement, NCAA rules are not imposed from the top down by an

independent entity but rather emerge from the collective decisions of the schools themselves, using

the NCAA as a shared administrative vehicle.

Second, the schools not only make the rules, but also enforce them.  Although enforcement

may formally proceed through bodies bearing the NCAA's name, these are in fact composed of

school personnel.  For example, enforcement actions are overseen by the Committee on Infractions

and  the  Infractions  Appeals  Committee,  both  of  which  include  school  and  conference

---

[19]     "Facilities," marist.edu, https://www.marist.edu/student-life/athletics/facilities (Last visited on July 1, 2025)

[20]     "Athletics," marist.edu, https://www.marist.edu/athletics (Last visited on July 1, 2025)

[21]     Proud to be in the American: Tulane Begins a New Era in the American Athletic Conference, tulanegreenwave.com, (July 1, 2024) https://tulanegreenwave.com/news/2014/7/1/Proud_to_be_in_the_American_Tulane_Begins_a_New_Era_in_the_American_Athletic_Conference

representatives.  Id. ¶ 247.  The Enforcement Staff operates under procedures devised by the schools and relies extensively on the schools themselves to self-report violations and provide cooperation in investigations.  Id. ¶¶ 247-250.  Moreover, the enforcement process includes significant peer-review components, with penalties often determined by representatives from other schools.  Id. ¶¶ 249-251.  Thus, enforcement is not a top-down disciplinary system imposed by an external regulator, but a horizontal system of joint regulation among schools acting through their common agent, the NCAA.

Third, the NCAA's authority is entirely derivative of the schools' own decisions and actions.  It does not employ coaches, run sports programs or admit athletes.  These responsibilities remain exclusively with the schools.  Id. ¶ 109.  Even routine regulatory functions like maintaining eligibility records or processing drug testing and consent forms are performed by schools and merely submitted to the NCAA.  Id. ¶¶ 299-303.  The so-called NCAA Eligibility Center depends on data provided by the schools and cannot act independently to assess or enforce eligibility without their cooperation.  Id.  These facts sufficiently plead that the NCAA does not operate autonomously but instead relies entirely on the member institutions to generate, supply, and administer the information it processes.

Lastly, the TAC alleges that the NCAA operates exclusively through agreements among its members, reinforcing the conclusion that it functions as the member schools' agent.  The member institutions have jointly agreed not to pay student athletes for their athletic labor and to enforce this policy through the NCAA's published Bylaws.  Id. ¶ 175.  The NCAA's so-called enforcement authority exists only because the schools have agreed to bind themselves to this policy and have delegated its administration to a common platform.  The TAC makes clear that the NCAA's staff

and administrative procedures remain subject to the oversight and approval of its member institutions, id. ¶¶ 244-245, again demonstrating that the NCAA's role is purely derivative.

In sum, the NCAA does not exist apart from its members. It is a coordinating mechanism, i.e. a legal and administrative mouthpiece through which the member institutions jointly govern intercollegiate athletics. Every major decision attributed to the NCAA is in fact a decision by the schools themselves, including Duke, Marist, Notre Dame and Tulane, made collectively and executed through a shared agent.

### iii.    The NCAA Conceded That It Has a Nationwide Presence

The TAC clearly alleges that the NCAA maintains a nationwide presence through its commercial activities and regulatory reach across all NCAA D1 member schools. The NCAA has entered into multi-year, multi-billion-dollar agreements with networks such as ESPN, CBS and Turner Sports to broadcast NCAA contests nationwide. Id. ¶ 17. These agreements result in substantial revenue that is distributed among all D1 institutions. Id. ¶ 18. In addition to revenue sharing from national broadcasts, member schools individually and through conferences participate in additional multi-million-dollar deals with television and radio networks to promote NCAA contests throughout the country. Id. ¶ 18. Aside from broadcasting at the national scale, NCAA member schools promote their athletic programs across state lines to attract student-athletes, collect application fees and tuition from out-of-state residents, solicit donations from alumni nationwide, and sell NCAA-licensed merchandise both in stores and online across the United States. Id. ¶ 21.

### iv.    Member Schools, Like the NCAA, are Subject to This Court's Personal Jurisdiction

"[A] plaintiff need not make direct showing of a principal-agent relationship in order to assert personal jurisdiction over a purported principal. Instead, to overcome a motion to dismiss

for lack of personal jurisdiction under an agency theory, a plaintiff must only 'make a prima facie showing of the connection between the actions of the agent and the principal.'" Spiro, 2013 WL 5270772, at *4 (quoting D'Jamoos ex rel. Weingeroff v. Pilatus Aircraft Ltd., 566 F.3d 94, 108 (3d Cir. 2009)). The TAC essentially alleges that the NCAA is co-extensive with its member schools. The NCAA relies on and requires significant and sustained participation from all of its member schools. See TAC ¶¶ 243-303. The same is true for NCAA's recruitment and advertising efforts. See id. ¶¶ 43, 123, 136, 242-244, 265-280. As a result of Marist, Duke, Notre Dame and Tulane's joint nationwide recruiting efforts with the NCAA, Plaintiffs Walsh, Suarez, Harris and Schmidt and prospective class members became student athletes at their respective schools, and the harm they suffered arose out of these recruitment contacts.

### C.   Plaintiffs are Entitled to Jurisdictional Discovery to Ascertain Defendant Universities' Contacts With the Forum State

"Although the plaintiff bears the burden of demonstrating facts that support personal jurisdiction, courts are to assist the plaintiff by allowing jurisdictional discovery unless the plaintiff's claim is clearly frivolous." Toys "R" Us, Inc. v. Step Two, S.A., 318 F.3d 446, 456, n.10 (3d Cir. 2003) (internal citations and quotations marks omitted). This "clearly frivolous" standard is "[t]he rule of the Third Circuit Court of Appeal" for allowing jurisdictional discovery. Vonbergen v. Liberty Mut. Ins. Co., 705 F. Supp. 3d 440, 450 (E. D. Pa. 2023) (internal quotations omitted). "Where the plaintiff has made this required threshold showing, courts within this Circuit have sustained the right to conduct discovery before the district court dismisses for lack of personal jurisdiction." Toys "R" Us, Inc., 318 F.3d at 456; see also In re Automotive Refinishing Paint Antitrust Litigation, No. 1426, 2002 WL 31261330, at *9 (E. D. Pa. July 31, 2002) (denying motion to dismiss and permitting jurisdictional discovery where plaintiff made a "threshold prima facie showing of personal jurisdiction over Defendants"); W. Africa Trading & Shipping Co., et

al. v. London Int'l Group, et al., 968 F. Supp. 996, 1001 (D.N.J. 1997) (denying a defendant's motion to dismiss where the plaintiffs' "request for jurisdictional discovery is critical to the determination of whether [the court can] exercise personal jurisdiction over the defendant"); Centralized Health Systems, Inc. v. Cambridge Medical Instruments, Inc., No. 89 Civ. 3322, 1989 WL 136277, at *1 (E.D. Pa. Nov. 8, 1989) (holding motion to dismiss in abeyance to permit party to take discovery on jurisdiction where contract might satisfy minimum contacts).

Here, Plaintiffs have presented factual allegations "that suggest with reasonable particularity the possible existence of the requisite contacts between the defendant[s] and the forum state," and "[their] right to conduct jurisdictional discovery should be sustained." Vonbergen, 705 F. Supp. 3d at 450 (quotation marks omitted). See § V.A.-B., supra. At the minimum, Plaintiffs should be allowed to conduct jurisdictional discovery to ascertain information as to each school, including but not limited to:

- Comparative information concerning the recruitment of students and student athletes in Pennsylvania and nationwide, including but not limited to: (i) the proportion of total marketing and recruitment spending directed towards Pennsylvania and (ii) the number and frequency of recruitment events in Pennsylvania,

- Comparative information concerning the presence of bank accounts and property in Pennsylvania and nationwide,

- Comparative information concerning the presence of employees in Pennsylvania and nationwide, either on a temporary or a full-time basis,

- Comparative information concerning revenues generated in Pennsylvania and nationwide, including tuition and investment income,

- Information concerning the number of admitted and enrolled students who resided in Pennsylvania,

- Information concerning events held in Pennsylvania, including but not limited to alumni events, presentations, job fairs, charitable events and conferences,

- Information concerning the number and percentage of student athletes on the named Plaintiff's teams who resided in Pennsylvania.

## VII.   ALL PLAINTIFFS' FLSA CLAIMS ARE TIMELY

Marists' argument that Plaintiff Liam Walsh's FLSA claims are untimely fails for several independent reasons. First, the Court ordered a tolling agreement with respect to "[t]he statute of limitations on any claim pursuant to the Fair Labor Standards Act asserted by any member or potential member of the 'Proposed FLSA Collective.'" Dkt. No. 36. Second, even if the Court's prior Orders did not expressly toll the claims against Marist, extraordinary circumstances merit equitable tolling since (1) the Court's ruling on conditional certification and corresponding notice has been delayed, and (2) that notice is vital for appraising potential opt-ins of their claims due to the "sui generis" nature of student athletes in the employment context. Johnson, 108 F.4th at 177.

### A.   Court Ordered Tolling Agreement Applies to Plaintiff Walsh

On April 17, 2020, a telephone conference was held before your Honor to discuss ensuring future FLSA class members' claims were not time barred by any delay in ruling on Plaintiffs' motion for conditional certification. Dkt. No. 35; Dkt. No. 36 ("WHEREAS, on April 17, 2020, the Court conducted a telephonic conference with the parties concerning a further continuance of Defendants' deadline to oppose [Plaintiff's motion for conditional certification] and the appropriate conditions for such a continuance"). During the conference, Plaintiffs' counsel raised concerns that claims of the members of the FLSA collectively might be extinguished if the motion for conditional certification was not promptly decided. See Declaration of Michael J. Willemin ("Willemin Decl.") at ¶ 3. The Court agreed that it would be appropriate to toll the statute of limitations for all members of the prospective collective until such time as the Court could decide the motion for conditional certification. Id. at ¶ 4.

As such, on April 22, 2020, Plaintiffs' counsel signed an agreement tolling the statute of limitations with respect to "any claim pursuant to the Fair Labor Standards Act asserted by any member or potential member of the 'Proposed FLSA Collective.'" Dkt. No. 36. On April 23,

2020, the Court approved the tolling agreement, which tolled the statute of limitations from April 6, 2020 (the day Plaintiffs' motion for certification was filed), until motion practice for conditional certification continued or the Court dismissed or removed the motion. The language agreed to and approved by the Court is as follows:

> The statute of limitations on any claim pursuant to the Fair Labor Standards Act asserted by any member or potential member of the "Proposed FLSA Collective," as defined in ¶ 256 of the First Amended Complaint (ECF 2)[22], or any member or potential member of any collective to which the Court ultimately grants conditional certification, shall be tolled from April 6, 2020 through either (a) the date Defendants file their opposition to the pending motion for conditional certification of their claims under the Fair Labor Standards Act, and etc. (ECF Nos.31-33), or (b) the date the Court denies, dismisses or removes such motion from the calendar without opposition, whichever comes earlier.")

Dkt. No. 36. The understanding of all parties was that a protracted timeline for a decision on the motion for conditional certification, which would allow Plaintiffs' Counsel to alert thousands of potential plaintiffs of their rights and their corresponding time limitations, would not prejudice the potential members of the FLSA collective.

Thus, as a member of the "Proposed FLSA Collective," Plaintiff Walsh's FLSA claims have been tolled since April 6, 2020, and his claims remain timely.

## B.    Extraordinary Circumstances Merit Equitable Tolling

Further, extraordinary circumstances merit the tolling of Plaintiff Walsh's FLSA claims because potential opt-ins did not have notice of their claims due to (1) the delay in the Court's ruling–occasioned by lengthy motion practice and an interlocutory appeal in this cas –which has delayed conditional certification and corresponding collective notice; and (2) the "*sui generis*" nature of student athletes in the employment context. Johnson, 108 F.4th at 177. While a

---

[22]    Dkt. 2 ¶ 256 ("All individuals, in all NCAA sports and of both genders, who were identified on any NCAA Squad List maintained by Defendants pursuant to NCAA Division I Bylaws 12.10.2 and/or 15.5.11, at any time within the FLSA statute of limitations and through the date of final judgment (the 'Proposed FLSA Collective Period')").

plaintiff's consent to join typically marks when their claims are tolled, equitable tolling can be granted if plaintiff "in some extraordinary way has been prevented from asserting his or her rights." Charles v. Progressions Behav. Health Servs., Inc., No. 17 Civ. 2439, 2018 WL 4924169, at *6 (E.D. Pa. Oct. 9, 2018) (quoting Santos ex rel. Beato v. United States, 559 F.3d 189, 197 (3d Cir. 2009)).  Importantly, "[o]pt-in plaintiffs' FLSA claims are [] particularly vulnerable to the running of the statute of limitations."  DePalma v. Scotts Co. LLC, No. 13 Civ. 7740, 2017 WL 1243134, at *2 (D.N.J. Jan. 20, 2017).  Thus, delays in notice to potential opt-ins because of court delays and employer failure to post notice can qualify as extraordinary circumstances meriting equitable tolling.  Alvarez v. BI Inc., No. 16 Civ. 2705, 2018 WL 2288286, at *14 (E.D. Pa. May 17, 2018) ("delays in deciding a motion for conditional certification, and in approving a notice to potential opt-in plaintiffs, constitute extraordinary circumstances meriting equitable tolling"); Burrell v. Staff, 60 F.4th 25, 48 (3d Cir. 2023) (granting equitable tolling in part because an employer failed to post notice).  Many courts have found that delays in rulings on conditional certification and corresponding class notice are sufficient, on their own, to justify equitable tolling.  Alvarez, 2018 WL 2288286, at *16 (citing cases that allowed equitable tolling solely on the basis that decision on motion for conditional certification was delayed); DePalma, 2017 WL 1243134, at *2; Bosley v. Chubb Corp., No. 04 Civ. 4598, 2007 WL 9604965, at *1 n.1 (E.D. Pa. Feb. 20, 2007).  Here, the Court's ruling on conditional certification has been significantly delayed.  Plaintiffs first filed for conditional certification on April 6, 2020.  Since then, the Court had further postponed motion practice and a corresponding ruling on conditional certification due to proceedings in the Third Circuit in response to Defendants' Motion for Interlocutory appeal, the Third Amended Complaint, and further motions to dismiss.  Importantly, "*no* part of the delay is attributable to the potential

opt-in plaintiffs, who had not received notice of this lawsuit but nevertheless were in jeopardy of losing their claims." DePalma, 2017 WL 1243134, at *7 (emphasis in original).

Second, due to the "*sui generis*" nature of collegiate athletes, these potential opt-ins are even more vulnerable than typical opt-ins to claim expiration because they did not even know they had claims in the first place. Id. Indeed, whether Plaintiffs qualify as employees and are entitled to minimum wage remains a case of first impression. Potential opt-ins had no way of knowing that they had viable claims under the FLSA or that the clock was running for those claims. Thus, to avoid prejudice against Plaintiff Walsh, equitable tolling of his FLSA claims from the date of Plaintiffs' filing for conditional certification, April 6, 2020, is warranted. DePalma, 2017 WL 1243134, at *5.

## VIII.  PLAINTIFFS MAY JOINTLY MAINTAIN A FLSA COLLECTIVE ACTION AND RULE 23 CLASS ACTION

In their moving papers, Oregon and Purdue argue that Plaintiffs cannot jointly maintain a FLSA collective action and Rule 23 class action because they are incompatible. In support, Defendants rely upon Warner v. Orleans Home Builders, Inc., 550 F. Supp. 2d 583, 590 (E.D. Pa. 2008).

However, subsequent case law has affirmatively established that a plaintiff may simultaneously pursue a FLSA collective action and Rule 23 class action. See Knepper v. Rite Aid Corp., 675 F.3d 249, 258–59 (3d Cir. 2012); Verma v. 3001 Castor, Inc., 937 F.3d 221, 225–26 (3d Cir. 2019) ("We and other circuits have endorsed this dual-track procedure, which is used widely to pursue wage-and-hour cases in federal court simultaneously under federal and state law"); In re Citizens Bank, N.A., 15 F.4th 607, 612 (3d Cir. 2021) ("Despite . . . marked differences, we have held that an FLSA opt-in collective action is not, by its nature, incompatible with a parallel state law Rule 23 opt-out class action."). In fact, the Third Circuit has specifically

disagreed with the Oregon and Purdue's assertion that FLSA opt-in collective actions and Rule 23 opt-out class actions are inherently incompatible.  <u>Knepper</u>, 675 F.3d at 261 ("we disagree with the conclusion that jurisdiction over an opt-out class action based on state-law claims that parallel the FLSA is inherently incompatible with the FLSA's opt-in procedure.").

Accordingly, Plaintiffs may jointly maintain a FLSA collective action and Rule 23 class action and University of Oregon and 'Purdue's motion to dismiss must be denied.

## IX.     <u>PLAINTIFFS HAVE ALLEGED A COGNIZABLE INJURY</u>

Fordham, in the school's Motion to Dismiss, argues that the Fordham Plaintiffs "have not alleged a cognizable, concrete injury" that would support a lawsuit.  Dkt. No. 215-1 at 17-18. Plaintiffs have alleged that they "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision."  <u>Spokeo, Inc. v. Robins</u>, 578 U.S. 330, 338 (2016).  Plaintiffs were not paid for work they performed for the Defendants, and Plaintiffs should prevail the Court can award Plaintiffs those unpaid wages along with liquidated damages.  <u>See</u> 29 U.S.C. § 216(b).  Fordham's argument is meritless.

## X.      IN THE ALTERNATIVE, PLAINTIFFS SHOULD BE GRANTED LEAVE TO AMEND THE COMPLAINT

Should the Court find that Plaintiffs have failed to plead with sufficient specificity at this stage of litigation, Plaintiffs respectfully request leave to further amend the Complaint.  Such leave should be "freely given when justice so requires."  Fed. R. Civ. P. 15(a).  This liberal amendment standard is meant to ensure that "a particular claim will be decided on the merits rather than on technicalities."  <u>Dole v. Arco Chem. Co.</u>, 921 F.2d 484, 487 (3d Cir. 1990).  "[P]rejudice to the non-moving party is the touchstone for the denial of an amendment."  <u>Cornell & Co. v. Occupational Safety & Health Review Comm'n</u>, 573 F.2d 820, 823 (3d Cir. 1978).

Defendants cannot seriously argue that they would be prejudiced by a further amendment. Rather they contend that Plaintiffs have failed to plead their allegations with specificity, and that "dismissal with prejudice is appropriate where a plaintiff has had many opportunities over several years and multiple iterations of the complaint to plead facts indicating that he has stated a claim for relief, yet has failed to do so." Dkt. No. 203 at 38-39 (quoting United States ex rel. Schumann v. Astrazeneca Pharms. L.P., 769 F.3d 837, 849 (3d Cir. 2014)). Defendants deliberately misstate the history of this case. In fact, Plaintiffs *prevailed* on the first Motion to Dismiss filed by Defendants, and the Court found that they had, in fact, stated a plausible claim for relief. The test by which Plaintiff's pleading is to be held was then *altered on appeal*, but at no point did any Court determine that Plaintiff's failed to adequately plead the claims at issue. This is not a situation in which intransigent plaintiffs have had numerous bites at the apple or Plaintiffs have "repeated[ly] fail[ed] to cure deficiencies by amendments previously allowed." Foman v. Davis, 371 U.S. 178, 182 (1962). Instead, Plaintiffs were presented with one hurdle (which they surpassed) and are now being presented with a different one.

The history of this case shows that Plaintiffs not been "intransigent" in this case's pleading history or in amending the Complaint. While the matter is five years old, almost three years passed from the date of Defendants' first motion for an interlocutory appeal until the Third Circuit ruled on their appeal. In other words, while Defendants make much of the age of this case and the number of complaints filed, the truth of the matter is that the number of complaints and the age of this case is a function of the interlocutory appeal and subsequent Third Circuit ruling and not any action taken on the part of Plaintiffs. Rather than having had multiple bites at the apple, Plaintiffs' complaint has never been assessed under the Third Circuit's new test for assessing the employment status of collegiate athletes. See Worldcom, Inc. v. Graphnet, Inc., 343 F.3d 651, 657 (3d Cir.

73

2003) (noting, where a second amended complaint was the operative complaint, that because the merits of the claims in that complaint had never been tested because of a dismissal without prejudice and a transfer, the defendant did "not correctly represent the record" in arguing that the plaintiff had "three bites at the apple").  Should the Court find that the TAC is deficient, Plaintiffs' previous opportunities to amend their complaint should not bar them from doing so in the future.

Defendants do not cite a single case that was dismissed without permitting amendment where a legal standard was altered on appeal.  Rather, they rely heavily on cases in which a party was denied leave to amend after repeatedly failing to remedy the same pleading deficiencies and claims that were subject to heightened pleading standards.  See Davis v. Abington Mem'l Hosp., 765 F.3d 236, 244-45 (3d Cir. 2014) (affirming district court decision to deny leave to amend where complaint was amended four times and plaintiffs' counsel had attempted to file similar cases, that were dismissed, in seven other district courts); Gasoline Sales, Inc. v. Aero Oil Co., 39 F.3d 70, 74 (3d Cir. 1994) (affirming district court decision to deny leave to amend where additional complaint would modify the plaintiff's allegations "even to the point of contradicting its prior pleadings"); California Public Employees' Retirement System v. Chubb Corp., 394 F.3d 126, 164 (3d Cir. 2004) (affirming district court decision to deny leave to amend in a Private Securities Litigation Reform Act case, which has a heightened pleading standard "to screen out lawsuits" at the motion to dismiss stage and that was subject to the heightened particularity standard in a pleading that is governed by Federal Rule of Civil Procedure 9(b)) (quotation and citation omitted).  Such is not the case here.

Finally, Defendants write that Plaintiffs are engaging in "gamesmanship" and taking a "wait-and-see" approach.  Dkt. No. 203 at 46.  Their lengthy, overwrought arguments belie how empty these accusations really are.  Plaintiffs are plainly not taking a "wait-and-see" approach,

which would entail making one set of accusations and then much later requesting leave to amend their Complaint to overhaul their accusations or theory of recovery after it became clear their initial approach was lacking.  See Trunzo v. Citi Mortg., 43 F. Supp. 3d 517, 527 (W.D. Pa. 2014). Plaintiffs have been presented with a new employment test at this stage of litigation.  Nor is it at all clear what "gamesmanship" Defendants are accusing Plaintiffs of engaging in.  Should the Court find that Plaintiffs have not pleaded the employment relationship with sufficient particularity, they should be given leave to amend.

## **CONCLUSION**

For these reasons, Plaintiff respectfully requests that the Court deny Defendants' motion in its entirety.

Dated:  July 7, 2025
      New York, New York      Respectfully submitted,

                            **WIGDOR LLP**

                            By: _____
                               Michael J. Willemin (Admitted *Pro Hac Vice*)
                               William R. Baker (Admitted *Pro Hac Vice*)

                             85 Fifth Avenue
                             New York, New York 10003
                             Telephone: (212) 257-6800
                             Facsimile: (212) 257-6845
                             mwillemin@wigdorlaw.com
                             wbaker@wigdorlaw.com

                                   AND

                             Paul L. McDonald (PA Bar No. 84856)
                             1800 JFK Boulevard, Suite 300
                             Philadelphia, PA   19103
                             Tel: (267) 238-3835
                             Fax: (267) 238-3801
                             paul@plmcdonaldlaw.com

*Counsel for Plaintiffs and
Proposed Counsel for the Members of
the Proposed FLSA Collective,
the Proposed Pennsylvania Class,
the Proposed New York Class,
the Proposed Connecticut Class,
the Proposed North Carolina Class,
the Proposed Oregon Class,
the Proposed Louisiana Class,
the Proposed Arizona Class, and
the Proposed Indiana Class.*